IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTRAL IOWA HOSPITAL CORPORATION, successor-in-interest to IOWA LUTHERAN HOSPITAL, | |
| Plaintiff, | CASE NO.: 1:07-CV-00295-RWR |
| v. | |
| MICHAEL O. LEAVITT, as Secretary of Health and Human Services, | |
| Defendant. | |

## PLAINTIFF'S MOTION
## FOR SUMMARY JUDGMENT

Plaintiff, Central Iowa Hospital Corporation, successor-in-interest to Iowa Lutheran Hospital, pursuant to Rule 56 of the Federal Rules of Civil Procedure, respectfully moves this court for summary judgment in the above-captioned action awarding that relief prayed for in Plaintiff's complaint for judicial review of final adverse agency decision on Medicare reimbursement. In support of said motion, Plaintiff states that there are no genuine issues as to any material facts and that Plaintiff is entitled to judgment as a matter of law.

The reasons supporting Plaintiff's motion are more fully set forth in the memorandum in support of motion for summary judgment and statement of material facts as to which there is no genuine issue which are enclosed herewith and incorporated herein by reference, and the certified administrative record previously filed with the court in this matter.

Respectfully submitted,

CENTRAL IOWA HOSPITAL
CORPORATION,    successor-in-interest
to IOWA LUTHERAN HOSPITAL


_____/s/_____.
Stephen D. Charnoff (D.C. Bar #502324)
Harold Belkowitz (D.C. Bar #449800)
Ober, Kaler, Grimes & Shriver
A Professional Corporation
1401 H Street, N.W.
Washington, D.C. 20005-3324
(202) 408-8400

Plaintiff's Attorneys


OF COUNSEL:

Robert E. Mazer
Ober, Kaler, Grimes & Shriver
A Professional Corporation
120 East Baltimore Street
Baltimore, Maryland 21202-1643
(410) 685-1120


Dated at Washington, D.C.
this 25th day of July, 2007

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 25th day of July, 2007,  a copy of the forgoing

Plaintiff's Motion for Summary Judgment and Proposed Order was served by certified United

States mail, postage prepaid, return receipt requested upon:

> Joel McElvain
> United States Department of Justice
> Civil Division, Federal Programs Branch
> Room 7130
> 20 Massachusetts Avenue, N.W.
> Washington, D. C. 20001

_____ */s/* _____.
Stephen D. Charnoff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CENTRAL IOWA HOSPITAL
CORPORATION, successor-in-interest to
IOWA LUTHERAN HOSPITAL,

       Plaintiff,

          v.

MICHAEL O. LEAVITT, as Secretary of
Health and Human Services,

       Defendant.

CASE NO.: 1:07-CV-00295-RWR

---

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

I.    <u>INTRODUCTION</u>

      Plaintiff Central Iowa Hospital Corporation, successor-in-interest to Iowa Lutheran Hospital, by its undersigned attorneys, hereby files this Memorandum in Support of its Motion for Summary Judgment.

      This case involves Medicare reimbursement for depreciation costs incurred by Iowa Lutheran Hospital in furnishing services to Medicare beneficiaries. Medicare regulations provided that in the event of a statutory merger between unrelated parties, Medicare would recognize the merging entity's gain or loss incurred on the transaction. This permitted Medicare to reconcile the periodic depreciation payments that Medicare had made to the merging entity prior to the transaction with the asset's actual loss of value, as reflected in the transaction. In the early 1990s, it was doubtful whether Iowa Lutheran Hospital could survive as an independent hospital. Therefore, on November 22, 1993, it merged into an unrelated entity, Iowa Methodist Medical Center. Iowa Lutheran Hospital incurred a loss on the transaction and claimed

Medicare reimbursement for Medicare's share of the loss in accordance with applicable regulations.

The federal agency that administers the Medicare program (previously called the Health Care Financing Administration ("HCFA") and now called the Centers for Medicare & Medicaid Services ("CMS"))[1] disallowed the loss based on changes in its policy regarding when it would recognize losses from statutory mergers. One principal element of the new policy was that such a loss would not be recognized, even if the parties to the statutory merger were unrelated prior to the transaction, if a significant number of the members of the governing board or management team of the merging entity became members of the board or assumed management positions with the merger's surviving entity. Another principle element of the new policy was that HCFA began to require that statutory mergers between unrelated parties satisfy requirements of a *bona fide* sale, applicable to transactions involving the purchase and sale of assets. In conjunction with this, HCFA changed the definition of *bona fide* sale from a transaction negotiated in good faith between unrelated parties for *valuable consideration* to a transaction where the seller received what HCFA determined to be *fair market value* consideration. The new policies were not published by HCFA until 2000, but were used to disallow the loss incurred by Iowa Lutheran Hospital resulting from its November 22, 1993 statutory merger.

As set forth below, HCFA's application of these new policies to Iowa Lutheran Hospital was unlawful and should be set aside. The new policies represented a significant change in HCFA's longstanding interpretation of the regulations, which clearly provided for recognition of a loss that was incurred on a statutory merger if the merging entities were not subject to common ownership or common control prior to the transaction. Additionally, the new policies were developed and applied on a retrospective basis to completed transactions in disregard of

---

[1] The name change was effective July 1, 2001. This memorandum refers to HCFA even as to actions taken when the agency operated as CMS.

applicable notice and comment requirements and basic legal principles.  Iowa Lutheran Hospital

satisfied all applicable requirements for Medicare's recognition of its loss on statutory merger.

For these reasons, summary judgment should be entered in favor of Plaintiff, Central Iowa

Hospital Corporation, its successor in interest.

II.    MEDICARE STATUTORY AND REGULATORY FRAMEWORK

 A. General

 Title XVIII of the Social Security Act establishes a program of health insurance for the

aged and disabled commonly known as "Medicare."  42 U.S.C. §§ 1395-1395hhh.  This appeal

involves Parts A and B of the Medicare program, which relate to hospital inpatient and outpatient

services, respectively.    42  U.S.C.  §§ 1395c-1395i-5;  42  U.S.C.  §§ 1395j-1395w-4j.    To

participate in the Medicare program, a hospital must file a "provider agreement" with the

Secretary of Health and Human Services ("Secretary").    42  U.S.C.  § 1395cc.    Payment to

providers of Medicare services is made through fiscal intermediaries pursuant to contracts with

the Secretary.  42 U.S.C. § 1395h.  The fiscal intermediary for Iowa Lutheran Hospital during

the period at issue was Blue Cross Blue Shield of Iowa, which was subsequently replaced by

Wellmark Blue Cross and Blue Shield (collectively the "Intermediary").    As a result, the

Intermediary was responsible for Medicare audit of, and payment to, Iowa Lutheran Hospital.

 Historically, the Medicare program reimbursed hospital services on a "reasonable cost"

basis.  42 U.S.C. § 1395f(b).[2]  The Medicare statute requires that the reasonable cost of services

reimbursed  under  the  Medicare  program  be  determined  in  accordance  with  regulations

promulgated by the Secretary.    42  U.S.C.  § 1395x(v)(1)(A).    The Secretary has published

---

[2] The Social Security Amendments of 1983, Pub. L. No. 98-21 provided for payment of hospital
inpatient services based upon a prospective payment system, beginning on or after October 1,
1983.  The Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, § 4006(b) (1987),
required payments for certain capital costs to be based on a prospective payment system,
effective for cost reporting periods beginning on or after October 1, 1991.  These statutory
amendments did not result in a change to Medicare regulations addressing statutory mergers.

extensive regulations addressing Medicare reimbursement issues. The Secretary has also issued various manuals intended to advise providers and fiscal intermediaries of the Secretary's interpretations of the Medicare statute and regulations, including the Provider Reimbursement Manual ("PRM") and Medicare Intermediary Manual ("MIM"). *See generally Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995).

Since its inception, Medicare regulations have recognized that depreciation on buildings and equipment represents a reasonable cost of services required to be reimbursed under the Medicare statute. *See* 42 C.F.R. §§ 413.130, 413.134 (1993). This recognition of depreciation compensates a Medicare provider for an asset's loss of value resulting from its use in furnishing services to Medicare beneficiaries. Medicare reimburses depreciation costs to a provider each year based on the historical cost of the provider's depreciable assets divided by each asset's estimated useful life. The historical cost minus the depreciation previously recognized by Medicare is called the asset's "net book value." The annual depreciation payments made to hospitals reflect estimates of an asset's loss in value. Upon disposal of the asset, Medicare regulations provide for a reconciliation of previous depreciation payments with the actual depreciation costs that had been incurred by the hospital as reflected in the transaction resulting in the asset's disposal.

If a depreciable asset is sold or otherwise disposed of, a gain or loss is determined based on a comparison of the consideration received for the depreciable asset and its net book value. In the event of a gain (resulting from receipt of consideration in excess of the asset's calculated net book value), Medicare "recaptures" depreciation previously made to the hospital because previous Medicare depreciation payments reflected in the asset's net book value exceeded the actual loss of value as reflected in the compensation received for the asset. In the event of a loss (resulting from receipt of less than the asset's net book value), Medicare makes additional

payments to the hospital because previous depreciation payments were less than the asset's actual loss of value. *See generally, Lake Med. Ctr. v. Thompson,* 243 F.3d 568, 569 (D.C. Cir. 2001); (A.R. 8-9, 60-61, 527). Medicare depreciation regulations require that when a statutory merger of two or more unrelated corporations occurs, assets of the merged corporation are "revalued." 42 C.F.R. § 413.134(*l*)(2)(i) (1993) (Administrative Record ("A.R.") 592).[3] Additionally, if the merged corporation is a Medicare provider, it is required to recognize any gain or loss incurred on the transaction. *Id.*

Medicare providers file annual cost reports with their fiscal intermediaries. Following an audit, the intermediary issues a notice of amount of program reimbursement ("NPR") setting forth the final determination of Medicare reimbursement due to the provider for that cost year. 42 C.F.R. §§ 405.1803(a), 405.1835(c). A provider that is dissatisfied with that determination may request a hearing before the Provider Reimbursement Review Board ("PRRB"). 42 U.S.C. §1395oo(a). A PRRB decision becomes final sixty (60) days after its receipt by the provider unless, within that time, the provider requests judicial review or the HCFA Administrator ("Administrator") reverses, affirms or modifies the PRRB decision. 42 U.S.C. § 1395oo(f)(1). A provider may obtain judicial review of a final decision of the PRRB or of the Administrator by filing a civil action within sixty (60) days of its receipt of the decision. *Id.* A provider that seeks judicial review and is the prevailing party in such litigation is entitled to interest on the amount in controversy. 42 U.S.C. § 1395oo(f)(2).

---

[3] At the time of the transaction, the regulation was at § 413.134(*l*)(2) (1993) (A.R. 592). The Administrator's decision, however, refers to the recodified version at § 413.134(k)(2) (A.R. 12-13). Prior to 1986, this regulation was codified at 42 C.F.R. § 405.415(*l*)(2) (1979).

B.     Development Of Medicare Policy Regarding Statutory Mergers

1.     Prior To November 22, 1993 Statutory Merger

On November 22, 1966, the Secretary issued regulations for Medicare's reimbursement for provider costs. Regulations stated that depreciation was an "allowable cost," and required that gains and losses from disposal of assets be included in the allowable cost determination. 31 Fed. Reg. 14,804, 14,810-11 (Nov. 22, 1966) (A.R. 515-16).

On January 19, 1979, the regulations were amended to address particular "disposals," including "bona fide sales." 44 Fed. Reg. 3980 (Jan. 19, 1979).

On February 5, 1979, the regulations were amended again to state that when two or more unrelated corporations merged, an adjustment to the Medicare cost basis of the merged corporation's assets or "revaluation" would be required, and the merged corporation would be required to recognize any gain or loss incurred on the transaction. 44 Fed. Reg. 6912, 6915 (Feb. 5, 1979).

On January 18, 1984, Congress enacted Section 2314 of the Deficit Reduction Act of 1984 ("DEFRA") (Pub. L. No. 98-369), requiring Medicare regulations to "provide for recapture of depreciation in the same manner as provided under the regulations in effect on June 1, 1984."

In April 1987, HCFA published interpretations of regulations addressing statutory mergers in its Medicare Intermediary Manual ("MIM") (A.R. 604). The MIM provided for recognition of any gain or loss resulting from a statutory merger between unrelated parties (A.R. 604).

In a letter dated May 11, 1987, William Goeller, HCFA's Director, Division of Payment and Reporting Policy, Office of Reimbursement Policy, Bureau of Eligibility, Reimbursement and Coverage, stated that Medicare regulations required recognition of a gain or loss when two unrelated non-profit hospitals merged or consolidated (A.R. 594-95).

