IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CENTRAL IOWA HOSPITAL CORPORATION,    )
successor-in-interest to Iowa Lutheran Hospital,    )
    )
    Plaintiff,    )
    )
    v.    )    Case No. 1:07-cv-00295-RWR
    )
MICHAEL O. LEAVITT, as Secretary of Health    )
and Human Services,    )
    )
    Defendant.    )

## DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, the defendant,

Michael O. Leavitt, as Secretary of Health and Human Services, moves this Court for an

order awarding summary judgment in his favor.

The grounds in support of this motion are set out more fully in the accompanying memorandum.

Dated: August 24, 2007

Of Counsel:

DANIEL MERON
General Counsel

KATHLEEN H. McGUAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate General
   Counsel for Litigation

DAVID HOSKINS
Attorney
Office of the General Counsel
U.S. Department of Health
   and Human Services

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

   /s/ Joel McElvain
SHEILA M. LIEBER
Deputy Director
JOEL McELVAIN, D.C. Bar # 448431
Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7130
Washington, D.C. 20001
Telephone:  (202) 514-2988
Fax:        (202) 616-8202
Email:     Joel.L.McElvain@usdoj.gov

*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CENTRAL IOWA HOSPITAL CORPORATION, successor-in-interest to Iowa Lutheran Hospital, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:07-cv-00295-RWR |
| MICHAEL O. LEAVITT, as Secretary of Health and Human Services, | ) ) ) | |
| Defendant. | ) ) ) | |

**MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT, AND IN SUPPORT
OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Of Counsel:

DANIEL MERON
General Counsel

JANICE HOFFMAN
Acting Associate General Counsel

MARK D. POLSTON
Deputy Associate General
   Counsel for Litigation

DAVID HOSKINS
Attorney
Office of the General Counsel
U.S. Department of Health
   and Human Services

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

SHEILA M. LIEBER
Deputy Director
JOEL McELVAIN, D.C. Bar No. 448431
Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7130
Washington, D.C. 20001
Telephone:  (202) 514-2988
Fax:        (202) 616-8202
Email:     Joel.L.McElvain@usdoj.gov

*Attorneys for the Defendant*

# TABLE OF CONTENTS

**Page**

Preliminary statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    Statutory and regulatory framework . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.    Factual background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    C.    Procedural history . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

I.    This Court owes deference to the Secretary's interpretation of his
own regulations, and to the Administrator's factual findings . . . . . . . . . . . . . . . 14

II.    The loss claim must be disallowed because the merger was not
a bona fide sale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    A.    A provider may realize a Medicare loss from a merger
only if the transaction qualifies as a bona fide sale . . . . . . . . . . . . . . . . . 16

    B.    Substantial evidence supports the Administrator's
finding that the merger was not a bona fide sale . . . . . . . . . . . . . . . . . . . 23

III.    The loss claim must be disallowed because the merger was
between related parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    A.    A provider may realize a Medicare loss from a merger only
if it does not retain a significant power of control over
the surviving entity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    B.    Substantial evidence supports the Administrator's finding that
Lutheran retained a significant power of control over Central Iowa . . . . . 31

IV.    The Secretary is permitted to interpret his own regulations, and
deference is owed to that interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

    A.    The Secretary has not changed his interpretation of his
regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

**<u>Page</u>**

    B.     The Secretary has provided a reasoned explanation for
          his interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36

    C.     The Secretary was not required to follow APA rulemaking
          procedures to announce his interpretation of his existing
          regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38

    D.     The Deficit Reduction Act of 1984 does not prohibit the Secretary
          from interpreting his regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   41

    E.     The Congressional Review Act does not prohibit the Secretary
          from interpreting his regulations  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44

## TABLE OF AUTHORITIES

**Page**

**Cases:**

*Air Transp. Ass'n v. FAA*, 291 F.3d 49 (D.C. Cir. 2002) ................................ 38, 39
*Alaska Prof'l Hunters Ass'n v. FAA*, 177 F.3d 1030 (D.C. Cir. 1999) ................ 39
\*   *Albert Einstein Med. Ctr. v. Leavitt*, 2007 WL 2221417
      (E.D. Pa. Aug. 1, 2007) ..................................................... 17, 23,
                                                   27, 40
*Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106
      (D.C. Cir. 1993) ........................................................ 38
*Ass'n of Am. R.R. v. Dep't of Transp.*, 198 F.3d 944 (D.C. Cir. 1999) ................ 39
*Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945) ................................ 15
*Burkhart v. WMATA*, 112 F.3d 1207 (D.C. Cir. 1997) ........................................ 18
*Castlewood Prods., L.L.C. v. Norton*, 365 F.3d 1076 (D.C. Cir. 2004) .............. 15
*Chief Probation Officers v. Shalala*, 118 F.3d 1327 (9th Cir. 1997) .................... 40
*Commodity Carriers, Inc. v. FMCSA*, 434 F.3d 604 (D.C. Cir. 2006) ................ 39
*Farmers Tel. Co. v. FCC*, 184 F.3d 1241 (10th Cir. 1999) .................................. 40
*General Instr. Corp. v. FCC*, 213 F.3d 724 (D.C. Cir. 2000) .............................. 43
*Health Ins. Ass'n of Am. v. Shalala*, 23 F.3d 412 (D.C. Cir. 1994) ..................... 40
*Hempstead Gen. Hosp. v. Whalen*, 474 F. Supp. 398 (E.D.N.Y. 1979),
      *aff'd*, 622 F.2d 573 (2d Cir. 1980) ............................................ 21
*Hospital Affiliates Int'l, Inc. v. Schweiker*, 543 F. Supp. 1380
      (D. Tenn. 1982) ..................................................... 22, 32
*Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420 (D.C. Cir. 2004) .................. 43
\*   *Jeanes Hosp. v. Leavitt*, 453 F. Supp. 2d 888 (E.D. Pa. 2006) ............ 22-23, 27, 40
*Kidney Ctr. of Hollywood v. Shalala*, 133 F.3d 78 (D.C. Cir. 1998) ................... 27
*Lake Med. Ctr. v. Thompson*, 243 F.3d 568 (D.C. Cir. 2001) ......................... 6, 42
\*   *Lehigh Valley Hosp. v. Leavitt*, 2006 WL 2547061
      (E.D. Pa. Aug. 31, 2006), *appeal docketed*, No. 06-4194
      (3d Cir. Sept. 26, 2006) ..................................................... 18, 23
*Long Island Care at Home, Ltd. v. Coke*, 127 S. Ct. 2339 (2007) ....................... 40
*Martin v. OSHRC*, 499 U.S. 144 (1991) ....................................................... 15, 16
*Medical Ctr. of Independence v. Harris*, 628 F.2d 1113
      (8th Cir. 1980) ..................................................... 28, 32, 34
*Mercy Home Health v. Leavitt*, 436 F.3d 370 (3d Cir. 2006) .............................. 24
*Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185 (3d Cir. 1986) ............................ 28
*Nat'l Cable & Telecom. Ass'n v. Brand X Internet Servs.*,
      545 U.S. 967 (2005) ..................................................... 37
*In re Operation of Mo. R. Sys. Litig.*, 363 F. Supp. 2d 1145
      (D. Minn. 2004), *rev'd in part*, 421 F.3d 618 (8th Cir. 2005) .................. 42

**Page**

**Cases (continued):**

*Paulsen v. Commissioner*, 469 U.S. 131 (1985) .................................................. 29

*Rio Hondo Mem. Hosp. v. United States*, 689 F.2d 1025 (Ct. Cl. 1982) ........ 21, 34

*Schoenbohm v. FCC*, 204 F.3d 243 (D.C. Cir. 2000) .......................................... 16

*St. Francis Hosp. Ctr. v. Heckler*, 714 F.2d 872 (7th Cir. 1983) ........................ 16

*St. Mark's Charities Liquidating Trust*, 141 F.3d 978 (10th Cir. 1998) .............. 41

*Sun Towers, Inc. v. Heckler*, 725 F.2d 315 (5th Cir. 1984) ........................... 15-16

*Tenet HealthSystems HealthCorp. v. Thompson*, 254 F.3d 238
    (D.C. Cir. 2001) ........................................................................................... 16

\*   *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504 (1994) ......................... 15-16, 36

*United States v. American Elec. Power Serv. Corp.*,
    218 F. Supp. 2d 931 (S.D. Ohio 2002) ........................................................ 42

*University of Cincinnati v. Heckler*, 733 F.2d 1171 (6th Cir. 1984) .................. 24

*Vallejo Gen. Hosp. v. Bowen*, 851 F.2d 229 (9th Cir. 1988) .............................. 22

\*   *Via Christi Regional Med. Ctr. v. Leavitt*, 2006 WL 2773006
    (D. Kans. Sept. 25, 2006), *appeal docketed*, No. 06-3402
    (10th Cir. Nov. 22, 2006) ...................................................................... 22, 43

*Warder v. Shalala*, 149 F.3d 73 (1st Cir. 1998) ................................................. 38

*White v. Shalala*, 7 F.3d 296 (2d Cir. 1993) ...................................................... 40


**Statutes:**

5 U.S.C. § 553(b) ............................................................................................... 38

5 U.S.C. § 706(2) ............................................................................................... 16

5 U.S.C. § 801 .................................................................................................... 42

5 U.S.C. § 804 ............................................................................................... 42-43

5 U.S.C. § 805 .................................................................................................... 42

42 U.S.C. § 1395 .................................................................................................. 4

42 U.S.C. § 1395f(b) ............................................................................................. 4

42 U.S.C. § 1395h .................................................................................................. 4

\*   42 U.S.C. § 1395x(v) ............................................................. 1, 4, 8, 15-16, 43

42 U.S.C. § 1395x(v)(1)(O) (repealed 1997) ...................................................... 41

42 U.S.C. § 1395hh(a) ......................................................................................... 38

42 U.S.C. § 1395hh(c) ......................................................................................... 38

42 U.S.C. § 1395oo ......................................................................................... 4, 16

Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4404(a),
    111 Stat. 251, 400 ......................................................................................... 8

**Page**

**Regulations:**

    42 C.F.R. § 405.1875 ........................................................... 4
    42 C.F.R. § 413.9 ............................................................... 15
\*    42 C.F.R. § 413.17(b) .................................................. *passim*
    42 C.F.R. § 413.130(a) ....................................................... 18
    42 C.F.R. § 413.134(a) ......................................................... 5
\*    42 C.F.R. § 413.134(b) ......................................... 5, 6, 17, 21
\*    42 C.F.R. § 413.134(f) ................................................ *passim*
\*    42 C.F.R. § 413.134(k) ............................................... *passim*
    42 C.F.R. § 413.134(*l*) ........................................................ 7
    42 C.F.R. § 413.144 ........................................................... 18
    42 C.F.R. § 413.149 ........................................................... 18

**Miscellaneous:**

    *Ashland Regional Med. Ctr.*, 1998 Medicare & Medicaid Guide (CCH)
        ¶ 46,109 (P.R.R.B. Feb. 27, 1998) ........................................... 22
    142 Cong. Rec. E571, E575 (Apr. 19, 1996) ...................................... 43
    *Edgecombe Gen. Hosp.*, 1993 Medicare & Medicaid Guide (CCH)
        ¶ 41,704 (P.R.R.B. Sept. 9, 1993) ........................................... 22
    42 Fed. Reg. 17,485 (Apr. 1, 1977) .............................................. 20
    44 Fed. Reg. 3980 (Jan. 19, 1979) ................................................ 6
    44 Fed. Reg. 6912 (Feb. 5, 1979) ..................................... 7, 20, 29, 34
    HCFA Ruling 80-4 ............................................................. 29
    H.R. Rep. No. 98-861 (1984), *reprinted in* 1984 U.S.C.C.A.N. 697 ................... 41
    *Lac Qui Parle Hosp.*, 1995 Medicare & Medicaid Guide (CCH)
        ¶ 43,269 (P.R.R.B. May 10, 1995) ........................................... 22
    Medicare Intermediary Manual § 4502.10 ........................................ 30
\*    Program Memorandum A-00-76 (Oct. 19, 2000) ........................... *passim*
    Provider Reimbursement Manual:
\*        § 104.24 .......................................................... 6, 17, 21
        § 1004.4 ............................................................... 29
        § 1011.1 ............................................................... 29
    1 Richard Pierce, Administrative Law Treatise § 6.4 (4th ed. 2002) .................. 40
    S. Rep. No. 79-752 (1945) ..................................................... 43

## PRELIMINARY STATEMENT

This case involves the allowance that providers may claim for the depreciation of capital assets used in treating Medicare beneficiaries. The plaintiff, Central Iowa Hospital Corporation, contends that, if a hospital merges into another entity, the basis of the assets of the merged hospital must be limited only to the amount of its liabilities at the time of the merger. Under the plaintiff's reasoning, the Medicare program would then be required to pay the new entity for the "depreciation" supposedly reflected in the difference between the old book values and this new basis, no matter the actual value of the hospital. The plaintiff's argument distorts both the language and the purpose of the Medicare regulations, and the Secretary has chosen a different interpretation that does not require him to pay for a loss that occurs on paper only.

