IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTRAL IOWA HOSPITAL CORPORATION, successor-in-interest to IOWA LUTHERAN HOSPITAL,<br><br>        Plaintiff,<br><br>                v.<br><br>MICHAEL O. LEAVITT, as Secretary of Health and Human Services,<br><br>        Defendant. | CASE NO.: 1:07-CV-00295-RWR |

PLAINTIFF'S REPLY TO DEFENDANT'S MEMORANDUM
IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT,
AND IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

I.      INTRODUCTION

Plaintiff Central Iowa Hospital Corporation ("Central Iowa") demonstrated that Medicare regulations and related interpretations required the Secretary to recognize Iowa Lutheran Hospital's loss incurred on a statutory merger with an unrelated entity.   *See Memorandum of Points and Authorities In Support of Plaintiff's Motion for Summary Judgment* ("*Mem. Supp. Pl.'s Summ. J.*").   The Secretary disagrees.   The linchpin of the Secretary's position is the October 2000 PM on which the Administrator relied in denying Iowa Lutheran Hospital's claim.

II.      FACTS OF THE DISPUTE

The Secretary admitted that Iowa Lutheran Hospital merged into Iowa Methodist Medical Center and that the transaction was a statutory merger (*Defendant's Response to Plaintiff's Statement of Material Facts* ("*Def.'s Resp. Pl.'s Mat. Facts*") at ¶ 10).   The Secretary also admitted that prior to the statutory merger, the two entities were not related parties, i.e., subject to common ownership or control (*Id.* at ¶17).   Accordingly, undisputed facts demonstrate that the transaction was a statutory merger between unrelated parties.

III.    <u>ARGUMENT</u>

    A.    The Secretary Has Not Demonstrated That The Administrator's Determination <u>Was Consistent With The Medicare Statute And  Regulations</u>

        1.    The Secretary Would Improperly Restrict Review Of The Administrator's <u>Determination</u>

Central Iowa demonstrated that the Administrator's determination was contrary to the Secretary's regulations and interpretations.  Relying on *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504 (1994), the Secretary asserts that this court must nevertheless give substantial deference to his interpretation of Medicare regulations and uphold the Administrator's decision (*Memorandum In Opposition To Plaintiff's Motion For Summary Judgment and In Support of Defendant's Cross-Motion for Summary Judgment* ("*Mem. Opp'n Pl.'s Summ. J.*") at 15. However, a regulatory interpretation which is plainly erroneous or inconsistent with the regulation or other indications of the Secretary's intent when he promulgated the regulation need not be accepted.  512 U.S. at 512.   Additionally, "an agency's interpretation of a . . . regulation that conflicts with a prior interpretation is 'entitled to considerably less deference' than a consistently held agency view."  512 U.S. at 515.[1]

An agency's regulatory interpretation may receive deference only if: (1) the language of the regulation is ambiguous; (2) the agency's interpretation is fairly supported by the regulatory text; and (3) there is no reason to suspect that the agency's interpretation does not reflect its fair and considered judgment.  *Drake v. F.A.A.*, 291 F.3d 59, 68 (D.C. Cir. 2002).[2]   The regulatory interpretation fails on all three counts.  The regulation's plain language – requiring recognition of

---

[1]   The Court relied on *Watt v. Alaska*, 451 U.S. 259, 272-73 (1981) where it rejected an agency's statutory interpretation that was contrary to its longstanding interpretation, finding that the agency's *previous* "contemporaneous construction carries persuasive weight."

[2]   The *Drake* court referred to the Supreme Court's decision in *Auer v. Robbins*, 519 U.S. 452 (1997).  *Auer* was decided subsequent to *Thomas Jefferson Univ.,* but applied the same principles.

a gain or loss when a "statutory merger is between two or more corporations that are unrelated" – unambiguously required recognition of Iowa Lutheran Hospital's loss (*Mem. Supp. Pl.'s Summ. J.* at 16-17, 20-21, 29); the Secretary's contrary interpretation is not supported by the regulatory text (*id.*); and there is *every* reason to suspect that the regulatory interpretation set forth in the PM on which the Administrator relied did not reflect the agency's fair and considered judgment. The PM reversed the Secretary's longstanding interpretation solely because it proved to be contrary to the Secretary's economic interest (*Id.* at 7-10). *See Drake*, 291 F.3d at 69 (in determining whether regulatory interpretation was "fair and considered," court should consider whether agency previously adopted contrary interpretation).

The Secretary asserts that the Administrator's findings that the merger was not a *bona fide* sale and that Iowa Lutheran Hospital and Central Iowa were related parties were supported by substantial evidence (*Mem. Opp'n Pl.'s Summ. J.* at 16, 23). Even assuming *arguendo* that that were true (it is not), as stated by then-Judge Scalia, "an agency action which is supported by the required substantial evidence may in another regard be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' – for example, because it is an abrupt and unexplained departure from agency precedent." *Association of Data Processing Ser. Org. v. Board of Governors of Fed. Reserve Syst.*, 745 F.2d 677, 683 (D.C. Cir. 1984). The Administrator disallowed Iowa Lutheran Hospital's loss claim based on requirements to which it was not subject. Accordingly, it is irrelevant whether substantial evidence supports his determination that those requirements were not satisfied.

### 2. The Secretary Seeks To Avoid His Own Regulations

The Secretary would have this court believe that the Administrator had the unfettered right to make whatever determination he believed would result in payment of "reasonable cost," and that the court should defer to such determination, irrespective of the terms of the Secretary's

regulations.  According to the Secretary, his mandate is to pay providers only for their actual and reasonable costs, and his interpretation requiring a statutory merger to be a "*bona fide* sale" and requiring control over the surviving entity to be held by individuals with no previous connection to the merged entity is consistent with that mandate (*Mem. Opp'n Pl.'s Summ. J.* at 1, 33).

However, the Medicare statute does not permit the Secretary to disregard his own regulations.  The Secretary's statutory mandate is to "prescribe such regulations" as are necessary to carry out the Medicare program (42 U.S.C. § 1395hh), and then to reimburse providers based on "the reasonable cost of [their] services" as determined under *regulations* defining "reasonable cost."  42 U.S.C. § 1395(f)(b).  The Secretary's obligation to reimburse reasonable costs *as defined in regulations* is reaffirmed in the statutory definition of "reasonable cost" of services as "the cost actually incurred . . . determined in accordance with regulations." 42 U.S.C. § 1395x(v)(1)(A).  Therefore, the Secretary is required to recognize Iowa Lutheran Hospital's loss in accordance with his regulations.  *See Maximum Home Health Care v. Shalala*, 272 F.3d 318, 321 (6th Cir. 2001) (Medicare interpretation that required providers to satisfy requirement not included in regulations "undermines the clear Congressional purpose underlying the requirement that significant rules be established by regulation") (S*ee generally, Mem. Supp. Pl.'s Summ. J.* at 17).[3]

In seeking deference for his position, the Secretary asserts that Congress assigned him the role of defining reimbursable costs, and that in fulfilling this statutory mandate, he may be required "to draw fine lines" (*Mem. Opp'n Pl.'s Summ. J.* at 15) (*quoting Sun Towers, Inc. v. Heckler*, 725 F.2d 315 (5th Cir. 1984)).  In promulgating regulations addressing depreciation, the

---

[3] The Secretary asserts that "[i]n the 1990's providers used the 'loss-on-sale' rules to make large claims for depreciation reimbursement that did not reflect their actual and reasonable costs" (*Mem. Opp'n Pl.'s Summ. J.* at 8, n.1).  The agency's OIG expressed concern regarding Medicare's increasing liability for losses on hospital sales (A.R. 543-45).  However, it did not find that questionable loss claims were being submitted, or that Medicare was not required to reimburse such losses under existing regulations.

