IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CENTRAL IOWA HOSPITAL CORPORATION, successor-in-interest to Iowa Lutheran Hospital, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:07-cv-00295-RWR |
| MICHAEL O. LEAVITT, as Secretary of Health and Human Services, | ) ) ) ) | |
| Defendant. | ) ) | |

**REPLY MEMORANDUM IN SUPPORT OF
DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Of Counsel:

DANIEL MERON
General Counsel

JANICE HOFFMAN
Acting Associate General Counsel

MARK D. POLSTON
Deputy Associate General
   Counsel for Litigation

DAVID HOSKINS
Attorney
Office of the General Counsel
U.S. Department of Health
   and Human Services

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

SHEILA M. LIEBER
Deputy Director
JOEL McELVAIN, D.C. Bar No. 448431
Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7130
Washington, D.C. 20001
Telephone:   (202) 514-2988
Fax:             (202) 616-8202
Email:         Joel.L.McElvain@usdoj.gov

*Attorneys for the Defendant*

# **TABLE OF CONTENTS**

**Page**

Preliminary statement ................................................................................ 1

Argument ................................................................................................... 3

I.    The loss claim must be disallowed because the merger was not a
bona fide sale ....................................................................................... 3

    A.    A provider may realize a Medicare loss from a merger
only if the transaction qualifies as a bona fide sale ..................... 3

    B.    Substantial evidence supports the Administrator's finding that
the merger was not a bona fide sale ............................................. 5

II.    The loss claim must be disallowed because the merger was between
related parties ....................................................................................... 7

    A.    A provider may realize a Medicare loss from a merger only if
it does not retain a significant power of control over the
surviving entity ............................................................................. 7

    B.    Substantial evidence supports the Administrator's finding that
Lutheran retained a significant power of control over Central
Iowa ............................................................................................. 11

III.    The Secretary is permitted to interpret his own regulations, and
deference is owed to that interpretation ............................................ 12

    A.    The Secretary has not changed his interpretation of his
regulations ................................................................................... 13

    B.    The Secretary has provided a reasoned explanation for his
interpretation ............................................................................... 15

    C.    The Secretary was not required to follow APA rulemaking
procedures to announce his interpretation of his existing
regulations ................................................................................... 16

**Page**

D.    The Deficit Reduction Act of 1984 does not prohibit the
Secretary from interpreting his regulations ................................. 17

E.    The Congressional Review Act does not prohibit the Secretary
from interpreting his regulations ............................................... 18

Conclusion ............................................................................................... 19

## TABLE OF AUTHORITIES

**Page**

**Cases:**

*Air Transp. Ass'n v. FAA*, 291 F.3d 49 (D.C. Cir. 2002) ............................... 16-17

\*     *Albert Einstein Med. Ctr. v. Leavitt*, 2007 WL 2221417
      (E.D. Pa. Aug. 1, 2007), *appeal docketed*, No. 07-3807
      (3d Cir. Sept. 27, 2007) ........................................................................... 6

*Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 11106
      (D.C. Cir. 1993) ....................................................................................... 16

*Ass'n of Am. R.R. v. Dep't of Transp.*, 198 F.3d 944 (D.C. Cir. 1999) ................ 17

*Castlewood Prods., L.L.C. v. Norton*, 365 F.3d 1076 (D.C. Cir. 2004) ......... 10, 12

*Commodity Carriers, Inc. v. FMCSA*, 434 F.3d 604 (D.C. Cir. 2006) ................ 17

*Health Ins. Ass'n of Am. v. Shalala*, 23 F.3d 412 (D.C. Cir. 1994) ...................... 16

*Hempstead Gen. Hosp. v. Whalen*, 474 F. Supp. 398 (E.D.N.Y. 1979),
      *aff'd*, 622 F.2d 573 (2d Cir. 1980) ............................................................. 5

*Hospital Affiliates Int'l, Inc. v. Schweiker*, 543 F. Supp. 1380
      (D. Tenn. 1982) .......................................................................... 5, 11, 13

*Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420 (D.C. Cir. 2004) ................... 19

\*     *Jeanes Hosp. v. Leavitt*, 453 F. Supp. 2d 888 (E.D. Pa. 2006) .............................. 6

*Lake Med. Ctr. v. Thompson*, 243 F.3d 568 (D.C. Cir. 2001) .............................. 18

\*     *Lehigh Valley Hosp. v. Leavitt*, 2006 WL 2547061
      (E.D. Pa. Aug. 31, 2006), *appeal docketed*, No. 06-4194
      (3d Cir. Sept. 26, 2006) ............................................................................. 6

*Long Island Care at Home, Ltd. v. Coke*, 127 S. Ct. 2339 (2007) ....... 12, 14-15, 17

*Medical Ctr. of Independence v. Harris*, 628 F.2d 1113
      (8th Cir. 1980) ......................................................................... 8-9, 11, 13

*Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185 (3d Cir. 1986) ........................... 10