There were no further agency interpretations of the Medicare regulation addressing statutory mergers as of November 23, 1993, the effective date of Iowa Lutheran Hospital's statutory merger into Iowa Methodist Medical Center. All prior interpretations required recognition of any gain or loss incurred on a statutory merger when the merging entities were unrelated to each other prior to the transaction, i.e., not subject to common ownership or control.

2.    Subsequent To November 23, 1993 Statutory Merger

By letter dated August 24, 1994, Charles R. Booth, HCFA's Director, Office of Payment Policy, Bureau of Policy Development, stated that when two independent hospitals consolidated, recognition of a gain or loss would be required, even if the consolidated entity resulting from the transaction was controlled by former board members of the consolidating entities (A.R. 672-80).

Although Director Booth's determination was consistent with the language of the regulations and longstanding agency policy, HCFA officials became concerned that continued application of such policy would lead to significant additional Medicare costs. From the start of Medicare until the early 1990s, hospitals frequently realized gains when they were sold, merged, or consolidated, providing a basis for Medicare to recover depreciation payments that had been made previously to the selling, merging or consolidating hospital (A.R. 275). *See, e.g., St. Mark's Charities Liquidating Trust v. Shalala,* 141 F.3d 978 (10th Cir. 1998). However, starting in the 1990s, managed care and other related factors resulted in significant reductions in hospital profitability (*see generally,* A.R. 215). As a consequence, more and more frequently, hospitals were receiving less than net book value for their assets as part of a change of ownership transaction ("CHOW"). This, in turn, resulted in hospitals claiming additional Medicare payments for the losses that were being incurred, relying upon the same regulation that Medicare had relied upon to recover depreciation when a gain was realized upon a hospital's sale, merger or consolidation. According to a report published by the Secretary's Office of Inspector General

("OIG"), between 1990 and 1996, net Medicare losses resulting from hospital change of ownership transactions more than quadrupled (A.R. 533-34).

On November 3, 1995, HCFA's Boston Regional Office advised its Central Office that an $11 million loss on consolidation claim under its review was a "test case" and that if Medicare regulations were deemed to require its reimbursement, Medicare could be required to pay more than $100 million to consolidating hospitals in the Boston region alone (A.R. 561). Several months later, on May 29, 1996, HCFA's Philadelphia Regional Office provided the Central Office with an intermediary's memorandum addressing what it believed were inappropriate payments of reimbursement resulting from CHOWs being paid under existing regulations (A.R. 567-68). The Regional Office stated that it "hope[d] attention to this matter can lead to action to remedy the increased Medicare cost exposure . . . " (A.R. 568).

By memorandum dated March 6, 1996, E. Stephanie Crowley, HCFA's Director, Division of Payment and Reporting Policy, instructed the Boston Regional Office to disallow the loss on consolidation claim under review based on a new theory, "continuity of control," that had never been applied to change of ownership transactions, particularly statutory mergers or consolidations (A.R. 564). Her determination was contrary to CMS' longstanding policy, including recent advice from Director Booth who had held a superior position at HCFA (A.R. 294, 671-80). On that same day, Ms. Crowley advised attorney Joanne Erde that a statutory merger about which Ms. Erde had requested advice would also be considered a related party transaction based on "continuity of control" (A.R. 1271-74).

By contrast, in response to the Philadelphia Regional Office's memorandum, other agency officials concluded that, notwithstanding the potential financial exposure, reimbursement for losses could not be eliminated through an informal agency interpretation that might be implemented quickly. Their conclusion was reflected in a handwritten question and answer

written on the memorandum.  The handwritten note asks:  "Can we do anything via Manual, or do we need a reg?"  The handwritten reply states:  "Bruce [Oliver] has per him | Chuck [Booth, Director, Officer of Payment Policy] — nothing to be done until next year" (A.R. 567).

In a June 1997 report addressing "Medicare Losses on Hospital Sales", the OIG determined that approximately $122 million in Medicare payments had been claimed for losses in 1996; not a single dollar would be recovered from a gain (A.R. 545).  Additionally, $168 million in Medicare payments might be required by transactions for which no financial data was available and by transactions anticipated in 1997 (A.R. 544-45).  The OIG recommended legislation to eliminate the statutory provision that required recognition of losses (*e.g.,* DEFRA), a recommendation with which HCFA agreed (A.R. 548, 555-56).

In accordance with the OIG's recommendations, HCFA arranged for legislation that eliminated the statutory requirement that Medicare recapture depreciation based on policies in effect on June 1, 1984.  Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4404, 111 Stat. 400 (1997).  HCFA then amended Medicare regulations to eliminate reimbursement of losses as of December 1, 1997, the legislation's effective date.  *See generally* 63 Fed. Reg. 1379, 1380-82 (Jan. 9, 1998).  However, these changes would not affect losses incurred prior to that date, such as Iowa Lutheran Hospital's loss.

On October 19, 2000, HCFA issued a Program Memorandum ("PM") to its fiscal intermediaries requiring disallowance of loss claims resulting from mergers and consolidations involving non-profit providers based on new policies (A.R. 1536).  The PM – purporting to interpret regulations that had been published in 1979 – was to be applied to all cost reports that had not been finally settled and to finalized cost reports subject to reopening (A.R. 1540).  Because regulations had eliminated recognition of gains and losses as of December 1, 1997, the

PM would have retrospective application only, i.e., to transactions completed on or before November 30, 1997 (A.R. 1537).

The PM reflected the "continuity of control" policy from the memorandum and letter written some four years earlier by Ms. Crowley, and was contrary to HCFA's longstanding regulatory interpretations as reflected in the letters from HCFA Directors Goeller and Booth and in the MIM, including in the following respects:

1.     The PM stated that because the regulations addressing mergers and consolidations had been written to address transactions involving for-profit entities only, "special considerations" would be applied to transactions involving non-profit entities (A.R. 1537). HCFA had previously applied the Medicare regulations uniformly to transactions involving for-profit and non-profit entities (*see* pp. 37-38).

2.     The PM required the related party determination to be based on a comparison of control over the merged entity prior to the transaction with control over the surviving entity after the transaction (A.R. 1538). HCFA had previously required the related party determination to be based on the relationship of the merging entities immediately prior to the transaction (*see* pp. 19-22).

3.     The PM required a statutory merger between unrelated parties to be a *bona fide* sale before recognition of any related gain or loss (A.R. 1539). HCFA had previously interpreted Medicare regulations to require recognition of a gain or loss incurred on a statutory merger between unrelated parties; no other requirements had to be satisfied (*see* pp. 28-30).

Notwithstanding the statutory provision that required the Secretary to continue to recapture depreciation based on policies that were in effect in 1984, the PM was to be applied to periods preceding the 1997 legislative change that eliminated this requirement.

III.    FACTS OF THE DISPUTE

Prior to its statutory merger, it was doubtful whether Iowa Lutheran Hospital would survive without a merger or similar transaction (A.R. 216-18, 224-35, 460-61, 478).   Iowa Lutheran Hospital's market was dominated by two larger hospitals, Mercy Medical Center and Iowa Methodist Medical Center, each of which was aggressively attempting to enhance its market position (A.R. 428-30).   Iowa Lutheran Hospital's charges were higher than either of those hospitals, and its physical plant was nearly twice as old as those hospitals (A.R. 211-12, 431-32, 440, 454, 494).   Additionally, less than one-half of Iowa Lutheran Hospital's licensed beds were generally in use (A.R. 210).   Approximately one-half of its inpatient census received behavioral and mental health care (A.R. 211, 217).   Iowa Lutheran Hospital's limited range of services would not permit it to provide the full range of services that managed care entities required (A.R. 213-14).   Additionally, Iowa was in the process of modifying its Medicaid program to pay for mental health services using managed care principles, which modification had the potential to dramatically reduce hospital use in the provision of those services (A.R. 214-15).

Iowa Lutheran Hospital recognized that it had to upgrade its facilities in order to remain competitive (A.R. 213, 215, 437-38).   Its original hospital building had been constructed in the early 1900s, and expanded several times thereafter (A.R. 211).   Iowa Lutheran Hospital's master facility plan required an estimated $49 million of construction; estimated minimum capital expenditures over the next five years exceeded $70 million; and its chief executive officer believed that nearly $90 million would actually be required (A.R. 215-16, 232, 443-47). Because Iowa Lutheran Hospital had a debt capacity of only $28.5 million, it would be unable to finance the upgrade of its facilities and expansion of services required to continue as a stand-

alone hospital (A.R. 213-16, 440-41, 460).  Accordingly, Iowa Lutheran Hospital required some type of affiliation with a stronger health care organization (A.R. 216, 225).

Iowa Methodist Medical Center, whose sole member was Iowa Methodist Health System, Inc. ("Iowa Methodist Health System"), was the most complementary facility in Des Moines (A.R. 211-12, 219-20, 480-88).  Iowa Methodist Medical Center would be able to assist in the financing of Iowa Lutheran Hospital's needed capital improvements; it provided tertiary care, permitting a combined entity to offer the full range of services managed care required; and it was located on the other side of the river that split Des Moines (A.R. 211-12).

Arm's-length negotiations between the two organizations resulted in an agreement for the two entities to merge (A.R. 184-85, 200-01, 220).  Effective November 22, 1993, Iowa Lutheran Hospital merged into Iowa Methodist Medical Center (A.R. 185-88, 356-75, 1225; *see also* A.R. 511).  As a result of the statutory merger, Iowa Methodist Medical Center succeeded to Iowa Lutheran Hospital's assets and became legally responsible for its liabilities (A.R. 185-88, 190-91, 315).  Iowa Lutheran Hospital ceased to exist (A.R. 185-88, 204, 356-75, 1225; *see also* A.R. 511).  Iowa Methodist Medical Center, the surviving entity, then changed its name to Iowa Health System Hospital Corporation ("Iowa Hospital Corporation") (A.R. 385).[4]

At the time the transaction was negotiated, related documents were executed, and the statutory merger occurred, Iowa Lutheran Hospital and Iowa Methodist Medical Center were not subject to common ownership or common control (A.R. 183-84, 193, 205).  The Intermediary acknowledged that they were unrelated to one another prior to the transaction (A.R. 302, 315, 320).  Under Iowa law, Iowa Hospital Corporation succeeded to Iowa Lutheran Hospital's assets and liabilities, including its Medicare claim for reimbursement for the loss on statutory merger that it incurred (A.R. 185-88, 190-91).  After the transaction, Iowa Methodist Medical Center's

---

[4]    Effective August 7, 1995, Iowa Hospital Corporation changed its name to Central Iowa Hospital Corporation.

sole member, Iowa Methodist Health System, remained the sole member of Iowa Hospital Corporation. However, Iowa Methodist Health System's name was changed to Iowa Health System (A.R. 185-86, 377).

Following the merger, control over Iowa Hospital Corporation, including assets that had been owned previously by Iowa Lutheran Hospital, was held by individuals who had been part of Iowa Methodist Health System (A.R. 230-31). Iowa Hospital Corporation's post-transaction governing board had nineteen members, only eight of whom had served previously on Iowa Lutheran Hospital's governing board (A.R. 186, 193). Iowa Health System's governing board had twenty-three individuals, only ten of whom had served previously on Iowa Lutheran Hospital's governing board (A.R. 186, 193).

Iowa Lutheran Hospital received $28,092,831 compensation for its assets, reflecting its liabilities that passed to Iowa Hospital Corporation (A.R. 190, 236-37, 902). Medicare payment principles provided for assignment of $6,819,713 to Iowa Lutheran Hospital's depreciable assets, reflecting the relative fair market value of those assets to its total assets that passed to Iowa Hospital Corporation. These assets had a Medicare net book value of $26,571,959. Accordingly, Iowa Lutheran Hospital incurred a loss of $19,752,246 on depreciable assets. Medicare's portion of the loss was $5,423,196, reflecting Medicare's relative use of the facility during the period in which Iowa Lutheran Hospital's assets were used to furnish patient care services (A.R. 902).

IV.     ADMINISTRATIVE APPEAL PROCESS

Iowa Lutheran Hospital claimed reimbursement for Medicare's share of the loss on depreciable assets (A.R. 236, 898). The Intermediary determined that Iowa Lutheran Hospital's merger with Iowa Methodist Medical Center was between related parties and disallowed the loss claim (A.R. 1231, 1246, 1535). Relying principally on the composition of Iowa Hospital

Corporation's governing board and its senior officers after the transaction, and provisions for distribution of assets upon a corporate dissolution, the Intermediary found that the statutory merger had caused Iowa Lutheran Hospital to become related to Iowa Methodist Medical Center (A.R. 298, 1244-46).