At the time relevant to this case, a provider of health care was reimbursed by Medicare for its reasonable costs – *i.e.*, "the [reasonable] cost actually incurred," subject to certain limitations – of furnishing covered services to those beneficiaries. 42 U.S.C. § 1395x(v)(1)(A). For this purpose, a provider's reasonable costs have been defined to include an annual allowance for the depreciation of certain assets that are used in treating Medicare beneficiaries. A provider that sells a depreciable asset, however, might do so at a price that is less than the "net book value" of the asset, that is, the original cost of that asset less the depreciation allowances claimed for that asset in previous years. Medicare's regulations presumed that in such a case, the provider's actual and reasonable costs in the use of the asset would include an additional cost beyond that reflected in the depreciation allowances, and the regulations thus provided that a sale of the asset for less

than the net book value would permit the provider to claim reimbursement for that additional loss.  Conversely, a sale for more than the net book value would be evidence of a gain, and would result in a recoupment by Medicare.

Because the purpose of the depreciation allowance, and the accompanying "loss-on-sale" rule, was to reimburse the provider for its "cost *actually* incurred," Medicare imposed two requirements to ensure that the price received by the provider in exchange for its Medicare asset approximated the true value of that asset, and that any resulting adjustment to the depreciation allowance thus approximated the provider's true costs in providing service to program beneficiaries.  First, the assets could not be exchanged in a transaction between "related parties" – such as parties with significant powers of control over each other – because a party that will continue to exercise significant control over an asset after its purported transfer lacks an incentive to bargain for the true value of the asset (particularly where the party stands to gain money, *e.g.*, additional Medicare reimbursement, by understating the asset's value in the deal).  Second, for similar considerations, the provider must dispose of the asset in a "bona fide sale," that is, a transaction in which the parties thereto were motivated to exchange like value for like.

This case concerns the merger of a Medicare provider, Iowa Lutheran Hospital ("Lutheran," or "the provider"), into another entity, Iowa Methodist Medical Center ("Methodist"), which has since been renamed as Central Iowa Hospital Corporation.  Central Iowa – which is acting in this case as the successor-in-interest to Lutheran's claim for Medicare payment – argues that its assumption of Lutheran's liabilities amounted to

the consideration for the "sale" of Lutheran's assets in the merger, and it seeks to charge the Medicare program approximately $5.4 million in additional depreciation payments to reflect Medicare's share of the loss that Lutheran purportedly incurred in the "sale."  That merger, however, was not the product of an arm's-length transaction involving two parties bargaining in their own economic self interest.  Rather, the principals of Lutheran chose, essentially, to give its assets away, without seeking fair consideration in exchange, so that they could continue its mission in the form of a newly-constituted entity in which they would continue to have substantial control.

The Administrator of the Centers for Medicare and Medicaid Services ("CMS") found that the merger was not evidence that Lutheran had actually and reasonably incurred additional depreciation costs that would be reimbursable by Medicare.  He found that the merger did not meet the regulatory requirement of a "bona fide sale," in that Lutheran had not attempted to strike a bargain for fair value before entering into the merger.  Thus, the purported sale price for its assets could not be said to reflect any actual and reasonable loss that Lutheran had incurred.  The Administrator also found that the merger was between "related parties," in that there was significant continued participation by Lutheran's board of directors and its officers in the surviving entity.  Thus, because the principals of Lutheran were not truly divorcing themselves from continued participation in its management, the supposed sale price in the transaction could not be presumed to have reflected the actual value of Lutheran's assets.  The Administrator accordingly denied Lutheran's claim of a loss.  Central Iowa now seeks review in this Court.

-3-

## BACKGROUND

### A.    Statutory and Regulatory Framework

The Medicare Act (42 U.S.C. §§ 1395 *et seq.*) establishes a program of subsidized health insurance for the aged and disabled.  It is administered on behalf of the Secretary by CMS.  Providers of covered Medicare services submit claims for reimbursement, which are processed and paid by contractors known as fiscal intermediaries.  *See* 42 U.S.C. § 1395h.  If the provider is not satisfied with an intermediary's reimbursement determination, it may file an administrative appeal with the Provider Reimbursement Review Board, a five-person body within the Department of Health and Human Services. *See* 42 U.S.C. § 1395oo.  The PRRB's decision may be reviewed by the Administrator in his discretion.  *See* 42 C.F.R. § 405.1875.  The decision of the Administrator (or, if the Administrator does not grant review, that of the Board) becomes the final decision of the Secretary, which may be appealed in district court.  *See* 42 U.S.C. § 1395oo(f).

Providers of covered Medicare services may be reimbursed for "the reasonable cost of such services."  42 U.S.C. § 1395f(b)(1).  The statute provides that "[t]he reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of the incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations" promulgated by the Secretary.  42 U.S.C. § 1395x(v)(1)(A).

Under the Secretary's regulations in effect at the time of the transaction at issue in this case, "[a]n appropriate allowance for depreciation on buildings and equipment used

in the provision of patient care [was] an allowable cost." 42 C.F.R. § 413.134(a). The allowance is determined by taking the asset's "historical cost" – *i.e.*, "the cost incurred by the present owner in acquiring the asset," 42 C.F.R. § 413.134(b)(1) – and prorating it over the asset's estimated useful life. *See* 42 C.F.R. § 413.134(a)(3). The result is a schedule of annual depreciation for certain assets. Providers are reimbursed for a percentage of the depreciation equal to the percentage of the asset used to provide covered services to Medicare patients.

To supplement these annual depreciation payments, the Secretary has determined that certain disposals of depreciable assets may give rise to recognition of a "gain" or "loss." His regulations recite that "[d]epreciable assets may be disposed of through sale, scrapping, trade-in, exchange, demolition, abandonment, condemnation, fire, theft, or other casualty." 42 C.F.R. § 413.134(f)(1). The manner in which Medicare treats gains or losses that result from these disposals "depends on the manner of disposition of the asset, as specified in paragraphs (f)(2) through (6) of this section." *Id.* For "bona fide sales," gains or losses are calculated as follows: the consideration that the provider obtains for the sold asset is compared to the asset's "net book value," *i.e.*, its historical cost minus any previous Medicare depreciation payments. If the consideration obtained for the asset is less than its net book value, the provider may claim a "loss," and may be reimbursed for the Medicare share of that loss. If the consideration is greater than the asset's net book value, the provider has reaped a "gain," and must reimburse Medicare for Medicare's share of that gain. *See* 42 C.F.R. § 413.134(f).

The purpose of the gain/loss provision is to ensure that "Medicare pays the actual cost the provider incurred in using the asset for patient care."  44 Fed. Reg. 3980, 3980 (Jan. 19, 1979).  In a "bona fide sale," for example, Medicare assumes that the consideration represents the actual fair market value of the asset.  *See* 42 C.F.R. § 413.134(b)(2).  Accordingly, if the consideration is less than the asset's net book value, Medicare assumes that the actual diminution in the asset's value – a type of cost to the provider – has exceeded the amount reflected in the previous depreciation payments.  A loss payment ensures that Medicare pays its share of that "reasonable" and "actually incurred" cost.  Conversely, if the consideration is greater than the asset's net book value, Medicare assumes that previous depreciation payments overstated the actual diminution in the asset's value.  The provider then must reimburse Medicare the program's share of the gain to ensure that Medicare has paid only the actual cost of using the asset.  *See, e.g., Lake Med. Ctr. v. Thompson*, 243 F.3d 568, 569 (D.C. Cir. 2001).

Consistent with this purpose, not every disposal of assets gives rise to recognition of a gain or loss.  For example, if the sale of an asset is not "bona fide" – *i.e.*, if it is not an arm's-length transaction in which reasonable consideration is exchanged for the asset – no gain or loss is permitted.  42 C.F.R. § 413.134(f)(2); *see also* Provider Reimbursement Manual ("PRM") § 104.24 (quoted at A.R. 11).  A gain or loss similarly is not allowed where the parties to the transaction are "related" – *i.e.*, where one party "to a significant extent is associated or affiliated with or has control of or is controlled by" another.  42

-6-

C.F.R. § 413.17(b)(1). In such a case, the "purchase price" is not sufficiently reliable evidence of the asset's value to warrant adjustment to its pre-set depreciation schedule.

The Secretary has added a paragraph to the gain/loss regulation that addresses "[t]ransactions involving a provider's capital stock." 42 C.F.R. § 413.134(k) (formerly 42 C.F.R. § 413.134(*l*)). The purpose of the regulation was to codify the manner in which Medicare had applied existing regulations to complex financial transactions, including mergers and consolidations. *See* 44 Fed. Reg. 6912, 6912 (Feb. 5, 1979). The regulation specifies that providers that transfer assets pursuant to a merger are "subject to the provisions of [paragraph] (f) of this section concerning . . . the realization of gains and losses." 42 C.F.R. § 413.134(k)(2)(i). As discussed above, paragraph (f) in turn allows the provider to claim a gain or loss if the transaction involves or effectuates a "bona fide sale." 42 C.F.R. § 413.134(f). In addition, section 413.134(k)(2)(ii) specifies that a merger cannot trigger a gain or loss if it "is between two or more corporations that are related (as specified in § 413.17)."

In addition to the above regulations, the Secretary has issued a Program Memorandum addressing the application of 42 C.F.R. § 413.134(k) – which, as the regulation's title indicates, addresses "transactions involving a provider's capital stock" – to non-profit providers. PM A-00-76 (Oct. 19, 2000), at A.R. 1536. The Program Memorandum notes that non-profits often may affiliate with other entities for reasons "that may differ from the traditional for-profit merger or consolidation," and are not "driven by the ownership equity interests to seek fair market value for the assets involved

-7-

in the transaction." A.R. 1537-38. The Program Memorandum emphasizes that non-profit mergers and consolidations are nonetheless subject, just as for-profit transactions are, to the regulatory requirement of a "bona fide sale" or other qualifying disposition. A.R. 1539.