Secretary drew a discernible line between sales of assets and statutory mergers.  In the case of a sale of assets, a gain or loss is recognized if the transaction is a *bona fide* sale. 42 C.F.R. § 413.134(f)(2).  In the case of a statutory merger, a gain or loss is recognized if the merging entities were not related parties prior to the transaction (*Id.* at (*l*)).  The Secretary should not be permitted to disregard the regulatory distinction that he has made and require statutory mergers to satisfy requirements applicable to sales of assets.  *See Sun Towers*, 725 F.2d at 331 (upholding Secretary's distinction between statutory mergers and stock acquisitions).  *See also, Richey Manor, Inc. v. Schweiker*, 684 F.2d 130, 135-36 (D.C. Cir. 1985) (upholding distinction between purchase of corporate stock and purchase of corporate assets).

> 3.   The Administrator's Related Parties Determination Was Contrary To Law And Regulation

> > a.   Regulations Do Not Permit The Determination To Be Based On Control Over The Surviving Entity After A Statutory Merger

Notwithstanding the fact that Iowa Lutheran Hospital merged into Iowa Methodist Medical Center and that prior to the transaction those entities were not subject to common control or ownership, the Secretary argues that Iowa Lutheran Hospital "was related to the entity into which it merged" and which received its assets (*Mem. Opp'n Pl.'s Summ. J.* at 25).  The Secretary asserts that the statutory merger was between related parties based on the "relationship" of Iowa Lutheran Hospital before the transaction and Iowa Hospital Corporation, the surviving entity, after its completion.  According to the Secretary, "the regulation's use of the present tense – 'that are unrelated' – is most naturally read to refer not to the parties' prior relationship, but instead to include the relationship created at the time of the merger itself, including the continuing relationship with the entity surviving from the merger" (*Id.* at 26).  However, the present tense reflects the regulatory intent that the related party determination be based on the parties' status at the time of the transaction, not thereafter.  Additionally, the regulation refers to a statutory merger

"*between* two or more corporations that are unrelated." The statutory merger was between Iowa Lutheran Hospital and Iowa Methodist Medical Center. (*See also, Id.* at 6-7) (gain or loss not allowed "where the parties to the transaction are 'related'. . . ").

The Secretary attempts to find support for the Administrator's determination that the statutory merger was between related parties in Medicare's general related party regulations (*Id.* at 26, 30). These regulations do not and cannot override Medicare regulations that specifically define a statutory merger between unrelated parties. To the extent that the two regulations are inconsistent with one another, "normally the specific governs the general." *Long Island Care at Home, Ltd. v. Coke*, 127 S. Ct. 2339, 2348 (2007).[4]

The Secretary's memorandum states that the continuity of control test is consistent with the related party rule "because a party that will continue to exercise significant control over an asset after its purported transfer lacks an incentive to bargain for the true value of the asset . . ., " and that Medicare regulations presume that parties who retain significant control after a statutory merger lack incentive to seek fair market value (*Mem. Opp'n Pl.'s Summ. J.* at 2, 32). This argument should be rejected. The *Secretary* has not suggested that his continuity of control position reflects concerns regarding the merging entity's lack of incentive to seek fair compensation based on its post-transaction relationship with the surviving entity. This theory is an improper *post hoc* rationalization provided by his attorneys. *See Investment Co. Institute v. Camp*, 401 U.S. 617, 628 (1971) (Court finds that agency counsel has rationalized basis of regulation with "great professional competence," but such rationalizations were not agency's interpretations that may receive "great weight"). Additionally, there is no indication in the

---

[4] Central Iowa does not challenge the criteria specified in the general related party regulations. If a statutory merger is between entities that are subject to common control or ownership as defined in those regulations, then the transaction is between related parties. However, that was not the case.

regulatory text or administrative history that related party principles were intended to apply to transactions between unrelated parties based on the perceived incentives of one or both parties.

As explained by Michael Maher, the former agency official who was in charge of developing the regulation addressing statutory mergers, recognition of a gain or loss on a statutory merger between unrelated parties reflected the agency's determination that such a transaction would provide a better basis to recompute depreciation that the initial computation which would have been based on the asset's initial cost and estimated useful life (*Mem. Supp. Pl.'s Summ. J.* at 18). This reflected the agency's early recognition that depreciation calculated based on a formula might be characterized as "a guesstimate" (A.R. 527). On that basis, there was no requirement that there be a change in control or that a merging provider demonstrate that its liabilities assumed by the surviving entity reflected the fair market value of its assets ((*Mem. Supp. Pl.'s Summ. J.* at 18, 22, 29).[5] Whether the Secretary (or his attorneys) now believe that another policy could better fulfill the purpose of the related party rule or the Medicare program generally is irrelevant. The Secretary cannot interpret regulations to provide what he elected not to say when the regulations were promulgated.[6]

Finally, to support his position that related party regulations require disallowance of Iowa Lutheran Hospital's loss, the Secretary treats the statutory merger as a purchase and sale. The Secretary states that the regulation "provides that the relevant inquiry is that between the entity

---

[5] Relying on *Burkhart v. WMATA*, 112 F.3d 1207 (D.C. Cir. 1977), the Secretary would have this court disregard testimony of Mr. Maher and Eric Yospe, who was in charge of preparation of the corresponding MIM provision (*Mem. Opp'n Pl.'s Summ. J.* at 18, n. 13). However, *Burkhart* addressed admissibility of evidence under the Federal Rules of Evidence ("FRE"). The Board was not bound by the FRE (*see* 42 C.F.R. § 405.1855). Moreover, testimony from Messrs. Maher and Yospe regarding agency intent and HCFA's prior application of those provisions is clearly relevant. Their testimony was consistent with the plain terms of the regulation and MIM; it was not used to contradict their language.

[6] Medicare regulations preclude recognition of costs resulting from transactions between related parties even though this might result in disallowance of reasonable costs that were necessarily incurred. *See, Shaker Medical Center Hospital v. Secretary of Health and Human Services,* 686 F.2d 1207 (6th Cir. 1982). It was not unreasonable for the Secretary to determine that the fact that the parties to a statutory merger were *not* related was a sufficient basis to recalculate depreciation costs.

furnishing the goods or services (the seller, in this case, Lutheran) and the entity receiving them (the buyer, in this case, the surviving entity – Central Iowa)" (*Id*. at 27).  But a statutory merger is not a "sale" and a merging entity is not a "selling party."  Therefore, the Secretary's reliance on general related party regulations fails.