*Nat'l Cable & Telecom. Ass'n v. Brand X Internet Servs.*,
      545 U.S. 967 (2005) ................................................................................. 15

*Rio Hondo Mem. Hosp. v. United States*, 689 F.2d 1025 (Ct. Cl. 1982) ............... 5

*Sid Peterson Mem. Hosp. v. Thompson*, 274 F.3d 301 (5th Cir. 2001) ................. 8

*Texas Sav. & Comm. Bankers Ass'n v. FHFB*, 1998 WL 842181
      (W.D. Tex. 1998), *aff'd*, 201 F.3d 551 (5th Cir. 2000) ............................ 18

\*     *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504 (1994) ................................. 3, 14

*Whitecliff, Inc. v. Shalala*, 20 F.3d 488 (D.C. Cir. 1994) ..................................... 18

**Page**

**Statutes:**

5 U.S.C. § 553(b) ................................................................................ 16
5 U.S.C. § 801 .................................................................................... 18
5 U.S.C. § 805 .................................................................................... 18
*    42 U.S.C. § 1395x(v) ........................................................................ 1

**Regulations:**

*    42 C.F.R. § 413.17(b) ............................................................... *passim*
42 C.F.R. § 413.134(b) ...................................................................... 5
*    42 C.F.R. § 413.134(f) ................................................................. 3, 13
42 C.F.R. § 413.134(g) ...................................................................... 5
42 C.F.R. § 413.134(j) ....................................................................... 5
*    42 C.F.R. § 413.134(k) ............................................................. *passim*

**Miscellaneous:**

44 Fed. Reg. 6912 (Feb. 5, 1979) .............................................. 4, 9, 13
HCFA Ruling 80-4 ............................................................................. 8
H.R. Rep. No. 98-861 (1984), *reprinted in* 1984 U.S.C.C.A.N. 697 .................. 41
*    Program Memorandum A-00-76 (Oct. 19, 2000) .................................. 9, 12, 15-16

## PRELIMINARY STATEMENT

As the Secretary showed in his opening brief, the Medicare statute requires that he reimburse providers only for their reasonable costs "actually incurred" in furnishing covered health care services to Medicare beneficiaries. 42 U.S.C. § 1395x(v)(1)(A). This principle applies to the allowance for the use of depreciable assets in treating Medicare beneficiaries, and to any adjustment to that allowance that might be made after the disposal of those assets. In other words, for a provider to claim reimbursement for a loss on the disposal of its depreciable assets, it must show that the sale price of those assets better reflects their true value – and, thus, better reflects the depreciation of those assets, and the provider's actually "incurred" costs in their use – than did the depreciation allowances that the provider previously had received for those assets.

The Secretary has imposed two requirements in particular to ensure that he pays only for the provider's actual and reasonable costs, and not for mere paper losses, when the provider disposes of a depreciable Medicare asset. First, the provider must dispose of the asset in a "bona fide sale," that is, a transaction in which the parties thereto are motivated to exchange like value for like, because only such a transaction will permit an accurate determination of the value of the asset and thus of the provider's costs in the use of that asset. Second, the asset may not be exchanged in a transaction between "related parties," as a provider that will exercise significant control over the entity to which it transfers its Medicare assets lacks the incentive to seek a realistic sale price in the transaction. As the Secretary showed in his initial brief, both the statutory requirement that a provider be reimbursed only for its reasonable and actual costs, and the specific application of this requirement that an asset must be exchanged in a bona fide sale between unrelated parties before an adjustment will be made to that asset's depreciation allowance, apply fully where a provider disposes of its Medicare assets in a merger.

The provider in this case, Iowa Lutheran Hospital ("Lutheran," or "the provider"), merged into another entity, Iowa Methodist Medical Center. The principals of Lutheran continued to exercise significant control over the entity that survived the merger, which is now known as Central Iowa Hospital Corporation. In addition, the purported consideration that Lutheran received in the merger was far less than the value of the monetary assets that it surrendered, let alone the value of all of its assets together. Thus, both because the merger did not qualify as a bona fide sale, and because the merger was a related-party transaction, the "price" obtained through the merger did not reflect Lutheran's actually incurred costs in the use of its Medicare assets, and no adjustment to its depreciation allowance for those assets is permitted.

Central Iowa recognizes that the Secretary's mandate permits him to pay only for reasonably and actually incurred costs, but it asserts (Reply Br. at 7), without explanation or support, that the consideration received by Lutheran in the merger – in the form of an assumption of its liabilities – accurately reflected the value of the assets that Lutheran surrendered in the merger. It accordingly argues that the Secretary must accept the fiction that those liabilities represented fair consideration for the assets transferred in the merger, and that therefore Lutheran's costs in the use of its assets can be fairly calculated from the amount of the surrendered liabilities. But the amount of a merging party's liabilities, at best, bears no relationship whatsoever to the value of its depreciable assets, or to the amount of depreciation that it has incurred on those assets, as Central Iowa forthrightly concedes elsewhere in its brief. (Reply Br. at 16-17 n.7.) Central Iowa's claim for Medicare payment is thus completely divorced from any proof that Lutheran had incurred actual and reasonable costs for which it had not already been reimbursed by Medicare's prior depreciation payments.