Iowa Lutheran Hospital requested a hearing before the PRRB to challenge the Intermediary's determination.  The Intermediary relied initially on the grounds that it had used to deny Iowa Lutheran Hospital's loss, i.e., that the statutory merger was between related parties (A.R. 1227-39).  However, on November 4, 2002, the Intermediary submitted a Supplemental Position Paper that reflected the PM that had been issued the previous month (A.R. 1278-1303). The Intermediary asserted that Iowa Lutheran Hospital's loss could not be reimbursed because the statutory merger was not a "*bona fide* sale"  (A.R. 1280, 1290-1302).  The Intermediary's belated *bona fide* sale contention reflected that fact that until issuance of the PM, there had been no requirement that statutory mergers satisfy *bona fide* sales criteria before recognition of a related loss.

After a two-day hearing, on October 6, 2006, the PRRB issued its decision reversing the Intermediary's disallowance of Iowa Lutheran Hospital's claimed loss (A.R. 57-68).  The PRRB stated that the transaction was a statutory merger, and that prior to the merger, the merging entities, Iowa Lutheran Hospital and Iowa Methodist Medical Center, were unrelated corporations.  Therefore, the transaction was a statutory merger between unrelated parties and Iowa Lutheran Hospital was entitled to Medicare reimbursement for the related loss (A.R. 64-67).  The PRRB rejected the Intermediary's assertion that the statutory merger was between related parties based on participation of individuals from the governing boards of the merging entities on the surviving entity's post-transaction governing board, finding that the statutory merger regulation based the related party determination on the merging entities "as they existed

<u>prior</u> to the transaction" (A.R. 65-66) (emphasis in original).  The PRRB remanded the action to the Intermediary for calculation of the loss (A.R. 67).

On December 8, 2006, the Administrator reversed the PRRB's decision (A.R. 1-31). Relying on the PM, the Administrator found that the statutory merger was between related parties because there was "continuity of control" between the merging entity (Iowa Lutheran Hospital) prior to the transaction and the surviving entity (Iowa Hospital Corporation) afterwards (A.R. 17-19, 26-27).  Notwithstanding the fact that Iowa Lutheran Hospital ceased to exist as a result of the statutory merger, the Administrator stated that the "carry forward" of Iowa Lutheran Hospital executives and board members to Iowa Hospital Corporation/Iowa Health System permitted Iowa Lutheran Hospital to significantly influence or direct the actions or policies of those entities, and showed a continuity of control (A.R. 27).  The Administrator also relied on the *bona fide* sale requirements that had been introduced belatedly into the PRRB proceedings by the Intermediary.  Relying on a definition of *bona fide* sale added to the Provider Reimbursement Manual ("PRM") in May 2000 and reflected in the October 2000 PM, the Administrator stated that Iowa Lutheran Hospital's "transfer price" – its liabilities that passed to Iowa Hospital Corporation – did not reflect "reasonable consideration" for Iowa Lutheran Hospital's assets or "support a finding that the transaction was an arm's length transaction" (A.R. 29).  The Administrator's decision constituted the final administrative decision of the Secretary with respect to Iowa Lutheran Hospital's loss claim.

V.    <u>ARGUMENT</u>

A.    The Administrator's Determination Was Contrary To The Medicare Statute, The Secretary's Regulations, Longstanding Interpretations Of Those Regulations, and <u>Was Otherwise Arbitrary And Capricious</u>

1.    <u>Standard Of Review</u>

This court must hold unlawful and set aside the Administrator's determination if it is

"unsupported by substantial evidence," or it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §§ 706(2)(A), (E).  *See also* 42 U.S.C. § 1395oo(f) (judicial review of agency's reimbursement decisions made under Administrative Procedure Act ("APA") standards).  Under this standard, if the Administrator's decision is contrary to the Secretary's regulations, it must be reversed.

> ### 2.    Iowa Lutheran Hospital Satisfied Regulatory Requirements For Recognition Of A Loss On Statutory Merger

The Medicare statute requires that the reasonable cost of services reimbursed under Medicare be determined in accordance with regulations promulgated by the Secretary.  42 U.S.C. § 1395x(v)(1)(A).  As of the date of the transaction, Medicare regulations stated:

> A statutory merger is a combination of two or more corporations under the corporate laws of the State, with one of the corporations surviving.  The surviving corporation acquires the assets and liabilities of the merged corporation(s) by operation of State law. The effect of a statutory merger upon Medicare reimbursement is as follows:
>
> (i)  Statutory merger between unrelated parties.  If the statutory merger is between two or more corporations that are unrelated (as specified in §413.17), the assets of the merged corporation(s) acquired by the surviving corporation may be revalued. . . .  *If the merged corporation was a provider before the merger, then it is subject to the provisions of paragraph . . . (f) of this section concerning . . . the realization of gains and losses.*

42 C.F.R. § 413.134(l)(2)(i) (1993) (A.R. 592) (emphasis added).

The transaction on which Iowa Lutheran Hospital incurred a loss was a statutory merger between unrelated parties.  Iowa Lutheran Hospital statutorily merged into Iowa Methodist Medical Center (A.R. 185-88, 356-72, 1225).  There is no dispute that the transaction was a statutory merger under Iowa law and that, prior to the transaction, Iowa Lutheran Hospital and Iowa Methodist Medical Center, the parties to the transaction, were not related parties subject to common control or common ownership (A.R. 183-84, 302, 315, 320; *see also* A.R. 193, 205).

Accordingly, the Administrator was required to reimburse Iowa Lutheran Hospital for the loss it incurred in accordance with the Secretary's regulations. *See AT&T Corp. v. Federal Communications Comm'n,* 448 F.3d 426, 434 (D.C. Cir. 2006) (elementary that agency must adhere to own rules and regulations); *S.Cal. Edison Co. v. Federal Energy Regulatory Comm'n,* 415 F.3d 17, 22-23 (D.C. Cir. 2005) (agency may alter regulations, but "may not keep regulations in place and then disregard them"); *Battle v. Federal Aviation Admin.*, 393 F.3d 1330, 1335-36 (D.C. Cir. 2005) (agencies may not violate own rules and regulations to prejudice of others).

Informal agency interpretations of Medicare regulations demonstrate that HCFA has given effect to the plain meaning of these regulations and confirm that the regulations require recognition of a loss incurred on a statutory merger between two or more unrelated corporations. In a letter dated May 11, 1987, HCFA Director Goeller, who had participated in development of the applicable regulation (A.R. 270, 1313), stated:

> Mergers and consolidations of nonstock, nonprofit providers may give rise to revaluations of assets . . . and/or adjustments to recognize realized gains and losses. Notwithstanding the reference to "capital stock" in the caption of regulations section 42 C.F.R. § 413.134(k) (formerly 42 C.F.R. § 405.415(l)), we look to that regulation for authority in addressing mergers and consolidations of nonstock issuing corporations because the principles involved would be the same. If the transaction . . . meets the definition of either a statutory merger or consolidation as set forth in the regulations section (a judgment we reserve to the fiscal intermediary), then a revaluation of assets and/or an adjustment to recognize related gains and losses may occur.
>
> * * *
>
> In a situation where the surviving/new corporation assumes liability for outstanding debt of the merged/consolidated corporations, the assumed debt would be viewed as consideration given . . . . [A]n adjustment to recognize any gain or loss to the merged/consolidated corporations would be required . . . . For purposes of calculating the gain or loss, the amount of the assumed debt would be used as the amount received for the assets.

(Emphasis added)  (A.R. 594-95).

MIM § 4502.6 (A.R. 604) also required recognition of Iowa Lutheran Hospital's loss claim because it resulted from a statutory merger, and the two merging entities were unrelated prior to the transaction.

Witnesses for Iowa Lutheran Hospital, Mr. Michael Maher and Mr. Eric Yospe, two previous HCFA senior officials who were in charge of the developing the relevant regulation (A.R. 256-57) and corresponding MIM (A.R. 280), respectively, testified that the transaction was a statutory merger between unrelated parties, requiring recognition of Iowa Lutheran Hospital's loss (A.R. 257-58, 262, 267, 293).[5]  Mr. Maher testified that HCFA recognized that while the merged entity's liabilities on which the gain or loss would be based would not necessarily reflect the assets' fair market value, a statutory merger between unrelated parties would provide a better basis to compute depreciation costs than previously-computed amounts that had been based on the asset's cost and estimated useful life (A.R. 256, 258, 272, 274-76, 278).  Mr. Yospe testified that the MIM provision was consistent with the regulation (A.R. 281, 283).

To the extent that there is any ambiguity in the meaning of the regulations, well-established case requires that great deference be afforded to informal regulatory interpretations such as the letter from Director Goeller and the MIM, which clearly require recognition of a loss incurred on a statutory merger with an unrelated entity.  *See Auer v. Robbins,* 519 U.S. 452, 461 (1997); *In re Wal-Mart Stores,* 395 F.3d 1177, 1184-85 (10th Cir. 2005) (DOL Wage & Hour opinion letters).  Unlike the PM, these interpretations were "not advanced by an agency seeking

---

[5] The testimony of Mr. Maher and Mr. Yospe is particularly significant because courts give substantial weight to the testimony of individuals who participated in drafting the regulations or were subsequently responsible for their application in determining regulatory intent.  *See North Anna Envtl. Coalition v. United States Nuclear Regulatory Comm'n,* 533 F.2d 655, 662-63 (D.C. Cir. 1976) (testimony of agency staff members who had been involved in development of regulations provided substantial support for agency findings).  *See also, Hayes Int'l Corp. v. McLiecas,* 509 F.2d 247, 261-63 (5th Cir. 1975).

to defend past agency action against attack;" nor is there any "reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question." *Auer,* 519 U.S. at 462. *See also, Akzo Nobel Salt v. Federal Mine Safety & Health Rev. Comm,* 212 F.3d 1301, 1304-05 (D.C. Cir. 2000).

In fact, the Intermediary was required to recognize the loss in accordance with the MIM to which it was bound (A.R. 281, 283, 291). The Administrator's failure to give effect to these provisions requires reversal of his decision. *See Home Health Care v. Heckler,* 717 F.2d 587, 592-93 (D.C. Cir. 1983) (Secretary's payment determination reversed when fiscal intermediary failed to comply with Intermediary Letter). *See generally, Shalala v. St. Paul-Ramsey Med. Ctr.*, 50 F.3d 522, 528-29 (8th Cir. 1995) (Secretary can not deny payments for bad debt costs based on requirements not included in PRM).

> 3.    The Administrator Erred In Finding That The Statutory Merger Was Between Related Parties Based On Continuity Of Control

Relying on the PM, the Administrator found that the parties to the merger were related through control (A.R. 26). However, as discussed below, the Administrator did not apply the appropriate standard. The Administrator relied on a comparison of control over Iowa Lutheran Hospital as it existed prior to the statutory merger with control over Iowa Hospital Corporation and Iowa Health System, as they existed after the transaction. Under Medicare regulations specifically addressing statutory mergers, a statutory merger is between related parties if, and only if, the merging entities were subject to common control or common ownership at the time of the transaction. *See generally, Kidney Ctr. of Hollywood v. Shalala,* 133 F.3d 78, 84-86 (D.C. Cir. 1998) (merger determined to be related party transaction because same individuals

controlled both parties to the negotiations leading to the transaction).[6]  Moreover, even if "continuity of control" were a valid concept that could be applied to a statutory merger consistent with the regulations, common control did not exist between Iowa Lutheran Hospital and Iowa Hospital Corporation.

> a.   Medicare Regulations Require The Related Party Determination To Be Based On The Relationship Of The Merging Entities Immediately Prior To The Transaction

In the case of a statutory merger, Medicare regulations require that the related party determination be based on the relationship of the merging entities immediately before the transaction.  Specifically, those regulations provide that a "statutory merger between unrelated parties" occurs "[i]f the statutory merger is between two or more corporations that are unrelated . . . ." 42 C.F.R. § 413.134(l)(2)(i) (A.R. 592).  There is no dispute that Iowa Lutheran Hospital and Iowa Methodist Medical Center were unrelated entities prior to and at the time of the transaction (A.R. 183-84, 193, 205, 302, 315, 320).   The Intermediary's witness also acknowledged that Medicare regulations did not state that a statutory merger became a related party transaction based on continuity of control (A.R. 302, 315-16, 319-20).