The Program Memorandum similarly emphasizes that non-profit mergers and consolidations, like for-profit transactions, must be between "unrelated" corporations in order to qualify for gain/loss treatment under 42 C.F.R. § 413.134. It cautions that, "[u]nlike for-profit mergers or consolidations, which often involve a dispatching of the former governing body and/or management team, many non-profit mergers and consolidations involve the continuation, in whole or in part, of the former governing board and/or management team." A.R. 1537. Where the governing body, or management team, of the merging or consolidating hospital is significantly represented on the governing body, or management team, of the entity that acquires the assets, the transaction must be considered a "related party" transaction, and no gain/loss may be allowed. A.R. 1537-38.[1]

---

[1] These regulations are no longer in effect. In the 1990's, providers used the "loss-on-sale" rules to make large claims for depreciation payments that did not reflect their actual and reasonable costs. The Department's Inspector General recommended legislation eliminating gain/loss recognition on a change of ownership. The predecessor to CMS concurred, noting that it "will limit the gaming of Medicare losses in hospital sales." A.R. 556. Congress adopted the recommendation in the Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4404(a), 111 Stat. 251, 400; 42 U.S.C. § 1395x(v)(1)(O)(i).

### B.    Factual Background

Before 1993, Iowa Lutheran Hospital ("Lutheran") was a non-profit corporation that participated in the Medicare program.  A.R. 183.  Its sole member (*i.e.*, the equivalent of a sole shareholder for a non-profit corporation) was the Southeastern Iowa Synod of the Evangelical Lutheran Church of America.  A.R. 183, 876.  In 1992, Lutheran began to consider forming a partnership with another provider, as a means to respond to the rise of managed care in the health care market.  A.R. 216.

Lutheran entered into discussions with Iowa Methodist Medical Center ("Methodist") regarding a possible affiliation between the two entities.  A.R. 211-12. (Methodist, like Lutheran, had only one member, the Iowa Methodist Health System. A.R. 511.)  These discussions culminated in early 1993, when the two hospitals entered into a memorandum of understanding reciting their agreement to a merger.  A.R. 352.

In the negotiations leading to this agreement to merge, the principals of Lutheran had "particular concerns" that the transaction could lead to a "[l]oss of control" of the hospital, as well as a "fear of losing our Lutheran identity" in the transaction.  A.R. 220. Accordingly, the negotiations between the parties focused on the structure of the board and of the executive leadership of the entity that would survive from the merger.  A.R. 184, 199-200, 220.  The perpetuation of the provider's Lutheran heritage and identity were also an important part of the negotiations.  A.R. 220, 223.

Neither Lutheran nor Methodist discussed the possibility of negotiating a price at which Methodist would buy Lutheran's assets.  A.R. 199.  The principals of Lutheran did

not place the hospital for sale on the open market, and, in particular, did not attempt to contact any investor-owned hospital chains regarding any potential sale. A.R. 228. Lutheran received no consideration in exchange for the surrender of its assets in the merger, other than the assumption of its liabilities. A.R. 240.

The merger became effective on November 22, 1993. A.R. 356. In the transaction, Lutheran merged into Methodist, and the surviving entity was renamed as the Iowa Health System Hospital Corporation. A.R. 186. (The surviving entity has since been renamed again as Central Iowa Hospital Corporation. A.R. 235.) Methodist's sole member, the Iowa Methodist Health System, was renamed as Iowa Health System and continued as the sole member of the surviving entity. A.R. 186, 511.

Consistent with the focus in the parties' negotiations on the distribution of control of the surviving entity, the merger agreement contained detailed provisions describing the composition of the surviving entity's board and management team. The board of Iowa Health System, the sole member of the surviving entity, had 23 members, 11 of whom were appointed from Lutheran. A.R. 201-02, 352-53, 379. Nine directors (including two physicians) were selected by the board of Lutheran; Lutheran's president, Rex Levering, continued as the vice-president of Iowa Health System, and served on its board; and the Bishop of the Southeastern Iowa Synod of the Evangelical Church of America, which had been Lutheran's sole member, served as an *ex officio* member of the new sole member's board. A.R. 201-02, 352-53, 379. The board of the surviving entity, Iowa Health System

Hospital Corporation, was similarly constituted.  It had 19 members, nine of whom were appointed from Lutheran.  A.R. 202, 386-87.

Mr. Levering served as the surviving entity's vice-president, as well as president of its newly-constituted "Iowa Lutheran Hospital Division."  A.R. 369, 372.  Thomas D. Smith, formerly the chairman of the Lutheran board, served as vice-chairman of the boards both of Iowa Health System Hospital Corporation and its sole member, and Lutheran was given the assurance that either Mr. Smith or another representative from Lutheran would serve the next term as chairman of both boards.  A.R. 369-70.

The parties deliberately included members from the former board of Lutheran on the board of the surviving entity, in order to draw on their experience with that hospital. According to Mr. Levering, members from the Lutheran board were selected because "[t]hey had a lot to contribute.  They had been intimately involved with Lutheran as board members.  As a smaller hospital, hospital boards tend to become more involved when closer to the institution than large regional healthcare systems, and that was certainly true of the Iowa Lutheran Board."  A.R. 221.

Lutheran's sole member, the Southeastern Iowa Synod, retained the right to approve any change in the name of the Lutheran facilities through the year 2000, and also retained a reversionary interest in the surviving corporation's assets.  A.R. 352, 381. Lutheran had been affiliated with a charitable foundation, the Iowa Lutheran Hospital Foundation.  Under the merger agreement, that foundation continued in existence, and

donations to the foundation were guaranteed to be used for Lutheran's hospital facilities. A.R. 205-06.

The surviving entity submitted a cost report to Medicare that treated the merger as the equivalent of a sale of Lutheran's assets. For this purpose, it claimed that Lutheran had surrendered all of its assets, with a value of $64.9 million (including $40.1 million in cash or cash equivalents), in exchange for the surviving entity's assumption of Lutheran's liabilities, which amounted to $28.1 million. A.R. 167-68, 190-91, 756. The surviving entity claimed that it was entitled to payment from Medicare for a $5.4 million portion of the "loss" in value of Lutheran's depreciable assets purportedly evidenced by this exchange. A.R. 236-37.

In contrast to the claimed loss on the Medicare cost report, on its internal financial statements, the surviving entity treated the merger not as a sale of assets, but instead as a "pooling of interests." A.R. 307, 1352, 1369. Under this method, Central Iowa did not, for purposes of its own records, treat the combination as a change of ownership, and did not report any loss from the transaction. A. 131-33. Consistent with this treatment in its own records, in cost reports submitted to Medicare for later years, Central Iowa used the higher basis resulting from the pooling method to calculate the depreciation allowance for Lutheran's depreciable assets. A.R. 242. The effect of this approach was to permit Central Iowa to claim the same depreciation allowance twice for the same assets.

### C.  <u>Procedural History</u>

Medicare's fiscal intermediary reviewed the cost report, and denied the claim for Medicare payment.  A.R. 1535.  Central Iowa appealed to the PRRB, and the Board issued a decision that allowed the claim, but that remanded the matter to the intermediary to resolve an apparent discrepancy in the calculation of the fair market value of Lutheran's assets, and also to adjust the claim to account for the additional depreciation that Central Iowa had claimed for the years following the merger.  A.R. 59.  The CMS Administrator issued a decision reversing the decision of the PRRB, and disallowing the claimed loss.  A.R. 2.  He determined that the merger could not qualify as a bona fide sale, as would be required for the realization of a loss on the transfer of depreciable assets.  He found that the absence of any arm's-length bargaining, or of any attempt by the principals of Lutheran to seek fair value for its assets, indicated that the exchange was not a bona fide sale.  A.R. 29.  In addition, he found that the sizable discrepancy between the reported value of Lutheran's assets and their purported sale price further indicated that no bona fide sale had occurred.  A.R. 29.  The Administrator also disallowed the claim for a second, independent  reason:  the merger was a related party transaction.  A.R. 27.  The Administrator noted that Lutheran's principals continued to participate as members of the surviving entity's board and as top executives of that entity.  A.R. 27.  Thus, for two independent reasons, the Administrator determined that the merger was not a transaction that accurately reflected Lutheran's actual and reasonable costs in the use of its Medicare assets, and he accordingly disallowed the loss claim.

The Administrator's decision became the final decision of the agency. Central Iowa, acting as the successor-in-interest to Lutheran's claim for Medicare reimbursement, now brings this suit seeking review of the Administrator's decision.

## ARGUMENT

### I.      This Court Owes Deference to the Secretary's Interpretation of His Own Regulations, and to the Administrator's Factual Findings

The Administrator applied the Secretary's interpretation of his own regulations to hold that a "bona fide sale" is one in which the parties act at arm's length in an attempt to gain reasonable consideration, and he further found that the merger was not a bona fide sale under this definition. The Administrator also applied the Secretary's interpretation of his own regulations to hold that a provider is a "related party" with the surviving entity that it merges into if its board or management team continues to hold the power significantly, directly or indirectly, to influence the management of that entity. The Administrator found that the principals of Lutheran held that power in the surviving entity, that consequently Lutheran was a related party with the entity that it merged into, and that no loss claim was available arising from that merger. Central Iowa now challenges the Secretary's interpretation of the regulations, and also disputes the Administrator's factual findings.

It faces a heavy burden in these challenges. It is well established that a court must give substantial deference to an agency's interpretation of its own regulations; that interpretation "must be given 'controlling weight unless it is plainly erroneous or

-14-

inconsistent with the regulation.'" *Martin v. OSHRC*, 499 U.S. 144, 150-51 (1991)

(quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)); *see also*

*Castlewood Prods., L.L.C. v. Norton*, 365 F.3d 1076, 1082 (D.C. Cir. 2004).  The court

must defer to the regulatory interpretation "unless an alternative reading is compelled by

the regulation's plain language or by other indications of the Secretary's intent at the time

of the regulation's promulgation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512

(1994) (internal quotation omitted).

This principle of deference holds particular force in the context of the Secretary's

interpretation of his Medicare regulations governing reimbursable costs.  Congress has

assigned to the Secretary the role of defining the kinds of costs that are reasonably related

to the rendition of patient care services, that are also necessary to that care, and that thus

are reimbursable by Medicare.  42 U.S.C. § 1395x(v)(1)(A); *see* 42 C.F.R. § 413.9.  The

fulfillment of this statutory mandate of "separating reimbursable costs from those that are

not may require the Secretary to draw fine lines." *Sun Towers, Inc. v. Heckler*, 725 F.2d

315, 328 (5th Cir. 1984).  The Secretary's drawing of those lines in the Medicare

regulations, and his interpretation of those regulations in light of the statutory purpose to

limit Medicare reimbursement to a provider's actual, reasonable, and necessary costs,

thus are entitled to great deference.  "This broad deference is all the more warranted

when, as here, the regulation concerns a complex and highly technical regulatory

program, in which the identification and classification of relevant criteria necessarily

require significant expertise and entail the exercise of judgment grounded in policy

-15-

concerns." *Thomas Jefferson Univ.*, 512 U.S. at 512; *see also Tenet HealthSystems HealthCorp. v. Thompson*, 254 F.3d 238, 248 (D.C. Cir. 2001).[2]

Central Iowa also challenges the Administrator's findings that the merger was not a bona fide sale, and that Lutheran and Central Iowa were related parties. These factual determinations made by the Administrator in denying the loss claim must be upheld if they are supported by substantial evidence. *See* 5 U.S.C. § 706(2); 42 U.S.C. § 1395oo(f). For this purpose, "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schoenbohm v. FCC*, 204 F.3d 243, 246 (D.C. Cir. 2000). In this case, the Administrator correctly applied the Secretary's reasonable interpretation of the regulations. His findings that the merger was not a bona fide sale, and that the merger was a related-party transaction, are supported by substantial evidence. Consequently, his decision must be affirmed.