(i)    The Administrator's Determination Was Contrary To HCFA Interpretations

The Secretary asserts that he has consistently reasoned since well before 1993 that the related party rule applies to providers that are related before a transaction and "to providers that will become related as part of the transaction itself" (*Mem. Opp'n Pl.'s Summ. J.* at 34). However, Iowa Lutheran Hospital did not "become related" to the surviving entity after the statutory merger; Iowa Lutheran Hospital ceased to exist as a result of the transaction (*Def.'s Resp. Pl.'s Mat. Facts* at ¶14).  Additionally, the Secretary refers to no evidence within the administrative record of more than 1500 pages that indicates that, on or before the date of the transaction, a loss on statutory merger (or consolidation) had ever been disallowed based on post-transaction control over the surviving entity.  According to the Secretary, Central Iowa's reliance on letters from Directors Booth and Goeller and the MIM is based on "negative inferences from silence in [those] documents" (*Mem. Opp'n Pl.'s Summ. J.* at 36).  The Secretary asserts that Directors Booth and Goeller did not address how the related party determination was made in the context of a statutory merger (*Id.* at 35).  However, as discussed below, the MIM clearly demonstrates that the related party determination is to be based on the relationship of the merging entities prior to the transaction.  Additionally, in response to an inquiry related to a consolidation, Director Booth determined that the transaction was between unrelated parties even though the governing board of the entity resulting from the transaction was comprised exclusively of former members of the governing boards of the two entities that engaged in the transaction (*Mem. Supp. Pl.'s Summ. J.* at 22).  Director Booth's conclusion demonstrated that

the related party determination was based on the relationship of the participants at the time of the transaction. The Secretary also asserts that Director Goeller stated that recognition of a gain or loss from a statutory merger "is not automatic" (*Mem. Opp'n Pl.'s Summ. J.* at 35). However, Director Goeller stated that where the surviving corporation after the transaction assumed debt of the merged corporation, "an adjustment to recognize any gain or loss to the . . . corporations *would* be required in accordance with regulations section 42 CFR 413.134(f) (emphasis added)" (A.R. 594-95).

Finally, the Secretary asserts that the MIM did not provide "that parties that become related after the fact will recognize a loss" on statutory merger (*Mem. Opp'n Pl.'s Summ. J.* at 35). However, the MIM – which continued to be in effect after the PM's publication – demonstrates that only the merging entities' relationship prior to the transaction is relevant to the related party determination (*Mem. Supp. Pl.'s Summ. J.* at 21-22). When Corporation A merged with an unrelated entity, Corporation B, with Corporation A surviving, recognition of any gain or loss was required, with no further qualification. There is nothing to suggest that control over the surviving entity, Corporation A "after the fact" is relevant. Contrary to the Secretary's suggestion (*Mem. Opp'n Pl.'s Summ. J.* at 6), this is in stark contrast to *Thomas Jefferson Univ.* where the Court rejected reliance on silence in an internal operating memorandum regarding the relevant payment principle because the memorandum "did not purport to be a comprehensive review" and "attempted to review only a number of situations . . . ." 512 U.S. at 515-16. The MIM was intended to provide as much detail and direction to fiscal intermediaries as possible (A.R. 281, 283). It was silent regarding post-transaction control for the same reason that it did not specify the location of the transaction participants, whether they were for-profit or non-profit entities, and other immaterial facts. *See generally, Battle Creek Health System v. Leavitt*, 2007

Fed. App. 0314P (6th Cir. Aug. 14, 2007) (MIM "often referenced by the courts as an authoritative source") (citations omitted)).

The MIM and letters from Directors Booth and Goeller are entitled to substantial deference. *See Air Transport Ass'n of America, Inc. v. Federal Aviation Administration,* 291 F.3d 49, 53 (D.C. Cir. 2002) (letter from agency's deputy counsel and Federal Register notice incorporating letter entitled to deference); *Public Citizens, Inc. v. Lew*, 127 F.Supp.2d 1, 7-8, 10 (D. D.C. 2000) (court defers to agency's interpretation set forth in OMB Circular and sworn declaration of agency's deputy administrator) (*Mem. Supp. Pl's Summ. J.* at 18-19). They cannot be disregarded as the Secretary suggests. *See Watt v. Alaska, supra.,* n.1.

(ii)    Policies Related To Other Transactions Do Not Support The Administrator

The Secretary states that the MIM provides "that a corporate organization is a 'related party' transaction if a party before the reorganization is related to the surviving entity" (*Mem. Opp'n Pl.'s Summ. J.* at 35). However, the transaction at issue was not a corporate reorganization (*see Mem. Supp. Pl.'s Summ. J.* at 23). The Secretary also asserts that the surviving entity treated the merger as a "pooling of interests" and did not report a loss on its financial statements (*Mem. Opp'n Pl.'s Summ. J.* at 12). However, application of general accounting principles are irrelevant to this dispute (*see Mem. Supp. Pl.'s Summ. J.* at 23-24). *See also Richey Manor,* 684 F.2d at 135 (accounting and legal principles in other contexts "have little persuasive force" where issue addressed by Medicare regulations and related policies). Finally, the Secretary asserts that the surviving entity used the higher basis in completing its Medicare cost reports, as a result of which, it "claim[ed] the same depreciation allowance twice for the same assets" (*Mem. Opp'n Pl.'s Summ. J.* at 12). However, the surviving entity's cost reports were consistent with the Intermediary's determination rejecting the loss claim, and put

the Intermediary on notice that it disagreed with that treatment by including "a negative protested item" on its cost report in accordance with Medicare directives (A.R. 49-52, 242).

> (iii)    The Administrator's Related Party Determination Was Contrary To Applicable Case Law

The Secretary asserts that *Medical Ctr. of Independence v. Harris ("MCI")*, 628 F.2d 1113 (8th Cir. 1980), *aff'g*, No. 76-CV-525-W-4 [1979 Transfer Binder] Medicare and Medicaid Guide (CCH) ¶ 29,948 (W.D. Mo. June 20, 1979) demonstrates "the need for a full review of the parties' relationship" (*Mem. Opp'n Pl.'s  Summ. J.* at 28).   However, *MCI*  did not involve a statutory merger subject to regulations that specify how related party regulations are to be applied, but rather, involved expenses related to a contractual relationship between a hospital and management company for on-going services.  The district court observed that the "three and one-half page management contract which purports to establish the rights and liabilities of a hospital and hospital manager over the next fifteen years, would have to be continually 'renegotiated' (to use the term loosely)." (CCH) ¶ 29,948 at 9,226. According to the court, "[i]n such a case, the true character of the relationship between the parties is determined not so much by the character of the initial contract negotiations, but, instead, by the hundreds of 'renegotiations' and accommodations which will most certainly occur over the life of the principal contract" (*Id.*). Since the contract manager had power to significantly influence the hospital after the contract was in place, it could "cut back" on services, without fear that the hospital might insist on strict compliance with the contract (*Id.*).  In affirming the lower court's determination that the contract was a related party transaction, the appellate court emphasized that the terms of the agreement would "be refined, modified and enforced in light of experience and the parties' respective power through the years."  628 F.2d at 1119.