Central Iowa's arguments rest on its claim that the Secretary is required to pay for losses that exist on paper only. The Secretary has reasonably chosen a different interpretation of his regulations that does not mandate such a windfall. This Court is obligated to defer to the Secretary's reasonable interpretation of the Medicare regulations. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

## ARGUMENT

### I.  The Loss Claim Must Be Disallowed because the Merger Was Not a Bona Fide Sale

#### A.  A Provider May Realize a Medicare Loss from a Merger Only if the Transaction Qualifies as a Bona Fide Sale

As the Secretary showed in his initial brief, the Medicare regulations permit recognition of a loss or gain in a merger between unrelated parties, but only if the merger also meets the conditions of a bona fide sale. "If the statutory merger is between two or more corporations that are unrelated (as specified in § 413.17), . . . [and] if the merged corporation was a provider before the merger, then it is subject to the provisions of paragraph (d)(3) and (f) of this section concerning recovery of accelerated depreciation and the realization of gains and losses." 42 C.F.R. § 413.134(k)(2)(i). Subsection (f) describes a series of methods by which a provider could dispose of an asset, *e.g.*, by bona fide sale, donation, exchange, or involuntary conversion, and specifies whether the realization of a loss or gain was available in each of those eventualities. 42 C.F.R. § 413.134(f). In particular, recognition of gains and losses is allowed in the case of a bona fide sale. 42 C.F.R. § 413.134(f)(2). Because none of the other circumstances described in subsection (f) that permit recognition of a gain or loss is even arguably present here, Central Iowa's merger therefore must qualify as a bona fide sale in order for a loss claim to be permitted.

Central Iowa claims (Reply Br. at 15) that the merger regulation does not require that assets be disposed of in a bona fide sale before a loss may be recognized. Tellingly, Central Iowa fails entirely to discuss the actual language of the regulation, which, as the Secretary has shown, explicitly requires just that. Section 413.134(k) could have been written to specify that, if a merger is between unrelated parties, recognition of a gain or loss would be automatic. The Secretary did not write the regulation in that manner; instead, he wrote it to specify that recognition would not automatically be allowed or disallowed, but instead would be permitted as otherwise allowed under subsection (f). Central Iowa argues (Reply Br. at 5) that Section 413.134(k) would be superfluous if a merging party were not automatically allowed to claim the loss purportedly reflected in the transaction. This argument, however, misconstrues the reasons that the Secretary promulgated subsection (k). He acted to resolve confusion over the treatment of certain complex transactions, providing, for examples, that stock sales could not ever qualify as an event resulting in recognition, but that mergers could qualify so long as ordinary related-party and bona fide sale requirements have been met. *See* 44 Fed. Reg. 6912, 6912-13 (Feb. 5, 1979).

Central Iowa also argues (Reply Br. at 15-16) that the party receiving assets in a merger will automatically revalue those assets for purposes of its own depreciation calculations. It asserts that, therefore, the party surrendering the assets must be permitted to recognize a gain or loss to ensure that there is symmetry between the two calculations. Central Iowa ignores the fact, however, that it has *not* revalued the assets it received from Lutheran; instead, it has relied on Lutheran's old basis for its assets to claim depreciation allowances from Medicare, as if Lutheran had never claimed the additional depreciation allowance at issue in this case. A.R. 242. In any event, there is no automatic rule that the

net book value of assets for the surrendering party and the receiving party must match; the Medicare regulations recognize a variety of circumstances in which the two calculations will diverge. *See* 42 C.F.R. § 413.134(g), (j).

Central Iowa also argues (Reply Br. at 17-18) that, even if the bona fide sale requirement applies to mergers, nothing in the regulation specifies that fair market value must be exchanged for a sale to be bona fide. As the Secretary has already shown, the text of the regulation itself directly contradicts this claim. Fair market value is defined as that value received in a bona fide sale. 42 C.F.R. § 413.134(b)(2). The Secretary, accordingly, has consistently required a showing that a sale is for fair market value in order to determine that it is bona fide. *See Hospital Affiliates Int'l, Inc. v. Schweiker*, 543 F. Supp. 1380, 1389 (D. Tenn. 1982); *see also Rio Hondo Mem. Hosp. v. United States*, 689 F.2d 1025, 1034 (Ct. Cl. 1982); *Hempstead Gen. Hosp. v. Whalen*, 474 F. Supp. 398, 409 (E.D.N.Y. 1979) (same), *aff'd*, 622 F.2d 573 (2d Cir. 1980). Central Iowa also argues (Reply Br. at 18) that it is not possible for a merger to be a bona fide sale under the Secretary's definition; it ignores, however, that in a truly arm's length exchange, the merging parties will negotiate an exchange of consideration to accompany the transfer of assets and assumption of liabilities, in order to ensure that like is traded for like. A.R. 269. The parties did not engage in such negotiations here.