However, the Administrator would interpret the Secretary's regulations to require a statutory merger to be "between two or more corporations that are unrelated," *and* that each merged entity be unrelated to the surviving entity resulting from the transaction.  Even if the Secretary might have promulgated such a regulation, the Secretary is bound by his regulations as he wrote them.  The PRRB recognized that the plain language of the regulation is "unambiguous in its meaning that the related party concept will be applied to the entities that are merging as they existed prior to the transaction" (A.R. 66) (emphasis in original).  The regulation cannot be

---

[6] As an example of a statutory merger between related parties, the regulations refer to a merger of two corporations under common ownership at the time of the transaction, *i.e.*, a subsidiary merges into its parent.  42 C.F.R. § 413.134(l)(2) (A.R. 592).

reasonably interpreted to permit the related party determination to be based on a comparison of control of the merging corporation prior to the transaction and of the surviving corporation after the transaction. *See generally Christensen v. Harris County,* 529 U.S. 576, 588 (2000) (agency may not create *de facto* new regulation under guise of regulatory interpretation); *Maximum Home Health Care v. Shalala*, 272 F.3d 318, 321-22 (6th Cir. 2001) (Secretary's reliance on interpretive manual to require competitive bidding not required by regulation contrary to APA and arbitrary and capricious). As the court stated in *Aspenwood Inv. Co. v. Martinez*, 355 F.3d 1256, 1261 (10th Cir. 2004), "[t]he agency could easily have drafted language to achieve the result which it now advocates but did not do so." A court should not "'torture the language' to reach the result the agency wishes," when the result is not permitted by its plain meaning. *Id.* (citations omitted). *See also Fina Oil and Chemical Co. v. Norton,* 332 F.3d 672, 676-79 (D.C. Cir. 2003) (court requires reversal of agency determination that based government royalty on proceeds accruing to entity controlled by lessee, when regulatory definition of "lessees" did not include phrase "and their affiliates").

               (i)      The Administrator's Related Party Determination Was Contrary To Longstanding HCFA Interpretations

The MIM, consistent with Medicare regulations, confirms that a statutory merger is between two or more unrelated corporations if, as here, the parties to the statutory merger were unrelated *prior to the transaction* (A.R. 281, 283, 291). The MIM provides the following example:

> Corporation A (a non-provider) signs an agreement of merger consistent with the principles of applicable state law with corporation B, the provider, with corporation A surviving. Corporation A will be operated as a provider. *Corporations A and B were unrelated parties prior to the transactions . . . .*

> The [HCFA Regional Office] determines that the transaction constitutes a CHOW [change of ownership] for Medicare certification purposes and issues the tie-in notice . . . . You determine that the

> transaction constitutes a CHOW for Medicare reimbursement purposes
> since Corporation A will be operated as a provider. *A gain/loss to the
> seller and a revaluation of the acquired assets to the buyer are
> computed.*

MIM § 4502.6 (emphasis added) (A.R. 604). Thus, in determining whether a statutory merger is between unrelated parties, the merging entities' relationship immediately *prior* to the transaction is determinative; arrangements existing after the statutory merger are immaterial. The MIM is quite blunt about this and requires only that "Corporations A and B [be] unrelated parties *prior* to the transaction" (*Id.*).

A subsequent communication from HCFA Director Booth confirms that this policy remained in place immediately after Iowa Lutheran Hospital's statutory merger. In a letter to HCFA dated June 6, 1994, Michael Maher, then a Coopers & Lybrand partner, described a consolidation of two unrelated not-for-profit hospital corporations (Hospital A and Hospital B) to form a new corporate entity (Hospital C) (A.R. 672-73). Mr. Maher stated that individuals from the consolidating entities' governing boards would control the consolidated entity's board after the transaction, i.e., one-half of its board would be from each entity's previous governing board. Mr. Maher indicated that under Medicare principles, the transaction was between unrelated parties. Director Booth, HCFA's final say on this issue, confirmed that the transaction appeared to be between unrelated parties requiring recognition of any gain or loss (A.R. 278-79, 679-80). The Intermediary's witness acknowledged that Director Booth had not erred in his conclusion (A.R. 314). Director Booth's determination reflected long-standing Medicare policies. According to Messrs. Maher and Yospe, under the applicable regulation and MIM provisions, the related party determination was intended to be based on the relationship of the merging entities immediately prior to the transaction, not thereafter (A.R. 258-59, 267-68, 279-84, 286, 290-91, 293-94). Medicare authorities did not permit denial of a loss based on the composition of the surviving entity's governing board after the transaction (*Id.*).

(ii)    The Administrator's Reliance On Policies Related To Other Types Of Transactions Demonstrates That There Was No Basis For His Related Party Determination

In support of his related party determination, the Administrator relied on IRS rules, and referred to "common criteria" between these rules and Medicare principles under which a transaction resulting in continuity of control would be treated "similar to, or as, a reorganization (in that no gain or loss is recognized)" (A.R. 27).  Additionally, according to the Administrator, treatment of the transaction as a "pooling" under generally accepted accounting principles ("GAAP"), particularly Accounting Principles Board ("APB") No. 16, supports his determination (A.R. 28).

However, each witness who addressed the issue, including the Intermediary's witness, testified that the transaction was *not* a "reorganization" (A.R. 193, 261-62, 291, 315-16, 323).  The Administrator's reliance on GAAP was also shown to be without basis.  In the preamble to the 1979 regulations addressing statutory mergers, HCFA responded to comments that the proposed policy was contrary to APB 16 by saying that "[GAAP] are considered in the development of Medicare reimbursement policy, but are not the controlling factor"  (A.R. 1315).  Similarly, in addressing the computation of gains and losses from consolidations, HCFA Director Booth made clear that where Medicare regulations and instructions address an issue, GAAP was irrelevant (A.R. 679-800).  The Intermediary's witness acknowledged that Medicare regulations did not require reimbursement in accordance with APB 16 because Medicare regulations and the MIM specifically addressing the issue displaced GAAP (A.R. 312, 324-25; *see also,* A.R. 263, 290) (similar testimony of Messrs. Maher and Yospe)).  *See generally*, MIM § 4500 ("Where you encounter a situation which is not addressed in this CHOW chapter, refer to Medicare instructions; where a situation is not covered by existing instructions, apply generally accepted accounting principles as appropriate") (A.R. 597).  *See Life Care Ctr. of Aurora v. Thompson*,

2003 U.S. Dist. LEXIS 25353 (D.D.C. Sept. 29, 2003) (court agrees with PRRB that Medicare regulations addressing transaction make GAAP inapplicable).  The Intermediary witness' acknowledgement  that APB 16 applied only when the combining entities were independent of one another makes the Administrator's reliance on GAAP to support his determination that the merger was between related parties particularly curious (A.R. 324-25).

(iii)    The Administrator's Related Party Determination Was Contrary To Applicable Case Law

Case law applying related party principles to CHOWs other than statutory mergers and consolidations also demonstrates that post-transaction control is irrelevant to the related party determination.  In *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185 (3d Cir. 1986), the court refused to judge "relatedness" based on circumstances existing *after* the transactions, basing its determination on the parties' relationship when the transactions were entered into.  The court stated:  "The regulation governing depreciation, although it does not speak of control or relatedness, requires a purchaser of a care providing facility to demonstrate 'that the sale was bona fide.' . . . We interpret this regulation as addressing the 'bona fides' . . . of a sale *at the time of that sale*."  *Id.* at 1192 (footnotes omitted).  The court stated that evidence of the seller's lack of control after the transaction, "while interesting, is not material to the legal issue before us: the control [the seller] exercised over the [buyer] *at the time of the conversion*."  *Id.* at 1194 n.25.

Similarly, in *Buckingham Valley Ctr. v. Aetna Life and Casualty Co.*, PRRB Hearing Dec. No. 90-D13, [1990 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 38,369 (Jan. 30, 1990), the PRRB rejected a contention that a merger was between related parties because a merger agreement caused some transaction participants to become under other participants' control.  The PRRB determined that the statutory merger was between unrelated parties based on the parties' relationship before they agreed to merge.  *Id.* at 22,092.  This decision was upheld by the Secretary and ultimately by the Court of Appeals.  *Buckingham Valley Ctr. v. Aetna Life and*

*Cas. Co.*, HCFA Adm'r Dec., [1990 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 38,459 (Mar. 28, 1990), *aff'd sub nom*, *Nursing Ctr. of Buckingham and Hampden v. Shalala*, 990 F.2d 645 (D.C. Cir. 1993).

Thus, there was no legal or regulatory basis for the Administrator to find that the statutory merger was between related parties based on post-transaction control over Iowa Hospital Corporation.

> b.    Even If Continuity Of Control Were A Valid Application Of Medicare Regulations, No Individual Or Organization Controlled Iowa Lutheran Hospital Before The Statutory Merger And Iowa Hospital Corporation After The Statutory Merger

In finding continuity of control, the Administrator relied on a description of Iowa Health System's initial governing board (although he incorrectly referred to it as the board of the surviving entity, Iowa Health Hospital) (A.R. 352). According to the Administrator, the board included eleven individuals with ties to Iowa Lutheran Hospital, including nine individuals selected by Iowa Lutheran Hospital's governing board (including two medical staff members), the Bishop of its religious affiliation, and its former president (A.R. 26). According to the Administrator, "[t]his membership comprised approximately 48 percent of the voting positions in the surviving entity's board of directors" (*Id.*). In fact, ten members of Iowa Health System's initial governing board had served previously on Iowa Luthern Hospital's board reflecting approximately 43% of Iowa Health System's board (A.R. 186, 193).[7] There were sound reasons why former members of Iowa Lutheran Hospital's governing board were included on Iowa Hospital Corporation's board that were unrelated to maintenance of control over Iowa Lutheran Hospital's assets (A.R. 221). Additionally, Iowa Methodist Health System controlled one more

---

[7] The Intermediary's witness stated that Medicare instructions did not provide guidance regarding what percentage of voting interests was sufficient to confer control under related party principles, however, she would "draw the line" at about 40% (A.R. 329).

seat on Iowa Health System's post-transaction governing board than Iowa Lutheran Hospital (A.R. 352). Additionally, Iowa Methodist Health System's Board Chairman and President became the Chairman and President of Iowa Health System and Iowa Hospital Corporation (A.R. 369, 372).

Medicare related party principles apply to entities related by "common ownership or control." 42 C.F.R. § 413.17(a) (1993) (A.R. 1276). Control exists where "an *individual or an organization* has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution." 42 C.F.R. § 413.17(b)(3) (emphasis added) (A.R. 1276). For there to be potential continuity of control, Iowa Hospital Corporation, the merger's surviving entity, must have come under the control of an *individual or organization* that had controlled Iowa Lutheran Hospital prior to the transaction. This was not the case.

Witnesses for Iowa Lutheran Hospital and the Intermediary agreed that no individual could significantly influence or control Iowa Lutheran Hospital before the transaction and Iowa Hospital Corporation afterwards (A.R. 221-23, 284-87, 295, 321). No such individual controlled even six percent of the votes of Iowa Health System's nineteen-person governing board or Iowa Hospital Corporation's twenty-three person board. There was no factual or legal basis for the Administrator to aggregate the voting interests of former members of Iowa Lutheran Hospital's board to assert their significant control over Iowa Health System on a collective basis. There was no relationship among these individuals; they did not reflect a single ideology or approach to issues, and there was no indication that they would vote as a block (A.R. 221-22). Moreover, combining voting interests of unrelated individuals to demonstrate their substantial collective control is not permitted by regulations, which refer to control by an "individual" (A.R. 258-59, 284, 288).

Similarly, no single *organization* controlled Iowa Lutheran Hospital before the transaction and Iowa Hospital Corporation thereafter.  Prior to the transaction, Iowa Lutheran Hospital was controlled by its governing board (A.R. 183, 220-21).  After the transaction, Iowa Health System was the sole corporate member of Iowa Hospital Corporation (A.R. 185-86, 377).  Iowa Health System (formerly Iowa Methodist Health System) had had no relationship to Iowa Lutheran Hospital prior to the transaction (A.R. 183-84, 193, 205).