## II.    The Loss Claim Must Be Disallowed because the Merger Was Not a Bona Fide Sale

### A.    A Provider May Realize a Medicare Loss from a Merger Only if the Transaction Qualifies as a Bona Fide Sale

The Administrator found that the merger of Lutheran into (what is now known as) Central Iowa did not constitute a bona fide sale of its assets to Central Iowa. Because

---

[2] The fact that the PRRB read the regulations at issue here differently than the Secretary has does not diminish the deference owed the Secretary's legal interpretations. It is the Secretary, not the PRRB, to whose expertise deference is owed. *See, e.g., Sun Towers, Inc.*, 725 F.2d at 326; *St. Francis Hosp. Ctr. v. Heckler*, 714 F.2d 872, 874 (7th Cir. 1983); *see also Martin v. OSHRC*, 499 U.S. 144, 152-58 (1991).

there was no exchange of fair value for Lutheran's assets, the merger could not provide

the basis to calculate any costs that Lutheran incurred from an alleged diminution in value

of those assets.  Accordingly, the Administrator determined that Lutheran could not

obtain additional Medicare payments to compensate for its supposed "loss."  His decision

is fully consistent with the text, history, and purpose of the Medicare regulations, and

with the Secretary's reasonable interpretation of those regulations.

As discussed above, the regulations in effect at the time of the merger establish

that a provider would recognize a loss or gain on the disposition of assets in certain ways,

such as through a bona fide sale, but not if assets were disposed of in other ways.  *See* 42

C.F.R. § 413.134(f).  When assets are disposed of in a bona fide sale, the regulations

presume that the sale price would be a more accurate measure of their actual value (and,

thus, of any diminution in their actual value over time) than the previously-established

depreciation schedule for those assets had been.  Accordingly, the regulations permit a

gain or loss to be calculated by comparing the bona fide sale price of the asset to its net

book value.  42 C.F.R. § 413.134(f)(2).  For this purpose, a "bona fide sale" is defined as

one in which the provider engages in an arm's-length transaction, and attempts to receive

reasonable consideration.  *See* 42 C.F.R. § 413.134(b)(2) ("fair market value" is value

established in bona fide sale); PRM § 104.24; *Albert Einstein Med. Ctr. v. Leavitt*, 2007

WL 2221417, at * 13 (E.D. Pa. Aug. 1, 2007) (unpublished opinion) (failure to receive

fair market value shows that transaction was not bona fide sale); *Lehigh Valley Hosp. v.*

*Leavitt*, 2006 WL 2547061, at *6 (E.D. Pa. Aug. 31, 2006) (unpublished opinion) (same), *appeal docketed*, No. 06-4194 (3d Cir. Sept. 26, 2006).

The regulations also allow the recognition of a gain or loss when assets are transferred in a merger between unrelated parties, if that transaction independently satisfies the requirements of paragraph (f) for such recognition.  "If the statutory merger is between two or more corporations that are unrelated (as specified in § 413.17), . . . [and] if the merged corporation was a provider before the merger, then it is subject to the provisions of [paragraph] (f) of this section concerning . . . the realization of gains and losses."  42 C.F.R. § 413.134(k)(2)(i).  Thus, the regulation does not, by its own force, declare that a gain or loss will or will not be realized from a merger.  Instead, the regulation declares that paragraph (f) would govern that issue.  *See also* 42 C.F.R. § 413.130(a)(1) (limiting allowable capital-related costs to "[n]et depreciation expense as determined under §§ 413.134, 413.144, and 413.149, adjusted by gains and losses realized from the disposal of depreciable assets under § 413.134(f).")  And, as discussed above, paragraph (f) permits the recognition of a gain or loss where the transaction is a bona fide sale, but not in other circumstances, such as where the transaction amounts to a donation of assets.[3]

_____

[3] Central Iowa relies throughout its brief on the testimony of its purported expert witnesses before the Board, who presented the provider's preferred interpretation of sections 413.134 and 413.17.  The meaning of the Medicare regulations, however, is not properly the subject of expert testimony.  *See Burkhart v. WMATA*, 112 F.3d 1207, 1212-13 (D.C. Cir. 1997).

The Medicare regulations thus do not state a blanket rule that any party to a merger may automatically recognize a gain or loss.  To the contrary, under the plain language of the regulations, such recognition is allowed only if the transaction satisfies the requirement of paragraph (f) that it be a bona fide sale.[4]  At a minimum, the Secretary has reasonably interpreted the regulations to apply this rule.  *See* PM A-00-76.  This interpretation is fully consistent with the text and purpose of the Medicare reimbursement regulations.  Those provisions are intended to reimburse a provider only for its actual and reasonable costs.  A merger that does not effectuate a bona fide sale will not result in a price reflective of the true value of the provider's assets.  Thus, the provider's actual costs, in the form of any additional diminution in the value of those assets, cannot be calculated from the transaction.  There is therefore no reason to adjust the provider's depreciation allowance to reflect a supposed paper loss arising from the merger.

Central Iowa argues (Br. 29) that the Secretary did not explicitly state in his Federal Register notices that the bona fide sale rule applies to mergers.  But the explicit statement that Central Iowa seeks is found in the regulation itself.  42 C.F.R. § 413.134(k)(2)(i).  In any event, the regulatory history confirms the application of the bona fide sale rule.  The Secretary promulgated (what is now) section 413.134(k) not to create a new category of disposals eligible for gain/loss recognition beyond those

---

[4] Paragraph (f) permits recognition in other circumstances, such as scrapping, theft, or casualty.  The only provision allowing recognition of a gain or loss that even arguably applies here, however, is the bona fide sale provision.

specified in the existing regulations, but instead to clarify the application of the existing regulations (including paragraph (f)) to complex financial transactions. In providing notice of the proposed merger and consolidation regulation, the Secretary noted that "[t]he proposed amendments are a specific interpretation of existing program policy *based on previously promulgated regulations*." 42 Fed. Reg. 17,485, 17,485 (Apr. 1, 1977) (emphasis added). Similarly, in finalizing the regulation, the Secretary observed that the amendment codified his "interpretation and application" of existing regulations. *See* 44 Fed. Reg. 6912, 6912 (Feb. 5, 1979). This description forecloses Central Iowa's interpretation, under which paragraph (k) would allow merging providers to claim gains or losses regardless of whether the transaction met the other existing regulatory criteria.

Central Iowa also argues (Br. 30) that, because the parties to a merger do not negotiate a sale price, it should be excused from the regulatory requirement that a merger qualify as a bona fide sale before a gain or a loss may be recognized. But its factual premise is simply incorrect. As Central Iowa's own expert witness acknowledged, merging parties frequently negotiate an exchange of consideration (even if the parties here did not). A.R. 269. In any event, Central Iowa's argument only underscores the need for the bona fide sale rule. It claims that, because no sale price was negotiated here, the amount of Lutheran's liabilities assumed by the surviving entity must be treated as the purchase price of Lutheran's assets; however, the value of those assets bears no logical

relationship at all to the amount of those liabilities.  *See* A.R. 264.[5]  Thus, any loss claim

resulting from this treatment would be a loss on paper only, and not reflective of any

actual costs that the provider has incurred.  Because the Secretary's mandate is to pay

only a provider's actual costs, he has reasonably interpreted section 413.134 not to

require such a windfall to the provider.

Central Iowa also contends (Br. 31) that, even if the bona fide sale rule applies to

mergers, that rule is satisfied so long as any consideration is exchanged in the transaction,

and that no inquiry is needed into the fair market value of the assets exchanged or the

reasonableness of the consideration.  On this score, it contends that the Secretary did not

declare that the reasonableness of consideration was relevant until after the merger at

issue here took place, and that it could not have anticipated such a requirement.  (Br. 31,

citing PRM § 104.24.)  This is incorrect; the regulation itself confirms that a sale cannot

be "bona fide" if it is not an exchange for fair value.  *See* 42 C.F.R. § 413.134(b)(2) ("fair

market value" is value received in a bona fide sale).  Consistent with the language of the

regulation, the Secretary has looked to the reasonableness of consideration since long

before the transaction at issue in this case.  *See, e.g., Rio Hondo Mem. Hosp. v. United

States*, 689 F.2d 1025, 1034 (Ct. Cl. 1982) (provider bears burden to prove sale was for

fair market value); *Hempstead Gen. Hosp. v. Whalen*, 474 F. Supp. 398, 409 (E.D.N.Y.

---

[5]  Indeed, any relationship would be an inverse one.  Under Central Iowa's theory,
a provider that is deeply in debt will be deemed to be very valuable, while a well-run
entity with little debt will be deemed to be of little value.  The Secretary cannot be
presumed to have intended such an illogical result.

1979) (same), *aff'd*, 622 F.2d 573 (2d Cir. 1980); *Hospital Affiliates Int'l, Inc. v. Schweiker*, 543 F. Supp. 1380, 1389 (D. Tenn. 1982) (same).[6]

Thus, the Medicare regulations directly require that a merger meet the requirements of a bona fide sale of a provider's assets in order for the provider to realize a gain or loss. For this purpose, a bona fide sale is one in which the provider operates at arm's length from the buyer, and in which the provider receives fair value in exchange for the transfer. This rule fulfills the Secretary's statutory mandate to reimburse providers only for their actual and reasonable costs, and not also for inflated costs arising from transactions in which the provider lacked the incentive to seek fair value. The Secretary has reasonably interpreted the regulations to so require, and his interpretation accordingly must be accorded controlling weight. *See Jeanes Hosp. v. Leavitt*, 453 F. Supp. 2d 888, 903 (E.D. Pa. 2006); *Via Christi Regional Med. Ctr. v. Leavitt*, 2006 WL 2773006, at *16 (D. Kans. Sept. 25, 2006) (unpublished opinion), *appeal docketed*, No. 06-3402 (10th Cir. Nov. 22, 2006).

---

[6] Ignoring these precedents, Central Iowa asserts (Br. 31-33) that several Board decisions reveal that the Secretary had not previously required sales to be for fair market value. Central Iowa misreads these decisions. In each case, the finding of a bona fide sale turned on the fact that parties with adverse interests had negotiated at arm's length to arrive at reasonable consideration for the exchange. *See Vallejo Gen. Hosp. v. Bowen*, 851 F.2d 229, 232 (9th Cir. 1988); *Ashland Regional Med. Ctr.*, 1998 Medicare & Medicaid Guide (CCH) ¶ 46,109 (P.R.R.B. Feb. 27, 1998); *Edgecombe Gen. Hosp.*, 1993 Medicare & Medicaid Guide (CCH) ¶41,704 (P.R.R.B. Sept. 9, 1993); *Lac Qui Parle Hosp.*, 1995 Medicare & Medicaid Guide (CCH) ¶ 43,269 (P.R.R.B. May 10, 1995).