Even if application of related party principles to statutory mergers was not specified in regulations, *MCI's* reasoning does not apply to Iowa Lutheran Hospital's statutory merger with

Iowa Methodist Medical Center.  The transaction terms were specified in detailed legal documents – not a short agreement requiring additional negotiations to determine each party's contractual responsibilities (A.R. 356-90).  Additionally, unlike a management contract, the statutory merger did not result in an on-going relationship.  Because Iowa Lutheran Hospital ceased to exist, there was no potential for the parties to refine or modify their agreement over time.  Additionally, the *MCI's* court's concern was with the reasonableness of costs incurred after the contract arrangements there at issue, 628 F.2d at 1119, not with "unreasonable costs in the transaction" as the Secretary suggests (*Mem. Opp'n Pl.'s  Summ. J.* at 28).  The *MCI* court "emphasize[d] that, while the [related party] regulation relieves the Secretary of the need to determine the unreasonableness of particular costs, she must establish by substantial evidence the applicability of the regulations to the facts of each case."  628 F.2d at 1120.  The Secretary has not done so here.  The Secretary suggests that, as reflected in HCFA Ruling 80-4 and certain PRM provisions, he adopted *MCI* as his formal interpretation of the related party regulation (*Mem. Opp'n Pl.'s  Summ. J.* at 29).  However, HCFA Ruling 80-4 refers to "Inclusion in Allowable Costs of Payments Made Pursuant to Lease and Management Agreements"  (A.R. 1396).  It does not reflect any agency intention to apply *MCI* to other arrangements.  Similarly, the PRM provisions on which the Secretary relies do not address such transactions.

Relying on *Kidney Ctr. of Hollywood v. Shalala*, 133 F.3d 78 (D.C. Cir. 1988), the Secretary asserts that the related party rule is reasonably interpreted "to require an examination of the relationship between the seller and actual buyer."  However, the "actual buyer" to which the court referred was "NMC Holding," one of the parties to the statutory merger, as that entity existed prior to the transaction (*Id*. at 85-86).  After the transaction, NMC Holding became known as National Medical Care, Inc. or "New NMC" (*Id*. at 83).  The issue in dispute was "whether the transaction between Old NMC and *NMC Holding* was in fact between related

parties. . . ." *Id.* at 85 (emphasis added). Thus, the Secretary and court were concerned solely with whether there was a related party relationship between the merging entities *prior to* the transaction. The Secretary asserts that *Monsour Medical Center v. Heckler*, 806 F.2d 1185 (3rd Cir. 1985) supports his position that all aspects of the parties' relationship must be considered, including the relationship resulting from the transaction (*Mem. Opp'n Pl.'s Summ. J.* at 28, n.8). However, in *Monsour*, the related party determination was based on the relationship of the parties at the time of the transaction, not thereafter (*see Mem. Supp. Pl.'s Summ. J.* at 24). Similarly, *North Iowa Med. Ctr. v. Department of Health and Human Servs.*, 196 F. Supp. 2d 784 (N.D. Iowa 2002), did not involve a statutory merger, and the court decided ultimately that the sale was not a related party transaction. *Jeanes Hosp. v. Leavitt*, 453 F. Supp. 2d 288 (E.D. Pa. 2006) incorrectly accepted the Secretary's continuity of control argument. The court failed to consider the specific regulatory directive regarding how the related party determination was to be made in the case of a statutory merger.

      b.      No Individual Or Organization Controlled Iowa Lutheran Hospital Before The Statutory Merger And Iowa Hospital Corporation Afterwards

The Secretary asserts that Iowa Lutheran Hospital's principals ensured that they would retain significant control over the surviving entity after the merger (*Mem. Opp'n Pl.'s Summ. J.* at 9, 25, 31-32). However, the Secretary admitted that "[n]o individual could significantly influence or control Iowa Lutheran Hospital before the transaction and Iowa Hospital Corporation afterwards" (*Def.'s Resp. Pl.'s Mat. Facts* at ¶23). Thus, the potential for former members of Iowa Lutheran Hospital's governing board to significantly influence *collectively* Iowa Hospital Corporation would not result in control by "any individual or organization" before and after the transaction. *See* 42 C.F.R. § 413.17(b)(3).

Moreover, the undisputed testimony was that Iowa Lutheran Hospital's governing board recognized that they would lose control over the hospital as a result of the transaction, and that post-transaction control was held by individuals who had been associated previously with Iowa Methodist Health System (*Mem. Supp. Pl.'s Summ. J.* at 27).   Contrary to the Secretary's suggestion (*see Mem. Opp'n Pl.'s Summ. J.* at 32), the fact that individuals from Iowa Lutheran Hospital's governing board were appointed to the surviving entity's board because of their prior knowledge and experience does not demonstrate that they would vote as a block or in accordance with an Iowa Lutheran Hospital point of view (*see* A.R. 221-22).

The Secretary argues that Iowa Lutheran's sole member, the Southeastern Iowa Synod ("Synod"), retained the right to approve any name change and had a reversionary interest in Iowa Lutheran Hospital's assets.   Similarly, he states that donations to Iowa Lutheran Hospital's foundation would be used for Iowa Lutheran Hospital facilities (*Mem. Opp'n Pl.'s Summ. J.* at 11-12, 31).  However, the Administrator did not find – and the Secretary does not assert – that any of these facts resulted in control. The Intermediary's witness agreed with other witnesses that the reversionary interest did not provide Synod with any control (A.R. 195, 260-61, 284-85, 322-23).  *See also, Biloxi Reg. Med. Ctr. v. Bowen,* 835 F.2d 345, 352-53 (D.C. Cir. 1987). Accordingly, under the Secretary's regulations, there was no regulatory or factual basis for the Administrator's continuity of control finding.

4.      Denial Of Iowa Lutheran Hospital's Loss Based On Requirements Related To *Bona Fide* Sales Of Assets Was Contrary To Medicare Regulations

The Secretary would have this court believe that (1) regulations expressly required a statutory merger to be a *bona fide* sale (*Mem. Opp'n Pl.'s Summ. J.* at 19, 22), and that (2) regulations defined *bona fide* sale to require an arm's-length negotiation resulting in fair market value compensation (Id. at 17, 21, 22).  However, that is not the case.  Those policies are set forth only in the PM.  Moreover, the Secretary has not demonstrated that Iowa Lutheran Hospital

did not engage in arm's-length negotiations or receive fair compensation for its depreciable assets.