### B.    Substantial Evidence Supports the Administrator's Finding that the Merger Was Not a Bona Fide Sale

The Secretary has reasonably interpreted his regulations to require a merger to qualify as a bona fide sale – that is, an exchange at arm's length for fair value – before a gain or loss may be recognized from that merger. The Administrator found that there was no such exchange for fair value here, and there easily is substantial evidence to support that finding. Lutheran's principals explicitly rejected the option of selling its assets, or

otherwise seeking fair value in exchange for a true surrender of their control over the provider. They instead chose to pursue a merger with the expectation that they would *not* receive full value for the provider's assets. And that expectation proved to be entirely correct; they surrendered assets with a value of $64.9 million, in purported exchange for an assumption of liabilities that amounted only to $28.1 million, less even than the value of Lutheran's current (liquid) assets alone.[1] The Administrator thus properly found that the merger did not constitute a bona fide sale of Lutheran's assets. *See Jeanes Hosp.*, 453 F. Supp. 2d 888, 903 (E.D. Pa. 2006); *Albert Einstein Med. Ctr. v. Leavitt*, 2007 WL 2221417, at *13 (E.D. Pa. Aug. 1, 2007); *Lehigh Valley Hosp. v. Leavitt*, 2006 WL 2547061, at *6 (E.D. Pa. Aug. 31, 2006).

Central Iowa attempts to demonstrate that the merger qualified as a bona fide sale by arguing (Reply Br. at 20) that Lutheran also surrendered contingent liabilities of uncertain value. The potential for such liabilities did not prevent Central Iowa from asserting, for purposes of calculating its loss claim, that the supposed consideration for the exchange was only the $28.1 million figure that represented known liabilities. A.R. 167. In any event, Central Iowa made no attempt to calculate the value of such contingent liabilities, or to assert that the parties to the merger viewed the assumption of contingent liabilities to be fair consideration for the transfer of Lutheran's assets. To the

---

[1] Lutheran asserts (Reply Br. at 19) that the value of Lutheran's cash and cash equivalents was less than the value of the liabilities that were assumed. The record is flatly to the contrary; the value of Lutheran's monetary assets – that is, its current assets and limited-use assets – significantly exceeded the amount of its liabilities. A.R. 1331, 1336. Lutheran's argument, in any event, obscures the ultimate point, to which there is no dispute; the total value of all of the assets passed to Central Iowa in the merger was vastly in excess of the amount of the liabilities that were assumed, and thus the latter cannot be seen as fair consideration for the former.

contrary, the record amply demonstrates that Lutheran's principals were not motivated to seek fair consideration in the exchange.  A.R. 184, 199-200, 220.

Substantial evidence in the record thus supports the Administrator's finding that Lutheran did not dispose of its assets in a bona fide sale.  Because the supposed "sale price" for Lutheran's assets in the merger did not reflect an attempt to exchange those assets for fair consideration, the value of those assets cannot be determined from the transaction, and the Administrator properly denied a claim for Medicare payment that was based on the assertion that the merger demonstrated a loss in value of those assets.

## II.   <u>The Loss Claim Must Be Disallowed because the Merger Was Between Related Parties</u>

### A.   <u>A Provider May Realize a Medicare Loss from a Merger Only if It Does Not Retain a Significant Power of Control over the Surviving Entity</u>

In his initial brief, the Secretary demonstrated that there is a second, independent reason to uphold the Administrator's determination.  Lutheran, the entity that surrendered its assets, and Central Iowa, the entity that received the assets, were related parties.  Therefore, under 42 C.F.R. §§ 413.134(k)(2) and 413.17, no adjustment to the depreciation allowance for Lutheran's assets arising from the merger could be permitted.  In response, Central Iowa disputes the Secretary's interpretation of his regulations, contending that it is irrelevant whether Lutheran's principals would have a continuing relationship with the entity to which they transferred its assets.  Central Iowa also disputes the evidence for the Administrator's finding that it and Lutheran were related.  None of its arguments has merit.

Section 413.134(k)(2) prohibits recognition of a gain or loss arising from a merger between related parties, and refers to 42 C.F.R. § 413.17 for the standards governing whether parties will be deemed to be related.  As the Secretary has shown, Section 413.17

establishes that all aspects of the parties' relationship must be considered, including the relationship created by the transaction itself, such as a provision allowing one party to continue to exercise significant control over the party that receives its assets. The Secretary's interpretation of these provisions is fully in keeping both with their express language, and with the purpose of the "related party" rule, which is to prevent Medicare from paying costs incurred in transactions where the parties lack the incentive to obtain fair market value in an exchange.