Prior to the transaction, Iowa Lutheran Hospital's board recognized that it would cede control of the hospital (A.R. 220).  As a result of the transaction, control over Iowa Lutheran Hospital's former assets and operations transferred to individuals who had been part of Iowa Methodist Health System (A.R. 223, 230-33).  Rex Levering, Iowa Lutheran Hospital's former President, testified that after the transaction, a single management team dominated by individuals from Iowa Methodist Health System was put in place for Iowa Lutheran Hospital (A.R. 222-23).  According to Mr. Levering, there was no question who had decision-making authority when management positions were eliminated (A.R. 231).  For every position eliminated from Iowa Methodist Medical Center, three were eliminated from Iowa Lutheran Hospital (A.R. 223-24).  Only one of Iowa Lutheran Hospital's five or six senior executives remained after the transaction (A.R. 222).  Accordingly, there was no basis for the Administrator's determination that there was common control over Iowa Lutheran Hospital before the merger and Iowa Hospital Corporation afterwards.

        4.        The Administrator Erred In Denying Iowa Lutheran Hospital's Loss Based On Requirements Related To *Bona Fide* Sales Of Assets

The Administrator stated: "Since the parties to this transaction are found to be related, the Administrator finds that the transaction was not consummated through an arm's-length transaction.  A *bona fide* sale contemplates an arm's length transaction, between unrelated parties for reasonable consideration, with each party acting in its own self interest"  (A.R. 28).

The Administrator's assertion that his related party determination, reflecting his continuity of control finding, demonstrated that the statutory merger was not an arm's-length transaction is unsupportable.  The undisputed facts were that two independent entities  negotiated the transaction terms.

The Administrator's determination that failure to satisfy *bona fide* sale requirements, as HCFA would define them, precluded recognition of Iowa Lutheran Hospital's loss, is also contrary to the plain terms of the regulation and to Medicare payment policies in effect at the time of the transaction.  As demonstrated below, the regulatory requirements for *bona fide* sales did not apply to statutory mergers, and *bona fide* sale requirements did not require that there be "reasonable consideration," as determined by HCFA. The Intermediary could not identify any document that required the liabilities assumed in a statutory merger to reflect the fair market value of the merging entity's assets  (A.R. 323).

      a.    A Statutory Merger Is Not Subject To *Bona Fide* Sale Requirements

It is axiomated that a statutory merger is fundamentally different from a purchase and sale of assets (A.R. 192-93).  *See also* A.R. 800-01 (treatise stating that "[p]urchase and transfer of assets to one corporation by (and to) a second corporation is not a consolidation or merger")). *Cf.  United States v. Seattle-First Nat'l Bank*, 321 U.S. 583, 590 (1944) (real estate  transferred as a result of consolidation could not "be said to have been 'sold' or vested in a 'purchaser or purchasers' within the ordinary meanings of those terms"). The structure of the regulations demonstrates that HCFA recognized these differences and intended for purchase and sales transactions to be governed by different regulatory provisions than those applicable to statutory mergers and consolidations.

Regulations providing for recognition of a gain or loss on a *bona fide* sale (section (f)(2)) had been published on January 19, 1979.  44 Fed. Reg. at 3982-83.  The final rule addressing

statutory mergers and consolidations was published on February 5, 1979, less than one month later.  44 Fed. Reg. at 6912-15 (A.R. 1313-16).  The February rule contains no mention of any requirement that a statutory merger or consolidation between unrelated parties be a *bona fide* <u>sale</u> before a gain or loss would be recognized.  In fact, HCFA avoided use of the term *bona fide* <u>sale</u>, stating instead that revaluation of assets was provided for when "assets are transferred by means of a bona fide <u>transaction</u> between unrelated parties."  44 Fed. Reg. at 6913 (emphasis added) (A.R. 1314).

Medicare regulations provide for recognition of gains and losses from statutory mergers between unrelated parties in accordance with section (f), "*Gains and losses on disposal of assets*" (A.R. 592).  They do not require compliance with, or refer to, any particular subsection within section (f), such as (f)(2) addressing "*bona fide* sale."  Similarly, there is nothing that ties the "*bona fide* sale" requirements in (f)(2) to the regulatory provision addressing statutory mergers (A.R. 585-86).  Messrs Maher and Yospe testified that losses recognized by Medicare are not limited to those that result from a *bona fide* sale of assets; provisions for *bona fide* sales did not apply to statutory mergers and consolidations (A.R. 261, 268-70, 273, 275-76, 289-90).  The Intermediary acknowledged that  Ms. Crowley's letter to Ms. Erde did not require a statutory merger to be a *bona fide* sale before recognition of a gain or loss (A.R. 313-14, 323, 1271-74).

In fact, as of the date of the transaction, HCFA had never required statutory mergers or consolidations to comply with *bona fide* sale requirements (*see* A.R. 261, 268-70, 273, 275-76, 289-90).  The letters from Directors Goeller and Booth and the MIM – which, as discussed above, are entitled to great deference – do not indicate that a statutory merger must be a *bona fide* sale before recognition of a gain or loss (A.R. 594-95, 604, 679-80).  In responding to Mr. Maher's inquiry, Director Booth specifically recognized that the "fair market value [of the

assets] exceeded the sales price" (A.R. 680)  Director Booth would require recognition of Hospital A's loss even though its assets that would pass to the consolidated entity had a book value of $46 million, including cash and current assets of $28 million, while the consolidated entity would assume only $26 million of Hospital A's liabilities (A.R. 676).

The lack of a *bona fide* sale requirement for statutory mergers was purposeful.  In developing the regulation addressing mergers and consolidations, HCFA determined that the fact that a merger or consolidation was between unrelated parties provided Medicare with sufficient protection to justify recomputation of depreciation costs (A.R. 272, 274, 276, 278).  Moreover, the Administrator has not suggested that a merger is required to satisfy *bona fide* sale requirements before related assets would be "revalued" after the merger under the regulations. Permitting a revaluation of merged assets upon *any* statutory merger between unrelated parties, but permitting recognition of a gain or loss only when such a transaction was also a *bona fide* sale, would destroy the symmetry between the two provisions within the same regulatory section.

Finally, statutory mergers do not contemplate an exchange of negotiated consideration; the compensation for assets passing by merger is assumption of the merging entity's liabilities (A.R. 190-91). It would be mere happenstance if the appraised fair market value of the merged entity's assets were equal to its known liabilities for which the surviving entity would become responsible.  Contrary to the Administrator's determination, HCFA did not require that to be the case before a loss on statutory merger would be recognized.

        b.    A *Bona Fide* Sale Does Not Include Requirements Used To Deny
              Iowa Lutheran Hospital's Loss Claim

The term "*bona fide* sale" commonly means a "sale made by a seller in good faith, *for valuable consideration*, and without notice of a defect in title or any other reason not to hold the sale."  BLACK'S LAW DICTIONARY 1337 (7th ed. 1999) (emphasis added) (A.R. 820). Intermediary Blue Cross Blue Shield Association relied on this definition in Medicare

reimbursement disputes, finding it a "reliable and acceptable definition []." *See Edgecombe Gen. Hosp. v. Blue Cross Blue Shield Ass'n*, PRRB Hearing Dec. No. 93-D87, [1993-2 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 41,704 at 37,400 (Sept. 9, 1993). This definition had also been adopted substantially by the PRRB. *See Ashland Reg'l Med. Ctr. v. Blue Cross and Blue Shield Ass'n*, PRRB Hearing Dec. No. 98-D32, [1998-1 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 46,109 at 57,585 (Feb. 27, 1998). As of the date of the transaction, HCFA had not defined "*bona fide* sale" to require "reasonable consideration." The first articulation of a reasonable consideration standard was added to the PRM in May 2000, more than six years after completion of the transaction (A.R. 11, n.12).

The fact that HCFA had not articulated a "*reasonable* consideration" requirement prior to the transaction is reflected in the statement of the *Monsour Med. Ctr.* court that "[w]ithout additional guidance from Congress or the relevant agency, we thus feel constrained to assume – and reasonable in assuming – that a bona fide sale . . . is one transacted between organizations that are not 'related' . . . ." 806 F.2d at 1191 n.13. Similarly, in a memorandum dated January 11, 1989, the Acting Director of HCFA's Bureau of Eligibility, Reimbursement and Coverage stated that "bona fide sale" "means simply that the parties to the sale are not related . . ." (A.R. 823-24).

Likewise, in its June 1997 report, the OIG stated: "For the most part, a bona-fide sale would be defined as a sale between two unrelated parties (frequently called 'arms-length transactions')" (A.R. 833).

Additionally, in transactions involving asset sales, the PRRB and Administrator recognized losses frequently where amounts received for depreciable assets were asserted by intermediaries to be inadequate, even when the sales price was less than the value of monetary assets transferred as part of the transaction. In *Ashland Reg'l Med. Ctr.*, the provider sold a

hospital and skilled nursing facility with a total appraised value of $2.4 million; certain gifts, grants and donations; and accounts receivable, including Medicare receivables of more than $500,000 in exchange for $100,000 compensation. The PRRB reversed the Intermediary's disallowance of the loss claim, determining that the transaction was a *bona fide* sale because there was an actual transfer of assets between unrelated parties and valuable consideration was given by both parties, including cash and future service obligations. *Id.* at 57, 585. Similarly, in *Lac Qui Parle Hosp. of Madison, Inc. v. Blue Cross and Blue Shield Ass'n*, PRRB Hearing Dec. No. 95-D37, [1995-1 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 43,269 (May 10, 1995), the Intermediary denied a loss claim when the hospital seller accepted approximately $330,000 for assets worth more than $1.1 million, including current assets exceeding $500,000. Once again, the PRRB held that there was a *bona fide* sale, and required recognition of the loss. Likewise, in *Edgecombe Gen. Hosp.*, the provider sold a hospital and Medicare receivables for $2.8 million dollars ($3.6 million dollars less $800,000 liabilities). The Intermediary asserted that the fair market value of the hospital land and depreciable assets was approximately $7 million. However, the PRRB determined that the loss resulted from a *bona fide* sale pursuant to an arm's-length agreement whereby the assets were sold in a completed transaction. The Administrator elected not to review the PRRB's determinations in *Ashland*, *Lac Qui Parle Hosp.*, and *Edgecombe,* reflecting his determination that they did not reflect an erroneous interpretation of law, regulation, or agency ruling. *See* 42 C.F.R. § 405.1875(c). The PRRB's decision became the Secretary's final decision in each matter.

Finally, in *Broadway Unit of Vallejo Gen. Hosp. v. Blue Cross and Blue Shield Ass'n*, HCFA Dep. Adm'r Dec., [1985 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 34,529 (Dec. 19, 1984), *aff'g*, PRRB Hearing Dec. No. 85-D11 (CCH) ¶ 34,435 (Oct. 1, 1984), the appraised value of the facility was substantially higher than the sales price ($4.3 million vs. $3.1

million).  Nevertheless, the Deputy Administrator found that the hospital sale "was *bona fide*, *i.e.*, consummated between informed buyer and seller bargaining at arms-length."  The Deputy Administrator stated that regulations addressing allocation of purchase price were not intended "to require an appraiser to document or impute a fair market value when they are set out in the contract.   The sale price agreed upon by the parties is the real market value; further documentation is superfluous."  The Deputy Administrator's decision was affirmed by the  Court of Appeals.  *Vallejo Gen. Hosp. v. Bowen*, 851 F.2d 229 (9th Cir. 1998).  *See also, Lake Med. Ctr.,* 243 F.3d at 570-71 (reflecting HCFA's recognition of loss, even though $14.4 million sales price was less than $17 million appraised value of assets); *Whitecliff, Inc.  v. Shalala,* 20 F.3d 488, 489-90, n.1, 493-94 (D.C. Cir. 1994) (Congress endorsed Secretary's regulations requiring recognition of gain or loss based on comparison of sales price and asset's depreciated book value).

In short, the reasonable consideration requirement is nothing more than a late-arriving justification to deny losses on mergers and consolidations.  In none of the authorities discussed above is there any mention of the requirements that the Administrator would impose – reasonable compensation or demonstrated efforts to maximize purchase price.  As a result of assumption of its liabilities, Iowa Lutheran Hospital received valuable consideration of over $28 million, including more than $6.8 million for its depreciable assets (A.R. 167-68, 190, 902).  There was no defect in title or any other reason not to hold the sale (A.R. 190).  Accordingly, if, as the Administrator implies, a merger is a "sale," then this transaction  was a "*bona fide* sale" because it was entered into in good faith, was between unrelated parties, and passed good title to hospital assets in exchange for valuable consideration (A.R. 183-84, 190; *see also* A.R. 315-16, 323) (Intermediary does not dispute that parties acted in good faith and negotiated on own behalf).

        c.       The Record Does Not Support The Administrator's Determination That Iowa Lutheran Hospital Received Inadequate Compensation For Its Depreciable Assets

The Administrator stated that Iowa Methodist Medical Center assumed Iowa Lutheran Hospital's liabilities of $28,092,831 and received $41,093,761 in cash and Iowa Lutheran Hospital's physical assets (A.R. 29). The Administrator then applied the entire $28 million consideration against Iowa Lutheran Hospital's assets other than its physical assets. After doing so, the Administrator stated that "the surviving entity received cash/liquid assets of approximately $14 million and the value of physical assets which were in excess of the liabilities assumed." (A.R. 29) The Administrator concluded that "[t]his does not on its face, in the Administrator's view, support a finding that [Iowa Lutheran Hospital] transferred assets for reasonable consideration and as a result of a bona fide sale" (*Id.*).