**B.**    **Substantial Evidence Supports the Administrator's Finding that the Merger Was Not a Bona Fide Sale**

Consistent with the Secretary's interpretation, the Administrator determined that the merger in this case did not effectuate a bona fide sale of Lutheran's assets to Central Iowa.  That determination is supported by substantial evidence.  The principals of Lutheran explicitly rejected the option of selling its assets, or otherwise seeking fair value in exchange for a true surrender of their control over the provider.  They chose instead to pursue a merger with the knowledge that they would not receive full value in that transaction.  The appraisal of Lutheran's assets, moreover, revealed a sizable gap between the assets' fair value and their purported purchase price; those assets were valued at $64.9 million, far greater than the claimed sale price of $28.1 million.[7]  Indeed, the claimed sale price was less even than the value of Lutheran's cash and cash equivalents.  A.R. 167-68, 1331, 1336.  In other words, Central Iowa effectively claims that Lutheran sold its cash at a discount and its depreciable Medicare assets for nothing.  Such a sizable discrepancy establishes that no bona fide sale took place.  *See Jeanes Hosp.*, 453 F. Supp. 2d at 903; *Albert Einstein Med. Ctr.*, 2007 WL 2221417, at *13; *Lehigh Valley Hosp.*, 2006 WL 2547061, at *6.

---

[7]  Central Iowa disputes the amount of the fair market value of Lutheran's assets (Br. 35 n.8), but it flatly misreads the record.  The "appraised business enterprise value" to which it refers excluded Lutheran's monetary assets, and that appraisal's estimate of the total value of all of the assets transferred by Lutheran to the surviving entity was approximately the amount found by the Administrator.  A.R. 917, 972.  Central Iowa definitively claimed below that, for the purposes of calculating the amount of its alleged loss, the fair market value of Lutheran's assets was $64.9 million.  A.R. 38, 46.

In response, Central Iowa asserts (Br. 35) that its appraisal of the fair value of Lutheran's assets does not establish that there was a discrepancy in the purported sale price of those assets, as the appraisal would not necessarily reflect the uncertain risk that Lutheran would have incurred losses in the future. This argument places the burden of proof precisely backwards. The burden to prove that the assets were exchanged for fair value rested with Central Iowa, not the Administrator. *See Mercy Home Health v. Leavitt*, 436 F.3d 370, 380 (3d Cir. 2006); *University of Cincinnati v. Heckler*, 733 F.2d 1171, 1175 (6th Cir. 1984). Central Iowa did not even attempt to put forward such proof. Any such attempt would have been futile, since Lutheran gave up more in cash alone than it received through the assumption of its liabilities. Moreover, the appraisal upon which Central Iowa relied in calculating its loss claim explicitly incorporated an analysis of the risks faced in Lutheran's continued operations. A.R. 924.

Central Iowa further contends (Br. 35) that the sale was bona fide, because the new entity also assumed contingent liabilities of uncertain value from St. Joseph. But Central Iowa made no effort during the administrative proceedings to prove the value of those contingent liabilities, or that those liabilities could have accounted for the sizable difference between the reported value of the assets and their purported sale price. In any event, Lutheran was insured against contingent liabilities, A.R. 469-70, and it further warranted in the merger agreement that its financial statements had fairly described its financial condition. A.R. 358. More fundamentally, there is no evidence in the record that the principals of Lutheran believed the assumption of contingent liabilities to be fair

consideration for its assets.  Indeed, the record demonstrates that Lutheran was not motivated to seek fair consideration at all, but instead focused its concerns on ensuring that its principals would play a continuing role in the surviving entity.  A.R. 184, 199-200, 220.

The record thus amply supports the Administrator's finding that Lutheran did not dispose of its assets in a bona fide sale.  Because an accurate valuation of Lutheran's assets – and thus of Lutheran's actually incurred, reasonable costs in the use of those assets – cannot be derived from the supposed "sale price" for the assets in the merger, the Administrator properly denied the loss claim.

**III.**   **The Loss Claim Must Be Disallowed because the Merger Was Between Related Parties**

      **A.**   **A Provider May Realize a Medicare Loss from a Merger Only if It Does Not Retain a Significant Power of Control over the Surviving Entity**

In addition to finding that the merger was not a bona fide sale, the Administrator disallowed the loss for a second, independent reason.  He found that Lutheran was related to the entity into which it merged, Central Iowa, and thus, under 42 C.F.R. §§ 413.134(k)(2) and 413.17, it could not claim a loss supposedly evidenced by that merger.  In reaching this determination, he applied the Secretary's reasonable interpretation of those regulations to hold that a provider may not realize a loss from a merger if it is related to the surviving entity that receives its assets.  *See* PM A-00-76. Central Iowa argues that the relevant question instead is only whether Lutheran and

Methodist were related before the transaction.  The Secretary's interpretation, unlike Central Iowa's, is fully in keeping with the express language of the regulation, which incorporates a review of the relationship of the parties created as a result of the transaction itself.  His interpretation is also fully in keeping with the purpose of the "related party" rule, which is to prevent Medicare from paying costs incurred in transactions where the parties lack the incentive to obtain fair market value in an exchange.  The Secretary's reasonable interpretation of his own regulation accordingly should be upheld.

The Medicare regulations expressly provide that a merger (that also meets the requirements for a bona fide sale) will result in the realization of a gain or loss only if the parties to the transaction are not related.  "If the statutory merger is between two or more corporations that are unrelated (as specified in § 413.17), . . . [and] [i]f the merged corporation was a provider before the merger, then it is subject to [paragraph] (f) of this section concerning . . . the realization of gains and losses."  42 C.F.R. § 413.134(k)(2)(i). Central Iowa contends that the regulation addresses only the relationship existing between the parties before the merger occurs.  To the contrary, the regulation's use of the present tense – "that *are* unrelated" – is most naturally read to refer not to the parties' prior relationship alone, but instead to include the relationship created at the time of the merger itself, including the continuing relationship with the entity surviving from the merger.

Any doubt on this score is erased by the regulation's parenthetical, which expressly incorporates the definition of "related parties" found in 42 C.F.R. § 413.17.

That section provides that the relevant relationship is that between the entity furnishing the goods or services (the seller, in this case, Lutheran) and the entity receiving them (the buyer, in this case, the surviving entity – Central Iowa):  "Related to the provider means that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies."  42 C.F.R. § 413.17(b)(1).  *Accord, Kidney Ctr. of Hollywood v. Shalala*, 133 F.3d 78, 85 (D.C. Cir. 1998) ("related party" rule is reasonably interpreted "to require an examination of the relationship between the seller and the actual buyer").  Thus, sections 413.134(k) and 413.17, read together, prohibit a provider that is related to the party into which it merges – and to which it transfers its assets in the transaction – from realizing a gain or loss from the transfer.  *See Jeanes Hosp.*, 453 F. Supp. 2d at 899; *Albert Einstein Med. Ctr.*, 2007 WL 2221417, at *7.

The Secretary's interpretation of section 413.134(k) and section 413.17 follows logically from the purpose of the "related party" rule, which is to fulfill his statutory mandate to pay providers only for their actual, reasonable costs.   The Secretary adopted this rule as a prophylactic measure to protect Medicare from paying claims arising from transactions with a high potential for self-dealing.

> The related organization principle . . . serves to screen out both costs not actually incurred and unreasonable costs.  That is to say, the regulation precludes reimbursement for cost increases due solely to transactions between different parts of a single economic unit, and it polices 'sweetheart' contracts with suppliers that may inflate costs to the provider.

*Medical Ctr. of Independence v. Harris*, 628 F.2d 1113, 1119 (8th Cir. 1980) ("*MCI*");

*see also Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1191 n.15 (3d Cir. 1986) (section

413.17 applies a categorical rule that "seek[s] to prevent the potentially huge payoffs that

could otherwise result from a care provider's self-dealing").[8]  This potential for self-

dealing exists, not only where parties are already related, but also where they become

related as a result of the transaction itself.  Section 413.17 accordingly requires a review

of the relationship of the parties at the time of and resulting from the relevant transaction.

　　　　The court's holding in *MCI* demonstrates the need for a full review of the parties'

relationship.  *MCI* involved a claim for reimbursement for expenses resulting from a

long-term lease and management contract.  The court held that the terms of that contract

itself caused the two parties to become related to each other, even though they had not

previously been related, and thus disallowed the claim under the (materially identical)

predecessor to section 413.17.  *MCI*, 628 F.2d at 1119.  The court noted that, because the

related party rule "serves as a rough prophylactic rule barring the reimbursement of

presumptively unreasonable costs," *id.*, the rule applies where the parties become related

as part of the transaction itself, since those parties would also have an incentive to incur

unreasonable costs in the transaction.  *Id.* at 1119-20.  The Secretary has adopted this

---

[8]  Central Iowa misreads (Br. 24) *Monsour* as adopting the opposite rule.  That
court held that the parties, which were related at the time of the transaction but which
would be divorced later, were related under the predecessor of section 413.17.  It rejected
the provider's argument that *only* the relationship after the transaction could be
considered.  806 F.2d at 1191.  This reflects the Secretary's position that all aspects of the
parties' relationship must be considered.

reasoning as his formal interpretation of section 413.17.  *See* HCFA Ruling 80-4, at A.R. 1396; *see also* PRM § 1004.4, Ex. 2, at A.R. 1268-69; PRM § 1011.1, at A.R. 1263.

Like a party to a long-term management contract, a party to a merger could provide – and in this case, the principals of Lutheran did provide – that it would retain power to influence the management of the entity to which its assets would be transferred. In such a case, it cannot be presumed that the merging party will truly surrender control over its assets, or that it will have an incentive to bargain for the actual value of those assets.  Accordingly, its actual costs in the use of those assets cannot be reliably calculated from the supposed consideration that it receives in the merger.  The Secretary thus has determined that he will apply the "related party" rule of section 413.17 to ensure that a merging provider may not claim a loss for its transfer of assets to an entity over which it will exercise control.  *See* 44 Fed. Reg. 6912, 6913 (Feb. 5, 1979) ("In determining what is a related party, the criteria specified in [section 413.17's predecessor] will be used.").[9]

Central Iowa argues (Br. 27) that it and Lutheran cannot be related parties, because they never existed at the same time, and thus one could not have had any power of control over the other.  Under this interpretation, the principals of a provider could create a

---

[9]  For the same reason, tax law looks to the relationship between a merging taxpayer and the surviving entity, and denies recognition of a gain or loss where there is a significant continuity of control between the two.  *See Paulsen v. Commissioner*, 469 U.S. 131, 136 (1985) (this rule aims to avoid "purely 'paper profits or losses' wherein there is no realization of gain or loss in the business sense but merely the recasting of the same interests in a different form") (quotation marks and citations omitted).

Medicare loss simply by dissolving the provider, transferring its assets to a newly-created entity at a discount, and assuming control of the new entity; because the two entities never existed at the same time, they would not be related.  In order to avoid such an obvious loophole, the Secretary wrote the "related party" regulation to cover not only cases where one party directly controls the other, but also cases where the principals of one entity will indirectly assume a significant power of control over the other.  "Control exists if an individual or an organization has the power, *directly or indirectly*, significantly to influence or direct the actions or policies of an organization or institution."  42 C.F.R. § 413.17(b)(3); *see also* Medicare Intermediary Manual § 4502.10, at A.R. 1412 (corporate reorganization, in which one provider is dissolved and a new entity is created, is a related party transaction).

Thus, in order to clarify what the "reasonable costs" of unclaimed depreciation might be in a consolidation between non-profit corporations, the Secretary has interpreted sections 413.134(k) and 413.17 to be consistent, and to hold that, where a party merges into an entity over which it will retain a significant power of control, it may not claim Medicare payment for a loss supposedly arising from its transfer of the assets in the merger.  *See* PM A-00-76.  This interpretation furthers the purpose of his regulations, which is to ensure that Medicare will not pay claims to parties that lack the incentive to incur only their actual and reasonable costs.  The Secretary's interpretation of his own regulations is reasonable, and is therefore entitled to deference.