    a.  A Statutory Merger Is Not Subject To *Bona Fide* Sale Requirements

  The Secretary recognizes that although the regulation refers only to *bona fide* sales, it applies only to sales of assets (*See Id.* at 16, 17). Therefore, to support the Administrator's reliance on *bona fide* sale requirements, the Secretary asserts that Iowa Lutheran claims to have *sold* it assets, and that it treated assumption of its liabilities as the *sale price* (*Id.* at 2, 3, 12, 20, 23-25). Central Iowa did not claim that the transaction was a "sale," nor has it asserted that there was a "sales price." Its consistent position has been that a statutory merger is different from a sale of assets. The Secretary asserts that requiring a merger to be a *bona fide* sale is consistent with the text and purpose of Medicare regulations (*Id.* at 19). However, Medicare regulations and related interpretations provide no indication that a statutory merger must be a *bona fide* sale before recognition of a related gain or loss. The applicable regulation provides for recognition of a gain or loss from a statutory merger in accordance with 42 C.F.R. § 413.134(f); it does not require that such a transaction satisfy requirements for a *bona fide* sale addressed in section (f)(2) (*See Mem. Supp. Pl.'s Summ. J.* at 28-30). The Secretary asserts that regulatory history confirms that *bona fide* sale requirements apply to statutory mergers because the regulation providing for recognition of any gain or loss from a statutory merger was intended to reflect previously-established policies (*Mem. Opp'n Pl.'s Summ. J.* at 19-20). However, there is no evidence that the Secretary had recognized previously a gain or loss from a statutory merger only if it was a *bona fide* sale. The Secretary published the *bona fide* sale rule only one month before the rule addressing statutory mergers *(See Mem. Supp. Pl.'s Summ. J.* at 5). Additionally, requiring a statutory merger to be a *bona fide* sale before a related loss might be recognized – but not before revaluation of assets – would destroy the symmetry between revaluation of assets and

recognition of gain or loss (*Id*. at 30).  *See Richey Manor,* 684 F.2d at 135 (rejecting regulatory interpretation that would "destroy the symmetry of the regulatory scheme by divorcing a step up in basis [upward revaluation] from depreciation recapture").

The Secretary argues that  regulations permit recognition of a gain or loss from a *bona fide* sale because it is presumed that the sales price would be a better measure of the asset's value than that which resulted from application of a depreciation schedule (*Mem. Opp'n Pl.'s Summ. J.* at 17).  According to the Secretary, because the results of a statutory merger do not reflect a fair value exchange, they do not provide a basis to recompute the assets' actual loss of value.  The Secretary asserts that there is "no logical relationship" between the value of Iowa Lutheran Hospital's assets and liabilities (*Id.* at 16-17, 20, 26, 28).  The Secretary's assertion assumes incorrectly that fair market value consideration is a *bona fide* sale requirement (*See pp.* 17-18).  Additionally, while there may be no precise relationship between the value of a hospital's assets and liabilities, as discussed above, in adopting the regulatory provision addressing statutory mergers, the Secretary determined that in the case of a statutory merger between unrelated parties, the assumed liabilities was a better basis for calculating depreciation than the result of a calculation based on the asset's cost and estimated useful life (*See,* p. 7).  The Secretary's regulation requiring recognition of a loss on a statutory merger with an unrelated entity reflected the Secretary's reasonable policy judgment that such transactions would produce meaningful financial results that might be used to recompute depreciation. The Secretary cannot avoid his own regulations because he may now have second thoughts regarding the regulatory policies he adopted.[7]

---

[7] The Secretary asserts that any relationship between assets and liabilities would be an inverse one (*Mem. Opp'n Pl.'s Summ. J.* at 21, n.5).  However, the value of the assets of a hospital with significant liabilities is not inherently less than the value of the assets of a hospital with few liabilities. Generally, most hospital liabilities are related to long-term debt from capital borrowing, accounts payable, and other accrued liabilities, including payroll (*see* A.R. 1331). Capital borrowing results in an increase in the value of

b.    Assuming *Bona Fide* Sale Requirements Applied, They Were
      Satisfied

According to the Secretary, in order for a transaction to be a *bona fide* sale, it must be at arm's-length and the purchaser must seek or actually receive reasonable consideration for its assets (*Mem. Opp'n Pl.'s Summ. J.* at 6, 14, 17, 22).  Although the Secretary asserts that the merger was not an arm's-length transaction involving two parties bargaining in their own economic self-interest (*id.* at 3), he was unable to identify a basis to refute evidence that the statutory merger did result from arm's-length negotiations (*Def.'s Resp. Pl.'s Mat. Facts* at ¶ 9). The terms of the transaction documents also demonstrate the arm's-length nature of the transaction, including each party's warranty of the accuracy of its financial statements (A. R. 190, 358).  The Secretary was also unable to refute Central Iowa's demonstration that a *bona fide* sale did not require consideration that was deemed "reasonable" by Medicare  (*Mem. Supp. Pl.'s Summ. J.* at 30-33).  The Secretary asserts that the regulatory definition of fair market value "confirms that a sale cannot be 'bona fide' if it is not an exchange for fair value" (*Mem. Opp'n Pl.'s  Summ. J.* at 21).  The Secretary's assertion is circuitous, at best.  The definition of *bona fide* sale does not refer to the regulatory definition on which the Secretary relies; nor do the regulations state that "'fair market value' is value received in a bona fide sale" as the Secretary asserts (*Id.* at 21).

The Secretary asserts that he has looked to the reasonableness of consideration since long before this transaction (*Id.* at 21, 34).  However, the decisions on which the Secretary relies (none of which involve a statutory merger) demonstrate that HCFA *never* believed that reasonable compensation was a "*bona fide* sale" requirement.  In *Rio Hondo Memorial Hosp. v. U.S.*, 689 F.2d 1025, 1034 (Ct. Cl. 1982) and *Hempstead General Hospital v. Whalen*, 474 F.

_____

hospital assets purchased with proceeds from the borrowing.  Accounts payable and payroll  have no bearing on value of hospital assets.

Supp. 398, 409 n.12 (E.D. N.Y. 1979) the relevant Medicare regulation required the transaction to be a "bona fide sale *and* the price . . . not exceed the fair market value of the facility" (emphasis added). The separately stated fair market value requirement demonstrates that it was *not* subsumed within the requirements of a *bona fide* sale. Additionally, because "reasonable consideration" is not a required element of a *bona* fide sale (and *bona fide* sale requirements are not applicable to statutory mergers), the Secretary's argument that Central Iowa failed to meet its burden of proof fails (*Mem. Opp'n Pl.'s Summ. J.* at 24).[8] Finally, Central Iowa demonstrated that statutory mergers do not contemplate exchange of negotiated consideration (*Mem. Supp. Pl.'s Summ. J.* at 30). In response, the Secretary asserts that Iowa Lutheran Hospital's "own expert . . . acknowledged [that merging] parties frequently negotiate an exchange of consideration" (*Mem. Opp'n Pl.'s Summ. J.* at 20). However, Iowa Lutheran Hospital's expert made no such statement (*see* A.R. 269).

      c.      The Record Does Not Demonstrate That Iowa Lutheran Hospital Received Unreasonable Compensation For Its Depreciable Assets

Central Iowa demonstrated that the Administrator's determination that Iowa Lutheran Hospital received inadequate compensation reflected numerous errors and misstatements, and that the Administrator failed to consider Iowa Lutheran Hospital's precarious financial situation and its unknown potential liabilities that passed to Iowa Hospital Corporation (*Mem. Supp. Pl.'s Summ. J.* at 34-38). The Secretary continues to make assertions that are not supported by the record and to disregard potential liabilities that transferred as part of the transaction.