Central Iowa argues instead (Reply Br. at 5) that the regulation refers only to mergers in which the parties had already been related to each other before the fact. As with its arguments concerning the "bona fide sale" rule, discussed above, Central Iowa again fails entirely to discuss the actual language of the regulations, and in particular it fails to address the merger regulation's explicit incorporation of the related party standards provided under Section 413.17. The regulation permits a provider to seek an adjustment to its depreciation allowance when it disposes of its assets in a merger, but only if that merger is "between two or more corporations that are unrelated (as specified in 42 C.F.R. § 413.17)." 42 C.F.R. § 413.134(k)(2). The inclusion of this parenthetical phrase removes any doubt as to whether a provider may claim a loss when it merges into an entity over which it would assume significant control. The referenced section defines a "related party" in terms of control, and such "[c]ontrol exists if an individual or organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution." 42 C.F.R. § 413.17(b)(3). As the Secretary has shown previously, it has long been understood that parties are "related" under this rule if one party has such a power of control over the other at the time of the transaction, or if that power is created as the result of the transaction itself. *See, e.g.,*

*Medical Center of Independence v. Harris*, 628 F.2d 1113 (9th Cir. 1980) (adopted as the position of the Secretary in HCFA Ruling 80-4); *see also Sid Peterson Mem. Hosp. v. Thompson*, 274 F.3d 301, 309-10 (5th Cir. 2001) (all aspects of parties' relationship, including relationship created by transaction, must be considered to determine whether parties are related).

The explicit language of Section 413.134(k), then, establishes that only a merger between unrelated parties can qualify for a depreciation adjustment, and that for this purpose parties are related if they would be so defined under Section 413.17. There is no doubt that, under the latter section, a transaction in which one party gains significant control over the other is a related-party transaction. Therefore, a merger in which the provider retains significant control over the post-merger entity is one between related parties, and no depreciation adjustment is permitted. This fully comports with the Secretary's obligation under the Medicare statute, which is to ensure that he reimburse a provider only for its actual costs, such as a provider's costs that would be reflected by a true disposal of assets in a bona fide sale between unrelated parties. *See* 44 Fed. Reg. 6912, 6913 (Feb. 5, 1979) (related party principles for purposes of mergers will be consistent with definition of related parties in predecessor to Section 413.17).[2]

Despite this, Central Iowa now contends (Reply Br. at 11) that the principle of *Medical Center of Independence* does not apply in a "one-time transaction" such as a merger. It fails, however, to explain why this distinction is relevant. Section 413.17

_____

[2] Central Iowa argues (Reply Br. at 6) that concerns about the continuity of control are only *post hoc* rationalizations by the Secretary's attorneys. To the contrary, the Secretary has formally and explicitly interpreted Sections 413.134 and 413.17 to preclude recognition of a gain or loss by a party to a merger that does not truly surrender control over its assets, both in Program Memorandum A-00-76 and in the Administrator's decision at issue in this case. A.R. 17, 1537-38.

serves as a prophylactic rule to prevent a provider from creating inflated costs through self-dealing. *See Medical Center of Independence*, 628 F.2d at 1119. The danger of such self-dealing certainly exists where the principals of a provider transfer its assets – even in a "one-time transaction" – to a new entity over which they will continue to exercise significant control, and the Secretary has reasonably interpreted his regulations not to permit such a result. *See, e.g., Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1191 n. 15 (3d Cir. 1986). Under Central Iowa's theory, however, a provider could manufacture a Medicare loss simply by transferring its assets to a new entity on the understanding that its principals would later assume control of that new entity. Nothing in the regulations requires this absurd result.

Cental Iowa also argues (Reply Br. at 8) that it and Lutheran could not be related, because Lutheran ceased to exist as of the moment of the merger. Under this reasoning, the principals of a provider could create a Medicare loss simply by dissolving the provider, transferring its assets to a newly-created entity at a discount, and assuming control of the new entity; because the two entities never existed at the same time, under this theory, one could not be viewed as controlling the other. In order to avoid this obvious loophole, the Secretary wrote the Medicare regulations to provide that parties are related not only if one directly controls the other, but also if the principals of one party will assume significant control, directly or indirectly, of the other. *See* 42 C.F.R. § 413.17(b)(1), (b)(3), and (c)(2). The Secretary's reasonable interpretation of his regulations to prevent such windfalls is not plainly erroneous or inconsistent with his regulations, and thus should be given controlling weight. *See Castlewood Prods., L.L.C. v. Norton*, 365 F.3d 1076, 1082 (D.C. Cir. 2004).