As demonstrated above, HCFA has previously rejected assertions that a loss should be disallowed because the value of current assets transferred exceeded total consideration paid, even when the transaction was a purchase and sale of assets and *bona fide* sale requirements were clearly applicable (*see* pp. 31-32). Additionally, as discussed previously, Director Booth would require recognition of a loss on consolidation even though the consideration received was less than the value of the cash and current assets transferred by a hospital to the consolidated entity, and substantially less than the book value of that hospital's total assets (A.R. 876). In fact, this was not the case here. The $41,093,761 referred to by the Administrator reflects the net book value of all of Iowa Lutheran Hospital's assets other than its physical assets, plus its construction in progress (A.R. 902-03), not just "cash" as the Administrator stated.

Moreover, the Administrator's analysis does not reflect the calculation of Iowa Lutheran Hospital's Medicare loss claim, or Medicare program policy on which it was based. While Iowa Lutheran Hospital's initial cost report claim had assigned the entire consideration received to

- 34 -

assets other than property, plant and equipment ("PP&E"), Iowa Lutheran Hospital recomputed

its loss based on a subsequent HCFA regulatory interpretation (A.R. 679-80) requiring that total

consideration be allocated proportionately among all transferred assets reflecting their relative

fair market values (A.R. 236-39, 250-53, 898, 902). This resulted in assignment of more than

$10 million consideration to Iowa Lutheran Hospital's PP&E and more than $6.8 million to its

depreciable assets (A.R. 236-37, 898, 902). The allocation methodology used by the

Administrator to assert that Iowa Lutheran Hospital "disposed of the depreciable property for no

consideration" (A.R. 30) was contrary to Medicare regulations addressing allocation of

consideration (A.R. 679-80). Iowa Lutheran Hospital did not give away those assets for nothing

as the Administrator asserts (*See generally,* A.R. 220) (no intent by Iowa Lutheran Hospital to

donate assets).

Finally, economic reasonableness of a statutory merger cannot be fairly evaluated based

solely on pre-transaction financial statements. They did not reflect the actual fair market value

of Iowa Lutheran Hospital's assets; a possible change in Iowa's Medicaid payment formula that

would result in significant financial losses from behavioral and mental health care; the

substantial doubt that Iowa Lutheran Hospital might survive independently; and that to remain

viable, it would have to significantly upgrade its physical facilities, which expenditure it was

unable to finance.[8] Similarly, financial statements reflect only known liabilities. Iowa Hospital

Corporation assumed all of Iowa Lutheran Hospital's liabilities and obligations, including those

which were unknown, potential, or contingent and which were not reflected on its financial

statements, such as potential liability for recoupment of previously received Medicare

reimbursement and civil monetary penalties, and claims unrelated to Medicare, for example,

---

[8] Iowa Lutheran Hospital's appraised Business Enterprise Value was $35.5 million (*see* A.R. 937), not $64,949,110 as stated by the Administrator (A.R. 29, n.45). That figure includes non-operating assets (subsidiaries) (A.R. 937, 972).

environmental- or employment-related claims, which were not necessarily discoverable through due diligence (A.R. 190-93). Thus, while under Medicare principles, Iowa Lutheran Hospital received consideration of $28,092,831, reflecting Iowa Hospital Corporation's assumption of Iowa Lutheran Hospital's stated liabilities – the potential economic benefit to Iowa Lutheran Hospital (and the potential economic cost to Iowa Hospital Corporation) were substantially greater. The Administrator's failure to recognize this makes its analysis incomplete and unsound.

>5.    HCFA Failed To Explain Its Departure From Previous Agency Policy As Required, And The Administrator's Decision Was Otherwise Arbitrary And Capricious

In contrast to previous agency interpretations – providing that a statutory merger was between unrelated parties if the merging entities were unrelated at the time of the transaction – relying on the terms of the PM, the Administrator determined that the statutory merger was a related party transaction based on control over the surviving entity, Iowa Hospital Corporation, as it existed after the transaction (A.R. 26-27). Similarly, without any attempt to reconcile his position with previous agency interpretations – which reflected no such requirement – the Administrator disallowed Iowa Lutheran Hospital's loss on merger claim because it did not satisfy criteria for *bona fide* sales as required by the PM (A.R. 28-30).

An agency may depart from its own policies and precedents only when it has provided a rational explanation for its departure. *National Fed'n of Fed. Employees v. Federal Labor Relations Auth.,* 412 F.3d 119, 124 (D.C. Cir. 2005) (agency must follow own precedent or provide reasoned explanation for departure); *New York Cross Harbor R.R. v. Surface Transp. Bd.,* 324 F.3d 1177, 1181 (D.C. Cir. 2004) (reasoned analysis required for agency to change course); *Telecommunications Research and Action Ctr. v. Federal Communications Comm'n,* 800 F.2d 1181, 1184 (D.C. Cir. 1986) (agency that changes or departs from existing policies must articulate reasoned explanation for departure). *See also Yale-New Haven Hosp. v. Leavitt,*

470 F.3d 71, 79-87 (2nd Cir. 2006) (provision in Medicare manuals held unenforceable when Secretary failed to supply contemporaneous explanation for changed payment practices). Such a rational explanation for HCFA's change in policy is found in neither the PM nor the Administrator's decision.

In requiring recognition of Iowa Lutheran Hospital's loss, the PRRB relied on the MIM provisions addressing statutory mergers and letters from HCFA Directors Booth and Goeller (A.R. 66-67). However, the PM on which the Administrator's decision was based failed to acknowledge that it made any change in Medicare policy. Similarly, the Administrator did not address the HCFA letters in the Discussion or Findings sections of his decision, and made brief reference to the MIM provision only, ignoring its example requiring recognition of a gain or loss when merging entities were unrelated (A.R 20, 24-30).

The only attempt to explain application of the continuity of control rule – contrary to HCFA's previous application of related party principles to statutory mergers and consolidations – is HCFA's assertion that the statutory merger regulation was written to address for-profit providers, and non-profit entities might enter into mergers or consolidations for different reasons (A.R. 17-18).[9] However, each of HCFA's previous interpretations addressed a transaction involving non-profit entities, or applied to such transactions (A.R. 314, 594, 602, 604; *see also,* A.R. 257, 266, 267, 271-73, 281, 290, 295-96) (testimony that regulation and MIM provision addressing consolidations applied to transactions involving for-profit and non-profit entities). Accordingly, HCFA has provided no good explanation why the previous agency interpretations should not stand, and particularly why they should not be applied to the statutory merger in

---

[9] The Secretary bears a heavy burden in effectively requiring non-profit entities to satisfy additional requirements which for-profit entities are not required to satisfy. *See generally Diplomat Lakewood, Inc. v. Harris*, 613 F.2d 1009 (D.C. Cir. 1979) (Regulations imposing different cost finding methods on nursing homes compared to hospitals and hospital-nursing home complexes, without support for distinction, were unlawful).

which Iowa Lutheran Hospital participated. While these interpretations no longer served HCFA's financial interest once hospitals increasingly received less than Medicare net book value for their assets, HCFA's previous interpretations reflected the regulation's plain terms. There was no change in the statute or regulations that would permit the same regulatory terms to be given a different meaning. Moreover, the agency's failure to attempt to reconcile its new policy with previous policy requires a finding that the Administrator's decision was arbitrary and capricious. *See INS v. Yueh-Shaio Yang,* 519 U.S. 26, 32 (1966) (irrational departure from prior policy, as opposed to avowed alteration, may be arbitrary and capricious); *National Fed'n.,* 412 F.3d at 121 (agency acts arbitrarily and capriciously when it ignores relevant precedent.

6.    The Administrator's Determination Was Contrary To Statutory Provisions
Fixing Medicare Recapture Policy As Of June 1, 1984

As set forth above, the Deficit Reduction Act of 1984 required Medicare to recapture depreciation under reimbursement policies in effect on June 1, 1984. *See* 42 U.S.C. § 1395x(v)(1)(O); H.R. REP. NO. 98-861, at 1338 (1984) (Conf. Rep.), *reprinted in* 1984 U.S.C.C.A.N. 697, 2026. *See generally Whitecliff,* 20 F.3d at 489-90, n.1, 493-94. The Secretary has continuously recognized that the 1984 statutory mandate applies to transactions resulting in both gains and losses. 57 Fed. Reg. 43,906, 43,907, 43,915 (Sept. 23, 1992). *See Lake Med. Ctr.,* 243 F.3d at 570 ("Both parties agree that even though [DEFRA provision] refers only to 'recapture' it applies not only to transactions resulting in a gain but also a loss"). The policies on which the Administrator relied were contrary to those in effect on June 1, 1984, which required recognition of a gain or loss if the merging entities were unrelated parties (*see* A.R. 263, 290). Therefore, denial of Iowa Lutheran Hospital's loss claim violated the Medicare statute.

B.    The Administrator's Determination Reflected An Impermissible Retroactive
       Application Of A New Payment Standard

The MIM and letters from Directors Goeller and Booth – which the PRRB found were "indication[s] of the CMS' interpretation of the statutory merger regulation" (A.R. 66) – demonstrate individually, and particularly collectively, that the policies used to deny Iowa Lutheran Hospital's loss were not in effect on November 22, 1993, the date of the transaction. The Intermediary was unable to identify any document existing as of that date that supported disallowance of Iowa Lutheran Hospital's loss claim (A.R. 316; *see also* 319-20, 323, 326). The Secretary is prohibited from changing substantive standards governing which costs could be reimbursed by Medicare after the costs were incurred, which is precisely what occurred in this matter. *Bowen v. Georgetown*, 488 U.S. 204 (1988). *See also, Marrie v. Securities and Exchange Comm'n,* 374 F.3d 1196, 1207 (D.C. Cir. 2004) (rule clarifying that good faith was insufficient defense to SEC administrative charge imposed new legal consequences and duties and could not be applied retroactively); *Yale-New Haven Hosp.,* 470 F.3d at 87 n.16 (court will not require Secretary to make Medicare payments based on subsequently-published regulation); *Caruso v. Blockbuster-Sony Music Entm't Ctr.,* 193 F.3d 730, 737 (3rd Cir. 1999) ("[a]n agency is not allowed to change a legislative rule retroactively through the process of disingenuous interpretation of the rule to mean something other than its original meaning").[10]

_____

[10] The majority's dicta in *Health Ins. Ass'n of Am. v. Shalala,* 23 F.3d 412, 424-25 (D.C. Cir. 1994) permitting retroactive application of agency policies related to adjudicatory proceedings is not to the contrary. The agency's new interpretations of the statutory merger regulation did not arise out of an adjudicatory proceeding. The Administrator merely applied principles set forth in the PM to a particular statutory merger transaction. Given the fact that, generally, the exclusive means for a Medicare provider to challenge an agency Medicare payment policy is through agency adjudication, *see Your Home Visiting Nurse Servs. v. Shalala,* 525 U.S. 449, 456 (1999), a contrary position would provide HCFA with virtually unfettered discretion to develop new policy statements and to apply them retroactively. *Cf. Shell Offshore Inc. v. Babbatt,* 238 F.3d

C.    The Administrator's Determination Was Contrary To Procedural Requirements Under The APA And Medicare Statute

    1.    APA And Medicare Publication And Notice And Comment Requirements

Under the APA, substantive rules, and statements of general policy or interpretations, of general applicability, which change existing law or policy require publication in the Federal Register before being given effect.  5 U.S.C. § 552(a)(1)(D).  Additionally, an agency rule must be subject to public notice and comment before issuance.  5 U.S.C. § 553(b), (c).  While "interpretative" rules are exempt from these requirements, 5 U.S.C. § 553(b)(3)(A), a rule is not "interpretative" if it adds substantive content, such as the new requirements that HCFA imposed before a loss on statutory merger would be recognized.  *See American Hospital Ass'n v. Bowen*, 834 F.2d 1037, 1045-46 (D.C. Cir. 1987).  Additionally, even if an agency pronouncement may be characterized as interpretive, once an agency has interpreted a regulation, generally, the interpretation can be changed only through rulemaking.  *See Monmouth Med. Ctr. v. Thompson*, 257 F.3d 807, 813-14 (D.C. Cir. 2001).