**B.**    **Substantial Evidence Supports the Administrator's Finding that Lutheran Retained a Significant Power of Control over Central Iowa**

The Administrator applied the Secretary's interpretation of sections 413.134(k) and 413.17, and found that Lutheran and Central Iowa were related parties. Substantial evidence in the record supports the Administrator's finding, and his corresponding disallowance of the loss claim. First, nine out of 19 members of the board of the surviving entity were appointed from the Lutheran board; similarly, 11 out of 23 members of the board of the surviving entity's sole member were appointed from the Lutheran board. Second, Lutheran's chairman continued as the vice-chairman of the boards of both entities, and was given the assurance that he would next be appointed as the chairman of both boards. Third, Lutheran's president continued as the vice-president of both entities, and also served as the president of the newly-constituted "Iowa Lutheran Hospital Division" of the surviving entity. Fourth, Lutheran's sole member, the Southeastern Iowa Synod, retained the right to approve any name changes of Lutheran's facilities, and also retained a reversionary interest in the surviving entity's assets. Fifth, the charitable foundation affiliated with Lutheran continued in existence, and its funds were guaranteed to be directed for the benefit of Lutheran's facilities. These factors, viewed together, easily constitute substantial evidence that Lutheran was related to the merger's surviving entity, that is, that the principals of Lutheran retained "the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution." 42 C.F.R. § 413.17(b)(3).

-31-

Central Iowa claims (Br. 25-26) that, because Methodist controlled one more seat than did Lutheran on the boards both of the surviving entity and that entity's sole member, the parties cannot be considered to be related. But there is no rule requiring a party to have majority control of another party for the two to be related. Instead, the test is whether Lutheran retained the power "*significantly* to influence or direct the actions or policies" of the surviving entity. 42 C.F.R. § 413.17(b)(3). Lutheran's representation on both boards easily meets this standard. *See* PM A-00-76, at A.R. 1537-38.

Central Iowa also argues (Br. 26) that the composition of its board should be ignored, as there was no guarantee that the members appointed by Lutheran's principals would operate as a bloc. But section 413.17(b)(3) does not require the actual exercise of significant control, only the retained power to do so. *See MCI*, 628 F.2d at 1118; *Hospital Affiliates Int'l*, 543 F. Supp. at 1386. Central Iowa's argument ignores the fact that members from Lutheran were appointed to the new boards specifically because they had been "intimately involved" in managing Lutheran, and that experience would contribute to the success of the surviving entity. A.R. 221. Given this stated purpose, the Administrator did not err in finding that Lutheran's principals retained a significant power to influence the new entity through the board appointments.

The principals of Lutheran ensured that they would retain a significant power of control over Central Iowa, the entity to which Lutheran's assets were transferred in the merger. The Medicare regulations accordingly presume that they lacked the incentive to ensure that Lutheran received fair value for its assets. The Administrator thus correctly

determined that Lutheran could not recognize the loss that it claims it incurred in the consolidation.

## IV.    **The Secretary Is Permitted to Interpret His Own Regulations, and Deference Is Owed to That Interpretation**

As shown above, under the Secretary's reasonable construction of his Medicare regulations, a provider that does not obtain fair value for the transfer of its assets in a merger, or that transfers its assets in a merger to a party over which it will exercise significant control, cannot obtain payment from Medicare for the loss it supposedly incurs in the transaction. A merger that fails the "bona fide sale" or "related party" rules cannot be deemed to result in an accurate valuation of the provider's assets or, thus, of the provider's actual and reasonable costs in the use of those assets. *See* PM A-00-76.

Lutheran's merger into Central Iowa fails both of these rules, and the loss claim that Central Iowa submitted to Medicare reflected a loss that occurred only on paper. Central Iowa cannot demonstrate that it satisfies the requirements for its loss claim under any reading of the regulations that would reflect the Secretary's mandate to pay providers only for their actual and reasonable costs. It, instead, argues that the Secretary previously interpreted the regulations differently. It argues further that the Secretary could not revisit that interpretation without going through notice-and-comment rulemaking, or alternatively, that he was foreclosed from revisiting that interpretation at all. Its arguments are incorrect on all counts.

## A.    The Secretary Has Not Changed His Interpretation of His Regulations

The underlying premise of each of Central Iowa's arguments is that the Secretary formally committed himself to an interpretation permitting a provider to realize a gain or loss from the disposal of its assets in a merger, even if it did not receive fair value for the transfer, and even if the transfer was essentially to itself.  The Secretary never did so.  To the contrary, the Secretary has consistently reasoned, since well before 1993, that a bona fide sale requires an arm's-length transaction in which fair value has been exchanged. *See, e.g., Rio Hondo Mem. Hosp.*, 689 F.2d at 1034.  Likewise, the Secretary has consistently reasoned, since well before 1993, that the "related party" rule applies not only to providers that are related before a transaction, but also to providers that will become related as part of the transaction itself.  *See, e.g., MCI*, 628 F.2d at 1119.  The application of both of these rules to mergers and consolidations also should have come as no surprise.  In promulgating section 413.134(k), the Secretary expressly specified that the regulation incorporated the same principles for mergers and consolidations as are applicable to other transactions.  44 Fed. Reg. 6912, 6912 (Fed. 5, 1979).  He explained both that a provider in such a transaction would recognize a gain or loss only as provided under section 413.134(f) (which incorporates the bona fide sale rule), 44 Fed. Reg. at 6913, and that the generally applicable criteria of section 413.17 would govern whether merging or consolidating parties are deemed to be related, *id*.

-34-

Central Iowa refers instead to two letters from agency officials that it claims support its interpretation. This claim is unfounded. For example, the 1987 letter from William Goeller upon which Central Iowa relies states that his opinion is "necessarily general," and that any formal determination would be made only after a transaction was completed. A.R. 594. That letter recites that unrelated parties may realize a loss from a merger, but says absolutely nothing about how the agency will determine whether parties are related. A.R. 594. Moreover, the letter expressly states that gain/loss recognition in a consolidation is not automatic, but is instead governed by the provisions of section 413.134(f), including the prohibition against recognizing losses from donations. A.R. 594-95. Similarly, the 1994 letter from Charles Booth – which postdates the transaction at issue here – is silent as to how the parties to a consolidation will be determined to be related, and it instead only describes the methodology of calculating a gain or loss from the transaction, if a gain or loss were to be recognized. A.R. 679.

Central Iowa also relies on the Medicare Intermediary Manual ("MIM"), which contains an example describing the procedures for recognizing a gain or loss for parties that are unrelated prior to a merger. A.R. 1410. The example, however, does not recite that parties that become related after the fact will recognize a loss, or discuss the treatment of such parties at all. A separate section in the same manual, however, makes clear that a corporate reorganization is a "related party" transaction if a party before the reorganization is related to the surviving entity. *See* MIM § 4502.10, at A.R. 1412.

Central Iowa, in sum, cannot point to any formal document in which the Secretary committed himself to its preferred interpretation of sections 413.134 and 413.17. It instead relies on negative inferences from silences in the documents to which it cites. That is plainly insufficient. *See Thomas Jefferson Univ.*, 512 U.S. at 515-16 (mere silence in intermediary letter does not establish inconsistency in regulatory interpretation). In any event, any doubt as to whether the Secretary had formally committed himself to Central Iowa's interpretation is dispelled by the 1995 instructions from CMS's predecessor agency to the fiscal intermediary concerning this case, which specifically recited that the "related party" rule would apply to the Lutheran-Methodist merger. A.R. 1226; *see also* A.R. 564-65, 1271 (additional examples of agency's contemporaneous application of "related party" and "bona fide sale" rules to mergers).

### B.  The Secretary Has Provided a Reasoned Explanation for His Interpretation

Central Iowa claims (Br. 36) that the Secretary has failed to provide a reasoned explanation for his interpretation of sections 413.134 and 413.17, and that therefore his interpretation is arbitrary and capricious. The Secretary certainly has provided such a reasoned explanation here – his interpretation is necessary to ensure that providers be paid only for their actual and reasonable costs, and that the Medicare trust fund will not be drained by transactions that results in paper "losses."

In PM A-00-76, the Secretary explained that, in his view, there is "no real change of control of the assets" of a provider that merges into another entity, if the provider's

board or management team will retain a significant power of control over the surviving

entity. A.R. 1537. Accordingly, he reasoned that it is appropriate to compare the boards

and managements teams of the old and new entities to ensure that the parties are not

related. A.R. 1537. The Secretary also explained that a merger that involves only the

recording of the old entity's assets and liabilities on the new entity's books, without other

consideration, will not necessarily constitute a sale of the assets in exchange for fair

value. In the absence of arm's-length bargaining and an attempt to gain fair value in the

transfer, the Secretary reasoned, the mere surrender of assets in the merger will not result

in an accurate valuation of the provider's assets. A.R. 1539. Thus, the Secretary has

rationally explained the basis for his interpretation of 42 C.F.R. §§ 413.134 and 413.17.

This interpretation furthers the statutory requirement that providers be reimbursed only

for their reasonable and actual costs. Accordingly, the Secretary's interpretation is

certainly not arbitrary and capricious, and is entitled to the full measure of deference. *See

Nat'l Cable & Telecom. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005).

    Central Iowa contends (Br. 37) that the only possible explanation for the

Secretary's interpretation is that he elected to treat non-profit providers and for-profit

providers differently, and that this treatment would be arbitrary and capricious. This is

not so. PM A-00-76 does not apply the "bona fide sale" and "related party" rules only to

non-profit entities. These rules are regulatory criteria that apply to all mergers. PM

A-00-76 simply observes that non-profit transactions often have special characteristics

which must be considered when determining whether the regulatory criteria have been

met.  A.R. 1537.  As discussed above, the purpose of the Secretary's interpretation is not to impose special burdens on non-profit providers, but instead to ensure that providers not obtain payments for costs that they did not in fact incur.