The Secretary argues that Iowa Lutheran Hospital had more than $40 million in cash or cash equivalents, and that Iowa Lutheran received less than the value of its cash and cash

---

[8] The cases relied on by the Secretary have no relevance to this issue. In *Hospital Affiliates Intern., Inc. v. Schweiker*, 543 F. Supp. 1380 (E.D. Tenn. 1982), the Secretary did not deny the loss claim at issue based on reasonableness of consideration. *Mercy Home Health v. Leavitt*, 436 F.3d 370 (3rd Cir. 2006) related to allocation of home office costs. *University of Cincinnati v. Heckler*, 733 F.2d 1171 (6th Cir. 1984) addressed interest paid to a related party.

equivalents or that it received less than "cash alone" (*Mem. Opp'n Pl.'s Summ. J.* at 12, 23, 24). This is not correct. Iowa Methodist Medical Center assumed all of Iowa Lutheran Hospital's liabilities, including $28,092,831 known liabilities. Iowa Lutheran Hospital transferred less than $1 million in cash and cash equivalents to Iowa Methodist Medical Center (A.R. 755).[9] The Secretary asserts that Iowa Lutheran Hospital "chose, essentially to give its assets away" (*Mem. Opp'n Pl.'s Summ. J.* at 3). Similarly, the Secretary claims that Iowa Lutheran Hospital sold its cash at a discount and its depreciable assets for nothing (*Id.* at 23 ). However, Iowa Methodist Medical Center became legally responsible for all of Iowa Lutheran Hospital's liabilities (*Def.'s Resp. Pl.'s Mat. Facts* at ¶11). Iowa Lutheran Hospital's loss claim computed in accordance with Medicare directives attributed more than $6.8 million to depreciable assets (*Mem. Supp. Pl.'s Summ. J.* at 35).[10]

The Secretary would have this court believe that Iowa Lutheran Hospital could have obtained greater compensation for its assets, but elected instead to accept lesser compensation as part of its statutory merger with Iowa Methodist Medical Center (*Mem. Opp'n Pl.'s Summ. J.* at 23, 25; *see also Id.* at 3, 9-10). However, in seeking an entity to which it might sell its assets or merge, Iowa Lutheran Hospital was not dealing from a position of strength. The Secretary has recognized that it was doubtful whether it would have survived as an independent hospital (*Def.'s Resp. Pl.'s Mat. Facts* at ¶2). Additionally, if another hospital in Des Moines sold its assets or merged into another entity prior to Iowa Lutheran Hospital engaging in such a transaction, Iowa Lutheran Hospital "would be out in the cold" (A.R. 216). Iowa Lutheran Hospital contacted various entities, but none expressed interest in the hospital (A.R. 216, 218-

---

[9]  Iowa Lutheran Hospital had $664,544 "cash and short term investments" as of the transaction, and $2,031,440 cash and cash equivalents as of December 31, 1992 (A.R. 755, 1331).

[10]  The Administrator used a different approach to demonstrate that no payments were made for depreciable assets, but did not claim that his approach was correct, stating that he "does not reach the issue of how to calculate the loss" (A.R. 30).

219, 460-61). A merger with Iowa Methodist Medical Center – which recognized the significant risks from a merger with Iowa Lutheran Hospital (A.R. 490-98) – was the only available option.

Finally, in response to Iowa Lutheran Hospital's demonstration that the Secretary failed to consider the assumption of unknown or contingent liabilities, the Secretary asserts that Iowa Lutheran Hospital (1) made no attempt to prove their value; (2) was insured against such liabilities; (3) warranted the accuracy of its financial statements; and (4) did not demonstrate that its principals believed that assumption of contingent liabilities was fair consideration (*Mem. Opp'n Pl.'s Summ. J.* at 24-25). Each assertion is inaccurate or irrelevant. Iowa Lutheran Hospital passed to Iowa Hospital Corporation "a wide variety of potential legal risks," including "untold, unknown liability potentials" resulting from its status as a Medicare provider (A.R. 191). These liabilities could exceed the value of its assets. The mere fact that the particular potential liabilities that would become asserted liabilities was unknown (and remains unknown) and thus could not be included in a precise calculation of consideration does not mean that they can be properly disregarded. The potential for such claims was "a legal certainty" (A.R. 191). Additionally, the Secretary does not refer to any evidence demonstrating that all such liabilities were insured (insurance is clearly unavailable for penalties, Medicare recoupment and many other potential liabilities). Similarly, contingent liabilities are *not* reflected on financial statements, so any warranty regarding accuracy of those statements is irrelevant (*See* A.R. 191).

5. <u>HCFA Failed To Explain Its Departure From Previous Agency Policy</u>

Although established case law requires an administrative agency to provide a rational explanation for any departure from previous policies, the Secretary fails to even acknowledge a change in regulatory interpretation. He asserts that the Administrator's decision was consistent with the reasoning that he used well before 1993 (*Mem. Opp'n Pl.'s Summ. J.* at 34). The Secretary states that he provided a reasoned explanation for his interpretation – to ensure

payment of a provider's actual and reimbursable costs – and that that explanation was included in the PM (*Id.* at 36-37). The Secretary's assertion is factually inaccurate and legally inadequate. The Secretary points to no evidence within the administrative record – or in any of the more than 40 decisions on which he relies – demonstrating that prior to the transaction, he had required a statutory merger to satisfy *bona fide* sale requirements or result in a change of control over the merged entity's assets before recognition of a gain or loss.

The Secretary states that "the 1995 instructions from CMS' predecessor agency to the fiscal intermediary" demonstrates that he had not formally committed himself to Central Iowa's interpretations (*Id.* at 36). The "instructions" to which the Secretary refers was a telephone conversation with an agency staff analyst that occurred more than one year *after* the transaction (A.R. 1226). The "additional examples" of the agency's "contemporaneous" application of the regulations on which the Secretary relies were written more than two years *after* the transaction (A.R. 564-65, 1271-74). In further response to Central Iowa's assertion that the agency failed to explain its departure from previous agency policy, the Secretary asserts that his "interpretation is certainly not arbitrary and capricious, and is entitled to the full measure of deference (*Mem. Opp'n Pl.'s Summ. J.* at 37) (*citing Nat'l Cable & Telecom. Ass'n v. Brand X Internet Servs*, 545 U.S. 967, 981 (2005). However, *Nat'l Cable* – involving an agency's *statutory* interpretation set forth in a Declaratory Ruling – is not at odds with Central Iowa's position. According to the Court, "[i]f the agency adequately explains the reasons for a reversal of policy, 'change is not invalidating'. . . ." 545 U.S. at 981. The Secretary's unexplained change in policy – reflected in the PM and in the Administrator's decision – was arbitrary and capricious.