**B.      Substantial Evidence Supports the Administrator's Finding that
Lutheran Retained a Significant Power of Control over Central
Iowa**

The Administrator found that Lutheran and Central Iowa were, in fact, related

parties.  As the Secretary has shown in his initial brief, there is easily substantial evidence

to support this finding.  Nine out of 19 members of the board of the surviving entity, as

well as 11 out of 23 members of the board of the surviving entity's sole member, were

appointed from the Lutheran board.  Lutheran's chairman continued as the vice-chairman

of the boards of both entities, and was assured that he would be the next chairman of both

boards.  Lutheran's president continued as the vice-president of both entities, and also

served as the president of the newly-constituted "Iowa Lutheran Hospital Division,"

which would manage Lutheran's hospital.  Lutheran's sole member, the Southeastern

Iowa Synod, retained the right to approve any name changes of Lutheran's facilities, and

also retained a reversionary interest in the surviving entity's assets.  In addition, the

charitable foundation affiliated with Lutheran continued in existence, and its funds were

guaranteed to be directed for the benefit of Lutheran's facilities.  These factors, viewed

together, easily constitute substantial evidence that Lutheran was related to the merger's

surviving entity, that is, that the principals of Lutheran retained "the power, directly or

indirectly, significantly to influence or direct the actions or policies of an organization or

institution."  42 C.F.R. § 413.17(b)(3).

Central Iowa argues (Reply Br. at 13) that the composition of its board should be

ignored, as there was no guarantee that the members appointed by Lutheran's principals

would operate as a bloc.  But section 413.17(b)(3) does not require the actual exercise of

significant control, only the retained power to do so.  *See MCI*, 628 F.2d at 1118;

*Hospital Affiliates Int'l*, 543 F. Supp. at 1386.  The merger called for members from the

-11-

Lutheran board to be appointed to the new entities' boards specifically because they had been "intimately involved" in managing Lutheran, and because their experience would contribute to the success of the surviving entity. A.R. 221. Given this stated purpose, the Administrator did not err in finding that Lutheran's principals retained a significant power to influence the new entity through the board appointments.

III.  **The Secretary Is Permitted to Interpret His Own Regulations, and Deference Is Owed to That Interpretation**

The Secretary has reasonably interpreted his regulations to provide that a gain or loss may be recognized from the disposition of assets in a merger only if that merger qualifies as a bona fide sale – that is, assets were exchanged in the merger in an arm's length transaction for fair value – and if that merger is between unrelated parties – that is, the party disposing of the assets in the merger does not continue to hold significant control over the party receiving the assets. *See* PM A-00-76. This Court must give that reasonable interpretation controlling weight. *See Long Island Care at Home, Ltd. v. Coke*, 127 S. Ct. 2339, 2349 (2007); *Castlewood Prods., L.L.C.*, 365 F.3d at 1082. Central Iowa plainly cannot prevail under the Secretary's interpretation. Lutheran transferred its assets to an entity over which it would continue to exercise significant control, and it failed to receive fair consideration in the exchange; accordingly, the claim that Lutheran incurred a loss in the merger is a claim for a paper loss only. Because Central Iowa cannot prevail under the Medicare regulations, it argues instead that, for various reasons, the Secretary has bound himself to an interpretation that would require that the hospital be paid for a cost that it did not actually or reasonably incur. Its arguments on this score are incorrect.

-12-

### A.     The Secretary Has Not Changed His Interpretation of His Regulations

As the Secretary explained in his opening brief, Central Iowa's arguments turn on its contention that the Secretary once had formally committed himself to an interpretation of his regulations requiring recognition of a supposed loss arising from any disposal of assets in a merger, without regard to whether the provider received fair value in exchange for the disposal of assets, or whether the provider essentially transferred the assets to itself. The Secretary has not done so. To the contrary, the Secretary made clear when he promulgated Section 413.134(k) that the generally applicable principles of Section 413.134(f), which includes the bona fide sale rule, and of Section 413.17, which establishes the related party rule, would govern mergers in the same manner as they govern other transactions. 44 Fed. Reg. 6912, 6912-13 (Feb. 5, 1979). Moreover, he has consistently required that a transaction be at arm's length and for reasonable consideration in order to qualify as a bona fide sale. *See Hospital Affiliates Int'l*, 543 F. Supp. at 1389. He has also consistently reasoned that the "related party" rule applies not only to providers that are related before a transaction, but also to providers that will become related as part of the transaction itself. *See, e.g., MCI*, 628 F.2d at 1119.

Central Iowa asserts (Reply Br. at 8-9) that the Secretary had formally committed himself to precisely the opposite rule, but it simply misreads the materials that it claims as support. The 1987 letter from one HHS official, William Goeller, upon which Central Iowa relies disclaimed any formal interpretation of the regulations. It recited only generally that a consolidating entity could recognize a loss if the requirements of Section 413.134(f) – including the prohibition of a recognition of a gain or loss in the case of a donation of assets – were satisfied. The letter did not discuss the interpretation of the related parties rule at all. A.R. 594-95. It is difficult to understand how Central Iowa

interprets this letter to be a formal commitment to its contrary interpretation of the bona fide sale and related parties rules.