    The Medicare statute also requires notice and comment rulemaking when a substantive legal standard governing Medicare payments is established or changed. 42 U.S.C. §§ 1395hh(a)(2), (b).   The statutory requirement would apply  to  "any policy that had an  effect . . . on the payment methodology or amount of payment for services . . ."  H.R. REP. NO. 100-391, at 430 (1987), *reprinted in* 1987 U.S.C.C.A.N. 2313-1, 2313-250.  *See generally Monmouth Med. Ctr.,* 257 F.3d at 814.

    The Administrator's decision reflected application of a new rule included in the PM that required disallowance of a loss on statutory merger based on continuity of control and

_____
622, 627-28 (5th Cir. 2001) (when adjudication resulted from agency's previous policy change, APA rulemaking required).

requirements for *bona fide* sales.  Notwithstanding the agency's characterization of the PM as a

"clarification," the PM did not restate existing agency policy or clarify any ambiguous term in

the applicable regulation.  *See generally United States Telecom Assoc'n. v. Fed. Commc'ns*

*Comm.*, 400 F.3d 29, 35  (D.C. Cir. 2005) (APA bars courts from permitting agencies to avoid

rulemaking requirements by calling "substantive regulatory change an interpretative rule").

Additionally, even if it might be characterized as interpretive, the PM changed the interpretation

of the Medicare regulation addressing statutory mergers as reflected in the MIM and other HCFA

guidance.  The MIM standing alone is sufficiently authoritative to require the Secretary to

engage in rulemaking before a regulatory interpretation set forth therein can be changed.  *See*

*Paralyzed Veterans of America v. D.C. Arena L.P.,* 117 F.3d 579, 587 (D.C. Cir. 1997)

(technical assistance manual would be sufficiently "authoritative"); *Ball Mem'l Hosp. v. Leavitt,*

2006 WL 2714920 (D.D.C. 2006) (Medicare Program Memorandum that changed informal

regulatory interpretation reflected in CMS *form* held invalid based on agency's failure to comply

with rulemaking requirements); *Iyengar v. Barnhart,* 233 F. Supp. 2d 5, 14 (D.D.C. 2002)

(agency's change in regulatory interpretation included in operations manual required notice and

comment). Because the PM was not developed in accordance with procedural requirements, the

policies set forth therein cannot be used to deny Iowa Lutheran Hospital's loss claim.

## 2. The Small Business Regulatory Enforcement Fairness Act of 1996

The Small Business Regulatory Enforcement Fairness Act of 1996, otherwise known as

the Congressional Review of Agency Rule Making Act ("CRA"), was enacted to provide a

legislative check on administrative agency actions, particularly agency power to set policy.  5

U.S.C. § 801-808.  *See generally* Morton Rosenberg, *Whatever Happened To Congressional*

*Review of Agency Rulemaking?  A Brief Overview, Assessment, and Proposal for Reform*, 51

ADMIN. L. REV. 1051, 1052-74 (1999).  Under CRA, "[b]efore a rule can take effect," the agency

must submit a report to the Comptroller General and to Congress, including a copy of the rule and related information.  5 U.S.C. § 801(a)(1).  Additionally, with limited exceptions, a "major rule" cannot be put into effect until sixty days after Congress' receipt of the report.  5 U.S.C. § 801(a)(3).  CRA defines "rule" by incorporating the APA definition, with limited exceptions. 5 U.S.C. § 804(3).

Under the APA, a "rule" means "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency . . . ." 5 U.S.C. § 551(4).  This includes virtually every statement that an agency may make.  *Avoyelles Sportsmen's League v. Marsh,* 715 F.2d 897, 908 (D.C. Cir. 1983).  The APA's broad definition of rule was selected because Congress recognized that various agencies circumvented APA notice and comment requirements by attempting to give legal effect to "general statements of policy, 'guidelines,' and agency policy and procedure manuals" that were exempt from those requirements. 142 CONG. REC. E571, E578 (daily ed. Apr. 19, 1996) (Explanatory Statement of House Sponsor).  Thus, CRA applies to "rules" that are otherwise exempt from APA publication or notice and comment requirements. 142 CONG. REC. E571, E578; *see also* 142 CONG. REC. S3683, S3687 (daily ed. Apr. 18, 1996) (Joint Explanatory Statement of Senate Sponsors).

A rule is considered "major" if the Office of Management and Budget  find that it results in an annual effect on the economy of $100 million or more.  5 U.S.C. § 804(2).  HCFA's new rule requiring disallowance of a loss on statutory merger or consolidation based on continuity of control and *bona fide* sale requirements is a "rule" and "major rule" under CRA.  The Secretary's

failure to submit to Congress a copy of the rule violated CRA. Accordingly, the rule never

became effective, and its use to deny Iowa Lutheran Hospital's loss claim was impermissible.[11]

While the statute precludes judicial review of any related "determination, finding, action,

or omission" under CRA, 5 U.S.C. § 805, this provision does not prevent the court from

---

[11] As reflected in published administrative decisions related to this issue, the $100 million threshold was clearly satisfied. *Iowa Lutheran Hospital v. BlueCross BlueShield Association/Cahaba Government Benefits Administration*, CMS Adm'r Dec., CCH ¶ 81,629 (Dec. 8, 2006), *rev'g* PRRB Hearing Dec. No. 2007-D1, CCH ¶81,616 (FYE 11/21/93; $5,400,000) (the action here at issue); *Cardinal Cushing Hospital Goddard Memorial Hospital v. Blue Cross and Blue Shield Association/Associated Hospital Services of Maine*, CMS Adm'r Dec., CCH ¶ 80,975 (Jan. 29, 2003), *rev'g* PRRB Hearing Dec. No. 2003-D6, CCH ¶ 80,950 (FYE 09/30/94; $3,605,839) (consolidation); *St. Clare's Hospital (Dover) v. Blue Cross Blue Shield Association/*Riverbend *Government Benefits Administrator*, CMS Adm'r Dec., CCH ¶ 81,262 (Nov. 12, 2004), *rev'g* PRRB Hearing Dec. No. 2004-D38, CCH ¶ 81,191 (FY 09/30/94; $34,000,000) (consolidation); *St. Joseph Medical Center v. Blue Cross Blue Shield Association, Blue Cross Blue Shield of Kansas*, CMS Adm'r Dec., CCH ¶ 81,092 (Nov. 25, 2003), *rev'g* PRRB Hearing Dec. No. 2003-D64, CCH ¶ 81,050 (FYE 9/30/95; $9,700,000) (consolidation); *AHS 96 Related Organization Costs-Group v. Blue Cross Blue Shield Association/Riverbend Government Benefits Administrator*, CMS Adm'r Dec., CCH ¶ 81,083 (Aug. 19, 2003), *rev'g* PRRB Hearing Dec. No. 2003-D34, CCH ¶81,020 (FYE 04/30/96; $107,319,029) (consolidation); *Robert F. Kennedy Medical Center v. Blue Cross/Blue Shield Association/United Government Services*, CMS Adm'r Dec., CCH ¶ 81,363 (Feb. 10, 2005), *rev'g* PRRB Hearing Dec. No. 2005-D9, CCH ¶81,277 (FYE 05/30/96; $4,300,000); *Jeanes Hospital v. Mutual of Omaha Insurance Company*, CMS Adm'r Dec., CCH ¶ 81,094 (Nov. 25, 2003), *rev'g* PRRB Hearing Dec. No. 2003-D62, CCH ¶81,048 (FYE 06/30/96; $16,338,246); *Sewickley Valley Hospital (SVH) and The Medical Center of Beaver (TMC) v. BlueCross BlueShield Association/Veritus Medicare Services*, CMS Adm'r Dec., CCH ¶ 81,727 (Apr. 23, 2007), *rev'g* PRRB Hearing Dec. No. 2007-D19, CCH ¶ 81,693 (FYE 10/31/96; $26,314,000) (consolidation); *Meridian Hospitals Corporation v. Blue Cross Blue Shield Association/Riverbend Government Benefits Administrator*, CMS Adm'r Dec., CCH ¶ 81,082 (Aug. 19, 2003), *rev'g* PRRB Hearing Dec. No. 2003-D35, CCH ¶81,021 (FYE 12/31/96; $35,015,745 Medicare; $5,118,328, Medicaid) (consolidation); *University of Pittsburgh Medical Center – St. Margaret Hospital v. BlueCross Blue Shield Association/Veritus Medicare Services*, CMS Adm'r Dec., CCH ¶ 81,546 (July 25, 2006), *rev'g* PRRB Hearing Dec. No. 2006-D23, CCH ¶81,529 (FY 02/28/97; $13,244,231); *Carolina Medicorp '97 Claimed Loss Disallowance Group v. Blue Cross and Blue Shield Association/Blue Cross and Blue Shield of North Carolina/Cahaba Government Benefits Administration – North Carolina*, PRRB Hearing Dec. No. 2007-D42, CCH ¶81,739 (June 15, 2007) (FY 06/30/97; $11,062,753); *Germantown Hospital and Medical Center v. Mutual of Omaha Insurance Company*, CMS Adm'r Dec., CCH ¶ 81,263 (Oct. 28, 2004), *rev'g* PRRB Hearing Dec. No. 2004-D36, CCH ¶81,189 (FY 08/31/97; $4,800,000). *See generally* 63 Fed. Reg. at 1381 (regulatory amendment eliminating gains and losses considered "major rule"); (A.R. 561) (HCFA Boston Regional Office estimates total loss claims of $100 million in Boston region).

invalidating agency action based on a rule that the agency failed to submit. *See United States v. Southern Ind. Gas & Electric Co.,* No. IP 99-1692-C-M/S, 2002 WL 31427523 at 4 (S.D. Ind. Oct. 24, 2002) (unpublished). *See also* 142 Cong. Rec. E577 ("The limitation on judicial review in no way prohibits a court from determining whether a rule is in effect . . . . [T]he committees expect that a court might recognize that a rule has no legal effect due to the operation of sections 801(a)(1)(A) or 801(a)(3)"); 142 Cong. Rec. S3686 (recognizing court's authority to determine that legal rule was without legal effect based on non-compliance with CRA); *Rosenberg* at 1071-74.

VI.    <u>CONCLUSION</u>

Iowa Lutheran Hospital's Motion for Summary Judgment should be granted and the Secretary's final administrative decision should be reversed.  This court should require the Secretary to reimburse Plaintiff for Iowa Lutheran Hospital's loss on statutory merger as claimed, and award other relief prayed for in its complaint, including interest in accordance with 42 U.S.C. § 1395oo(f)(2).

Respectfully submitted,

CENTRAL IOWA HOSPITAL
CORPORATION,   successor-in-interest   to
IOWA LUTHERAN HOSPITAL


_____/s/_____
Stephen D. Charnoff (D.C. Bar #502324)
Harold Belkowitz (D.C. Bar #449800)
Ober, Kaler, Grimes & Shriver
A Professional Corporation
1401 H Street, N.W.
Suite 500
Washington, D.C. 20005-3324
(202) 408-8400

OF COUNSEL:

Robert E. Mazer
Ober, Kaler, Grimes & Shriver
A Professional Corporation
120 East Baltimore Street
Baltimore, Maryland 21202-1643
(410) 685-1120

Dated at Washington, D.C.
this 25th day of July, 2007

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 25th day of July, 2007,  a copy of the forgoing

Memorandum of Points and Authorities In Support of Plaintiff's Motion for Summary Judgment

was served by certified United States mail, postage prepaid, return receipt requested upon:

> Joel McElvain
> United States Department of Justice
> Civil Division, Federal Programs Branch
> Room 7130
> 20 Massachusetts Avenue, N.W.
> Washington, D. C. 20001


> _____/s/_____
> Stephen D. Charnoff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTRAL IOWA HOSPITAL CORPORATION, successor-in-interest to IOWA LUTHERAN HOSPITAL, | |
| Plaintiff, | CASE NO.: 1:07-CV-00295-RWR |
| v. | |
| MICHAEL O. LEAVITT, as Secretary of Health and Human Services, | |
| Defendant. | |

STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE

Plaintiff Central Iowa Hospital Corporation, successor-in-interest to Iowa Lutheran Hospital, by its undersigned attorneys, hereby files this Statement Of Material Facts As To Which There Is No Genuine Issue.