### C.    The Secretary Was Not Required to Follow APA Rulemaking Procedures to Announce His Interpretation of His Existing Regulations

Central Iowa contends (Br. 40) that the Secretary could not apply his interpretation of the Medicare regulations in the absence of publication and notice-and-comment rulemaking pursuant to the Administrative Procedure Act.  That argument lacks merit. The Secretary followed the necessary procedural requirements when he promulgated section 413.134 and section 413.17, and it is the operation of those regulations that forecloses Central Iowa's loss claim.  His explanation of these provisions in PM A-00-76 is not a new rule, but merely an interpretation of the regulations that he has already adopted.  Such interpretations are exempt from the APA's notice and comment requirement.  *See* 5 U.S.C. § 553(b)(A); *Air Transp. Ass'n v. FAA*, 291 F.3d 49, 55-56 (D.C. Cir. 2002); *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993).[10]

Central Iowa contends that, even if the Secretary would not otherwise be required to go through rulemaking to interpret his regulations, he is so required where he changes

---

[10]  For the same reason, rulemaking is not required under the Medicare Act, which, like the APA, exempts the agency's interpretations of its regulations from the rulemaking procedures.  *See* 42 U.S.C. § 1395hh(a)(2), (c); *Warder v. Shalala*, 149 F.3d 73, 79 n.4 (1st Cir. 1998).

his previously stated "definitive interpretation" of those regulations.  *See Alaska Prof'l Hunters Ass'n v. FAA*, 177 F.3d 1030, 1034 (D.C. Cir. 1999).  But this requirement would apply only if Central Iowa could show that the Secretary had previously stated an "express, direct, and uniform interpretation" that was the equivalent of the agency's common law on the issue, and that it had relied upon that interpretation to its detriment.  *See Ass'n of Am. R.R. v. Dep't of Transp.*, 198 F.3d 944, 948-50 (D.C. Cir. 1999).  Central Iowa cannot show that the Secretary ever had definitively adopted its preferred interpretation of the Medicare regulations.  As discussed above, the Secretary made clear in his Federal Register notices that mergers are subject to the same "related party" and "bona fide sale" rules as are other transactions, and the Secretary applied this interpretation, contemporaneously with Lutheran's merger, to disallow losses from similar transactions.  In these circumstances, the inferences that Central Iowa seeks to draw from two isolated examples of agency correspondence, or from negative implications in an intermediary manual section, could not amount to the Secretary's "definitive interpretation" of sections 413.134 and 413.17.  *See id.*; *see also Commodity Carriers, Inc. v. FMCSA*, 434 F.3d 604, 607 (D.C. Cir. 2006); *Air Transp. Ass'n*, 291 F.3d at 57-58.  Moreover, Central Iowa cannot show that it relied on what it alleges was the Secretary's interpretation of the Medicare regulations.  By its own admission, the

calculation of any claim for Medicare reimbursement did not play a role in the parties' agreement to merge.  A.R. 231.[11]

Central Iowa argues further (Br. 39) that the APA prohibits the Secretary from applying his interpretation of the regulations "retroactively" to its merger.  But the Secretary has not amended sections 413.134 or 413.17 to create any new rights or obligations.  *See Jeanes Hosp.*, 453 F. Supp. 2d at 899 (PM A-00-76 is not new rule, but clarification of existing regulations); *Albert Einstein Med. Ctr.*, 2007 WL 2221417, at *14 (same).  The Secretary instead has "merely clarified what those existing rights and obligations had always been" under those regulations, and thus his interpretation is no more retroactive than a judicial ruling would be.  *Farmers Tel. Co. v. FCC*, 184 F.3d 1241, 1250-51 (10th Cir. 1999) (retroactivity concerns arise only if agency revised a binding interpretation of regulation) (citation omitted).  Indeed, even if the Secretary had not issued PM A-00-76, but instead had announced his interpretation for the first time in

---

[11]  The rule in the D.C. Circuit requiring an agency to go through notice-and-comment rulemaking to revise a "definitive interpretation" of its regulation has been controversial.  *See Chief Probation Officers v. Shalala*, 118 F.3d 1327, 1337 (9th Cir. 1997) (for notice-and-comment rulemaking to be required, a "rule would have to be inconsistent with another rule having the force of law, not just any agency interpretation regardless of whether it had been codified"); *White v. Shalala*, 7 F.3d 296, 304 (2d Cir. 1993); *see also* 1 Richard Pierce, Administrative Law Treatise § 6.4 at 347-48 (4th ed. 2002).  Recent Supreme Court authority implicitly rejects this case law.  The Court has held that deference is owed to an agency's interpretation of its own regulation, even if the agency has departed from its previous interpretation, so long as the change does not create unfair surprise.  *Long Island Care at Home, Ltd. v. Coke*, 127 S. Ct. 2339, 2349 (2007).  Central Iowa fares no better under this standard.  Since Medicare reimbursement was not an issue in the merger, A.R. 231, it certainly could not claim to be unfairly surprised by the Secretary's purportedly new interpretation.

-40-

this adjudication, there would be no barrier to applying the interpretation to this merger.

*See Health Ins. Ass'n of Am. v. Shalala*, 23 F.3d 412, 424 (D.C. Cir. 1994).

> **D.    The Deficit Reduction Act of 1984 Does Not Prohibit the Secretary from Interpreting His Regulations**

Before 1984, the Medicare Act did not expressly direct the Secretary to

promulgate regulations providing for reimbursement for depreciation, or for the

recognition of gain or loss on the disposition of depreciable assets. Most courts, however,

accepted that the Secretary derived his authority to issue these regulations from his

statutory mandate that he insure that providers are reimbursed for, and only for, their

actual and reasonable costs. *See St. Mark's Charities Liquidating Trust*, 141 F.3d 978,

982 (10th Cir. 1998). In light of a circuit split on the issue, Congress enacted the Deficit

Reduction Act of 1984, which directed the Secretary to adopt regulations to "provide for

recapture of depreciation in the same manner as provided under the regulations in effect

on June 1, 1984." 42 U.S.C § 1395x(v)(1)(O)(ii) (repealed 1997).

Central Iowa argues (Br. 38) that the Secretary must show that his precise

"policies" with regard to depreciation reimbursement were in effect in 1984, and that the

statute precludes the Secretary from any further interpretation of his depreciation

regulations after that date. The statute established no such rule. Congress understood that

the existing regulations were not frozen into place, and that the Secretary had the power,

if he chose, to issue new regulations addressing the calculation of depreciation recapture.

H.R. Rep. No. 98-861, at 1338 (1984), *reprinted in* 1984 U.S.C.C.A.N. 697, 2026. Thus,

the statute directed the Secretary to apply the general "method of calculating

depreciation" similar to that already used in the existing regulations, but did not prevent

him from further interpreting the substantive application of those regulations. *See Lake*

*Med. Ctr.*, 243 F.3d at 570.

###### E.    The Congressional Review Act Does Not Prohibit the Secretary from Interpreting His Regulations

Central Iowa argues (Br. 42) that the Secretary violated the Congressional Review

Act, 5 U.S.C. §§ 801 *et seq.*, by applying his interpretation of his own regulations without

first submitting that interpretation to the House and Senate for review.  But that statute

expressly precludes judicial review of any "determination, finding, action, or omission"

under it.  5 U.S.C. § 805; *see In re Operation of Mo. R. Sys. Litig.*, 363 F. Supp. 2d 1145,

1173 (D. Minn. 2004) (Congressional Review Act explicitly forecloses judicial review),

*rev'd in part on other grounds*, 421 F.3d 618 (8th Cir. 2005).  Central Iowa argues (Br.

44) that 5 U.S.C. § 805 does not prevent a court first from determining whether a rule is

in effect under the Congressional Review Act's terms.  But such an exception cannot be

reconciled with the statutory text; any claim of an "omission" under the act could simply

be rephrased as a request to determine whether a rule is in effect.  *See United States v.*

*American Elec. Power Serv. Corp.*, 218 F. Supp. 2d 931, 949 (S.D. Ohio 2002).

In any event, the Congressional Review Act contemplates only that "rules," as

defined in the APA, will be submitted to Congress for review.  5 U.S.C. § 804(3).

Contrary to Central Iowa's claim that the act requires "virtually every statement an

agency might make" (Br. 57) first to be submitted to Congress, the Secretary's interpretation of his existing regulations is certainly not a "rule" for the purpose of the act.[12]  *See, e.g., Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 428 (D.C. Cir. 2004) (Roberts, J.) (interpretation of existing regulation is not a "rule" for purposes of the APA); *see also* S. Rep. No. 79-752, at 11 (1945) (legislative history of APA defining "rules" as pronouncements that "prescribe a course of conduct for the future rather than merely pronounce existing rights or liabilities"); *Via Christi Regional Med. Ctr.*, 2006 WL 2773006, at *15 (Secretary's interpretation of sections 413.134 and 413.17 is not a rule under the Congressional Review Act).  Thus, for the same reasons that the Secretary's interpretation is not subject to the rulemaking provisions of the APA, it is not a rule under the Congressional Review Act.[13]

---

[12]  Central Iowa references (Br. 43-44) statements placed in the Congressional Record after the enactment of the statute.  Such post-enactment history – or "legislative future" – is entitled to no weight.  *See General Instr. Corp. v. FCC*, 213 F.3d 724, 733 (D.C. Cir. 2000).  In any event, contrary to Central Iowa's contention, those statements establish that congressional review would not be required if an agency statement would not have to be published in the Federal Register.  142 Cong. Rec. E571, E575 (Apr. 19, 1996) (statement of Rep. Hyde).

[13]  Nor is his interpretation a "major rule" under the Act.  The Act defines a rule as "major" if it has an annual effect on the economy of $100 million or more.  5 U.S.C. § 804(2).  The provision governing gain/loss recognition upon which Central Iowa relies was repealed in 1997, *see* note 1 *supra*, and thus the Secretary's interpretation has no continuing impact upon the economy at all.

-43-

## <u>CONCLUSION</u>

For the foregoing reasons, the plaintiff's motion for summary judgment should be denied, the defendant's cross-motion for summary judgment should be granted, and judgment should be entered in favor of the defendant.

Dated: August 24, 2007                     Respectfully submitted,

                                            PETER D. KEISLER
                                            Assistant Attorney General

Of Counsel:

                                            JEFFREY A. TAYLOR
DANIEL MERON                                United States Attorney
General Counsel

JANICE HOFFMAN                              ___/s/ Joel McElvain_____
Acting Associate General Counsel           SHEILA M. LIEBER
                                            Deputy Director
MARK D. POLSTON                            JOEL McELVAIN, D.C. Bar # 448431
Deputy Associate General                   Attorney
    Counsel for Litigation                 United States Department of Justice
                                            Civil Division, Federal Programs Branch
DAVID HOSKINS                              20 Massachusetts Ave., NW, Room 7130
Attorney                                    Washington, D.C. 20001
Office of the General Counsel              Telephone:   (202) 514-2988
U.S. Department of Health                  Fax:         (202) 616-8202
    and Human Services                     Email:       Joel.L.McElvain@usdoj.gov

                                            *Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CENTRAL IOWA HOSPITAL CORPORATION, | ) | |
| successor-in-interest to Iowa Lutheran Hospital, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:07-cv-00295-RWR |
| | ) | |
| MICHAEL O. LEAVITT, as Secretary of Health | ) | |
| and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT'S RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS, AND DEFENDANT'S STATEMENT OF MATERIAL FACTS

The defendant, Michael O. Leavitt, as Secretary of Health and Human Services, hereby submits his response to the statement of material facts submitted by the plaintiff, Central Iowa Hospital Corporation. The Secretary also hereby submits his statement of material facts in opposition to the plaintiff's motion for summary judgment, and in support of his cross-motion for summary judgment.

### Defendant's Response to Plaintiff's Statement of Material Facts

Pursuant to 42 U.S.C. § 1395oo(f), this Court reviews the decision of the Administrator of the Centers for Medicare and Medicaid Services on the administrative record, and the sole issue before the Court is whether substantial evidence supports the Administrator's findings. The Secretary notes that, given this standard of review, many of the plaintiff's assertions are immaterial. The Secretary nonetheless responds to the plaintiff's statement of material facts as follows:

1.      Undisputed, but not material.

2.      Undisputed, but not material.

3.      Undisputed, but not material.

4.      Undisputed, but not material.

5.      Undisputed, but not material.

6.      Undisputed, but not material.

7.      Undisputed, but not material.

8.      Undisputed, but not material.

9.      Disputed.  Iowa Lutheran Hospital ("Lutheran") and Iowa Methodist Medical Center did not engage in arm's length negotiations.

10.     Undisputed.

11.     Undisputed.

12.     Undisputed.

13.     Undisputed, but the Secretary notes that the statement that "[t]he statutory merger was entered into in good faith" does not entail that the merger was the equivalent of a bona fide sale of Lutheran's assets.