B.    The Administrator's Determination Was Contrary To Medicare Recapture Policy As Of June 1, 1984

The Secretary argues that his determination was not contrary to the Deficit Reduction Act of 1984 ("DEFRA") because DEFRA required him only "to apply the general 'method of

calculating depreciation' similar to that already used in the existing regulations," and that he was not prohibited "from further interpreting the substantive application of those regulations" (*Mem. Opp'n Pl.'s Summ. J.* at 41-42). There is no authority indicating that so long as he *generally* maintained the pre-DEFRA depreciation computation methodology, the Secretary might eliminate payment for losses that had been previously recognized. In *Lake Med. Ctr. v. Thompson*, 243 F.3d 568 (D.C. Cir. 2001) relied by the Secretary, the court did not indicate that DEFRA applied only to depreciation calculations. Moreover, a statutory revision eliminating the DEFRA provision was required before recognition of gains and losses was eliminated effective December 1, 1997 (*see Mem. Supp. Pl.'s Summ. J.* at 9). Finally, even assuming that DEFRA prevented the Secretary from changing his general method of computing depreciation only, it would bar him from reinterpreting Medicare regulations to preclude computation of a loss on a statutory merger based on the difference between assumed liabilities and assets' book values. *See Whitecliff, Inc. v. Shalala*, 20 F.3d 488, 493-94 (D.C. Cir. 1994).

C.   The Administrator's Determination Reflected An Impermissible Retroactive Application Of A New Payment Standard

In response to Central Iowa's demonstration that the Secretary denied Iowa Lutheran Hospital's loss claim based on payment standards developed after the transaction, the Secretary asserts that he applied the regulatory interpretations here at issue "contemporaneously with Lutheran's merger, to disallow losses from similar transactions" (*Mem. Opp'n Pl.'s Summ. J.* at 39). However, as stated previously, there is no evidence within the administrative record that demonstrates that on or before November 22, 1993, the Secretary had ever disallowed a loss incurred on a statutory merger (or a consolidation) on the grounds used to disallow Iowa Lutheran Hospital's loss. The Secretary's contention that he only clarified what "[a Medicare provider's] rights and obligations have always been" is without basis.

The Secretary alleges that Iowa Lutheran Hospital did not rely on the Secretary's previous interpretation because the Medicare loss was not a factor in Iowa Lutheran Hospital's merger decision (*Id.* at 39-40).   This contention reflects the Secretary's "heads, I win, tails, you lose" position.   Had receipt of Medicare reimbursement been a factor in Iowa Lutheran Hospital's decision to merge, the Secretary would have undoubtedly challenged the *bona fides* of the transaction, particularly since the additional Medicare payments would belong to the surviving entity, Iowa Hospital Corporation (*see Germantown Hospital and Medical Center v. Mutual of Omaha Insurance Company*, CMS Adm'r Dec., CCH ¶ 81,263 at 203,859-60, 203,862 (Oct. 28, 2004), *rev'g* PRRB Hearing Dec. No. 2004-D36.

The Secretary asserts that if he had not issued the PM, but announced his interpretation for the first time in adjudication, then "there would be no barrier to applying the interpretation to the merger" (*Mem. Opp'n Pl.'s Summ. J.* at 40-41).   However, the Secretary *did* issue the PM, and the Administrator's determination reflected  only its application to a particular transaction (*see Mem. Supp. Pl.'s Summ. J.* at 39, n.10).   This is not a case where an agency changed its interpretation after providing interested parties with fair notice.  *Long Island Care*, 127 S. Ct. at 2347 (agency's changed interpretation may "create no unfair surprise"). There was no notice from the agency prior to the transaction that indicated that Iowa Lutheran Hospital's loss resulting from a statutory merger with an unrelated entity would be denied.

    D.    <u>The Administrator's Determination Was Contrary To  Procedural Requirements</u>

        1.    <u>APA And Medicare Publication And Notice And Comment Requirements</u>

The Secretary asserts that this court should reject Iowa Lutheran Hospital's APA argument because the PM was exempt from APA notice and comment requirements (*Mem. Opp'n Pl.'s Summ. J.* at 38).   However, because the PM effectively amended the regulation which required recognition of a gain or loss on a statutory merger with an unrelated entity, notice

and comment rulemaking was required (*see Mem. Supp. Pl.'s Summ. J.* at 40-41). The cases relied on by the Secretary are not to the contrary because the PM requirements were not "fairly encompassed" within the regulations, and the Administrator's opinion demonstrates that absent the PM, there would not have been an adequate basis for his determination (A.R 16-18, 26-28). The Secretary argues that a change in policy requires notice and comment only if there had been an "express, direct, and uniform interpretation that was equivalent to the agency's common law" (*Mem. Opp'n Pl.'s Summ. J.* at 38-39). Under applicable case law, the prior interpretation must only be "definitive." This requirement was satisfied by the MIM and the letters from Directors Goeller and Booth; there were no indications of any contrary policy prior to the transaction (*Mem. Supp. Pl.'s Summ. J.* at 41).

### 2.    The Small Business Regulatory Enforcement Fairness Act of 1996

According to the Secretary, his interpretation was not subject to CRA requirements for the same reason that he was exempt from APA notice and comment requirements (*Mem. Opp'n Pl.'s Summ. J.* at 43). However, CRA applies to agency pronouncements that are not subject to those APA requirements (*see Mem. Supp. Pl.'s Summ. J.* at 42). CRA does not include the statutory exceptions to general APA rulemaking requirements. *See* 5 U.S.C. §553(b)(A). Similarly, the cases on which the Secretary relies are inapposite. In *Independent Equip. Dealers v. EPA*, 372 F.3d 420 (D.C. Cir. 2004), an EPA letter was not a rule because it restated the agency's position, rather than implementing, interpreting, or prescribing law or policy. That is not the case here. In *In re Operation of Mo. R. Sys. Litig.*, 363 F. Supp. 2d 1145 (D. Minn. 2004), *rev. in part*, 421 F.3d 618 (8th Cir. 2005), the court determined that it could not review a finding that a critical habitat designation was not a "major rule." By contrast, in this matter, the agency failed to submit the rule to Congress. Interpreting CRA's judicial review preclusion to prevent a court from reviewing an agency's lack of compliance with the statute – as opposed to a

finding made in accordance with CRA requirements – would permit agencies to evade the statute altogether, and make it a nullity. *United States v. Southern Ind. Gas & Electric Co.*, No. IP 99-1692-C-M/S, 2002 WL 314275523 at 4-6 (S.D. Ind. Oct. 24, 2002). *See generally, Dart v. U.S.,* 848 F.2d 217 (D.C. Cir. 1988) (application of presumption of reviewability to agency action which violates statute "on its face").

Finally, the Secretary's assertion that Explanatory Statements made to Congress should be afforded "no weight" (*Mem. Opp'n Pl.'s Summ. J.* at 43, n.12) is contrary to case law stating that contemporaneous post-enactment legislative history provides strong evidence of Congressional intent. *See North Haven Board of Education v. Bell*, 456 U.S. 512, 526-27 (1982) (remarks of sponsor of the [statutory language] . . . are an authoritative guide to the statute's construction"). *See also, Newell v. Federal Energy Administration*, 445 F.Supp. 80, 85 n.13 (D. D.C. 1977) (Statement of sponsor of statutory amendment "is 'pregnant with significance'").[11]

<div style="margin-left: 50%;">

Respectfully submitted,

CENTRAL IOWA HOSPITAL CORPORATION, successor-in-interest to IOWA LUTHERAN HOSPITAL

/s/ Harold Belkowitz

_____

Harold Belkowitz (D.C. Bar #449800)
Ober, Kaler, Grimes & Shriver
A Professional Corporation
1401 H Street, N.W.
Washington, D.C. 20005-3324
(202) 408-8400
Fax: (202) 408-0640
E-mail: hgbelkowitz@ober.com

Plaintiff's Attorneys

</div>

---

[11] This court should reject the Secretary's assertion that the rule was not a "major rule" because the relevant regulatory provision was repealed (*Mem. Opp'n Pl.'s Summ. J.* at 43, n.11). The rule had an annual effect of $100 million or more when it was established, requiring CRA compliance.