Central Iowa also relies on a 1994 letter from another HHS employee, Charles Booth, which it claims established an interpretation of the regulations that the Secretary later deviated from in rejecting Central Iowa's loss claim. As an initial matter, this letter postdated the merger, and so Central Iowa cannot claim that it was subject to "unfair surprise" from the Secretary's supposed deviation from this letter. *Long Island Care at Home*, 127 S. Ct. at 2349. In any event, that letter is also silent as to how to determine whether parties to a consolidations are related, and discusses only the methodology of calculating any gain or loss that might be recognized. Central Iowa also relies on an example in the Medicare Intermediary Manual, which it claims establishes that only parties related before a merger occurs will be deemed to be related. The example simply does not discuss a circumstance in which parties become related as a result of the merger, and thus simply does not establish an interpretation either way on that issue. (Nor does the example discuss the bona fide sale rule.) Neither this example in the manual, nor either of the letters that Central Iowa cites, can fairly be viewed as definitively establishing the interpretation that the provider advances here. *See Thomas Jefferson Univ.*, 512 U.S. at 515-16 (mere silence in intermediary letter does not establish that Secretary had inconsistently interpreted regulation).

The Secretary simply did not adopt the interpretation that Central Iowa now wishes that he did. To the contrary, all the available evidence indicates that the Secretary, from an early date, recognized that Sections 413.134 and 413.17 establish the bona fide sale rule and the related parties rule for mergers. In accordance with this recognition, he acted formally to disallow claims for payment arising from mergers that were not bona fide

sales, or that involved parties that were related to the entity surviving the merger.  A.R. 564-65, 1226, 1271.  This Court should defer to the Secretary's reasonable and consistent interpretation of his regulations.

> **B.**     **The Secretary Has Provided a Reasoned Explanation for His Interpretation**

Central Iowa repeats its assertions (Reply Br. at 19-20) that no deference is owed to the Secretary's interpretation of his regulations, because the Secretary supposedly has acted arbitrarily and capriciously by failing to provide a reasoned explanation for that interpretation.  This is simply incorrect.  The Secretary has explained, in detail, that his mandate is to pay providers only for their reasonable and actual costs.  An adjustment to a provider's depreciation allowance for an asset may be made only where such an adjustment would reflect costs that the provider has reasonably and actually incurred in the use of that asset.  The Secretary's regulations establish a bona fide sale rule and a related parties rule for the disposal of assets in a merger, as for any other transaction, to ensure that any depreciation adjustment arising from the merger reflects the actual value of the assets transferred in the merger, and thus the provider's actual costs in the use of those assets.  *See* PM A-00-76.  The Secretary's regulations, and his interpretation of those regulations, is entirely in keeping with the statutory mandate of the Medicare Act, and thus is entitled to deference.  *See Long Island Care at Home*, 127 S. Ct. at 2349; *Nat'l Cable & Telecom. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005).

Central Iowa argues (Reply Br. at 21) that the Secretary's interpretation must be arbitrary and capricious unless some similar loss claim had been disallowed prior to 1993.  No such requirement exists in the law.  Sections 413.134 and 413.17, as reasonably interpreted by the Secretary, establish the bona fide sale and related parties rules for mergers, and thus the Secretary was permitted to apply those rules, even if he were to do

so for the first time in the adjudication of Central Iowa's claim.  *See Health Ins. Ass'n of Am. v. Shalala*, 23 F.3d 412, 424 (D.C. Cir. 1994).  (In any event, he did not first apply those rules here, as discussed above.  A.R. 564-65, 1226, 1271.)

### C.    The Secretary Was Not Required to Follow APA Rulemaking Procedures to Announce His Interpretation of His Existing Regulations

Central Iowa also repeats its argument (Reply Br. at 21, 24) that the Secretary could not interpret his Medicare regulations unless that interpretation were to be established through notice and comment.  As the Secretary has previously explained, he followed the Administrative Procedure Act's requirements when he promulgated Section 413.134 and Section 413.17, and it is the operation of those regulations that forecloses Central Iowa's loss claim.  His explanation of these provisions, as reflected in PM A-00-76 and in the decision of the Administrator at issue in this case, is merely an interpretation that follows from, and is fairly encompassed in, the regulations already in place.  Such interpretations are exempt from the APA's notice-and-comment requirement. *See* 5 U.S.C. § 553(b)(A); *Air Transp. Ass'n v. FAA*, 291 F.3d 49, 55-56 (D.C. Cir. 2002); *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993).

Central Iowa also asserts again (Reply Br. at 24) that, even if notice and comment were not otherwise required for the Secretary to interpret his regulations, such procedures would be required for the Secretary to change his regulatory interpretation.  As discussed above, the Secretary's interpretation has not changed.  In any event, Central Iowa flatly misconstrues this circuit's precedents regarding interpretive changes.  In this circuit, if an agency had established an "express, direct, and uniform interpretation" of a regulation that is the equivalent of the agency's common law on an issue, and if a party had relied on