1.      Prior to the statutory merger described below, Iowa Lutheran Hospital was controlled by its governing board (Administrative Record ("A.R.") 183, 220-21).

2.      Prior to the statutory merger described below, it was doubtful whether Iowa Lutheran Hospital would survive as an independent hospital (A.R. 214-18, 224-35, 460-61, 478).

3.      Prior to the statutory merger described below, Iowa Lutheran Hospital's charges were higher than those of the two larger hospitals that dominated the market (A.R. 428-31).

4.      Prior to the statutory merger described below, Iowa Lutheran Hospital's physical plant was nearly twice as old as that of the larger hospitals referred to in the preceding paragraph (A.R. 211-12, 428-30, 432, 440, 454).

5.      Prior to the statutory merger described below, Iowa Lutheran Hospital recognized that it had to upgrade its facilities in order to remain competitive (A.R. 213, 215, 437-38).

6.     Prior to the statutory merger described below, Iowa Lutheran Hospital's master facility plan required an estimated $49 million of construction; estimated minimum capital expenditures over the next five years exceeded $70 million; and its chief executive officer believed that nearly $90 million would actually be required (A.R. 215-16, 232, 443-47).

7.     Iowa Lutheran Hospital determined that because it had a debt capacity of only $28.5 million, it would be unable to finance the upgrade of its facilities and expansion of services required to continue as an independent hospital (A.R. 213-16, 440-41, 460).

8.     Iowa Lutheran Hospital determined that Iowa Methodist Medical Center was the most complementary facility in Des Moines with which it might merge (A.R. 211-12, 219-20, 480-88).

9.     Arm's-length negotiations between Iowa Lutheran Hospital and Iowa Methodist Medical Center resulted in an agreement for the two entities to merge (A.R. 184-85, 200-01, 220).

10.     Effective November 22, 1993, Iowa Lutheran Hospital merged into Iowa Methodist Medical Center (A.R. 185-88, 356-75, 1225; *see also* A.R. 511).   The transaction was a statutory merger between Iowa Lutheran Hospital and Iowa Methodist Medical Center under Iowa law (*Id.)*.

11.     As a result of the statutory merger, Iowa Methodist Medical Center succeeded to Iowa Lutheran Hospital's assets and became legally responsible for all of its liabilities (A.R. 185-88, 190-91, 315).

12.     Iowa Methodist Medical Center changed its name to Iowa Health System Hospital Corporation ("Iowa Hospital Corporation") (A.R. 385).

13.     The statutory merger was entered into in good faith and passed good title to Iowa Lutheran Hospital assets to Iowa Hospital Corporation (A.R. 183-84, 190, 315-16, 323).

14.     As a result of the statutory merger, Iowa Lutheran Hospital ceased to exist (A.R. 185-88, 204, 356-75, 1225; *see also* A.R. 511).

15.     Effective August 7, 1995, Iowa Hospital Corporation changed its name to Central Iowa Hospital Corporation (A.R. 235).

16.     Following the merger, Iowa Methodist Medical Center's sole member, Iowa Methodist Health System, remained the sole member of Iowa Hospital Corporation.   Iowa Methodist Health System's name was changed to Iowa Health System (A.R. 185-86, 377).

17.     At the time the statutory merger transaction was negotiated, related documents were executed, and the statutory merger occurred, Iowa Lutheran Hospital and Iowa Methodist Medical Center were not subject to common ownership or common control (A.R. 183-84, 193, 205, 302, 315, 320).

18.     Following the merger, control over Iowa Hospital Corporation was held by individuals who had been part of Iowa Methodist Health System (A.R. 223, 230-33).

19.     Iowa Methodist Health System's Board Chairman and President became the Chairman and President of Iowa Health System and Iowa Hospital Corporation (A.R. 369, 372).

20.     Following the merger, Iowa Hospital Corporation's post-transaction governing board had nineteen members, eight of whom had served previously on Iowa Lutheran Hospital's governing board  (A.R. 186, 193).

21.     Following the merger, Iowa Health System's governing board had twenty-three individuals, ten of whom had served previously on Iowa Lutheran Hospital's governing board (A.R. 186, 193).

22.     Iowa Methodist Health System controlled one more seat on Iowa Health System's post-transaction governing board than Iowa Lutheran Hospital (A.R. 352).

23.     No individual could significantly influence or control Iowa Lutheran Hospital before the transaction and Iowa Hospital Corporation afterwards (A.R. 221-23, 284-87, 295, 321).

24.     There was no relationship among former members of Iowa Lutheran Hospital's board who became members of Iowa Health System's board; they did not reflect a single ideology or approach to issues, and there was no indication that they would vote as a block (A.R. 221-22).

25.     As a result of the statutory merger, Iowa Lutheran Hospital received $28,092,831 compensation for its assets, reflecting its liabilities that passed to Iowa Hospital Corporation. Iowa Lutheran Hospital assigned $6,819,713 to depreciable assets, which had a Medicare net book value of $26,571,959.  Iowa Lutheran Hospital incurred a loss of $19,752,246 on depreciable assets.  Medicare's portion of the loss was $5,423,196, reflecting Medicare's relative use of the facility during the period in which Iowa Lutheran Hospital's assets were used to furnish patient care services (A.R. 167-68, 190, 236-37, 902).

26.     Iowa Lutheran Hospital claimed reimbursement for Medicare's share of the loss on depreciable assets related to the statutory merger (A.R. 236, 898).

27.     The Secretary's Intermediary determined that Iowa Lutheran Hospital's merger with Iowa Methodist Medical Center was between related parties and disallowed the loss claim (A.R. 1231, 1246, 1535).  The Intermediary found that the statutory merger had caused Iowa Lutheran Hospital to become related to Iowa Methodist Medical Center based principally on the composition of Iowa Hospital Corporation's governing board and its senior officers after the transaction, and provisions for distribution of assets upon a corporate dissolution (A.R. 298, 1244-46).

28.    The Health Care Financing Administration's rule requiring disallowance of a loss on statutory merger or consolidation based on continuity of control and *bona fide* sale requirements set forth in its Program Memorandum has an annual impact of $100 million or more. *Iowa Lutheran Hospital v. BlueCross BlueShield Association/Cahaba Government Benefits Administration*, CMS Adm'r Dec., CCH ¶ 81,629 (Dec. 8, 2006), *rev'g* PRRB Hearing Dec. No. 2007-D1, CCH ¶ 81,616 (FYE 11/21/93; $5,400,000) (the action here at issue); *Cardinal Cushing Hospital Goddard Memorial Hospital v. Blue Cross and Blue Shield Association/Associated Hospital Services of Maine*, CMS Adm'r Dec., CCH ¶ 80,975 (Jan. 29, 2003), *rev'g* PRRB Hearing Dec. No. 2003-D6, CCH ¶ 80,950 (FYE 09/30/94; $3,605,839) (consolidation); *St. Clare's Hospital (Dover) v. Blue Cross Blue Shield Association/*Riverbend *Government Benefits Administrator*, CMS Adm'r Dec., CCH ¶ 81,262 (Nov. 12, 2004), *rev'g* PRRB Hearing Dec. No. 2004-D38, CCH ¶ 81,191 (FY 09/30/94; $34,000,000) (consolidation); *St. Joseph Medical Center v. Blue Cross Blue Shield Association, Blue Cross Blue Shield of Kansas*, CMS Adm'r Dec., CCH ¶ 81,092 (Nov. 25, 2003), *rev'g* PRRB Hearing Dec. No. 2003-D64, CCH ¶ 81,050 (FYE 9/30/95; $9,700,000) (consolidation); *AHS 96 Related Organization Costs-Group v. Blue Cross Blue Shield Association/Riverbend Government Benefits Administrator*, CMS Adm'r Dec., CCH ¶ 81,083 (Aug. 19, 2003), *rev'g* PRRB Hearing Dec. No. 2003-D34, CCH ¶ 81,020 (FYE 04/30/96; $107,319,029) (consolidation); *Robert F. Kennedy Medical Center v. Blue Cross/Blue Shield Association/United Government Services*, CMS Adm'r Dec., CCH ¶ 81,363 (Feb. 10, 2005), *rev'g* PRRB Hearing Dec. No. 2005-D9, CCH ¶ 81,277 (FYE 05/30/96; $4,300,000); *Jeanes Hospital v. Mutual of Omaha Insurance Company*, CMS Adm'r Dec., CCH ¶ 81,094 (Nov. 25, 2003), *rev'g* PRRB Hearing Dec. No. 2003-D62, CCH ¶ 81,048 (FYE 06/30/96; $16,338,246); *Sewickley Valley Hospital (SVH) and The Medical Center of Beaver (TMC) v. BlueCross BlueShield Association/Veritus Medicare Services*, CMS

Adm'r Dec., CCH ¶ 81,727 (Apr. 23, 2007), *rev'g* PRRB Hearing Dec. No. 2007-D19, CCH ¶ 81,693 (FYE 10/31/96; $26,314,000) (consolidation); *Meridian Hospitals Corporation v. Blue Cross Blue Shield Association/Riverbend Government Benefits Administrator*, CMS Adm'r Dec., CCH ¶ 81,082 (Aug. 19, 2003), *rev'g* PRRB Hearing Dec. No. 2003-D35, CCH ¶ 81,021 (FYE 12/31/96; $35,015,745 Medicare; $5,118,328, Medicaid) (consolidation); *University of Pittsburgh Medical Center – St. Margaret Hospital v. BlueCross Blue Shield Association/Veritus Medicare Services*, CMS Adm'r Dec., CCH ¶ 81,546 (July 25, 2006), *rev'g* PRRB Hearing Dec. No. 2006-D23, CCH ¶ 81,529 (FY 02/28/97; $13,244,231); *Carolina Medicorp '97 Claimed Loss Disallowance Group v. Blue Cross and Blue Shield Association/Blue Cross and Blue Shield of North Carolina/Cahaba Government Benefits Administration – North Carolina*, PRRB Hearing Dec. No. 2007-D42, CCH ¶ 81,739 (June 15, 2007) (FY 06/30/97; $11,062,753); *Germantown Hospital and Medical Center v. Mutual of Omaha Insurance Company*, CMS Adm'r Dec., CCH ¶ 81,263 (Oct. 28, 2004), *rev'g* PRRB Hearing Dec. No. 2004-D36, CCH ¶ 81,189 (FY 08/31/97; $4,800,000).

Respectfully submitted,

CENTRAL IOWA HOSPITAL
CORPORATION, successor-in-interest to
IOWA LUTHERAN HOSPITAL


_____/s/_____
Stephen D. Charnoff (D.C. Bar #502324)
Harold Belkowitz (D.C. Bar #449800)
Ober, Kaler, Grimes & Shriver
A Professional Corporation
1401 H Street, N.W.
Suite 500
Washington, D.C. 20005-3324
(202) 408-8400


Plaintiff's Attorneys

OF COUNSEL:

Robert E. Mazer
Ober, Kaler, Grimes & Shriver
A Professional Corporation
120 East Baltimore Street
Baltimore, Maryland 21202-1643
(410) 685-1120

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 25th day of July, 2007, a copy of the forgoing

Plaintiff's Statement of Material Facts To Which There Is No Genuine Issue was served by

certified United States mail, postage prepaid, return receipt requested upon:

Joel McElvain
United States Department of Justice
Civil Division, Federal Programs Branch
Room 7130
20 Massachusetts Avenue, N.W.
Washington, D. C. 20001


_____
              /s/
Stephen D. Charnoff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CENTRAL IOWA HOSPITAL
CORPORATION, successor-in-interest to
IOWA LUTHERAN HOSPITAL,

      Plaintiff,

          v.

MICHAEL O. LEAVITT, as Secretary of
Health and Human Services,

      Defendant.

CASE NO.: 1:07-CV-00295-RWR

---

[PROPOSED] ORDER

Upon consideration of the parties' contentions, it is hereby

ORDERED that:

1.      The Plaintiff's Motion for Summary Judgment is granted, and that the Defendant's Motion for Summary Judgment is denied;

2.      The decision of the Secretary is reversed and set aside;

3.      The case is remanded to the Secretary with direction that Plaintiff be paid $5,423,196 Medicare reimbursement for the loss Iowa Lutheran Hospital incurred on its statutory merger;

4.      The Plaintiff receives interest on the amount in controversy, as provided by 42 U.S.C. § 1395oo(f)(2);

5.      The costs of this suit incurred by Plaintiff shall be reimbursed by the Secretary; and

6.      The Plaintiff receives such other and further relief as the Court may deem just and proper under the circumstances.

Dated:_____, 2007

_____
Richard W. Roberts
United States District Judge