14.     Undisputed.

15.     Undisputed.

16.     Undisputed.

17.     Disputed.  The Secretary does not dispute that Iowa Lutheran Hospital and Iowa Methodist Medical Center were not subject to common ownership or common

control before the merger.  At the time that the statutory merger occurred and thereafter, however, there was a significant continuity of control between the board and management team of Lutheran and the board and management of the surviving entity.

18.     Disputed.  Members of the board and management team of Lutheran retained a significant power of control over the surviving entity.

19.     Undisputed, but not material.

20.     Disputed.  Nine members of the surviving entity's board were appointed from Lutheran.  This discrepancy, however, is immaterial.

21.     Disputed.  Eleven members of the surviving entity's sole member's board were appointed from Lutheran.  This discrepancy, however, is immaterial.

22.     Undisputed, but not material.

23.     Undisputed, but not material.

24.     Disputed.  Members were appointed to the new boards from Lutheran specifically because those members shared common expertise in the management of that hospital.

25.     Undisputed that Lutheran's liabilities in the amount of $28,092,831 were assumed by the surviving entity.  The remainder of the paragraph is disputed.  Lutheran did not incur any loss evidenced by the merger, let alone a loss reimbursable by Medicare.

26.     Undisputed that Lutheran sought payment from Medicare for an alleged loss in the value of its depreciable assets.  The remainder of the paragraph is disputed.

Lutheran did not incur any loss as a result of the merger, let alone a loss reimbursable by Medicare.

27.    Undisputed.

28.    Disputed.  The Secretary's interpretation of the "related parties" and "bona fide sale" rules is not itself a rule.  Moreover, his interpretation does not have an annual impact of $100 million or more.  It has no annual impact at all, as the system under which provider could claim additional depreciation payments upon the disposal of an asset is no longer in place.  Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4404(a), 111 Stat. 251, 400.

<strong><u>Defendant's Statement of Material Facts</u></strong>

The defendant respectfully submits that there is no genuine dispute as to the following material facts:

1.    Before 1993, Lutheran was a non-profit corporation that participated in the Medicare program.  A.R. 183.

2.    Lutheran's sole member (*i.e.*, the equivalent of a sole shareholder for a non-profit corporation) was the Southeastern Iowa Synod of the Evangelical Lutheran Church of America.  A.R. 183, 876.

3.    In 1992, Lutheran began to consider forming a partnership with another provider, as a means to respond to the rise of managed care in the health care market. A.R. 216.

4.  Lutheran entered into discussions with Iowa Methodist Medical Center ("Methodist") regarding a possible affiliation between the two entities. A.R. 211-12.

5.  Methodist, like Lutheran, had only one member, the Iowa Methodist Health System. A.R. 511.

6.  These discussions culminated in early 1993, when the two hospitals entered into a memorandum of understanding reciting their agreement to a merger. A.R. 352.

7.  In the negotiations leading to this agreement to merge, the principals of Lutheran had "particular concerns" that the transaction could lead to a "[l]oss of control" of the hospital, as well as a "fear of losing our Lutheran identity" in the transaction. A.R. 220.

8.  The negotiations between the parties focused on the structure of the board and of the executive leadership of the entity that would survive from the merger. A.R. 184, 199-200, 220.

9.  The perpetuation of the provider's Lutheran heritage and identity were also an important part of the negotiations. A.R. 220, 223.

10.  Neither Lutheran nor Methodist discussed the possibility of negotiating a price at which Methodist would buy Lutheran's assets. A.R. 199.

11.  The principals of Lutheran did not place the provider for sale on the open market, and, in particular, did not attempt to contact any investor-owned hospital chains regarding any potential sale. A.R. 228.

- 5 -

12.    Lutheran received no consideration in the merger in exchange for the surrender of its assets, other than the assumption of its liabilities.  A.R. 240.

13.    The merger became effective on November 22, 1993.  A.R. 356.

14.    In the transaction, Lutheran merged into Methodist, and the surviving entity was renamed as the Iowa Health System Hospital Corporation.  A.R. 186.

15.    The surviving entity has since been renamed again as Central Iowa Hospital Corporation.  A.R. 235.

16.    Methodist's sole member, the Iowa Methodist Health System, was renamed as Iowa Health System and continued as the sole member of the surviving entity.  A.R. 186, 511.

17.    The merger agreement contained detailed provisions describing the composition of its board and management team.

18.    The board of Iowa Health System, the sole member of the surviving entity, had 23 members, 11 of whom were appointed from Lutheran.  A.R. 201-02, 352-53, 379.

19.    Nine directors (including two physicians) were selected by the board of Lutheran; Lutheran's president, Rex Levering, continued as the vice-president of Iowa Health System, and served on its board; and the Bishop of the Southeastern Iowa Synod of the Evangelical Church of America, which had been Lutheran's sole member, served as an *ex officio* member of the new sole member's board.  A.R. 201-02, 352-53, 379.

20.    The board of the surviving entity, Iowa Health System Hospital Corporation, was similarly constituted.  It had 19 members, nine of whom were appointed from Lutheran.  A.R. 202, 386-87.

21.    Mr. Levering served as the surviving entity's vice-president, as well as president of its newly-constituted "Iowa Lutheran Hospital Division."  A.R. 369, 372.

22.    Thomas D. Smith, formerly the chairman of the Lutheran board, served as vice-chairman of the boards both of Iowa Health System Hospital Corporation and its sole member, and Lutheran was given the assurance that either Mr. Smith or another representative from Lutheran would serve the next term as chairman of both boards.  A.R. 369-70.

23.    The parties deliberately included members from the former board of Lutheran on the board of the surviving entity, in order to draw on their experience with that hospital.  According to Mr. Levering, members from the Lutheran board were selected because "[t]hey had a lot to contribute.  They had been intimately involved with Lutheran as board members.  As a smaller hospital, hospital boards tend to become more involved when closer to the institution than large regional healthcare systems, and that was certainly true of the Iowa Lutheran Board."  A.R. 221.

24.    Lutheran's sole member, the Southeastern Iowa Synod, retained the right to approve any change in the name of the Lutheran facilities through the year 2000, and also retained a reversionary interest the surviving corporation's assets.  A.R. 352, 381.

25.    Lutheran had been affiliated with a charitable foundation, the Iowa Lutheran Hospital Foundation.  Under the merger agreement, that foundation continued in existence, and donations to the foundation were guaranteed to be used for Lutheran's hospital facilities.  A.R. 205-06.

26.    The surviving entity submitted a cost report to Medicare that treated the merger as the equivalent of a sale of Lutheran's assets.  For this purpose, it claimed that Lutheran had surrendered all of its assets, with a reported value of $64.9 million (including $40.1 million in cash or cash equivalents), in exchange for the surviving entity's assumption of Lutheran's liabilities, which amounted to $28.1 million.  A.R. 167-68, 190-91, 756.

27.    The surviving entity claimed that it was entitled to payment from Medicare for a $5.4 million portion of the loss in value of Lutheran's depreciable assets purportedly resulting from this exchange.  A.R. 236-37.

28.    The surviving entity prepared financial statements that treated the merger not as a sale of assets, but instead as a "pooling of interests."  A.R. 307, 1352, 1369.

29.    Under this method, Central Iowa did not, for purposes of its own records, treat the combination as a change of ownership, and did not report any loss from the transaction.  A. 131-33.

30.    In cost reports submitted to Medicare for later years, Central Iowa used the higher basis resulting from the pooling method to calculate the depreciation allowance for Lutheran's depreciable assets.  A.R. 242.

31.     The effect of this approach was to permit Central Iowa to claim the same depreciation allowance twice for the same assets.  A.R. 242.

32.     Medicare's fiscal intermediary reviewed the cost report, and denied the claim for Medicare payment.  A.R. 1535.

33.     Central Iowa appealed to the PRRB, and the Board issued a decision that allowed the claim, but that remanded the matter to the intermediary to resolve an apparent discrepancy in the calculation of the fair market value of Lutheran's assets, and also to adjust the claim to account for the additional depreciation that Central Iowa had claimed for the years following the merger.  A.R. 59.

34.     The CMS Administrator issued a decision reversing the decision of the PRRB, and disallowing the claimed loss.  A.R. 2.

35.     He determined that the merger could not qualify as a bona fide sale, as would be required for the realization of a loss on the transfer of depreciable assets.  He found that the absence of any arm's length bargaining, or of any attempt by the principals of Lutheran to seek fair value for its assets, indicated that the exchange was not a bona fide sale.  A.R. 29.

36.     In addition, he found that the sizable discrepancy between the reported value of Lutheran's assets and their purported sale price further indicated that no bona fide sale had occurred.  A.R. 29.

37.     The Administrator also disallowed the claim for a second, independent reason:  the merger was a related party transaction.  A.R. 27.  The Administrator noted

that Lutheran's principals continued to participate as members of the surviving entity's board and as top executives of that entity.  A.R. 27.

38.    Merging parties frequently will negotiate an exchange of consideration. A.R. 269.

39.    Lutheran was insured against contingent liabilities, A.R. 469-70, and it further warranted in the merger agreement that its financial statements had fairly described its financial condition.  A.R. 358.

40.    Lutheran was not motivated to seek fair consideration at all, but instead focused its concerns on ensuring that its principals would play a continuing role in the surviving entity.  A.R. 184, 199-200, 220.

41.    The calculation of any claim for Medicare reimbursement did not play a role in the parties' agreement to merge.  A.R. 231.

42.    Before the Administrator, Central Iowa claimed that, for the purposes of calculating the amount of its alleged loss, the fair market value of Lutheran's assets was $64.9 million.  A.R. 38, 46.

Dated: August 24, 2007

Of Counsel:

DANIEL MERON
General Counsel

KATHLEEN H. McGUAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate General
   Counsel for Litigation

DAVID HOSKINS
Attorney
Office of the General Counsel
U.S. Department of Health
   and Human Services

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney


   /s/ Joel McElvain
SHEILA M. LIEBER
Deputy Director
JOEL McELVAIN, D.C. Bar # 448431
Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7130
Washington, D.C. 20001
Telephone:   (202) 514-2988
Fax:         (202) 616-8202
Email:      Joel.L.McElvain@usdoj.gov

*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CENTRAL IOWA HOSPITAL CORPORATION,    )
successor-in-interest to Iowa Lutheran Hospital,    )
     )
                   Plaintiff,    )
     )
                   v.    )    Case No. 1:07-cv-00295-RWR
     )
MICHAEL O. LEAVITT, as Secretary of Health    )
and Human Services,    )
     )
                   Defendant.    )

## [PROPOSED] ORDER

Upon consideration of defendant's cross-motion for summary judgment, and the

memoranda filed in support thereof and in opposition thereto, it is hereby

ORDERED that defendant's cross-motion for summary judgment is GRANTED,

and it is

FURTHER ORDERED that plaintiff's motion for summary judgment is DENIED,

and it is

FURTHER ORDERED that judgment shall be entered in favor of the defendant.


Dated: _____, 2007    _____
                                  RICHARD W. ROBERTS
                                  UNITED STATES DISTRICT JUDGE

Copy To:

Joel McElvain
U.S. Department of Justice
20 Massachusetts Avenue, N.W., Room 7130
Washington, D.C.  20001
Attorney for Defendants

Harold G. Belkowitz
Ober, Kaler, Grimes & Shriver
1401 H Street, N.W., Suite 500
Washington, D.C.  20005
Attorney for Plaintiffs