OF COUNSEL:

Robert E. Mazer
Ober, Kaler, Grimes & Shriver
A Professional Corporation
120 East Baltimore Street
Baltimore, Maryland 21202-1643
(410) 685-1120

Dated at Baltimore, Maryland
this 21st day of  September, 2007

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 21st day of September, 2007,  a copy of the forgoing

Plaintiff's Reply To Defendant's Memorandum In Opposition To Plaintiff's Motion For

Summary Judgment, And In Support of Defendant's Cross-Motion For Summary Judgment was

served by certified United States mail, postage prepaid, return receipt requested upon:

> Joel McElvain
> United States Department of Justice
> Civil Division, Federal Programs Branch
> Room 7130
> 20 Massachusetts Avenue, N.W.
> Washington, D. C. 20001


> /s/ Harold Belkowitz
> _____
> Harold Belkowitz

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTRAL IOWA HOSPITAL CORPORATION, successor-in-interest to IOWA LUTHERAN HOSPITAL, | |
| Plaintiff, | CASE NO.: 1:07-CV-00295-RWR |
| v. | |
| MICHAEL O. LEAVITT, as Secretary of Health and Human Services, | |
| Defendant. | |

PLAINTIFF'S RESPONSE TO
DEFENDANT'S STATEMENT OF MATERIAL FACTS

The Plaintiff, Central Iowa Hospital Corporation hereby submits its response to the statement of material facts submitted by the Defendant, Michael O. Leavitt, as Secretary of Health and Human Services.

1.      Undisputed.

2.      Undisputed that Southeastern Iowa Synod was the sole member of Iowa Lutheran Hospital ("Lutheran").  Disputed that the sole member of a non-profit corporation is the precise equivalent of a sole shareholder, as a matter of law.

3.      Disputed.  Lutheran began considering an affiliation with other health care organizations prior to 1992; its purpose in seeking an affiliation was not limited to responding to managed care (A.R. 197-98, 217-18).

4.      Undisputed.

5.      Undisputed.

6.      Undisputed that a memorandum of understanding was executed.  Disputed that this was the culmination of all discussions (A.R. 201).

7.      Undisputed.

8.    Undisputed that negotiations included these issues; disputed that they were sole focus of negotiations (A.R. 184-85, 199-200, 220).

9.    Undisputed.

10.    Undisputed.

11.    Undisputed.  There were no investor-owned hospitals in Iowa (A.R. 219).

12.    Undisputed.

13.    Undisputed.

14.    Undisputed.  Lutheran merged into Iowa Methodist Medical Center ("Methodist").

15.    Undisputed.

16.    Undisputed.

17.    Disputed.  Lutheran's directors were stated in its restated articles of incorporation that were part of the Formation Agreement (A.R. 369, 386-87).  The "management team" was not designated therein (A.R. 356-372, 385-89).

18.    Disputed.  Iowa Health System's 23-person governing board included ten individuals who had been selected from Lutheran's governing board (A.R. 193).

19.    Undisputed.

20.    Disputed.  Iowa Health System Hospital Corporation included eight individuals from Lutheran's board.

21.    Undisputed that Mr. Levering served as president of the Iowa Lutheran Hospital Division.  Disputed that he served as vice president of Iowa Health System Hospital Corporation (A.R. 369, 386).

22.    Undisputed.

23.    Undisputed.

24.    Undisputed.

25.    Undisputed.

26.     Disputed.  The cost report submitted  by the surviving entity was in the name of the merged entity (A.R. 48).  The cost report reflected a merger which was not treated as a sale or the equivalent of a sale (A.R. 1244).  The surviving entity did not have cash and cash equivalents of $40.1 million (A.R. 755, 1331).   In its final loss calculation, Iowa Lutheran Hospital used an allocation basis (fair market value) of $64,949,110 (A.R. 167).

27.     Undisputed that the surviving entity claimed that as successor to Iowa Lutheran Hospital, it was entitled to $5.4 million from Medicare; otherwise disputed.

28.     Undisputed that the surviving entity's financial statements accounted for the merger as a "pooling of interests."

29.     Undisputed that Central Iowa did not report any loss as a "pooling of interest." "Change of ownership" is not addressed in the accounting authority related to "pooling of interests" (A.R. 1366-89)

30.     Undisputed.  However, the cost report reflected the Intermediary's determination and was filed "under protest" (A.R. 49-52, 242).

31.     Disputed.   The Secretary's reference does not support an assertion that the same depreciation was claimed twice.

32.     Undisputed.

33.     Undisputed.

34.     Undisputed.

35.     Disputed.    This statement reflects the Secretary's characterization of the Administrator's decision (A.R. 2-31).  It does not precisely reflect that determination.

36.     Disputed.    This statement reflects the Secretary's characterization of the Administrator's decision (A.R. 2-31).  It does not precisely reflect that determination.

37.     Undisputed that the Administrator determined that the merger was a related party transaction. The remainder of the statement reflects the Secretary's characterization of the Administrator's decision (A.R. 2-31). It does not precisely reflect that determination.

38.     Disputed. There is no evidence in the record supporting the Secretary's statement (A.R. 269).

39.     Disputed that Lutheran was insured against all contingent liabilities; there is no evidence in the record supporting the Secretary's statement; otherwise admitted.

40.     Disputed. The evidence referred to by the Secretary does not demonstrate that Lutheran did not believe assumption of its liabilities was not fair compensation. Undisputed that the parties negotiated, among other issues, issues related to board membership and officers in the surviving entity.

41.     Undisputed.

42.     Undisputed. This reflected the appraiser's judgment.

Respectfully submitted,

CENTRAL IOWA HOSPITAL CORPORATION, successor-in-interest to IOWA LUTHERAN HOSPITAL

/s/ Harold Belkowitz

_____
Harold Belkowitz (D.C. Bar #449800)
Ober, Kaler, Grimes & Shriver
A Professional Corporation
1401 H Street, N.W.
Washington, D.C. 20005-3324
(202) 408-8400
Fax: (202) 408-0640
E-mail: hgbelkowitz@ober.com

Plaintiff's Attorneys

OF COUNSEL:
Robert E. Mazer
Ober, Kaler, Grimes & Shriver
A Professional Corporation
120 East Baltimore Street
Baltimore, Maryland 21202-1643
(410) 685-1120

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 21st day of September, 2007, a copy of the forgoing

Plaintiff's Response To Defendant's Statement Of Material Facts was served by certified United

States mail, postage prepaid, return receipt requested upon:

> Joel McElvain
> United States Department of Justice
> Civil Division, Federal Programs Branch
> Room 7130
> 20 Massachusetts Avenue, N.W.
> Washington, D. C. 20001


/s/ Harold Belkowitz
_____
            Harold Belkowitz