-16-

that interpretation to its detriment, the agency may be required to go through notice and comment before it applies a new interpretation against that party. *See Ass'n of Am. R.R. v. Dep't of Transp.*, 198 F.3d 944, 948-50 (D.C. Cir. 1999). Central Iowa can satisfy neither prong of this test.[3] First, given that the Secretary's Federal Register notices themselves establish the bona fide sale and related parties rules, and that the Secretary contemporaneously applied those rules to deny several loss claims similar to that at issue here, Central Iowa simply cannot claim that the Secretary had expressly, directly, and uniformly followed the regulatory interpretation that it favors. *See Commodity Carriers, Inc. v. FMCSA*, 434 F.3d 604, 607 (D.C. Cir. 2006); *Air Transp. Ass'n*, 291 F.3d at 57-58. Second, Central Iowa conceded that the depreciation claim did not play a role in the parties' decision to merger, A.R. 231, and thus cannot assert that it relied to its detriment on the Secretary's supposed prior contrary interpretation. *See Long Island Care at Home*, 127 S. Ct. at 2349 (deference owed to agency's changed interpretation of regulation so long as change does not create unfair surprise).

### D. The Deficit Reduction Act of 1984 Does Not Prohibit the Secretary from Interpreting His Regulations

Central Iowa again asserts (Reply Br. at 22-23) that, because the Deficit Reduction Act of 1984 ratified the Secretary's depreciation regulations, the Secretary was precluded from issuing new regulations or from further interpreting the regulations in place after 1984. This argument is nonsensical; nothing in this Act, or in the case law cited by Central Iowa, purports in any way to limit the Secretary's authority to interpret his regulations, or to change the normal rules of deference that this Court owes to such

---

[3] Central Iowa apparently recognizes that it cannot satisfy either prong of this rule, and so instead it denies, without explanation, that such a rule exists. (Reply Br. at 24.) It cannot wish away this circuit's precedents, however.

interpretations.  *See Lake Med. Ctr. v. Thompson*, 243 F.3d 568 (D.C. Cir. 2001);

*Whitecliff, Inc. v. Shalala*, 20 F.3d 488 (D.C. Cir. 1994)   The Act's legislative history

recites that the Secretary had the authority to issue new regulations, and so it necessarily

follows that the Act did not freeze any policies in place in the manner that Central Iowa

contends.  H.R. Rep. No. 98-861, at 1338 (1984), *reprinted in* 1984 U.S.C.C.A.N. 697,

2026.  In any event, it is difficult to understand what benefit Central Iowa hopes to gain

from this argument.  It contends (incorrectly) that the Secretary made various

pronouncements after 1984 in which he obligated himself to pay Central Iowa's loss

claim.  Central Iowa cannot simultaneously assert that the Secretary was somehow

powerless to address the meaning of his own regulations and also argue that the

inferences it seeks to draw from later agency correspondence should be given binding

effect.

> **E.**     **The Congressional Review Act Does Not Prohibit the Secretary**
>            **from Interpreting His Regulations**

Finally, Central Iowa again argues (Reply Br. at 24-25) that the Secretary violated

the Congressional Review Act, 5 U.S.C. §§ 801 *et seq.*, by applying his interpretation of

his own regulations without first submitting that interpretation to the House and Senate

for review.  As the Secretary demonstrated in his opening brief, that statute expressly

precludes judicial review of any "determination, finding, action, or omission" under it.  5

U.S.C. § 805.  Central Iowa argues that this provision would render the Act a "nullity."

To the contrary, the explicit bar on judicial review establishes simply that "Congress

seeks to enforce the [Act] without the able assistance of the courts."  *Texas Sav. & Comm.*

*Bankers Ass'n v. FHFB*, 1998 WL 842181, at *7 n.15 (W.D. Tex. 1998), *aff'd*, 201 F.3d

551 (5th Cir. 2000).  And, in any event, the Secretary's interpretation of his existing

regulation is simply a pronouncement of existing rights and liabilities, and is not a

-18-

prescription of a course of conduct for the future.  Therefore, it is not a "rule" for

purposes of the APA or of the Congressional Review Act.  *See Indep. Equip. Dealers*

*Ass'n v. EPA*, 372 F.3d 420, 428 (D.C. Cir. 2004).

<h2 style="text-align:center;"><u>CONCLUSION</u></h2>

For the foregoing reasons, the plaintiff's motion for summary judgment should be

denied, the defendant's cross-motion for summary judgment should be granted, and

judgment should be entered in favor of the defendant.

Dated: October 19, 2007

Of Counsel:

DANIEL MERON
General Counsel

JANICE HOFFMAN
Acting Associate General Counsel

MARK D. POLSTON
Deputy Associate General
    Counsel for Litigation

DAVID HOSKINS
Attorney
Office of the General Counsel
U.S. Department of Health
    and Human Services

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney


_____/s/ Joel McElvain_____
SHEILA M. LIEBER
Deputy Director
JOEL McELVAIN, D.C. Bar # 448431
Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7130
Washington, D.C. 20001
Telephone:   (202) 514-2988
Fax:              (202) 616-8202
Email:           Joel.L.McElvain@usdoj.gov

*Attorneys for Defendant*