IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTRAL IOWA HOSPITAL CORPORATION, successor-in-interest to IOWA LUTHERAN HOSPITAL, | |
| Plaintiff, | CASE NO.: 1:07-CV-00295-RWR |
| v. | |
| MICHAEL O. LEAVITT, as Secretary of Health and Human Services, | |
| Defendant. | |

PLAINTIFF'S MOTION
FOR LEAVE TO AMEND COMPLAINT

Plaintiff, Central Iowa Hospital Corporation, successor-in-interest to Iowa Lutheran Hospital, pursuant to Rule 15(a) of the Federal Rules of Civil Procedure and LCvR 7(i) and 15.1, respectfully moves this Court for leave to amend its previously-filed complaint in this matter to add Count XIII, reflecting a recent decision of the United States Court of Appeals for the District of Columbia. A true and correct copy of the proposed Amended Complaint is attached hereto as Exhibit A.

BACKGROUND

1.      This action involves judicial review of the final decision of the Secretary of Health and Human Services ("Secretary") denying a claim of Iowa Lutheran Hospital for Medicare's payment of a portion of the loss that it incurred on a statutory merger with an unrelated entity.

2.      In its Complaint filed with this Court on February 8, 2007, Plaintiff Central Iowa Hospital Corporation, Iowa Lutheran Hospital's successor-in-interest, asserted that the Secretary's final administrative decision was based on a Program Memorandum issued by the Secretary's Centers for Medicare and Medicaid Services ("CMS") on October 20, 2000, more than six years after the statutory merger at issue, and that the Secretary's decision was contrary to substantive and

procedural requirements set forth in the Medicare statute and regulations and the Administrative Procedure Act ("APA").

3.      Each party has moved for summary judgment in this matter and has submitted memoranda in support of its motion and in opposition to the motion of the opposing party.  This matter became fully briefed on November 16, 2007.

4.      Plaintiff Central Iowa Hospital Corporation has not previously amended its Complaint in this matter.

<u>BASIS FOR AMENDMENT TO COMPLAINT</u>

5.      On December 21, 2007, the United States Court of Appeals for the District of Columbia issued a decision that would prohibit the Secretary's reliance on principles set forth in the Program Memorandum.  In *Chippewa Dialysis Services v. Leavitt*, No. 06-5371, 2007 WL 4461503 (D.C. Cir. Dec. 21, 2007), the Court stated that the Medicare statute required the Secretary to publish a list of all manual instructions, interpretative rules, statements of policy, and guidelines of general applicability in the Federal Register at least every three months.  *See* 42 U.S.C. § 1395hh(c)(1).  The Court indicated that because the standard relied on by the Secretary in that matter was a guideline of general applicability that had never been published in the Federal Register, the Secretary's reliance on this standard was impermissible.

6.      In this matter, the Program Memorandum on which the Secretary's decision was based was issued on October 20, 2000.  However, it was not listed in the Federal Register until June 28, 2002.  *See* "Medicare and Medicaid Programs; Quarterly Listing of Program Issuances – Fourth Quarter, 1999 through First Quarter, 2002." 67 Fed. Reg. 43,762, 43,784 (June 28, 2002).  Because the Program Memorandum was an interpretative rule (as asserted in the Secretary's *Memorandum In Opposition to Plaintiff's Motion for Summary Judgment and In Support of Defendant's Cross-Motion for Summary Judgment* at 38), a statement of policy, or guideline of general applicability, the Secretary's failure to timely include the Program Memorandum in a list of agency issuances

published in the Federal Register precluded the Secretary from relying on principles set forth therein.

7.      Count XIII of the proposed Amended Complaint reflects application of 42 U.S.C. 1395hh(c)(1), the statutory provision relied on in *Chippewa Dialysis Services,* to the Secretary's administrative decision here at issue.

<u>POINTS AND AUTHORITIES IN SUPPORT OF MOTION</u>

8.      The Federal Rules of Civil Procedure provide that a party may amend its pleading after a responsive pleading has been served "by leave of court or by written consent of the adverse party."  Fed.R.Civ.P. 15(a).  Those rules further provide that "leave shall be freely given when justice so requires."  *Id.*

9.      As this Court has stated, factors to be considered in evaluating a motion to amend include the movant's undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party resulting from the amendment, and futility of the amendment.  *Hunt v. Depuy Orthopaedics, Inc.,* Civil Action No. 03-900 (RWR), 2005 U.S. Dist. LEXIS 38665, at *2 (D. D.C. Sept. 22, 2005).  This Court has also recognized that courts should consider the relation of the proposed amended complaint to the original complaint, "favoring proposed complaints that do not 'radically alter the scope and nature of the case.'"  *Id.* (citation omitted).

10.      In the absence of a compelling reason for denying leave to amend a complaint, such leave should be granted.  *M.K. v. Tenet,* 216 F.R.D. 133, 137 (D. D.C. 2002).  *See Foman v. Davis,* 371 U.S. 178, 182 (1962).  In this matter, there is no compelling basis to deny Central Iowa Health System's motion to amend its Complaint.

11.      Amendment of the Complaint would not unduly prejudice the Secretary.  The amendment does not add factual allegations which are subject to dispute, but rather, includes an additional legal basis for the Court to award the relief previously sought, similar to several other

legal assertions. *See* Complaint, Counts V – XI. Additionally, this matter will be decided by the Court based solely on the administrative record made before the Secretary. Therefore, the amendment would not deprive the Secretary of any right to engage in discovery or to present relevant facts into evidence. *See generally, Hunt,* 2005 U.S. Dist. LEXIS, at *3 ("extent to which an amendment of a complaint would require additional discovery is a factor in assessing potential prejudice.")

12.    The motion for leave to amend the Complaint does not reflect undue delay, bad faith, a dilatory motive, a repeated failure to cure deficiencies by previous amendments, or futility of amendment, i.e., where the proposed complaint reflects a legal theory that would not survive a motion to dismiss – reasons that may justify denial of a motion to amend. *See Foman,* 371 U.S. at 182; *Hunt,* 2005 U.S. Dist. LEXIS, at *2; *M.K.,* 216 F.R.D. at 137.

<u>DUTY TO CONFER ON NONDISPOSITIVE MOTIONS</u>

13.    Pursuant to L.Cv.R.7(m), Plaintiff's counsel conferred with opposing counsel to determine whether the Secretary would oppose the relief sought herein. On January 29, 2008, the Secretary's counsel advised Plaintiff's counsel that it would oppose amendment of the Complaint on grounds of "futility". The Secretary's position was that the amendment was futile because the Program Memorandum was listed in the Federal Register and because Plaintiff's assertion that would be reflected in the Amended Complaint had not been raised below. As set forth below, Plaintiff's motion to amend its complaint is not futile.

14.    As stated in paragraph 6, the Program Memorandum was not listed in the Federal Register until more than twenty (20) months after it was published. The Secretary was required to include the Program Memorandum in a list that was required to be published "not less frequently than every 3 months." 42 U.S.C. § 1395hh(c)(1). The Secretary did not comply with the statutory directive.

15.     Similarly, the Secretary's position that Plaintiff's failure to raise the issue below makes the proposed amendment futile is without merit.  As demonstrated below, the Program Memorandum was not directly at issue in the administrative proceedings until the Secretary issued his final administrative determination, relying on the Program Memorandum to deny the loss claim at issue (A.R. 17-19, 26-29).  There were then no further administrative proceedings in which to challenge application of the Program Memorandum to the loss claim (A.R. 1).

16.     The Intermediary had not relied on the Program Memorandum in disallowing Iowa Lutheran Hospital's loss claim (A.R. 1244-46), or in any of the three briefs that it submitted to the Provider Reimbursement Review Board ("PRRB").    (A.R. 73-81, 1227-41, 1279-1303).    The PRRB, whose decision was reversed by the Secretary, did not disallow Iowa Lutheran Hospital's loss claim based on the Program Memorandum; it required recognition of Iowa Lutheran Hospital's loss in accordance with Medicare regulations (A.R. 64-68).

17.     In fact, because the Program Memorandum had not been introduced into evidence by either party during the administrative proceedings, the Secretary was required to include it in a supplement to the administrative record filed with this Court, as "one document considered by the Administrator of the Centers for Medicare and Medicaid Services."  *Notice of Filing of Supplement to Administrative Record* (Apr. 9, 2007).  Plaintiff cannot be required to raise all possible challenges to a Medicare interpretation that was not at issue during the course of the administrative proceedings, particularly one related to procedural publication requirements.

18.     Additionally, because neither the PRRB nor the Secretary addressed any of the procedural arguments that were raised at the administrative level (A.R. 2-31, 37-38, 59-68, 89, 142-43), this Court was not deprived of the Secretary's analysis of the application of 42 U.S.C. § 1395hh(c)(1) to the Program Memorandum as a result of the issue not being raised in the administrative proceedings. *Cf. R.R. Yardmasters of America v. Harris,* 721 F.2d 1332, 1338 (D.C.

Cir. 1983) (no waiver when resolution of issue does not require development of factual record, application of agency expertise, or exercise of administrative discretion).

19.    This Court has recognized that where, as here, Plaintiff's claim "may present a proper subject of relief . . . [i]t is best to permit an opportunity for it to be resolved on the merits." *Hunt,* 2006 U.S. Dist. LEXIS, at \*3.  *See also, Foman,* 371 U.S. at 182 (if facts or circumstances relied on by plaintiff may permit court to award requested relief, then plaintiff "ought to be afforded an opportunity to test his claim on the merits").  Plaintiff should be permitted to argue that the Secretary's reliance on the Program Memorandum was contrary to 42 U.S.C. § 1395hh(c)(1).

WHEREFORE, Plaintiff Central Iowa Hospital Corporation prays that this Court grant its motion and order, and accept the proposed Amended Complaint for filing.

Respectfully submitted,

CENTRAL IOWA HOSPITAL
CORPORATION, successor-in-interest to
IOWA LUTHERAN HOSPITAL

*/s/ Harold Belkowitz*
Harold Belkowitz (D.C. Bar #449800)
Ober, Kaler, Grimes & Shriver
A Professional Corporation
1401 H Street, N.W.
Washington, D.C. 20005-3324
(202) 408-8400

Plaintiff's Attorneys

OF COUNSEL:

Robert E. Mazer
Ober, Kaler, Grimes & Shriver
A Professional Corporation
120 East Baltimore Street
Baltimore, Maryland 21202-1643
(410) 685-1120

Dated at Washington, D.C.
this 1st day of February, 2008

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of February, 2008, I caused this document to be filed in this Court's electronic filing system, and that that filing constituted service of the document on the attorney listed below:

Joel McElvain
United States Department of Justice
Civil Division, Federal Programs Branch
Room 7130
20 Massachusetts Avenue, N.W.
Washington, D. C. 20001

*/s/ Harold Belkowitz*
Harold Belkowitz

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CENTRAL IOWA HOSPITAL | * | |
| CORPORATION, successor-in-interest to | | |
| IOWA LUTHERAN HOSPITAL | * | |
| | | |
| Plaintiff, | * | |
| | | |
| v. | * | CIVIL CASE NO. 1:07-CV-00295-RWR |
| | | |
| MICHAEL O. LEAVITT, as Secretary of | * | |
| Health and Human Services, | | |
| | * | |
| Defendant. | | |
| | *** | |

AMENDED COMPLAINT FOR JUDICIAL REVIEW OF FINAL
ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

Plaintiff Central Iowa Hospital Corporation, successor-in-interest to Iowa Lutheran Hospital, by its undersigned attorneys, hereby files this Complaint. This action involves the failure of Defendant Michael O. Leavitt, Secretary of Health and Human Services, to reimburse the Plaintiff amounts to which it is entitled under the Medicare program, namely reimbursement for its loss incurred on a statutory merger with an unrelated entity.

PARTIES

1.    During the relevant time period, Iowa Lutheran Hospital was a non-profit hospital located in Des Moines, Iowa. Iowa Lutheran Hospital was certified as a "provider of services" participating in the Medicare Program within the meaning of 42 U.S.C. § 1395x(u). Central Iowa Hospital Corporation is a non-profit corporation located in Des Moines, Iowa, and is the successor-in-interest to Iowa Lutheran Hospital, as further described in paragraphs 24 and 30 of this Complaint.

2.    Defendant Michael O. Leavitt, Secretary of Health and Human Services (hereinafter, "Secretary" and "HHS"), is responsible for the administration of the Medicare

**EXHIBIT A**

Program under Title XVIII of the Social Security Act, as amended. 42 U.S.C. §§ 1395-1395ggg (hereinafter, the "Act"). Pursuant to Medicare regulations, the Secretary is the real party in interest in the administration of the Medicare Program. 42 C.F.R. § 421.5(b). The Centers for Medicare and Medicaid Services (hereinafter, "CMS") is the operating component of HHS charged with the administration of the Medicare Program. During the cost reporting period at issue, CMS was known as the Health Care Financing Administration (hereinafter, "HCFA").

## JURISDICTION AND VENUE

3.      This action arises under the Medicare statute (Title XVIII of the Act), 42 U.S.C. §§ 1395-1395ggg; the Administrative Procedure Act, 5 U.S.C. §§ 553-808 (hereinafter, the "APA"); and the Declaratory Judgment Act, 28 U.S.C. § 2201. The action is based upon the failure of the Secretary to reimburse Iowa Lutheran Hospital for certain costs related to its provision of health care services to Medicare beneficiaries, namely, compensation for the loss it incurred from its statutory merger with an unrelated party.

4.      This court has jurisdiction under 42 U.S.C. § 1395oo(f)(1).

5.      Venue lies in this judicial district pursuant to 42 U.S.C. § 1395oo(f)(1) and 28 U.S.C. § 1391.

## MEDICARE STATUTORY AND REGULATORY FRAMEWORK

6.      Title XVIII of the Act establishes a program of health insurance for the aged and disabled commonly known as "Medicare." 42 U.S.C. §§ 1395-1395ggg. The Medicare program is divided into four parts, Part A through Part D. Part A and Part B of the Medicare program are the only parts that are relevant to this proceeding. Part A (the hospital insurance program) provides for reimbursement of inpatient hospital services. 42 U.S.C. §§ 1395c-1395i-5. Part B (the supplemental medical insurance program) pays for various health services not covered by Part A, including physician services and hospital outpatient services. 42 U.S.C. §§ 1395j-1395w-4j.

7.      To participate in the Medicare program, a hospital must file a "provider agreement" with the Secretary.  42 U.S.C. § 1395cc.

8.      Payment to providers of Medicare services is made through fiscal intermediaries pursuant to contracts with the Secretary.  42 U.S.C. § 1395h.

9.      The fiscal intermediary for Iowa Lutheran Hospital during the period at issue was Blue Cross and Blue Shield of Iowa ("BCBSI").  In June, 2000, Wellmark Blue Cross and Blue Shield ("Wellmark") replaced BCBSI as the fiscal intermediary responsible for Iowa Lutheran Hospital.  (BCBSI and Wellmark will be referred to individually and collectively as the "Intermediary").  The Intermediary was responsible for Medicare audit of, and payment to, Iowa Lutheran Hospital.

10.     Historically, the Medicare program reimbursed hospital services on a "reasonable cost" basis.  42 U.S.C. § 1395f(b).  Section 1861 of the Act requires that the reasonable cost of services reimbursed under the Medicare program be determined in accordance with regulations promulgated by the Secretary.  42 U.S.C. § 1395x(v)(1)(A).  During the relevant time period, Section 1861 of the Act also required the Secretary to provide for recapture of depreciation in the same manner as provided under the regulations in effect on June 1, 1984.  42 U.S.C. § 1395x(v)(1)(O).

11.     Since its inception, Medicare regulations have recognized that depreciation represents a reasonable cost of services required to be reimbursed under the Medicare statute.  *See* 42 C.F.R. § 413.134.  Recognition of depreciation compensates a provider for an asset's loss of value resulting from its use in furnishing services to Medicare beneficiaries.  Medicare reimburses depreciation costs to a provider on an annual basis, based on the historical cost of each depreciable asset divided by its estimated useful life.  If, upon disposal of a depreciable asset, a Medicare provider receives more than the asset's historic cost less previously recognized depreciation allowances ("Medicare book value"), then a gain occurs.  In that event, Medicare

recognizes the gain in the determination of the provider's allowable cost and recoups previously paid reimbursement for depreciation.  If, upon disposal of a depreciable asset, a provider receives less than the asset's Medicare book value, then Medicare recognizes the loss in the determination of the provider's allowable cost and pays additional reimbursement to compensate the provider for the previously unrecognized depreciation.

12.     Medicare depreciation regulations require that, upon the statutory merger of two or more corporations that are unrelated, assets of the merged corporation be "revalued."  The merged corporation, if a Medicare provider, is required to recognize any gain or loss incurred on the transaction.  42 C.F.R. § 413.134(l).  The merged entity's gain or loss is determined based on a comparison of the consideration received for its depreciable assets and their Medicare book value.

13.     The Social Security Amendments of 1983, Pub. L. 98-21, 97 Stat. 65 (1983), created a new method for payment of hospital inpatient services based upon a prospective payment system.  Effective for cost reporting periods beginning on or after October 1, 1983, Medicare began paying hospitals for certain inpatient operating costs based on a beneficiary's diagnosis at the time of discharge.  The amount per discharge varies according to the diagnosis-related group into which the patient's treatment falls.  42 U.S.C. § 1395ww(d).

14.     The Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, § 4006(b), 101 Stat. 1330, 1330-52 (1987), required payments for certain capital-related costs of hospitals to be made in accordance with a capital prospective payment system established by the Secretary, effective for cost reporting periods beginning on or after October 1, 1991.  Medicare regulations implementing the statutory directive are at 42 C.F.R. § 412.300, *et. seq.*

15.     The statutory and regulatory amendments providing for use of a prospective payment methodology to pay for hospital inpatient operating costs and capital-related costs did

not, however, result in a change to Medicare regulations addressing depreciation and gains and losses from statutory mergers.

16.     Medicare providers are required to file annual cost reports with their fiscal intermediaries.   Within twelve (12) months following the receipt of a cost report, the intermediary is required to send the provider a notice of amount of program reimbursement (hereinafter, "NPR") setting forth the amount of payment due to the provider by Medicare. 42 C.F.R. §§405.1803(a), 405.1835(c).   The NPR is considered the intermediary's final determination of total Medicare reimbursement due to the provider for the Medicare cost year to which the NPR relates.

17.     A provider that is dissatisfied with the determination reflected in its NPR may, provided that the amount in controversy exceeds $10,000, request a hearing before the Provider Reimbursement Review Board (hereinafter, "PRRB"), by filing an appeal within one hundred eighty (180) calendar days from the date of receipt of its NPR.  42 U.S.C. §1395oo(a); 42 C.F.R. §§ 405.1801-405.1889.   The PRRB has the authority to affirm, modify, or reverse an intermediary's determination reflected in the NPR.  A PRRB decision becomes final sixty (60) days after the receipt of the PRRB's decision unless, within that time, the provider requests judicial review or the CMS Administrator reverses, affirms or modifies the PRRB decision. 42 U.S.C. § 1395oo(f)(1).

18.     A provider may obtain judicial review of a final decision of the PRRB, or of the reversal, affirmation, or modification by the CMS Administrator of a PRRB decision, by filing a civil action within sixty (60) days of the date on which the provider receives notice of (1) a final decision by the PRRB or (2) any reversal, affirmation, or modification by the CMS Administrator.  *Id*.  A provider that seeks judicial review and is the prevailing party in such litigation is entitled to interest on the amount in controversy from the first day of the first month

beginning after the end of the one hundred eighty (180) day appeal period referenced above. 42 U.S.C. § 1395oo(f)(2).

FACTS OF THE DISPUTE

19.     From the Medicare program's inception until the statutory merger described below, Iowa Lutheran Hospital received Medicare depreciation allowances based on the historic cost of its depreciable assets and Medicare useful life guidelines.

20.     Prior to the statutory merger described below, it was uncertain whether Iowa Lutheran Hospital would survive without such a merger or similar transaction.  Although Iowa Lutheran Hospital was strong in primary care and behavioral and psychiatric care, the local hospital market was dominated by two larger hospitals, Mercy Medical Center and Iowa Methodist Medical Center ("Iowa Methodist") each of which was aggressively attempting to enhance its market position.  Iowa Lutheran Hospital's charges were higher than either of those hospitals, and Iowa Lutheran Hospital's physical plant was nearly twice as old as those hospitals.

21.     Prior to the statutory merger described below, less than one-half of Iowa Lutheran Hospital's licensed beds were generally in use.  Approximately one-half of its inpatient census received behavioral and mental health care.  Iowa Lutheran Hospital's limited range of services would not permit it to contract to provide the full spectrum of services that manage cared entities required.  Additionally, the state of Iowa was in the process of modifying its Medicaid program to pay for mental health services using managed care principles, which modification had the potential to dramatically reduce hospital use in the provision of these services.

22.     Prior to the statutory merger described below, Iowa Lutheran Hospital recognized that in order to remain competitive, it was required to upgrade its facilities.  Its original hospital building had been constructed in the early 1900s, and expanded several times thereafter.  Iowa Lutheran Hospital's master facility plan required an estimated $49 million of construction; estimated minimum capital expenditures over the next five years exceeded $70 million; and its

chief executive officer ("CEO") believed that nearly $90 million would actually be required. Because Iowa Lutheran Hospital had a debt capacity of only $28.5 million, it would be unable to finance the upgrade of its facilities and expansion of services that would be required to continue as a stand-alone hospital. Accordingly, Iowa Lutheran Hospital required some type of affiliation with another stronger health care organization.

23.    Iowa Lutheran Hospital determined that Iowa Methodist, an Iowa nonprofit corporation whose sole member was Iowa Methodist Health System, Inc., was the most complementary facility in Des Moines. It would be able to assist in the financing of Iowa Lutheran Hospital's needed capital improvements; it provided tertiary care, permitting a combined entity to offer the full range of services managed care arrangements would require; and it was located on the other side of the river that split Des Moines. Arm's-length negotiations between representatives of the two organizations resulted in an agreement for the two entities to merge.

24.    Effective November 22, 1993, Iowa Lutheran Hospital merged into Iowa Methodist, which was the surviving entity in the statutory merger. Iowa Methodist's name was changed to Iowa Health System Hospital Corporation ("Iowa Hospital Corporation"). The merger transaction was entered into in good faith and complied with all applicable legal requirements. Under Iowa law, Iowa Hospital Corporation succeeded to Iowa Lutheran Hospital's assets and liabilities, including Iowa Lutheran Hospital's Medicare claim for reimbursement for the loss on statutory merger that it incurred. Under Iowa law, the corporation that merged into Iowa Methodist, Iowa Lutheran Hospital, ceased to exist as a result of the statutory merger. Iowa Methodist's sole member, Iowa Methodist Health System, Inc., remained the sole member of Iowa Hospital Corporation. However, the name of Iowa Methodist Health System, Inc. was changed to Iowa Health System.

25.     At the time the terms of the statutory merger transaction were negotiated, when the transaction documents were executed, and when the statutory merger occurred, Iowa Lutheran Hospital and Iowa Methodist were neither subject to common ownership nor common control.  There were no common governing board members or officers between Iowa Lutheran Hospital and Iowa Methodist.  Accordingly, the transaction was a statutory merger between two unrelated parties.

26.     Iowa Lutheran Hospital incurred a loss on the statutory merger.  Iowa Lutheran Hospital received $28,092,831 consideration for all of its assets, reflecting its liabilities that passed to Iowa Hospital Corporation.  Medicare payment principles provided for assignment of $6,819,713 to its depreciable assets, including land improvements, building and improvements, fixed equipment, and moveable equipment, reflecting the relative fair market value of those assets to total assets of Iowa Lutheran Hospital that passed to Iowa Hospital Corporation.  Iowa Lutheran Hospital's depreciable assets had a Medicare book value of $26,571,959.  Accordingly, Iowa Lutheran Hospital incurred a loss of $19,752,246 on those assets.  Medicare's portion of the loss was $5,423,196, reflecting Medicare's relative use of the facility during the period in which Iowa Lutheran Hospital's depreciable assets were used to furnish patient care services.

27.     Following the merger, control over Iowa Hospital Corporation, including assets that had been owned previously by Iowa Lutheran Hospital, shifted to individuals who, prior to the merger, had been part of Iowa Methodist Health System.  No individual or organization had the ability to control or significantly influence Iowa Lutheran Hospital before the transaction and Iowa Hospital Corporation afterwards.  Iowa Hospital Corporation's post-transaction governing board had nineteen members, only eight of whom had served previously on Iowa Lutheran Hospital's governing board.  Iowa Health System's post-merger governing board had twenty-three individuals, only ten of whom had served previously on Iowa Lutheran Hospital's governing board.

28.    In completing its Medicare cost report for the period ending November 21, 1993, Iowa Lutheran Hospital claimed reimbursement for Medicare's share of the loss on depreciable assets that it calculated had been incurred on the statutory merger.

29.    After auditing Iowa Lutheran Hospital's cost report, the Intermediary disallowed Iowa Lutheran Hospital's loss claim.  The Intermediary determined that the merger of Iowa Lutheran Hospital into Iowa Methodist was a merger between related parties.  The Intermediary found that, as a result of the terms of the statutory merger transaction, particularly, those related to control over the surviving entity after the transaction, the merged entity, Iowa Lutheran Hospital and the surviving entity, Iowa Hospital Corporation, appeared to have become related parties.  The Intermediary's audit determination was reflected in an NPR dated September 30, 1996.

30.    Effective August 7, 1995, Iowa Hospital Corporation changed its name to Central Iowa Hospital Corporation ("Central Iowa Hospital").

<u>ADMINISTRATIVE APPEAL PROCESS</u>

31.    On November 5, 1996, Iowa Lutheran Hospital timely filed its notice of appeal and request for hearing with the Provider Reimbursement Review Board ("PRRB") challenging disallowance of the loss claim pursuant to 42 C.F.R. §§ 405.1835-.1841.  The amount of Medicare program funds in controversy was approximately $7,122,737.  Iowa Lutheran Hospital satisfied the jurisdictional requirements set forth in applicable Medicare regulations.

32.    As reflected in the Intermediary's final Position Paper submitted to the PRRB on March 31, 1999, the Intermediary defended its determination disallowing Iowa Lutheran Hospital's loss on the grounds that it had used to deny the loss, i.e., that the statutory merger was a related party transaction.

33.    While Iowa Lutheran Hospital's appeal was pending before the PRRB, CMS issued additional Medicare Program guidance that reversed longstanding agency policy related to

recognition of gains and losses from statutory mergers, reflected in section 4502.6 of the Medicare Intermediary Manual and in correspondence from senior agency officials. On October 19, 2000, CMS issued a Program Memorandum to its fiscal intermediaries requiring disallowance of loss claims resulting from mergers and consolidations involving non-profit providers based on "continuity of control" and where consideration paid for the assets was considered unreasonable. The Program Memorandum required the related party determination to be based on a comparison of control over the merging entity prior to the transaction with the control over the surviving entity subsequent to the transaction. The agency had previously interpreted the applicable regulation to require the related party determination to be based on the relationship of the merging entities immediately prior to the transaction. The Program Memorandum also required a statutory merger between unrelated parties to be a "*bona fide* sale" before recognition of any related gain or loss, and, based on a definition of that term added to the Provider Reimbursement Manual ("PRM") in May 2000, required related consideration to be "reasonable." The agency had previously interpreted Medicare regulations to require recognition of a gain or loss if it was incurred on a transaction that was a statutory merger and the transaction was between unrelated parties. The agency had not previously applied regulations addressing *bona fide* sales of assets to statutory mergers, or required that the consideration for the merged entity's assets – its liabilities that were assumed by the surviving entity – be considered "reasonable" or reflect the assets' fair market value.

34. On November 4, 2002, the Intermediary submitted a Supplemental Position Paper that reflected the Program Memorandum. The Intermediary asserted that the loss on statutory merger could not be reimbursed because the transaction was not a "*bona fide* sale." The Intermediary's *bona fide* sales contention – made more than six years after the Intermediary's audit determination – potentially prejudiced Iowa Lutheran Hospital which was then unable to

locate complete files of documents that would further demonstrate that the transaction was financially reasonable.

35.    On October 6, 2006, the PRRB issued its decision reversing the Intermediary's determination disallowing Iowa Lutheran Hospital's claimed loss.   A copy of the PRRB's decision is attached as Attachment A.  The PRRB concluded that the transaction was a statutory merger between unrelated parties because, prior to the merger, Iowa Lutheran Hospital and Iowa Methodist were independent, unrelated corporations.   Therefore, Iowa Lutheran Hospital was entitled to reimbursement for its loss on statutory merger.  The PRRB's determination requiring recognition of Iowa Lutheran Hospital's loss reflected the terms of Medicare regulations to which it was bound, interpretations required to be afforded great weight, and long-standing Medicare program policies.  The PRRB remanded the action to the Intermediary for calculation of the loss, instructing the Intermediary to resolve what the PRRB viewed as a discrepancy in Iowa Lutheran Hospital's loss calculation, and to reduce Iowa Lutheran Hospital's loss to account for any overstated depreciation that may have been received by the statutory merger's surviving entity, Iowa Hospital Corporation, in cost reporting periods subsequent to the statutory merger resulting from its continuing use of Iowa Lutheran Hospital's carrying values in the assets.

36.    By letter dated October 18, 2006, the CMS Office of the Attorney Advisor advised counsel for Iowa Lutheran Hospital that the CMS Administrator would review the PRRB's decision and determine whether that decision should be reversed, affirmed, modified or remanded.  Iowa Lutheran Hospital was advised of its right to submit comments.

37.    By letter to the Attorney Advisor dated October 25, 2006, Iowa Lutheran Hospital requested review of the PRRB's decision related to the computation of the loss.  Iowa Lutheran Hospital demonstrated that there were no unexplained discrepancies related to the loss computation that required reconciliation; the issue raised by the PRRB had been addressed in

testimony, and a further reconciliation of the values identified by the PRRB was provided. Additionally, Iowa Lutheran Hospital stated that the PRRB's requirement that Iowa Lutheran Hospital's loss be reduced by potential overstated depreciation allowances paid to the statutory merger's surviving entity in subsequent cost years was unprecedented, contrary to applicable Medicare payment authorities, and was beyond the PRRB's jurisdiction which was limited to matters covered by Iowa Lutheran Hospital's cost report for the period ended November 22, 1993. Iowa Lutheran Hospital indicated that if the Intermediary believed that its payment of depreciation costs in periods subsequent to the statutory merger were incorrect, Medicare reopening regulations provided the mechanism for a re-determination of the Medicare reimbursement due for the applicable cost reporting period.

38.    On December 8, 2006, the CMS Administrator reversed the PRRB's decision. A copy of the CMS Administrator's decision is attached as Attachment B. Relying on the Program Memorandum, the CMS Administrator found that the statutory merger was between related parties because there was "continuity of control" between the merging entity prior to the transaction and the surviving entity afterwards. The CMS Administrator stated that, "based on a combination of factors, the parties to the merger are related through control." The CMS Administrator stated that the "carry forward" of Iowa Lutheran Hospital executives and board members to Iowa Hospital Corporation/Iowa Health System after the transaction assured Iowa Lutheran Hospital's continuing influence and control of Iowa Lutheran Hospital in Iowa Hospital Corporation and Iowa Health System. Additionally, notwithstanding the fact that Iowa Lutheran Hospital ceased to exist as a result of the statutory merger transaction, the CMS Administrator stated that the "common former board members and officers" permitted Iowa Lutheran Hospital to significantly influence or direct the actions or policies of Iowa Health Corporation/Iowa Health System, and showed a continuity of control between Iowa Lutheran Hospital and Iowa Health Corporation/Iowa Health System. The CMS Administrator found that Iowa Lutheran

Hospital "is related through continuity of control with the surviving corporation [Iowa Hospital Corporation], and not entitled to a loss."

39.    In reversing the PRRB, the CMS Administrator also relied on the *bona fide* sale requirements that had been introduced belatedly into the PRRB proceedings by the Intermediary. The CMS Administrator stated that "[s]ince the parties to this transaction are found to be related," the transaction was not an arm's-length transaction.  Relying on the PRM definition of *bona fide* sale, the CMS Administrator stated that a "*bona fide* sale contemplates an arm's length transaction, between unrelated parties for reasonable consideration, with each party acting in its own self interest."  According to the CMS Administrator, Iowa Lutheran Hospital's "transfer price" of approximately $28 million – the value of its liabilities that passed to Iowa Hospital Corporation – did not reflect reasonable consideration for Iowa Lutheran Hospital's assets or "support a finding that the transaction was an arm's length transaction."  Finally, the CMS Administrator stated "[a]s a loss cannot be allowed in this case, [he] does not reach the issue of how to calculate the loss."

40.    The CMS Administrator's decision, received on December 13, 2006, constitutes the final administrative decision of the Secretary with respect to Iowa Lutheran Hospital's claim for reimbursement for its loss on statutory merger.  Iowa Lutheran Hospital has exhausted its administrative remedies with respect to its claim.

41.    This Complaint is filed within sixty (60) days of receipt of the CMS Administrator's decision, and is therefore timely.  42 U.S.C.A. § 1395oo(f)(1).

<u>COUNT I</u>

42.    Central Iowa Hospital hereby incorporates by reference paragraphs 1 through 41 of this Complaint.

43.    Based upon the record developed before the PRRB and CMS Administrator in this case (hereinafter, "administrative record"), which will be certified by the CMS

Administrator in accordance with 42 U.S.C. § 1395oo(f) and which is incorporated herein by reference, the Secretary's final administrative decision is contrary to the requirements of the Medicare statute because it fails to reimburse Iowa Lutheran Hospital for the loss in value of its depreciable assets, which is a cost actually incurred in providing covered services to Medicare beneficiaries, as required by 42 U.S.C. §§ 1395d(a), 1395f(b) and 1395x(v).

## COUNT II

44.     Central Iowa Hospital hereby incorporates by reference paragraphs 1 through 43 of this Complaint.

45.     Based upon the administrative record, the Secretary's final administrative decision is contrary to the requirements of the Medicare statute because it fails to reimburse Iowa Lutheran Hospital in accordance with regulations promulgated by the Secretary.  42 U.S.C. § 1395x(v)(1)(A).

## COUNT III

46.     Central Iowa Hospital hereby incorporates by reference paragraphs 1 through 45 of this Complaint.

47.     Based upon the administrative record, the Secretary's final administrative determination is contrary to the requirements of the Medicare statute because it fails to reimburse Iowa Lutheran Hospital's loss based on the applicable policies in effect on June 1, 1984 which required recognition of Iowa Lutheran Hospital's loss claim.  42 U.S.C. § 1395x(v)(1)(O).

## COUNT IV

48.     Central Iowa Hospital hereby incorporates by reference paragraphs 1 through 47 of this Complaint.

49.     Based upon the administrative record, the Secretary's final administrative determination contrary to the Secretary's governing regulation and long-standing interpretations,

which require reimbursement of a provider's loss incurred on a statutory merger with an unrelated corporation. 42 C.F.R. § 413.134(l); Medicare Intermediary Manual § 4502.6.

COUNT V

50.    Central Iowa Hospital hereby incorporates by reference paragraphs 1 through 49 of this Complaint.

51.    Based upon the administrative record, the Secretary's administrative determination is arbitrary and capricious and an abuse of discretion within the meaning of the APA, 5 U.S.C. § 706(2)(A), (E), because it reflects *bona fide* sale requirements that the Intermediary did not apply to this transaction until more than six years after its audit determination, while this matter was pending before the PRRB.

COUNT VI

52.    Central Iowa Hospital hereby incorporates by reference paragraphs 1 through 51 of this Complaint.

53.    Based upon the administrative record, the Secretary's determination is otherwise arbitrary, capricious, an abuse of discretion, otherwise not in accordance with the law, and is unsupported by substantial evidence in the record as a whole within the meaning of the APA, 5 U.S.C. § 706(2)(A), (E). *See* 42 U.S.C. § 1395oo(f)(2).

COUNT VII

54.    Central Iowa Hospital hereby incorporates by reference paragraphs 1 through 53 of this Complaint.

55.    Based upon the administrative record, the Secretary's determination violates the APA, 5 U.S.C. §§ 553, 706(D), because it reflects a substantive determination not expressed in any statute or regulation and which was contrary to the Secretary's previous regulatory interpretation, and which is void based on the Secretary's failure to comply with notice and comment rulemaking procedures. *See* 42 U.S.C. § 1395oo(f)(2).

## COUNT VIII

56.     Central Iowa Hospital hereby incorporates by reference paragraphs 1 through 55 of this Complaint.

57.     Based upon the administrative record, the Secretary's determination violates the Medicare statute, 42 U.S.C. § 1395hh(a) – (b), because it relies on a rule, requirement, or other policy statement changing a legal standard governing Medicare payment for services furnished to program beneficiaries that is void based on the Secretary's failure to comply with notice and comment rulemaking procedures.

## COUNT IX

58.     Central Iowa Hospital hereby incorporates by reference paragraphs 1 through 57 of this Complaint.

59.     Based upon the administrative record, the Secretary's determination violates the requirements of the APA, 5 U.S.C. § 552, because it relies on a substantive rule or interpretation of general applicability or a statement of general policy that was not stated and published in the Federal Register.

## COUNT X

60.     Central Iowa Hospital hereby incorporates by reference paragraphs 1 through 59 of this Complaint.

61.     Based upon the administrative record, the Secretary's determination is prohibited retroactive rulemaking because it reflects application of rules adopted after Iowa Lutheran Hospital's loss was incurred, including a rule requiring that the related party determination be based on control of the statutory merger's surviving entity after the transaction, a rule requiring that a statutory merger satisfy requirements for *bona fide* sales of assets, and a regulatory amendment published on January 9, 1998, precluding recognition of gains or losses on transactions that occurred on or after December 1, 1997.  63 Fed. Reg. 1379, 1382 (Jan. 9, 1998).

## COUNT XI

62.    Central Iowa Hospital hereby incorporates by reference paragraphs 1 through 61 of this Complaint.

63.    Based upon the administrative record, the Secretary's determination is contrary to the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, 1996 U.S.C.C.A.N. (110 Stat.) 847, 857 because it relies on a new rule which is void based on the Secretary's failure to adhere to procedures specified in that law.  5 U.S.C. § 801.  Before a rule can be put into effect, an agency must provide each House of Congress and the Comptroller General with a report, including a copy of the rule and related information.  A "major rule", such as that reflected in the Secretary's determination, cannot be put into effect earlier than sixty days after Congress receives the report, or the rule is published in the Federal Register.

## COUNT XII

64.    Central Iowa Hospital hereby incorporates by reference paragraphs 1 through 63 of this Complaint.

65.    Based upon the administrative record, the Secretary's retroactive determination constitutes an uncompensated taking of Iowa Lutheran Hospital's property without due process of law in violation of the Fifth Amendment of the United States Constitution.

## COUNT XIII

66.    Central Iowa Hospital hereby incorporates by reference paragraphs 1 through 65 of this Complaint.

67.    The Medicare statute requires the Secretary to publish a list of all manual instructions, interpretative rules, statements of policy, and guidelines of general applicability in the Federal Register at least every three months.  *See* 42 U.S.C. § 1395hh(c)(1).

68.    The Program Memorandum was an interpretative rule, statement of policy, or guideline of general applicability.

69.    Although the Program Memorandum was issued on October 20, 2000, it was not listed in the Federal Register until June 28, 2002.  *See* "Medicare and Medicaid Programs; Quarterly Listing of Program Issuances – Fourth Quarter, 1999 through First Quarter, 2002." 67 Fed. Reg. 43,762, 43,784 (June 28, 2002).

70.    Based upon the administrative record, the Secretary's determination violates the Medicare statute, 42 U.S.C. § 1395hh(c)(1), because it relies on interpretative rule, statement of policy, or guideline of general applicability that was not timely listed in the Federal Register.

<u>PRAYERS FOR RELIEF</u>

WHEREFORE, Central Iowa Hospital Corporation, successor-in-interest to Iowa Lutheran Hospital, prays:

(a)    For an order reversing and setting aside the decision of the Secretary;

(b)    For an order declaring that Central Iowa Hospital Corporation, successor-in-interest to Iowa Lutheran Hospital, is entitled to $5,423,196 or such other amount of Medicare reimbursement determined to be due for the loss Iowa Lutheran Hospital incurred on its statutory merger with Iowa Methodist;

(c)    For an order remanding the case to the Secretary with directions that the loss on statutory merger incurred by Iowa Lutheran Hospital be reimbursed;

(d)    For interest on the amount in controversy in this appeal, as provided by 42 U.S.C. § 1395oo(f)(2);

(e)    For the costs of this suit incurred by Central Iowa Hospital Corporation, successor-in-interest to Iowa Lutheran Hospital; and

(f)    For such other and further relief as the Court may deem just and proper under the circumstances.

Respectfully submitted,

CENTRAL IOWA HOSPITAL
CORPORATION, successor-in-interest to
IOWA LUTHERAN HOSPITAL


*/s/ Harold Belkowitz*
Harold Belkowitz (D.C. Bar #449800)
Ober, Kaler, Grimes & Shriver
A Professional Corporation
1401 H Street, N.W.
Washington, D.C. 20005-3324
(202) 408-8400

Plaintiff's Attorneys

OF COUNSEL:

Robert E. Mazer
Ober, Kaler, Grimes & Shriver
A Professional Corporation
120 East Baltimore Street
Baltimore, Maryland 21202-1643
(410) 685-1120

Dated at Washington, D.C.
this 1st day of February, 2008

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 1st day of February, 2008, I caused this document to be filed in this Court's electronic filing system, and that that filing constituted service of the document on the attorney listed below:

Joel McElvain
United States Department of Justice
Civil Division, Federal Programs Branch
Room 7130
20 Massachusetts Avenue, N.W.
Washington, D. C. 20001

*/s/ Harold Belkowitz*
Harold Belkowitz

# Exhibit A



**DEPARTMENT OF HEALTH AND HUMAN SERVICES-**
**PROVIDER REIMBURSEMENT REVIEW BOARD**
2520 Lord Baltimore Drive, Suite L
Baltimore MD 21244-2670
Phone: 410-786-2671          FAX: 410-786-5298

Suzanne Cochran, Esq., Chairperson
Gary B. Blodgett, D.D.S.
Elaine Crews Powell, CPA
Anjali Mulchandani-West
Yvette C. Hayes

Refer to:

OCT 0 6 2006

Case No.:   97-0174
Decision No.:   2007-Dl

**CERTIFIED MAIL**

Mr. Robert E. Mazer, Esquire
Ober, **Kaler**, Grimes & Shriver
120 East Baltimore Street
Baltimore, MD  21202-1643

RE:   Iowa Lutheran Hospital
      Provider No.:  16-0024
      FYE - 11/21/1993

Dear Mr. Mazer:

A copy of the Provider Reimbursement Review Board's decision on
the above-referenced appeal is enclosed.  Please see enclosure
for review and appeal information.

If you have any questions, please call (410) 786-2671.

Sincerely,

Paul J. Crofton, Director
Division of Hearings and Decisions

5 Enclosures
   Final Decision Review and Appeal Information
   Decision
   42 USC 1395oo(f)
   42 CFR 405.1875 and 405.1877

# PROVIDER REIMBURSEMENT REVIEW BOARD DECISION

2007-D1

**PROVIDER -**
Iowa Lutheran Hospital
Des Moines, Iowa

Provider No.:  16-0024

vs.

**INTERMEDIARY -**
BlueCross BlueShield Association/
Cahaba Government Benefits
Administrator

**DATE OF HEARING -**
June 12-13, 2003

Cost Reporting Period Ended -
November 21, **1993**

**CASE NO.:** 97-0174

## INDEX

| | Page No |
|---|---|
| Issue................................................................................................ | 2 |
| Medicare Statutory and Regulatory Background......................................... | 2 |
| Statement of the Case and Procedural History............................................ | 3 |
| Background of the Merger.................................................................... | 4 |
| Parties' Contentions........................................................................... | 4 |
| Findings of Fact, Conclusions of Law and Discussion................................. | 6 |
| Decision and Order............................................................................ | 9 |

CN: 97-0174

ISSUE:

Was the Intermediary's disallowance of the loss on disposal of assets resulting from a merger proper?

MEDICARE STATUTORY AND REGULATORY BACKGROUND:

This is a dispute over the amount of Medicare reimbursement due a health care provider.

The Medicare program provides health insurance to the aged and disabled. 42 U.S.C. §§1395-1395cc. The Centers for Medicare & Medicaid Services (CMS), formerly the Health Care Financing Administration (HCFA), is the operating component of the Department of Health and Human Services (DHHS) charged with the program's administration. CMS' payment and audit functions under the Medicare program are contracted out to insurance companies known as fiscal intermediaries. Fiscal intermediaries determine payment amounts due providers under Medicare law and interpretative guidelines published by CMS. See, 42 U.S.C. §1395h, 42 C.F.R. §§413.20(b) and 413.24(b).

At the close of its fiscal year, a provider must submit a cost report to the fiscal intermediary showing the costs it incurred during the fiscal year and the portion of those costs to be allocated to Medicare. 42 C.F.R. §413.20. The fiscal intermediary reviews the cost report, determines the total amount of Medicare reimbursement due the provider, and issues the provider a Notice of Program Reimbursement (NPR). 42 C.F.R. §405.1803. A provider dissatisfied with the intermediary's final determination of total reimbursement may file an appeal with the Provider Reimbursement Review Board (Board) within 180 days of the NPR. 42 U.S.C. §1395oo(a); 42 C.F.R. §405.1835.

Section 42 U.S.C. §1395x(v)(1)(A) of the Social Security Act (the Act) provides that the "reasonable cost" of any service shall be the actual cost incurred excluding any part of such costs found to be unnecessary in the efficient delivery of needed health services. The implementing regulation at 42 C.F.R. §413.9 states that reasonable cost includes all "necessary and proper" costs incurred in furnishing (healthcare) services, subject to principles relating to specific items of revenue and cost.

Under the Act, a provider is entitled to claim as a reimbursable cost the depreciation (i.e., the loss of value over time) of property, plant and equipment used to provide health care to Medicare patients. An asset's depreciable value is initially set at its "historical cost," generally equal to the purchase price. 42 C.F.R. §413.134(b)(1). To determine annual depreciation, the historical cost is then prorated over the asset's estimated useful life in accordance with an acceptable depreciation method. 42 C.F.R. §413.134(a)(3).

The calculated annual depreciation is only an estimate of the asset's declining value. If an asset is ultimately sold by the provider for less than its undepreciated basis calculated under Medicare (equivalent to the "net book value" and equal to the historical cost minus the depreciation recognized and claimed as allowable costs under the Medicare program,

CN: 97-0174

see 42 C.F.R. §413.134(b)(9)), then a "loss" has occurred, since the sales price was less than the estimated remaining value. In that event, it is assumed that the asset had depreciated more than was originally estimated and, accordingly, the Program provides additional reimbursement to the provider. Conversely, if the asset is sold for more than its undepreciated basis, then a "gain" has occurred, and the Secretary takes back or "recaptures" previously paid reimbursement. 42 C.F.R. §413.134(f)(1).

Where a provider sells several assets for a lump sum sales price, the regulation at 42 C.F.R. §413.134(f)(2)(iv) requires the determination of the gain or loss (depreciation adjustment) for each depreciable asset by allocating the lump sum sales price among all of the assets sold in accordance with the fair market value of each asset as it was used by the provider at the time of sale. An appropriate part of the purchase price is allocated to "all the assets sold" regardless of whether they are depreciable or non-depreciable.

The regulation providing for the recognition of gains and losses was originally implemented to address the disposition of assets through sale, scrapping, trade-in, exchange, donation, demolition, abandonment, condemnation, fire, theft or other casualty. In 1979, CMS extended the depreciation adjustment to "complex financial transactions" not previously addressed in subsection 42 C.F.R. §413.134(f) by including mergers and consolidations. A statutory merger between unrelated parties was treated as a sale of assets that would trigger: (1) the revaluation of assets in accordance with 42 C.F.R. §413.134(g), and (2) the realization of gains and losses under the provisions of 42 C.F.R. §413.134(f). However, a statutory merger between related parties is not a basis for revaluation that would trigger a gain or loss adjustment.

STATEMENT OF THE CASE AND PROCEDURAL HISTORY:

Iowa Lutheran Hospital (Provider) was a general, acute care, not-for-profit hospital located in Des Moines, Iowa. Effective November 22, 1993, the Provider merged with Iowa Methodist Medical Center (Iowa Methodist) pursuant to the laws of the State of Iowa. Iowa Methodist was the surviving corporation and continued to operate as a not-for-profit corporation. Following the effective date of the merger, the Provider submitted a terminating Medicare cost report for the period ended November 21, 1993 to its fiscal intermediary, Blue Cross and Blue Shield of Iowa which later became Wellmark Blue Cross and Blue Shield (Intermediary).[1]   Relying on the regulatory provisions of 42 C.F.R. §413.134 et seq., the Provider claimed a loss on the disposal of its assets resulting from the statutory merger. Upon audit of the cost report, the Intermediary disallowed the claimed loss on the basis that the merger was a transaction between related parties, citing Medicare's 42 C.F.R. §413.17 et seq.

The Provider appealed the Intermediary's disallowance to the Board and met the jurisdictional requirements of 42 C.F.R. §§405.1835-405.1841. The estimated amount of Medicare reimbursement in controversy is approximately $5,400,000.[2]

---

[1]   In June of 2000, Cahaba Government Benefits Administrators assumed Wellmark Blue Cross and Blue Shield's fiscal intermediary duties.

Page 4                                                                CN: 97-0174

The Provider was represented by Robert E. Mazer, Esquire, of Ober, Kaler, Grimes & Shriver. The Intermediary was represented by Bernard M. Talbert, Esquire, Associate Counsel, Blue Cross Blue Shield Association.

BACKGROUND OF THE MERGER:

In February of 1993, the Provider and Iowa Methodist executed a non-binding Memorandum of Understanding, that set forth their intention to merge and the anticipated benefits to be derived from their combination.[3] Each party was represented by legal counsel, and the transaction was contingent upon satisfactory due diligence results. On November 22, 1993, the Provider merged into Iowa Methodist through the simultaneous signing of a Formation Agreement and the filing of the Articles of Merger with the State.[4]

The name of Iowa Methodist, the surviving corporation, was changed to Iowa Health System Hospital Corporation, and the governing board of directors of nineteen members was modified to include eight individuals who had served previously on the Provider's governing board.[5] Similarly, Iowa Methodist's sole member, Iowa Methodist Health System, changed its name to Iowa Health System and remained the sole member of Iowa Health System Hospital Corporation. The post-merger governing board of Iowa Health System had twenty-three individuals, including ten individuals who were previously affiliated with the Provider.[6] Under Iowa law, Iowa Health System Hospital Corporation succeeded to the Provider's assets and liabilities, and the Provider ceased to exist.

PARTIES' CONTENTIONS:

The Intermediary contends that the merger is a related party transaction pursuant to 42 C.F.R. §413.17, because the Provider has the power to significantly influence or direct the actions and policies of Iowa Methodist, the surviving corporation. The Intermediary cites section 1011.1 of Medicare's Provider Reimbursement Manual, Part I (HCFA Pub. 15-1), which states: "[i]f a provider and a supplying organization are not related before the execution of a contract, but common ownership or control is created at the time of execution by any means, the supply contract will be treated as having been made between related organizations." The Intermediary notes that: 1) eight members of the surviving corporation's board of directors had served previously on the Provider's governing board; 2) the Bishop of the religious affiliation of Iowa Lutheran is a voting member of the surviving corporation's board as long as the Provider's religious name is being used; 3) the Provider maintains a financial interest in the surviving corporation's assets through calendar year 2000 should Iowa Methodist dissolve; 4) the Provider's President became the Executive Vice-President of the surviving corporation; and 5) the merger does not appear to be an arm's-length transaction since Iowa Methodist purchased the Provider by

---

[2] Provider's Post-Hearing Brief at Exhibit P-43.
[3] Exhibit P-1.
[4] Exhibit P-2.
[5] Exhibit P-3.
[6] Id.

assuming its liabilities totaling $28,092,831 but received $41,093,761 in cash plus all of the Provider's physical assets.[7]

The Intermediary also contends that the loss claimed by the Provider is non-allowable for program reimbursement because the merger with Iowa Methodist was not a bona fide sale.[8]  The Intermediary explains that pursuant to 42 C.F.R. §413.134(l)(2)(i), mergers between two or more unrelated corporations, where the merged corporation was a provider, are subject to 42 C.F.R. §413.134(f). This section, entitled Gains and losses on disposal of assets, addresses different ways in which a gain or loss may result from the disposition of depreciable assets. The Intermediary asserts that in order for a merger to qualify for a gain or loss determination, it must be a "bona fide" sale. The Intermediary then argues that this merger was not a bona fide sale because the Provider did not place its assets for sale in the open market to ascertain their worth, and there was no good faith bargaining between the parties to establish the fair market value of the Provider's assets as an ongoing concern. (413.134(b)(2)).

The Provider contends that pursuant to 42 C.F.R. §413.134(l)(2)(i), a statutory merger between unrelated corporations occurs if the parties are unrelated prior to the transaction, as in the instant case. The Provider asserts that its position is supported by section 4502.6 of Medicare's Part A Intermediary Manual (HCFA Pub. 13-4). The manual provides in part, an example of merging entities, unrelated through common ownership or control prior to the merger, that results in a change of ownership determination for Medicare certification purposes and a gain or loss calculation to the seller.[9] The Provider also cites to a letter written on August 24, 1994 by the Director of HCFA's Office of Payment Policy, which indicates that a loss calculation appears appropriate in circumstances such as those of the instant case.[10]

The Provider contends that even if the Intermediary's continuity of control argument were valid (i.e., the Intermediary's reliance upon HCFA Pub. 15-1 §1011.1), it does not exist in the instant case.[11]  According to 42 C.F.R. §413.17(b), related party principles apply where there is "common ownership or control" and "control" exists where an "individual or organization" has the power to significantly influence the actions or policies of an organization or institution. In this merger, no single individual previously associated with the Provider has the power to significantly influence the operations of Iowa Methodist. The Intermediary bases its continuity of control argument upon the fact that eleven of the twenty-three members of Iowa Methodist's governing board came from the Provider; however, the Provider maintains that there is no factual or legal basis upon which to aggregate these individuals' voting interests.

The Provider disagrees with the Intermediary's argument that "control" is represented by the fact that Iowa Lutheran's religious order would receive part of Iowa Methodist's

---

[7] Intermediary's Position Paper at 8.
[8] Intermediary's Supplemental Position Paper at 12.
[9] Exhibit P-18.
[10] Exhibit P-21.
[11] Provider's Post-Hearing Brief at 31.

assets if it were to dissolve between 1993 and 2000. This argument was rejected by the United States District Court in <u>North Iowa Medical Center v. Department of Health and Human Services</u>, No. 00CV70-DEO.[12]

Fnally, the Provider disagrees with the Intermediary's argument that the merger does not meet the requirements of a bona fide sale because reasonable compensation was not given for the Provider's assets. The Provider argues that the transaction was a statutory merger under state law and was not a purchase of assets. The Intermediary relies upon 42 C.F.R. §413.134(l)(2)(i), which subjects mergers involving unrelated parties to the requirements of 42 C.F.R. §413.134(f). However, there is nothing in section (f) that requires mergers to specifically comply with section (f)(2) regarding bona fide sales.

<u>FINDINGS OF FACT, CONCLUSIONS OF LAW AND DISCUSSION:</u>

After considering the Medicare laws and guidelines, the evidence presented, and the parties' contentions, the Board finds and concludes that the Provider and Iowa Methodist were unrelated parties as that term is defined and applied under the regulatory provisions of 42 C.F.R. §413.17 and 42 C.F.R. §413.134. Accordingly, a revaluation of the assets and a recognition of the loss incurred as a result of the merger is required under the specific and plain meaning of 42 C.F.R. §413.134(l)(2)(i).

The parties agree that the transaction at issue was a statutory merger under Iowa law, and that 42 C.F.R. §413.134, "Depreciation: Allowance for depreciation based on asset costs," is applicable. Section 413.134(l)(2) defines a statutory merger as "a combination of two or more corporations under the corporation laws of the State, with one of the corporations surviving." It is undisputed that Iowa Lutheran Hospital merged into Iowa Methodist Medical Center (which then became known as Iowa Health System Hospital Corporation), with the Iowa Lutheran Hospital entity ceasing to exist. Under the terms of the transaction, Iowa Methodist Medical Center (the surviving corporation) acquired all of the assets and assumed all of the liabilities associated with the operations of the Provider.

Under regulations set forth at 42 C.F.R. §413.134(l)(2), the effect of a statutory merger upon Medicare reimbursement is as follows:

(i) *Statutory merger between unrelated parties.* If the statutory merger is between two or more corporations that are unrelated (as specified in §413.17), the assets of the merged corporation(s) acquired by the surviving corporation may be revalued in accordance with paragraph (g) of this section. If the merged corporation was a provider before the merger, then it is subject to the provisions of paragraphs (d)(3) and (f) of this section concerning recovery of accelerated depreciation and the realization of gains and losses . . . .

---

[12] Exhibit P-23 at 11.

> (ii)   *Statutory merger between related parties.*  If the statutory
> merger is between two or more related corporations (as
> specified in §413.17), no revaluation of assets is permitted for
> the assets acquired by the surviving corporation. . . .

Accordingly, the initial question to be decided by the Board is whether the subject merger
was between related or unrelated parties.  While it is undisputed that the Provider and
Iowa Methodist were unrelated prior to the merger, the Intermediary argues that the
phrase "between related parties" requires that the merger transaction be examined for
relationships after the transaction as well.  The Intermediary refers to the related party
regulation at 42 C.F.R. §413.17 which states, in pertinent part:

> (b) *Definitions.* (1) *Related to the provider.*  Related to the
> provider means that the provider to a significant extent is
> associated or affiliated with or has control of or is controlled
> by the organization furnishing the services, facilities, or
> supplies.
>
> (2) *Common Ownership.*  Common ownership exists if an
> individual or individuals possess significant ownership or
> equity in the provider and the institution or organization
> serving the provider.
>
> (3) *Control.*  Control exists if an individual or an organization
> has the power, directly or indirectly, significantly to influence
> or direct the actions or policies of an organization or
> institution.

In particular, the Intermediary relies on subsection (3) that discusses control.  The
Intermediary contends that because the board of directors of the new entity was
substantially composed of board members of the two merging entities, there is a
"continuity of control" that results in the parties being related.  The Intermediary
contends that this relationship between the old and new entities disqualifies the merger
transaction from a revaluation of assets.  In support of its position, the Intermediary cites
section 1011.1 of Medicare's Provider Reimbursement Manual, Part I (HCFA Pub. 15-1),
which states:

> [i]f a provider and a supplying organization are not related before the
> execution of a contract, but common ownership or control is created at the
> time of execution by any means, the supply contract will be treated as
> having been made between related organizations.

The Board finds the plain language of the statutory merger regulation dispositive of the
Intermediary's argument.  The text at 42 C.F.R. §413.134(l)(2)(i), which states, "if the
statutory merger is between two or more corporations that are unrelated  . . ." is

unambiguous in its meaning that the related party concept will be applied to the entities that are merging as they existed _prior_ to the transaction.

The Board, therefore, concludes that the plain language of the regulation bars the application of the related party principle to the merging parties' relationship to the surviving entity. The construction of the regulation mandates a determination that only the relationship of the parties participating in the merger _before_ it was completed is relevant to whether the assets would be revalued and a gain or loss recognized. The Board's conclusion is further buttressed by the Secretary's interpretive guidelines published in section 4502.6 of Medicare's Intermediary Manual (HCFA Pub. 13-4), which states, in part: "Medicare program policy permits a revaluation of assets acquired in a statutory merger between unrelated parties, when the surviving corporation is a provider."

Further indication of CMS' interpretation of the statutory merger regulation can be found in two letters written by high level CMS officials. In a letter dated May 11, 1987,[13] the Director of the Division of Payment and Reporting Policy, Office of Reimbursement Policy, responded to an inquiry concerning the application of the gain and loss provisions to mergers or consolidations of not-for-profit hospitals. The letter concluded that a statutory merger between not-for-profit providers gives rise to the revaluation of assets and an adjustment to recognize related gains and losses. The letter also made it clear that, notwithstanding the reference to "capital stock" in the caption of the regulation at 42 C.F.R. §413.134(l), the Agency looked to that regulation for authority in addressing mergers and consolidations of non-stock issuing corporations because the principles involved would be the same. In a letter dated August 24, 1994, the Director, Office of Payment Policy, Bureau of Policy Development, agreed that a consolidation involving non-profit entities required recognition of a gain or loss based on this regulation.[14]

The Board finds that the transaction that resulted in the merger of the Provider into Iowa Health System Hospital Corporation was a transaction under Iowa corporation law. The completed transaction merged one independent hospital corporation, the Provider, into another hospital corporation, Iowa Methodist, with the merged entity ceasing to exist. Contrary to the Intermediary's "continuity of control" assertions, the Board finds that such an interpretation of the related party regulation is not only inconsistent with the regulation governing statutory mergers, but it is in direct opposition to the purpose of corporate mergers. The very nature of a statutory merger as a combination of entities would likely result in some overlap of membership on the board of directors of the merging corporation and the surviving entity, as well as a continuation of other operations and personnel of the merging organization. The fact that this occurs does not disqualify a statutory merger from revaluation and recognition of any gain or loss under 42 C.F.R §413.134(l).

---

[13] Exhibit P-17.
[14] Exhibit P-21.

●                                  ●

Page 9                                                    CN: 97-0174

The Board finds that the Provider ultimately agreed that the loss calculation should be based upon the proportionate allocation methodology prescribed by 42 C.F.R. §413.134(f)(2)(iv). Pursuant to this methodology, the consideration at issue is allocated among all the assets acquired based upon the relationship of each individual assets fair market value to the total fair market value of all of the assets in aggregate. However, the Board notes a discrepancy between the fair market value of the assets as described in Exhibit P-43 submitted with the Provider's Post-Hearing Brief of $64,949,110 and the amount shown in Exhibit P-41 ($62,700,000), which is the Business Evaluation of the Provider's operation conducted by KPMG Peat Marwick.[15] This discrepancy must be resolved in order to accurately determine the Provider's reimbursable loss.

Finally, the Board finds that the merger results in the Provider's assets being valued at amounts significantly less than their book value, thereby resulting in the loss. However, for accounting purposes, the merger was treated as a pooling of interests and the carrying value of the Provider's assets was not recorded in the financial records of the surviving entity at their written down values. As a result, for areas of the surviving entity that continued to be reimbursed under Medicare's reasonable cost principles, the amount of depreciation allowed by the Medicare program during the years following the merger has been overstated. Accordingly, the allowable loss must be adjusted (reduced) to account for this overstatement.

DECISION AND ORDER :

The Intermediary's adjustment disallowing the Provider's claimed loss on disposal of assets due to a change of ownership resulting from a statutory merger was contrary to the regulatory requirements of 42 C.F.R. §413.134(l)(2)(i) and is reversed. The matter is hereby remanded to the Intermediary for the proper calculation of the loss pursuant to the governing regulations. The Intermediary must reconcile the differences in the fair market value of the Provider's assets discussed above in order to determine the appropriate fair market value of the Provider's assets to be used in its loss calculation. In addition, the Intermediary is directed to adjust the loss computation to account for the overstatement of allowable depreciation expense in the years following the merger.

Board Members Participating:

Suzanne Cochran, Esq.
Gary B. Blodgett, D.D.S.
Elaine Crews Powell, C.P.A.
Anjali Mulchandani-West
Yvette C. Hayes

---

[15] For example, the fair market value of the Provider's land is shown as $10,250,749 in Exhibit P-41 (page 68), and as $7,872,163 in Exhibit P-43. Similarly, the value of the Provider's buildings is shown as $8,525,282 in Exhibit P-41, and as $7,845,156 in Exhibit P-43.

Page 10

CN: 97-0174

FOR THE BOARD:

OCT 0 6 2006

Suzanne Cochran, Esq.
Chairman

### Final Decision Review and Appeal Information

The Provider Reimbursement Review Board's (Board) decision becomes final 60 days after the date of receipt by the provider unless within that time the Administrator of HCFA notifies the parties of an action taken under the provisions of 42 C.F.R. § 405.1875.  If such action is taken, then the Administrator's decision becomes final 60 days after receipt thereof by the provider.

Providers are permitted to initiate two actions within specified time limits.  First, the provider (and/or the intermediary) may request the Administrator to review a Board decision within 15 days of its receipt.  (See § 405.1875(b)).  Secondly, Section 1878(f) of the Social Security Act ("Act"), 42 U.S.C. § 1395oo(f), permits a provider to obtain judicial review of a final decision of either the Board or the Administrator by filing a civil action within 60 days of the date on which the provider receives such decision.  (See also 42 C.F.R. § 405.1877).  For your convenience, a copy of each of the above-referenced authorities is enclosed.

Enclosures

## § 405.1875  Administrator's review.

(a) *General rule.* (1) Except for a Board determination under § 405.1842 that it lacks the authority to decide an issue, the Administrator, at his or her discretion, may review any final decision of the Board, including a decision under § 405.1873 about the Board's jurisdiction to grant a hearing. The Administrator may exercise this discretion on his or her own motion, in response to a request from a party to a Board hearing or in response to a request from HCFA.

(2) The Office of the Attorney Advisory will examine the Board's decisions, the requests made by a party or HCFA and any submission made in accordance with the provisions of this section in order to assist the Administrator in deciding whether to exercise this review authority.

(b) *Request for review.* A party or HCFA requesting the Administrator to review a Board decision must file a written request with the Administrator within 15 days of the receipt of the Board decision.

(c) *Criteria for deciding whether to review.* In deciding whether to review a Board decision, either on his or her own motion or in response to a request from a party to the hearing or HCFA, the Administrator will normally consider whether it appears that:

(1) The Board made an erroneous interpretation of law, regulation or HCFA Ruling;

(2) The Board's decision is not supported by substantial evidence; or

(3) The case presents a significant policy issue having a basis in law and regulations, and review is likely to lead to the issuance of a HCFA Ruling or other directive needed to clarify a statutory or regulatory provision;

(4) The Board has incorrectly assumed or denied jurisdiction or extended its authority to a degree not provided for by statute, regulation or HCFA Ruling; and

(5) The decision of the Board requires clarification, amplification, or an alternative legal basis for the decision.

(d) *Decision to review.* (1) Whether or not a party or HCFA has requested review, the Administrator will promptly notify the parties and HCFA whether he or she has decided to review a decision of the Board and, if so, will indicate the particular issues he or she will consider.

(2) The Administrator may decline to review a case or any issue in a case even if a party has filed a written request for review under paragraph (b) of this section.

(e) *Written submissions.* (1) Within 15 days of receipt of a notice that the Administrator has decided to review a Board decision, a party or HCFA may submit to the Administrator, in writing:

(i) Proposed findings and conclusions;

(ii) Supporting views or exceptions to the Board decision;

(iii) Supporting reasons for the exceptions and proposed findings; and

(iv) A rebuttal of the other party's request for review or other submissions already filed with the Administrator.

(2) These submissions shall be limited to issues the Administrator has decided to review and confined to the record of the Board hearing.

(3) A party or HCFA, within 15 days of receipt of a notice that the Administrator has decided to review a decision, may also request that the decision be remanded and state reasons for doing so. Reasons for a request to remand may include new, substantial evidence concerning—

(i) Issues presented to the Board; and

(ii) New issues that have arisen since the case was presented to the Board.

(4) A copy of any written submission made under this paragraph shall be sent simultaneously to each other party to the Board hearing and to HCFA, if HCFA has previously—

(i) Requested that the Administrator review a Board decision or filed a written submission in response to a party's request for review;

(ii) Responded to a party's request for review; or

(iii) Submitted material after the Administrator has announced that he or she will review a Board decision.

(f) *Ex parte communications prohibited.* All communications from any of the parties or HCFA about a Board decision being reviewed by the Administrator must be in writing and must contain a certification that copies have been served on the parties and HCFA, as appropriate. The Administrator will not consider any communication that does not meet these requirements or is not submitted within the required time limits.

(g) *Administrator's decision.* (1) If the Administrator has notified the parties and HCFA that he or she has decided to review a Board decision, the Administrator will affirm, reverse, modify or remand the case.

(2) The Administrator will make this decision within 60 days after the provider received notification of the Board decision and will promptly mail a copy of the decision to each party and to HCFA.

(3) Any decision other than to remand will be confined to—

(i) The record of the Board, as forwarded by the Board;

(ii) Any materials submitted under paragraphs (b) or (e) of this section; and

(iii) Generally known facts that are not subject to reasonable dispute.

(4) The Administrator may rely on prior decisions of the Board, the Administrator and the courts, and other applicable law, whether or not cited by the parties and HCFA.

(h) *Remand.* (1) A remand to the Board by the Administrator vacates the Board's decision.

(2) The Administrator may direct the Board to take further action with respect to the development of additional facts or new issues, or to consider the applicability of laws or regulations other than those considered by the Board. The following are not acceptable bases for remand—

(i) Presentation of evidence existing at the time of the Board hearing that was known or reasonably could have been known;

(ii) Introduction of a favorable court case that was either not available in print at the time of the Board hearing or was decided after the Board hearing;

(iii) Change of a party's representation before the Board;

(iv) Presentation of an alternative legal basis concerning an issue in dispute; or

(v) Attempted retraction of a waiver of a right made before or at the Board hearing.

(3) After remand, the Board will take the action requested in the remand action and issue a new decision.

(4) The new decision will be final unless the Administrator reverses, affirms, modifies, or again remands the decision in accordance with the provisions of the section.

[48 FR 45773, Oct. 7, 1983]

## THE SOCIAL SECURITY ACT AS AMENDED - TITLE XVIII

### Section 1878(f)(1) Judicial Review

(f)(1) A decision of the Board shall be final unless the Secretary, on his own motion, and within 60 days after the provider of services is notified of the Board's decision, reverses, affirms, or modifies the Board's decision. Providers shall have the right to obtain judicial review of any final decision of the Board, or of any reversal, affirmance, or modification by the Secretary, by a civil action commenced within 60 days of the date on which notice of any final decision by the Board or of any reversal, affirmance, or modification by the Secretary is received. Providers shall also have the right to obtain judicial review of any action of the fiscal intermediary which involves a question of law or regulations relevant to the matters in controversy whenever the Board determines (on its own motion or at the request of a provider of services as described in the following sentence) that it is without authority to decide the question, by a civil action commenced within sixty days of the date on which notification of such determination is received. If a provider of services may obtain a hearing under subsection (a) and has filed a request for such a hearing, such provider may file a request for a determination by the Board of its authority to decide the question of law or regulations relevant to the matters in controversy (accompanied by such documents and materials as the Board shall require for purposes of rendering such determination). The Board shall render such determination in writing within thirty days after the Board receives the request and such accompanying documents and materials, and the determination shall be considered a final decision and not subject to review by the Secretary. If the Board fails to render such determination within such period, the provider may bring a civil action (within sixty days of the end of such period) with respect to the matter in controversy contained in such request for a hearing. Such action shall be brought in the district court of the United States for the judicial district in which the provider is located (or, in an action brought jointly by several providers, the judicial district in which the greatest number of such providers are located) or in the District Court for the District of Columbia and shall be tried pursuant to the applicable provisions under chapter 7 of title 5, United States Code, notwithstanding any other provisions in section 205. Any appeal to the Board or action for judicial review by providers which are under common ownership or control or which have obtained a hearing under subsection (b) must be brought by such providers as a group with respect to any matter involving an issue common to such providers.

§ 405.1877  Judicial review.

(a) *General rule.* Section 1878(f) of the Act permits a provider to obtain judicial review of a final decision of the Board, or of a reversal, affirmation, or modification by the Administrator of a Board decision, by filing a civil action pursuant to the Federal Rules of Civil Procedure within 60 days of the date on which the provider received notice of—

(1) A final decision by the Board; or

(2) Any reversal, affirmance, or modification by the Administrator.

The Board's decision is not final if the Administrator reverses, affirms or modifies the decision within 60 days of the date on which the provider received notice of the decision.

(b) *Administrator declines to review a Board decision.* If the Administrator declines to review a Board decision, the provider must file its appeal within 60 days of receipt of the decision of the Board.

(c) *Administrator does not act after reviewing a Board decision.* If the Administrator notifies the parties that he or she has decided to review a Board decision and then does not make a decision within the 60 days allotted for his or her review, this subsequent inaction constitutes an affirmance allowing a provider an additional 60 days in which to file for judicial review, beginning with the date the Administrator's time expires for taking action under § 405.1875(g)(2).

(d) *Matters not subject to judicial review.* Certain matters affecting payments to hospital under the prospective payment system are not subject to judicial review, as provided in section 1886(d)(7) of the Act and § 405.1804.

(e) *Group appeals.* Any action under this section by providers that are under common ownership or control (see § 413.17 of this chapter) must be brought by the providers as a group with respect to any matter involving an issue common to the providers.

(f) *Venue for appeals.* An action for judicial review must be brought in the District Court of the United States for the judicial district in which the provider is located (or, effective April 20, 1983, in an action brought jointly by several providers, the judicial district in which the greatest number of such providers are located) or in the District Court for the District of Columbia. Effective April 20, 1983, any action for judicial review by providers under common ownership or control (§ 413.17 of this chapter), must be brought by such providers as a group with respect to any matter involving an issue common to the providers.

(g) *Service of process.* Process must be served as described under 45 CFR part 4.

[48 FR 39836, Sept. 1, 1983, as amended at 48 FR 45774, Oct. 7, 1983; 51 FR 34793, Sept. 30, 1986]



(a) General rule
Section 1878(f) of the Act permits a provider to obtain judicial review of a final
decision of the Board, or of a reversal, affirmation, or modification by the
Administrator of a Board decision, by filing a civil action pursuant to the Federal
Rules of Civil Procedure within 60 days of the date on which the provider received
notice of--
(1)    A final decision by the Board; or
(2)    Any reversal, affirmance, or modification by the Administrator.
The Board's decision is not final if the Administrator reverses, affirms or modifies
the decision within 60 days of the date on which the provider received notice of
the decision.

(b) Administrator declines to review a Board decision
If the Administrator declines to review a Board decision, the provider must file its
appeal within 60 days of receipt of the decision of the Board.

(c) Administrator does not act after reviewing a Board decision
If the Administrator notifies the parties that he or she has decided to review a
Board decision and then does not make a decision within the 60 days allotted for
his or her review, this subsequent inaction constitutes an affirmance allowing a
provider an additional 60 days in which to file for judicial review, beginning with
the date the Administrator's time expires for taking action under Section
405.1875(g)(2).

(d) Matters not subject to judicial review
Certain matters affecting payments to hospital under the prospective payment
system are not subject to judicial review, as provided in Section 1886(d)(7) of the
Act and Section 405.1804.

(e) Group appeals
Any action under this section by providers that are under common ownership or
control (see Section 405.427) must be brought by the providers as a group with
respect to any matter involving an issue common to the providers.

(f) Venue for appeals
An action for judicial review must be brought in the District Court of the United
States for the judicial district in which the provider is located (or, effective
April 20, 1983, in an action brought jointly by several providers, the judicial
district in which the greatest number of such providers are located) or in the
District Court for the District of Columbia. Effective April 20, 1983, any action
for judicial review by providers under common ownership or control (Section
405.427), must be brought by such providers as a group with respect to any matter
involving an issue common to the providers.

(g) Service of process
Process must be served as described under 45 CFR Part 4.

(41 FR 52051, Nov. 26, 1976. Redesignated at 42 FR 52826, Sept. 30, 1977 amended at 48 FR
39836, Sept. 1, 1983; 48 FR 45774, Oct. 7, 1983)

# Exhibit B

*received 12/13/06 REH*

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850
Telephone 410-786-3176 Facsimile 410-786-0043

*CMS*

*CENTERS for MEDICARE & MEDICAID SERVICES*

**Office of the Attorney Advisor**

DEC 1 1 2006

**VIA CERTIFIED MAIL**

Robert E. Mazer, Esquire
Ober, Kaler, Grimes & Shriver
120 East Baltimore Street
Baltimore, MD 21202-1643

Re: Iowa Lutheran Hospital, PRRB Decision No. 2007-D1

Dear Mr. Mazer:

Enclosed is a copy of the Administrator's decision in the above case reversing the decision of the

Provider Reimbursement Review Board. This constitutes the final administrative decision of the

Secretary of the Health and Human Services. Pursuant to Section 1878(f) of the Social Security

Act and 42 CFR 405.1877, the Provider may obtain judicial review by filing a civil action within

60 days of receipt of this decision.

Sincerely yours,

Jacqueline R. Vaughn
Attorney Advisor

Enclosure

cc: Bernard M. Talbert, Esquire, Intermediary's Representative

# CENTERS FOR MEDICARE AND MEDICAID SERVICES

## *Decision of the Administrator*

| | |
|---|---|
| **In the case of:** | **Claim for:** |
| | Provider Cost Reimbursement Determination for Cost Reporting P eriod Ending: 11/21/93 |
| **Iowa Lutheran Hospital** | |
| **Provider** | |
| **vs.** | |
| **Blue Cross /Blue Shield Association/ Cahaba Government Benefits Administrator** | Review of: PRRB Dec. No. 2007-D1 Dated: October 6, 2006 |
| **Intermediary** | |

This case is before the Administrator, Centers for Medicare & Medicaid Services (CMS), for review of the decision of the Provider Reimbursement Review Board (Board). The review is during the 60-day period in § 1878(f) (1) of the Social Security Act (Act), as amended (42 USC 1395oo (f)). The parties were notified of the Administrator's intention to review the Board's decision. Comments were received from the Center for Medicare Management (CMM) and the Intermediary requesting reversal of the Board's decision. Comments were also received from the Provider requesting affirmation of the Board's decision. All comments were timely received. Accordingly, this case is now before the Administrator for final agency review.

## **BACKGROUND**

Iowa Lutheran Hospital (Provider) was a general, acute care, not-for-profit hospital located in Des Moines, Iowa. Effective November 22, 1993, the Provider merged with Iowa Methodist Medical Center (Iowa Methodist) pursuant to the laws of the State of Iowa. Iowa Methodist was the surviving corporation and continued to operate as a not-for-profit entity. The Provider submitted a terminating Medicare

cost report for the period ended November 21, 1993 to its fiscal Intermediary.[1]  Based on the regulatory provisions of 42 C.F.R. § 413.134 et seq., the Provider claimed a loss on the disposal of its assets resulting from the statutory merger.  Upon audit of the cost report, the Intermediary disallowed the claimed loss on the basis that the merger was a transaction between related parties, pursuant to 42 C.F.R § 413.17 et seq.  The Provider appealed the Intermediary's disallowance to the Board and met the jurisdictional requirements of 42 C.F.R. §§ 405.1835-405.1841.  The estimated amount of Medicare reimbursement in controversy is approximately $5,400,000.[2]

## ISSUE AND BOARD'S DECISION

The issue is whether the Intermediary's adjustments to the Medicare cost report that disallowed the loss on disposal depreciable assets resulting from a merger were proper.

The Board held that the Provider is entitled to claim a loss on disposal as a result of the statutory merger of the Provider and Iowa Methodist, and stated that a revaluation of the assets and a recognition of the loss incurred as a result of the merger is required under the specific and plain meaning of 42 C.F.R. § 413.134(l)(2)(i).  The Board addressed the two fundamental arguments offered by the Intermediary in its denial of the Provider's claim.  First, the Board stated that contrary to the Intermediary's arguments, the merger was not between related parties and thus, the regulation at 42 CFR § 413.134(k)(2)(1) allows the assets of the merged corporations acquired by the surviving corporation to be revalued.

The Board rejected the Intermediary's assertion that the because the board of directors of the new entity was substantially composed of board members of the two merging entities, there was a "continuity of control" that resulted in the parties being related.   The Board concluded that the plain language of 42 C.F.R. § 413.134(l)(2)(iii) barred application of the related party principle to the merging parties' relationship to the surviving entity.  The Board concluded that the regulation only the relationship of the parties participating in the merger before it was completed is relevant to whether the assets would be revalued and a gain or loss recognized.  Furthermore, the Secretary's interpretive guidelines found at HCFA Pub. 13-4 § 4502.6, which stated in part: "Medicare program policy permits a revaluation

---

[1] In June 2000, Cahaba Government Benefits Administrators assumed Wellmark Blue Cross and Blue Shield's fiscal intermediary duties.

[2] Provider's Post-Hearing Brief at Exhibit P-43.

of assets affected by corporate mergers between unrelated parties" only helped to support the Board's determination.

The Board also found that because there is a specific regulation that controls the recognition of a loss on the merger transaction in this case, 42 CFR § 413.134(1), the merger is not required to meet bona fides of sales transactions addressed in 42 CFR § 413.134(f)(2).  The Board observed that while it is aware that the regulation on mergers may be interpreted as applying to stock transactions, the Agency interprets the regulation to apply to non-profit transactions as well.

The Board acknowledges that there was no "disposition" of assets as that term is used in the regulation on gains and losses and that the Providers, through merger under a new corporate structure, continued to provide substantially the same services using essentially the same facilities and personnel.  However, given the regulation's explicit limitation on the application of the related party principle and the Agency's longstanding interpretation that the regulation applies to non-stock company transactions, the Board found no authority in the regulation or guidelines in effect at the time of the transaction to permit motivations unique to non-profits to be a determining factor in the reimbursement treatment.

The Board found that the completed transaction merged one independent hospital corporation, the Provider, into another hospital corporation, with the merged entity ceasing to exist.  The Board found, contrary to the Intermediary's "continuity of control" assertions, that such an interpretation of the related party regulation is not only inconsistent with the regulation governing statutory mergers, but in direct opposition to the purpose of corporate mergers.  The Board reasoned that the very nature of a statutory merger as a combination of entities would likely result in some overlap of membership on the board of directors of the merging corporation and the surviving entity, as well as a continuation of other operations and personnel of the merging organization.  The Board concluded that the fact that this occurs does not disqualify a statutory merger from revaluation and recognition of any gain or loss under 42 C.F.R. § 413.134(l).

Finally, the Board found that the calculation of the loss should be based on the proportionate value method set forth in 42 C.F.R. § 413.134(f) (2) (iv).  The Board noted that a discrepancy between the fair market value of the assets described in Provider's Exhibit P-43, and P-41,[3] which must be resolved in order to accurately

---

[3] Exhibit P-43 was submitted with the Provider's Post-Hearing Brief of $64,949,110 and the amount shown in Exhibit P-41 of $62,700,000, which is the Business Evaluation of the Provider's operation conducted by KPMG Peat Marwick.

determine the Provider's reimbursable loss. The Board also found that the merger results in the Provider's assets being valued at amounts significantly less than their book value, resulting in a loss. However, the Board observed that for accounting purposes the merger was treated as a pooling of interests and the carrying value of the Provider's assets was not recorded in the financial records of the surviving entity at their written down values. The Board stated that for areas of the surviving entity that continued to be reimbursed under Medicare's reasonable cost principles, the amount of depreciation allowed by the Medicare program during the years following the merger has been overstated. As a result, the Board maintained that the allowable loss must be adjusted (reduced) to account for this overstatement.

## SUMMARY OF COMMENTS

### Intermediary Comments

The Intermediary submitted comments requesting that the Administrator reverse the Board's decision. The Intermediary argued that the transaction cannot be placed under 413.134(f) as a disposal of assets which would result in a depreciation corrective adjustment since there was no "bona fide sale." The Intermediary stated that the Administrator has recognized the exchange as between related parties in that the claimant was a partner to the creation of the product of the affiliation and the recipient of the assets and liabilities.[4]

### CMM Comments

CMM commented requesting that the Administrator reverse the Board's decision. CMM argued that the Board made several errors in its decision. First, the Board incorrectly found that, pursuant to 42 C.F.R § 413.134(l)(2), the Intermediary could only examine whether the parties to the merger were related prior to the merger transaction. Consequently, the Board rejected the Intermediary's argument that there was a continuity of control that resulted in the parties to the merger being related. CMM believes that the related party doctrine is not so limited, but is instead a broad rule designed to prevent Medicare from recognizing costs in transactions where the parties to have incentives to see above or below fair market value. CMM argued that the Intermediary correctly contended that the merger was a related party transaction pursuant to 42 C.F.R § 413.17, since the provider has the power to significantly influence or direct the actions and policies of Iowa Methodist, the surviving corporation. CMM noted that after the merger, directors affiliated with the Provider

---

[4] The Intermediary cited examples of the proper analysis,, referring to *St. Joseph Medical Center*, 2002-D64 and *Robert F. Kennedy Medical Center*, 2005-D9.

5

comprised a near majority of both the surviving corporation and that of the surviving corporation's sole member. CMM argued that the significant representation the Provider had on both boards was sufficient justification for the Intermediary to disallow the claimed loss-on-sale under the related party doctrine.

CMM commented that the courts that have addressed the issue have deferred to CMS's reasonable interpretation that 42 C.F.R. § 413.134(l)(2) must be read together with 42 C.F.R. § 413.17 and that the related party doctrine applies to relationships created by the transaction at issue as well as preexisting relationships.[5] CMM argued that an important factor is whether the composition of the new board of directors at the surviving corporation includes significant representation from the Provider's previous board or management team. CMM noted that eight members of the surviving corporation's board of directors had served previously on the Provider's governing board, the Provider maintained a financial interest in the surviving corporation's assets through calendar year 2000 should Iowa Methodist disperse, and the Provider's president became the executive vice-president of the surviving corporation.

Second, CMM argued that the Board erred in finding that the merger was not subject to the bona fide sale requirement. There is no indication in the regulations that the bona fide sale requirement is not applicable to mergers and consolidations. In this case, the transfer of assets from the merged provider corporation was not a bona fide, arms-length transaction between two non-related parties. There was never a bargaining or an attempt of maximizing fair market value of the purchase price being negotiated in an open market buyer/seller approach. The PRRB found that the Provider transferred assets with a fair market value in excess of $62 million, including $41 million in cash for the assumption of approximately $26 million in liabilities. CMM maintained that the transaction was not a bona fide sale, and that the Intermediary's disallowance should be upheld.

## Provider Comments

The Provider commented that the Board correctly determined that the Intermediary's disallowance of Iowa Lutheran Hospital's loss on statutory merger was contrary to regulatory requirements. Provider argued that Iowa Lutheran Hospital correctly determined the amount of loss incurred on the statutory merger, and that there were no discrepancies that require a remand to the Intermediary for recalculation of the claimed loss. The Provider also argued that the Board impermissibly required the Intermediary to disallow depreciation costs related to Medicare cost years that were

---

[5] Program Memorandum (PM) A-00-76 clarifies how 42 C.F.R. § 413.134(l) applies to mergers involving non-profit providers.

not before the Board. In doing so, the Board impermissibly interjected a new issue that was not part of the appeal, improperly reduced the amount in controversy, violated applicable statutory and regulatory requirements, and deprived the surviving entity to various rights provided under the Secretary's regulations addressing "reopening" of cost report determinations.

The Provider further cited three reasons as to why the Board's decision effectively reversing each Intermediary determination reimbursing the surviving entity for depreciation costs based on Iowa Lutheran Hospital's carrying value was impermissible. First, in determining Medicare reimbursement due to a Provider, Medicare statutory and regulatory principles consider each cost reporting period separate and distinct from others. There is no mechanism to permit reduction of a Provider's allowable cost for one cost reporting period based on cost reporting determinations that relate to subsequent Medicare cost reporting periods. Second, under the governing statute, the Board does not have jurisdiction to make determinations regarding costs covered by cost reports that are not before the Board, particularly in this matter, depreciation costs recognized by Medicare in periods subsequent to the cost reporting period over which the Board has jurisdiction. Third, the Secretary's regulations require revisions of settled cost reports to be made in accordance with "reopening" regulations.[6]

The Provider concluded that the Administrator should require reimbursement of the loss Iowa Lutheran Hospital incurred on statutory merger as calculated by the provider. The Intermediary may recover any overstated depreciation paid to the surviving entity in subsequent cost reporting periods only in accordance with the Secretary's reopening regulations.

## DISCUSSION

The entire record, which was furnished by the Board, has been examined, including all correspondence, position papers, and exhibits. The Administrator has reviewed the Board's decision. All comments received timely are included in the record and have been considered.

### I.    Medicare Law and Policy -- Reasonable Costs.

Section 1861(v)(1)(A) of the Social Security Act establishes that Medicare pays for the reasonable cost of furnishing covered services to program beneficiaries, subject to certain limitations. This section of the Act also defines reasonable cost as "the cost

---

[6] *See* 42 C.F.R § 405.1889.

patient care as specified by the regulation. The Secretary explained, regarding the computation of gains and losses on disposal of assets, that:

> Medicare reimburses providers for the direct and indirect costs necessary to the provision of patient care, including the cost of using assets for inpatient care. Thus, depreciation of those assets has always been an allowable cost under Medicare. The allowance is computed on the depreciable basis and estimated useful life of the assets. When an asset is disposed of, no further depreciation may be taken on it. However, if a gain or loss is realized from the disposition, reimbursement for depreciation must be adjusted so that Medicare pays the actual cost the provider incurred in using the asset for patient care.[9]

Basically, when there is a gain or loss, it means either that too much depreciation was recognized by the Medicare program resulting in a gain to be shared by Medicare, or insufficient depreciation was recognized by the Medicare program resulting in a loss to be shared by the Medicare program. An adjustment is made so that Medicare pays the actual cost the provider incurred in using the asset for patient care.

Although a gain or loss is recognized in the year of the disposal of the asset, the determination of Medicare's share of that gain or loss is attributable to the cost reporting periods in which the asset was used to render patient care under the Medicare program. Accordingly, although the event of the disposal of the asset may occur after the implementation of capital–PPS, a portion of the loss or gain may be attributable to cost years paid under reasonable costs and prior to the implementation of capital-PPS.

The regulation at 42 CFR § 413.130 explains, inter alia, that:

> (a) *General rule.*    Capital related costs ... are limited to:
>
> (1) Net depreciation expense as determined under §§ 413.134, 413.144, and 413.149, adjusted by gains and losses realized from the disposal of depreciable assets under 413.134(f). (Emphasis added.)

The regulation specifies that only certain events will result in the recognition of a gain or loss in the disposal of depreciable assets.    The Secretary explained in

---

[9] 44 Fed. Reg. 3980 (Jan 19, 1979).

actually incurred, excluding there from any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." The Act further authorizes the Secretary to promulgate regulations establishing the methods to be used and the items to be included in determining such costs. Consistent with the statute, the regulation at 42 CFR §413.9 states that all payments to providers of services must be based on the reasonable cost of services covered under Medicare and related to the care of beneficiaries.

### A. Capital Related Costs.

Reasonable costs include capital-related costs. Consistent with the Secretary's rulemaking authority, the Secretary promulgated 42 CFR §413.130, which lists capital-related costs that are reimbursable under Medicare. Capital-related costs under Medicare include depreciation, interest, taxes, insurance, and similar expenses (defined further in 42 CFR §413.130) for plant and fixed equipment, and for movable equipment.

Title VI of the Social Security Amendments of 1983[7] added §1886(d) to the Act and established the prospective payment system (PPS) for reimbursement of inpatient hospital services provided to Medicare beneficiaries. Under this system, hospitals are reimbursed their inpatient operating costs on the basis of prospectively determined national and regional rates for each discharge according to a list of diagnosis-related groups. Reimbursement under the prospective payment rate is limited to inpatient operating costs. The Social Security Amendments of 1983[8] amended subsection (a) (4) of §1886 of the Act to add a last sentence, which specifies that the term "operating costs of inpatient hospital services", does not include "capital-related costs (as defined by the Secretary for periods before October 1, 1986)...." That provision was subsequently amended until finally, §4006(b) of OBRA 1987 revised §1886(g)(1) of the Act to require the Secretary to establish a prospective payment system for the capital-related costs of PPS hospitals for cost reporting periods beginning in fiscal year (FY) 1992.

### 1. Depreciation.

For cost years prior to the implementation of capital PPS, pursuant to the reasonable cost provision of §1861(v)(1)(A) of the Act, the Secretary promulgated regulations on the payment of capital costs, including depreciation Generally, the payment of depreciation is based on the valuation of the depreciable assets used for rendering

---

[7] Pub. Law 98-21.
[8] Section 601(a)(2) of Pub. Law 98-21.

proposed amendments to the regulation clarifying and expanding existing policy on the recognition of gains and losses, in 1976, that:

> The revision would describe the various types of disposal recognized under the Medicare program, and would provide for the proper computation and treatment of gains and losses in determining reasonable costs. [10]

In adopting the final rule, the Secretary again explained that:

> Existing regulations contain a requirement that any gain or loss realized on the disposal of a depreciable asset must be included in Medicare allowable costs computations... The regulations, however, specify neither the procedures for computation of the gain or loss nor the methods for making adjustment to depreciation.  These amendments provide the rules for the treatment of gain or loss <u>depending upon the manner of disposition of the assets.</u> [11] (Emphasis added.)

These rules have been set forth at 42 C.F.R. § 413.134(f), which explains the specific conditions under which the disposal of depreciable assets may result in a gain or loss under the Medicare program.  This section of the regulation states:

> (1) *General*.  <u>Depreciable assets may be disposed of through sale, scrapping, trade-in, exchange, demolition, abandonment, condemnation, fire, theft, or other casualty.</u>  If disposal of a depreciable asset results in a gain or loss, an adjustment is necessary in the provider's allowable cost. The amount of a gain included in the determination of allowable cost is limited to the amount of depreciation previously included in Medicare allowable costs.   The amount of a loss to be included is limited to the un-depreciated basis of the asset permitted under the program.  <u>The treatment of the gain or loss depends upon the manner of disposition of the asset, as specified in paragraphs (f)(2) through (6) of this section</u> ....(Emphasis added.)

---

[10] 41 Fed. Reg. 35197 (August 20,1976) "Principles of Reimbursement for Provider Costs: Depreciation: Allowance for the Depreciation Based on Asset Costs." (Proposed rule.)

[11] 44 Fed. Reg. 3980. (1979) "Principles of Reimbursement for Provider Costs."(Final rule.)

The method of disposal of assets set forth at paragraph (f) (2) through (6) is as follows. Paragraph (f) (2) addresses gain and losses realized from the *bona fide* sale of depreciable assets and states:

> *Bona fide sale or scrapping.* (i) Except as specified in paragraph (f)(3) of this section, gains and losses realized from the *bona fide* sale or scrapping of depreciable assets are included in the determination of allowable cost only if the sale or scrapping occurs while the provider is participating in Medicare…. (Emphasis added).

With respect to paragraph (f) (2) and the *bona fide* sale of a depreciable asset, Section 104.24 of the PRM states that:

> A bona fide sale contemplates an arm's length transaction between a willing and well informed buyer and seller, neither being under coercion, for reasonable consideration. An arm's length transaction is … negotiated by unrelated parties, each acting in its own self interest. [12]

With respect to assets sold for lump sum, paragraph (f) (2) (iv) specifies:

> If a provider sells more than one asset for a lump sum sales price, the gain or loss on the sale of each depreciable asset must be determined by allocating the lump sum sales price among all the assets sold, in accordance with the fair market value of each asset as it was used by the provider at the time of sale. If the buyer and seller cannot agree on an allocation of the sales price, or if they do agree but there is insufficient documentation of the current fair market value of each asset, the intermediary for the selling provider will require an appraisal by an independent appraisal expert to establish the fair market value of each asset and will make an allocation of the sale price in accordance with the appraisal.

Paragraph (f)(3) addresses gains or losses realized from sales within 1 year after the provider terminates from the program, while §413.134(f)(4) addresses exchange trade-in or donation[13] of the asset stating that: "[g]ains or losses realized from the

---

[12] Trans. No. 415 (May 2000) (clarification of existing policy).

[13] A donation is defined in §413.134((b)(8). An asset is considered donated when the provider acquires the assets without making payment in the form of cash, new debt, assumed debt, property or services. Section 4502.12 of the Intermediary Manual states that when a provider is donated as an ongoing facility to an unrelated party,

exchange, trade-in, or donation of depreciable assets are not included in the determination of allowable cost." Finally, paragraph (f) (5) explains that the treatment of gains and losses when there has been an abandonment (permanent retirement) of the asset, and paragraph (f) (6) explains the treatment when there has been an involuntary conversion, such as condemnation, fire, theft or other casualty.

### 2. Revaluation of Assets.

Historically, as reflected in the regulation, the disposal of a depreciable asset used to render patient care may result in two separate and distinct reimbursement events: 1) the calculation of a gain or loss for the prior owner and 2) a revaluation of the depreciable basis for the new owner. While the determination of gains and losses is generally only of interest to the prior owner,[14] the new owner in the same transaction is interested in the determination of when Medicare will allow the revaluation of depreciation for purposes of calculating the new owner's depreciation expense.

This latter issue, on the revaluation of assets, was the subject of significant litigation for the Medicare program regarding complex transaction and resulted in agency rulemaking on the subject. In response to litigation, the regulations at 42 CFR §413.134(k)(1991).[15] were promulgated to address longstanding Medicare policy regarding depreciable assets exchanged for capital stock, statutory mergers and consolidation. Concerning the valuation of assets, the regulation states that: ·

> (l) *Transactions involving a provider's capital stock—*
>
> \*\*\*\*
>
> (2) *Statutory merger*. A statutory merger is a combination of two or more corporations under the corporation laws of the State, with one of the corporations surviving. The surviving corporation acquires the assets and liabilities of the merged corporations(s) by operation of State law. The effect of a statutory merger upon Medicare reimbursement is as follow:

---

there is no gain/loss allowed to the donor. The valuation of the assets to the donor depends upon use of the assets prior to the donation.

[14] While this is the general rule, the new owner can also have an interest in the gain or loss, when the new owner is to acquire the Medicare receivables for the terminating cost report along with the depreciable assets.

[15] (1995) Originally codified at 42 CFR §405.415(l).

12

(i)    *Statutory merger between unrelated parties*. If the statutory merge is between two or more corporations that are unrelated (as specified in §413.17), the assets of the merged corporation(s) acquired by the surviving corporation may be revalued in accordance with paragraph (g) of this section. If the merged corporation was a provider before the merger, then it is subject to the provisions of paragraphs (d) (3) and (f) of this section concerning recovery of accelerated depreciation and the realization of gains and losses. The basis of the assets owned by the surviving corporation are unaffected by the transaction. An example of this type of transaction is one in which Corporation A, a nonprovider, and Corporation B, the provider, are combined by a statutory merger, with Corporation A being the surviving corporation. In such a case the assets of Corporation B acquired by Corporation A may be revalued in accordance with paragraph (g) of this section.

(ii)   *Statutory merger between related parties*. If the statutory merger is between two or more related corporations (as specified in §413.17), no revaluation of assets is permitted for those assets acquired by the surviving corporation. An example of this type of transaction is one in which Corporation A purchase the capital stock of Corporation B, the provider. Immediately after the acquisition, of the capital stock of Corporation B, there is a statutory merger of Corporation B and Corporation A, with Corporation A being the surviving corporation. Under these circumstances, at the time of the merger the transaction is one between related parties and is not a basis for revaluation of the provider's assets.

**B. Related Organizations**

42 C.F.R. § 413.134 references the related organization rules at 42 C.F.R. § 413.17. The regulations at 42 C.F.R. § 413.17, states, in pertinent part:

(b) *Definitions. (1) Related to the provider*. Related to the provider means that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies.

(3) *Common ownership*.  Common ownership exists if an individual or individuals possess significant ownership or equity in the provider and the institution or organization serving the provider.

(4) *Control*.  Control exists if an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution.

Consistent with the Act and the regulations, the above principles are set forth in the Provider Reimbursement Manual or PRM, which provides guidelines and policies to implement Medicare regulations for determining the reasonable cost of provider services. In determining whether the parties to a transaction are related, the PRM at §1004 et. seq., establishes that the tests of common ownership and control are to be applied separately, based on the facts and circumstances in each case.   With respect to common ownership, the PRM at §1004.1 states:

> This rule applies whether the provider organization or supplying organization is a sole proprietorship, partnership, corporation, trust or estate, or any other form of business organization, proprietary or nonprofit.  In the case of nonprofit organization, ownership or equity interest will be determined by reference to the interest in the assets of the organization (e.g., a reversionary interest provided for in the articles of incorporation of a nonprofit corporation).[16]

Concerning the definition of control, the PRM at § 1004.3 states: "[t]he term 'control' includes any kind of control, whether or not it is legally enforceable and however it is exercisable or exercised."   The concept of "continuity of control" is illustrated at § 1011.4 of the PRM, in Example 2, which reads as follow:

> The owners of a 200-bed hospital convert their facility to a nonprofit corporation.   The owners sell the hospital to a non-profit corporation under the direction of a board of trustees made up of former owners of the proprietary corporation. Both corporations are considered related organizations; therefore, the asset bases to the nonprofit corporations remain the same as contained in the proprietary corporation's records, and there can be no increase in the book value of such assets.

---

[16] Trans. No. 272 (Dec. 1982)(clarifying certain ambiguous language relating to the determination of ownership or equity interest in nonprofit organizations.)

The related party organization was further explained in HCFA Ruling 80-4, which adopted the Eighth Circuit Court of Appeals' decision in <u>Medical Center of Independence v. Harris</u>, (CCH) Para. 30,656 (8th Cir. 1980).[17] The Ruling pointed out that the applicability of the related organization rule is not necessarily determined by the absence of a relationship between the parties prior to their initial contracting, although those factors are to be considered. The applicability of the rule is determined by also considering the relationship between the parties according to the rights created by their contract. The terms of the contracts and events, which occurred subsequent to the execution of the contract, in that case had the effect of placing the provider under the control of the supplier.

## C. Interaction of the Various Regulationa on 42 CFR 413.134(k)

The Administrator also notes that the Board also made several findings regarding the interaction of the various regulations on 42 CFR §413.134(k).[18]   However, the

---

[17] In <u>Medical Center of Independence</u>, <u>supra</u>, the court held that a medical center and a management corporation from which it leased and operated a hospital facility were related organizations within the meaning of § 413.17, where the management corporation had purchased the assets of the hospital and had entered into a 15 year lease agreement with the hospital, with a management agreement to run concurrently with the lease, and where six employees of the management corporation were elected as directors of the hospital, and two were elected as hospital officers.   The court upheld the District Court's finding that the management corporation had the power, directly or indirectly, significantly to influence or direct the actions or policy of the hospital, and rejected a contention that potential influence, in the absence of a past and present exercise of influence, is insufficient to warrant a finding of control.   The court stated that while the absence of any prior relationship between the parties is relevant to the issue of control, it should not automatically lead to the conclusion that the related party principle does not apply.

[18] While not dispositive to this case, the Board concluded that the CMS policy on consolidation revaluations in the final rule published Feb 5, 1979 was a change from the proposed rule published in April 1, 1977. However, the final rule would appear to contradict that conclusion. The  final rule states that it does not differ in substance from the proposed rule (44 Fed Reg. 6913) and it was made effective on the date published, an act consistent with that statement. An immediate effective date for any substantive change would have required a good cause exception under the APA published in the final rule. The final rule also stresses that the policy that the rule clarifies on the revaluation of assets is longstanding policy Medicare policy and does not note any changes on consolidations as a result of comments.   The change referenced from the proposed rule is that the final rule dedicates separate paragraphs to related and unrelated transactions involving consolidations, similar to that provided

Administrator finds that, as the issue under appeal involves the recognition of depreciation losses on the transfers of assets from a consolidation between non-profit entities, he cannot limit his review to the specific consolidation requirement of 42 CFR §412.134(k). Paragraph (k) was drafted specifically to address the revaluation of assets for proprietary corporations, while paragraph (f) specifically addresses circumstances under which a gain or loss will be recognized. Paragraph (k) did not modify or limit the general related party rules at §413.17 and does not address or modify the criteria for the recognition of gains or losses at paragraph §413.134(f). Instead, the Secretary explicitly stated that this provision was being promulgated consistent with both the related party rules and the disposal of depreciable asset rules set forth at paragraph (f).[19]

---

for statutory mergers. Thus, based on the foregoing, one could conclude that this change was to clarify the proposed language, rather than to promulgate a substantive change from the proposed rule.

[19] See, e.g., 44 Fed. Reg. 6912 (Feb 5, 1979)("Although no single provision of the Medicare regulations explicitly set forth these policies, our position has been based on the interaction of three regulations: 42 CFR 405.415, concerning the allowance for depreciation based on asset costs; 42 CFR 405.427, concerning cost related organizations; and 42 CFR 405.626, concerning change of ownership. We continue to believe that our interpretation and application of these regulations are reasonable and consistent with our statutory mandate to determine the scope of the reasonable costs for Medicare providers." (Emphasis added.)); 42 Fed. Reg. 6912 ("Our intent is not to change existing Medicare policy, but merely to state explicitly in the Code of Federal Regulations that which has been stated in the past in less formal settings."); 42 Fed. Reg. 17486(1977)("The proposed revision of paragraph (l) of 405.415 is also consistent with paragraph (f). When a provider's assets are sold the transaction causes adjustments to the seller's health insurance program allowance for the depreciation based upon the gain or loss on the sale of the asset. Because a sale of corporate stock is not a sale of the corporate assets, the provisions of paragraph (f) of 405.415 are not applicable to the seller after such a transaction."); 44 Fed. Reg. 6913 ("Only if the assets are transferred by means of a bona fide transaction between unrelated parties would revaluation be proper.")

### D.  Non-Profit Corporations and the Related Parties and Disposal of Depreciable Asset Regulations.

#### 1.  Program Memorandum A-00-76.

To clarify the application of 42 C.F.R.§ 413.134(l) to non-profit providers with respect to the related party rules and the rules on the disposal of depreciable assets, CMS issued Program Memorandum (PM) A-00-76, dated October 19, 2000.  This PM applies the foregoing regulations to the situation of non-profit corporations. In particular, this PM noted that non-profits differ in significant ways from for–profit organizations.  Non-profit organizations typically do not have equity interests (i.e. shareholders, partners), exist for reasons other then to provide goods and services for a profit, and may obtain significant resources from donors who do not expect to receive monetary repayment of or return on the resources they provide.  These differences, among others, cause non-profit organizations to associate or affiliate through mergers or consolidations for reasons that may differ from the traditional for-profit merger or consolidations.  In contrast, the regulations at 42 C.F.R. § 413.134(l) were written to address only for-profit mergers and consolidations.

The PM also noted that, unlike for-profit mergers or consolidations, which often involve a dispatching of the former governing body and/or management team, many non-profit mergers and consolidations involve the continuation, in whole or part, of the former governing board and/or management team.  Thus, in applying the related organization principles of 42 C.F.R. § 413.17, CMS stated that consideration must be given to whether the composition of the new board of directors, or other governing body and/or management team include significant representation from the previous board or management team.  If that is the case, no real change of control of the assets has occurred and no gain and loss may be recognized as a result of the transaction. This PM recognized that, _inter alia_, certain relationships formed as a result of the merger or consolidation of two entities constituted a related party transaction for which a loss on the disposal of assets could not be recognized.  The PM stressed that "between two or more corporations that are unrelated" should include the relationship between the constituent hospitals and the consolidating entity.   Consequently, the PM A-00-76 states that:

> whether the constituent corporations in a merger or consolidation are or are not related is irrelevant; rather the focus of the inquiry is whether significant ownership or control exists between a corporation that transfers assets and the corporation that receives them.

The PM stated that the term significant, as used in the PM has the same meaning as the term significant or significantly, in the regulations at 42 C.F.R. § 413.17 and the PRM at Chapter 10. Important considerations in this regard include that the determination of common control is subjective; each situation stands on its own merits and unique facts; a finding of common control does not require 50 percent or more representation; there is no need to look behind the numbers to see if control is actually being exercised, rather the mere potential to control is sufficient.

In addition, the PM stated that many non-profit mergers and consolidations have only the interests of the community at large to drive the transaction. This community interest does not always involve engaging in a bona fide sale or seeking fair market value of assets given. Rather, the assets and liabilities are simply combined on the merger/consolidated entities books. The merged/consolidated entity may or may not record a gain or loss resulting from such a transaction for financial reporting purposes. However, notwithstanding the treatment of the transaction for financial accounting purposes, no gain or loss may be recognized for Medicare payment purposes unless the transfer of the assets resulted from a bona fide sale as required by the regulation at 42 C.F.R § 413.134(l) and as defined in the PRM at § 104.24. The PM stated that the regulation at 42 C.F.R. § 413.134(l) does not permit a gain or loss resulting from the combining of multiple entities' assets and liabilities without regard to whether a bona fide sale occurred. The PM stressed that a bona fide sale requires an arm's length business transaction between a willing and well-informed buyer and seller. This also requires the analysis of the comparison of the sales price with the fair market value of the assets acquired as reasonable consideration is a required element of a bona fide sale.

Notably, the Administrator finds that the requirement that the term "between related organizations" includes an examination of the relationship before and after a transaction of assets under 42 C.F.R. § 413.417 (§ 405.17), was applied as early as 1977 by the agency in evaluating whether accelerated depreciation would be recaptured. The agency decided that "when the termination of the provider agreement results from a transaction between related organizations and the successor provider remains in the health insurance program and its asset bases are the same as those of the terminated providers, health insurances reimbursement is equitable to all parties": thus, the depreciation recovery provisions would not be applied.[20] The agency looked specifically at whether, in a related party transaction, the control and extent of the financial interest remained the same for the owners of the provider

---

[20] 42 Fed. Reg. 45897 (1977).

before and after the termination.[21] Thus, the PM interpretation of the related party rules as requiring an examination of the relationship before and after the transfer of assets is consistent with early Medicare policy and HCFAR 80-4.

This interpretation, that "between related organizations" must include an examination of all parties to the transaction, both before and after, is also consistent with the reality of a transaction involving the merging of two or more entities.  For example:

> Corporation A and Corporation B, both non-profit providers, are combined by statutory merger with Corporation A surviving. Corporations A and B were unrelated prior to the transaction, each being controlled by its respective Board of ten Directors.  After the merger, Corporation A's new ten member Board of Directors includes five individuals that served on Corporation B's pre-merger board. Thus, Corporation A's new Board of Directors includes a significant number of individual from both of the former entities' boards.  Because no significant change of control of the assets of former Corporation B has occurred, the transaction as between Corporation A and Corporation B is deemed to be between related parties and no gain or loss will be recognized as a result of the transaction.  Hence, Medicare reasonably examines the relationship between the merging corporations and the surviving corporation and recipient of the Medicare depreciable assets to determine whether the transfer involved a related party transaction.[22]

## 2. The Intermediary CHOW Manual and APB No. 16.

The Intermediary Manual, Chapter 4000, et seq., also addresses changes of ownership (CHOW) for purposes of Medicare certification and reimbursement. These sections provide guidelines based on Medicare law, regulations and implementing instructions for use by the Medicare intermediaries and providers on the reimbursement implications of various types of changes of provider organizations transactions or CHOWs.  Section 4502 explains that the first review of a CHOW transaction is to determine the provider structure both before and after the transaction and to determine the type of transaction which occurred because Medicare has developed specific policies on the reimbursement effect of various types of CHOW transactions which may be different from treatment under generally accepted accounting principles or GAAP.  Section 4502.1, list the various types of provider

---

[21]  42 Fed. Reg. 45897, 45898 (September 15, 1977) (Recovery of excess cost resulting from the use of accelerated depreciation when termination of provider agreement results from transaction between related organizations.)

[22] Program Memorandum A-00-76 at 3.

from that set forth in GAAP,[24] Intermediaries are instructed to refer to the principles outlined in the CHOW manual which specify when reference to APB No. 16 is in accordance with the current Medicare policy.

Generally, APB No. 16 suggests two approaches to the treatment of assets when there is a business combination involving stock corporations: the pooling method and the purchase method. Historically, a combination of business interest was characterized as either a "continuation of the former ownership" or "new ownership." A continuation of ownership was accounted for as a pooling of interest. The pooling of interest method accounts for business combinations as the uniting of the ownership interests of two or more companies. No acquisition is recognized because the combination is accomplished without disbursing resources of the constituents and ownership interests continue. The pooling of interests method results in no revaluation of assets or recording of gains or losses. In contrast, "new ownership" is accounted for as a purchase. The purchase method accounts for a business combination as the acquisition of one company by another and is treated as purchase or sale. Thus, APB No. 16 is similar to the PM, in that both recognize and treat the pooling of interests in a business combination as an event resulting in no gain or loss, while recognizing and treating a bona fide purchase or sale in a business combination as an event resulting in a gain or loss.

### E. Similarities of Internal Revenue Service Principles and Medicare Reimbursement Principles When Entities Consolidate or Merge.

This policy of not recognizing a gain or loss when the transaction is between related parties, whether it constitutes a reorganization, consolidation or merger, is also consistent with Internal Revenue Service (IRS) rules on the non-recognition of a gain or loss when a statutory reorganization has been determined to have occurred. Relevant to this case, while the Medicare rules may diverge from IRS rules and Medicare policy is not bound by IRS policy, IRS policy often reflects rationale underlying the establishment of similar policies under Medicare.[25] In fact, in setting forth principles applicable to the recognition of the gain or a loss, CMS has in the past recognized the similarity of the Medicare principles and the IRS principles and

---

[24] For example, Medicare will not recognize a revaluation/gain or loss due to a transfer of stock or in the case of a "two-step" transaction (i.e., the transfer of stock, than the transfer of the depreciable assets).

[25] See, e. g., Guernsey v. Shalala, 115 S. Ct. 1232 (1995), analogizing Medicare rules to IRS rules in citing to Thor Power Tools v. Commissioner, 439 U.S. 522 (1979).

organizational structures and included as one possible type of provider organization are Corporations.

In defining a Corporation, § 4502.1 explains that a corporation is a legal entity, which enjoys the rights, privileges and responsibilities of an individual under the law. An interest in a corporation is represented by shares of stock in proprietary situations (stockholders) or membership certificates in non-stock entities (members).

Among the various types of provider structures and transactions recognized by Medicare are mergers, consolidations, and corporate reorganizations at § 4502. Section 4502. 6, describes a statutory merger as the combination of two or more corporations pursuant to the laws of the state involved, with one of the corporations surviving the transaction. Medicare program policy permits a revaluation of assets acquired in a statutory merger between unrelated parties, when the surviving corporation is a provider. Notably, Medicare policy at § 4502.10 does not permit a revaluation of assets affected by a "reorganization" of a corporate structure. All such transactions are considered among or between related parties. As an example the Intermediary Manual explains that:

> Provider A is organized as a nonprofit corporation. The assets of Provider A are reorganized under state law into a newly created proprietary corporation. The transaction constitutes a related party transaction (i.e., corporate reorganization). As the transaction was among related organizations no gain/loss is allowed for the seller and no revaluation is allowed for the buyer.

In the instance of a re-organization, CMS examines, inter alia, the parties before and after the transaction in determining that the transfer of assets involved a related party transaction.

Section 4508.11 of the Intermediary Manual,[23] in addressing stock corporations states that, Medicare program policy places reliance on GAAP, as expressed in APB No. 16 in the reevaluation of assets and gain/loss computation processes for Medicare reimbursement purposes. While in certain areas, Medicare program policy deviates

---

[23] Section 4504.1 states that: "where Medicare instructions are silent as to the valuation of consideration given in an acquisition, rely upon generally accepted accounting principles. APB No. 16 discusses valuation methods of consideration given for assets acquired in business combinations."

has often explicitly stated when such Medicare policy agrees or diverges from IRS treatment.[26]

Under IRS rules, some mergers are considered statutory reorganizations and subject to the non-recognition of a gain or loss. The terms reorganization and merger are not mutually exclusive terms under IRS rules. Medicare policy similarly indicates that they are not mutually exclusive terms under Medicare rules. That is, consolidations and mergers may in fact constitute in essence, reorganizations and reorganizations may involve more than one corporation.[27]   For example, a merger where the predecessor corporation board continues significant control in the new corporation board is treated the same as reorganization for Medicare reimbursement purposes and no gain or loss is recognized.   However, for example, where the predecessor corporation board does not continue significant control in the new corporation board, a gain or loss will be recognized for Medicare reimbursement purposes.

Similar to Medicare rules, the IRS does not allow the recognition of the gain or loss when there is a re-organization, inter alia, because no gain or loss has in fact been realized.  As the courts have noted:

> The principle under which statutory reorganizations are not considered taxable events is that no substantial change has been affected either in the nature or the substance of the taxpayer's capital position, and no capital gain or loss has actually been realized.  Such a reorganization contemplates a continuity of business enterprise and a continuity of interest and control accomplished [in this instance] by an exchange of stock for stock.[28] (Emphasis added.)

---

[26] See, e.g., 44 Fed. Reg. 3980 (January 19, 1979) ("If a provider trades in or exchanges an asset, no gain or loss is included in the computation of allowable cost. Instead, consistent with the Internal Revenue Service (IRS), the un-depreciated value of the traded asset, plus any additional assets transferred to acquire the new assets, are used as the basis for depreciation of the new asset under Medicare"; 48 Fed. Reg. 37408 (Aug. 18. 1983) (finding that it was not appropriate for the Medicare program to use IRS accelerated costs recovery system for Medicare purposes and deleting IRS useful life guidelines).

[27] See Black's Law Dictionary (7th Ed. 1999), definition of a reorganization used interchangeably with merger and consolidation ("A reorganization that involves a merger or consolidation under a specific State statute.")

[28] Commissioners of IRS v. Webster Estates, 131  F. 2d 426, 429 (2nd Cir.1942) citing Helvering v. Schoellkopf, 100 F. 2d 415 (2d Cir ) While the foregoing IRS cases illustrate the continuity of interest, the  Administrator notes that the Medicare program does not recognize a loss on sale as a result of a stock transfer regardless of

Similarly, the courts have stated that the underlying purpose of the IRS provisions that find no gain or loss when there is a reorganization was twofold: "1) to relieve certain types of corporate reorganizations from taxation which seemed oppressively premature and 2) to prevent taxpayer's from taking losses on account of wash sales and other fictitious exchanges."[29]  Finally, as the Supreme Court found in Groman v. Commissioners, 302 U.S 82, 87 (1937) certain transactions speak for themselves, regardless of how they might be cast.  As the Supreme Court observed: "If corporate A and B transfer assets to C, a new corporation, in exchange for all of C's stock, the stock received is not a basis for calculation of a gain on the exchange… A and B are so evidently parties to the reorganization that we do not need [the IRS code] to inform us of the fact."  In sum, the purpose of these provisions is "to free from the imposition of an income tax purely 'paper profits or losses' wherein there is no realization of gain or loss in the business sense but merely the recasting of the same interests in a different form."[30]

The IRS rules also deny gains or losses from the sale or exchange of property between related parties.  In explaining the rationale for this tax law provision, the court in Unionbancal Corporation v. Commissioner, 305 F. 2d 976 (2001), explained that:

> This limitation on deductions for transfers between related parties, protects the fisc against sham transactions and manipulations without economic substance.  Not infrequently though, there are honest and important non-tax reasons for sales between related parties, so it's important to fairness to preserve the pre-sale basis where loss on the sale itself isn't recognized for tax purposes.  Otherwise the statute would be a heads-I-win, tails-you-lose provision for the IRS: the seller can't take the loss, but the IRS calculates the buyer's gain on resale using the lower basis.

---

the relationship between the parties. Case law also shows that term "continuity of interest" as provided in the IRS regulation is at times used interchangeably with the term "continuity of control." See e.g. New Jersey Mortgage and Title Co. v. Commissioner of the IRS, 3 T. C. 1277 (1944); Detroit–Michigan Stove Company v. U.S., 128 Ct. Cl. 585 (1954).

[29] C.H. Mead Coal Co. v. Commissioners of IRS,  72 F. 2d 22, 27-28 (4th Cir. 1934) (analyzing early sections of the code.)

[30] Paulsen ET UX v. Commissioner, 469 U.S. 131 ( 1985) citing Southwest Natural Gas Co. v. Commissioner, 189 F. 2d 332, 334 (CA 5), cert. denied, 342 U.S. 860 (1951) (quoting Commissioner v. Gilmore's Estate, 130 F. 2d 791, 794 (CA 3 1942)).

Consequently, one purpose of the IRS policy is to prevent the claiming of a gain or loss when no such event has in fact occurred. Similarly, the related party rules under Medicare, in holding that there is no recognition of a gain or loss when there is a reorganization, consolidation or merger between related parties, is to avoid the payment of costs not actually incurred by the parties. An overarching principle applicable under the Medicare statute and regulation, with which all reasonable cost regulations must be in accord, is the principle that Medicare will only share in costs actually incurred by the provider. Consistent with IRS rules, which recognize that no cost has been incurred under the foregoing facts, Medicare similarly does not find that the provider has incurred an actual cost for purposes of Medicare reimbursement under such facts.

## II. Finding of Facts and Conclusion of Law.

This particular case involves the Provider's claim for a loss on the disposal of assets as a result of a merger. The transaction involved the Iowa Lutheran Hospital (Provider) and the Iowa Methodist Medical Center (the surviving corporation)(Iowa Methodist.) Prior to the merger, the Provider was a general, acute care, not-for-profit hospital located in Des Moines, Iowa. The Provider was incorporated, _inter alia_, for the purpose of establishing, equipping operating and maintaining a "benevolent and charitable Christian institution for the providing of medical, surgical, and hospital care." (Provider Exhibit P-35.) The sole member of the corporation was the Southwest Iowa Synod of the evangelical Lutheran Church in America. (Provider Exhibit P-36)

In February of 1993, the Provider and Iowa Methodist executed a non-binding Memorandum of Understanding that set forth their intention to combine and the anticipated benefits to be derived from their combination. A purpose of the combination was to develop, improved and lower health care costs    for the communities served by the two hospitals through, inter alia, the integration of complimentary heath care delivery systems, operational efficiencies and reduced operating costs, increased responsiveness to changes in health care delivery, and achieving critical mass necessary to maximize service quality while minimizing costs. The Memorandum of Understanding anticipated that, after the combination Iowa Health System would be the sole member of Iowa Health System Corporation (formerly Iowa Methodist Medical Center) the surviving corporation. Iowa Health System would have no member. In addition, the final legal structure would be under review and would take into account applicable reimbursement rules and regulations . The memorandum of understanding included the composition for the sole member's board of directors, executive officers, and the governing documents of the sole member including the provision for distribution of its assets to the Southwestern

Iowa Synod of the ELCA in accordance with a schedule based on the calendar year of the dissolution.[31]

On November 22, 1993, the Provider merged into Iowa Methodist following the simultaneous signing of a Formation Agreement and the filing of the Articles of Merger with the State.[32] The sole member of Iowa Methodist, after the combination, was Iowa Health System. The Restated Articles of Incorporation of Iowa Health System were also made effective November 22, 1993. Iowa Methodist was renamed Iowa Health System Hospital Corporation.[33] The Restated Articles of Incorporation of Iowa Health System Hospital Corporation were made effective November 22, 1993. (P-3) By operation of the law, the existing assets and liabilities of the Provider were acquired and assumed by the surviving corporation Iowa Health System Hospital Corporation.

The governing documents provided the names "Iowa Methodist Medical Center" and "Iowa Lutheran Hospital" would continue to be used for the present campuses until at least the year 2000 unless otherwise agreed by the Southeastern Iowa Synod of the Evangelical Lutheran Church in America with respect to the Provider, and by the Iowa Annual Conference of the United Methodist Church with respect to Iowa Methodist.[34] The surviving corporation was organized exclusively for charitable, religious, scientific, and educational purposes.[35]

After the merger, the Agreement provided that the governing board for Iowa Health System, the sole member of the surviving corporation, would consist of a total of twenty-three members.[36] Specifically, the initial Board of Directors of the sole member, Iowa Health System, would consist of: eight directors selected by the current Board of Directors of Iowa Methodist Health System, seven directors selected by the current Board of Directors of the Provider. In addition, the board of directors would be comprised of the President and the Executive Vice President of the sole

---

[31] This provision in the Memorandum of Understanding was adopted in the Iowa Health System Articles of Incorporation. P-3 at p 4.

[32] Provider Exhibit P-2, Articles of Merger I(a), in pertinent part, "Iowa Lutheran Hospital...shall merge into Iowa Health System Hospital.... And Iowa Health System Hospital Corporation shall be the surviving corporation."

[33] Provider Exhibit P-1.

[34] Id.

[35] Provider Exhibits P-2, Restatement of Articles of Incorporation for Iowa Health System.

[36] Provider Exhibit P-2 Restated Articles of Incorporation of Iowa health System

member,[37] two physicians selected by the current Iowa Methodist Health System Board, two physicians selected by the Provider's current Board, the Bishop of the Southeastern Iowa Synod of the Evangelical Lutheran Church in America (sole member of the Provider), and the Bishop of the Iowa Annual Conference of the United Methodist Church.[38]

The Agreement provided that the Bishop of the Iowa Annual Conference of the United Methodist Church, or a person designated by the Bishop, shall be an ex officio member of the Board of Directors, with vote, so long as the word "Methodist" is used by the Corporation or by any other corporation in which the Corporation is a member or stockholder with majority interest. The Bishop of the Southeastern Iowa Synod of the Evangelical Lutheran Church in America, or a person designated by him, shall be an ex officio member of the Board of Directors, with vote, so long as the word "Lutheran" is used by the Corporation or by any other corporation in which the Corporation is a member or stockholder with majority interest.[39] The Agreement also provided that unless otherwise directed by the board of directors, gifts and bequests to the Iowa Methodist would be forwarded to Iowa Methodist Health Foundation and gifts and bequests to Iowa Lutheran Hospital would be forwarded to Iowa Lutheran Hospital Foundation.[40]

Applying the statute, regulations, PRM, and CMS policy to the facts of this case, the Administrator finds that based on a combination of factors the parties to the merger are related through control. In applying the related party principles at 42 C.F.R. § 413.17, the Administrator finds that consideration must be given as to whether the composition of the new board of directors at the surviving corporation included significant representation from the Provider's previous board or management team. This involves determining whether former board members of the Provider had the power, to directly or indirectly, influence or direct the actions or policies of the surviving corporation. If such is the case, then no real change of control of assets has occurred and no gain or loss will be recognized as a result of this transaction. As

_____

[37] The President and Vice President of the sole member are, respectively, the President of Iowa Methodist and President of Iowa Lutheran.

[38] Provider Exhibits P-2, Memorandum of Understanding. The board of director for the surviving corporation was similarly structured but with 19 board members. The composition was the same except for the exclusion of the two respective clergy and one board member chosen by the Provider and one board member chosen by the Iowa Methodist. See Provider Exhibit P-3, "Restated Articles of Incorporation of Iowa Health System Hospital"; Transcript of Oral Hearing at 127.

[39] Provider Exhibits P-3, Restated Articles of Incorporation of Iowa Health System.

[40] Provider Exhibit P-2 , Formation Agreement.

stated above, the term "control" includes any kind of control, whether or not it is legally enforceable and however it is exercisable or exercised.

In this case, the record shows that seven members of the Board were to be selected by the Provider's board of directors, that the Provider was to select two of the physicians for the board; that the former president of the Provider (as the current vice president of the sole member) and the Bishop of the religious affiliation of the Provider were to serve on the board. This membership comprised approximately 48 percent of the voting positions in the surviving entity's board of directors.[41] Moreover, the Chairman and President of the Provider, went on to accept positions as Vice Chairman of the Board and Executive Vice President, respectively, of the sole member of the surviving corporation.[42] In addition, the Vice chairman was is to be given first consideration upon the retirement of the chairman of the board or a person from the Provider is to be selected. This carry forward of top executives and board members from the Provider to the surviving corporation/sole member assured the continuing influence and control of the Provider in the surviving corporation and its sole member.

The Administrator finds that the common former board members and officers enabled the Provider to significantly influence or direct the actions or policies of the surviving corporation/sole member and showed a continuity of control between the Provider and the surviving corporation/sole member. A provider may not claim a loss on depreciation if the sale was between related parties. Thus, based on the totality of the circumstances, the Administrator finds that the Provider is related through continuity of control with the surviving corporation, and not entitled to a loss.

The Administrator finds that the rationale for finding that this entire transaction constitutes a related party transaction under the Medicare policy is supported by the record. An overarching principle of Medicare reimbursement, which serves as the basis for the prophylactic related party rule, is that the costs actually incurred are reimbursable under Medicare. Thus, it is reasonable to find in this case, the Provider's interests have been but recast in a different form only and thus a loss has not actually been incurred by the Provider that can be recognized by Medicare under §1861 (v)(1)(a) of the Act.

The Administrator finds the common criteria between the IRS rules and the Medicare rules is that a transaction is treated similar to, or as, a reorganization (in that no gain or loss is recognized), regardless of the transaction title , when there is a continuity of interest or control between the merged  corporation and the surviving corporation.

---

[41] Provider Exhibit P-2.
[42] Provider Exhibit P-2.

That is continuity of interest or control, is evidence that the entity has but recast its interest in another form and no actual loss has been incurred.

In addition, the reasonable cost rules are properly interpreted consistent with the economic reality of this transaction. Notably, the merger was treated as a pooling of interests.[43] The APB No 16, similar to the PM, recognizes and treats the pooling of interests in a business combination as an event resulting in no gain or loss, while recognizing and treating a bona fide purchase or sale in a business combination as an event resulting in a gain or loss. The evidence indicating that the merger transaction was treated as a pooling of interest again shows that no actual loss was incurred by the Provider in which Medicare should share.

Since the parties to this transaction are found to be related, the Administrator finds that the transaction was not consummated through an arm's length transaction. A *bona fide* sale contemplates an arm's length transaction, between unrelated parties for reasonable consideration, with each party acting in its own self interest. As outlined in PM A-00-76, in evaluating whether a *bona fide* sale has occurred with respect to a merger or consolidation between or among nonprofit entities, a comparison of the sale price with the fair market value of the assets acquired is required. A large disparity between the sale price (consideration) and the fair market value of the assets sold indicates the lack of reasonable consideration and, hence, the lack of a *bona fide* sale. Examples of transactions that raise the issue of a bon fide sale are set forth in PM A-00-76:

> In some situations, the sale price of the assets may be barely in excess of, or less than, the market value of the current assets sold, leaving a minimal, or no, part of the sales price to be allocated to the fixed (including depreciable) assets. In such circumstance, effectively the current assets have been sold, and the fixed assets have been given over a minimal or no cost. If a minimal or no portion of the sales price is allocated to the fixed (including depreciable) assets a bona fide sale of those assets has not occurred.

The PMA-00-76 further states that:

> Non-monetary consideration, such as a seller's concession from a buyer that the buyer must continue to provide care for a period of time or to provide care to the indigent, may not be taken into account in evaluating the reasonableness of he overall consideration (even where

---

[43] See e.g. Intermediary Supplemental Position Paper at 23-24, Exhibits I-12, I-14.

such elements may be quantified in dollar terms). These factors are more akin to goodwill than to considerations.

In this case, the record shows that assets were transferred from the Provider to Iowa Methodist for the assumption of liabilities totaling $28,092,831. The surviving corporation received $41,093,761 in cash plus all of the Provider's physical assets.[44] That is, the surviving corporation received cash/liquid assets of approximately $13 million and the value of physical assets which were in excess of the liabilities assumed. This does not on its face, in the Administrator's view, support a finding that the Provider transferred assets for reasonable consideration and as a result of a *bona fide* sale.[45] In the Administrator's view, the "transfer price", does not support a finding that the transaction was an arm's length transaction As set forth in the PRM at § 104.24, <u>reasonable consideration</u> is a required element of a *bona fide* sale.

In addition, the fact that the parties did not secure an appraisal prior to the transaction is also an indication that the Provider was not concerned with receiving reasonable consideration for its depreciable assets.[46]   The Provider also did not place its assets for sale in the open market to ascertain their worth established that there was no good faith bargaining between the parties to establish the fair market value of the Provider's assets as an ongoing concern. There is no documentation in the record to support a conclusion that the assumption of debt was fair consideration for the Provider's assets.[47]   Instead a primary negotiation point was the composition of the board and executive officers and the Lutheran identity of the hospital; that is, the retention of control and power after the merger.[48]   Thus, the Administrator finds that,

---

[44] Intermediary's Position Paper at 8. Provider Exhibit 38.

[45] Even relying on the Provider Exhibit P-43 and P-41, the fair market value of assets is shown as $64,949,110 and $62,700,000, respectively, an amount far in excess of the liabilities assumed.

[46] <u>See</u> e.g. Provider Exhibit 41; KPMG Business Evaluation dated November 19, 1993.

[47]   The record also does not show that the parties were engaged in arms length bargaining, reflective of a bona fide sale of the assets, over the potential Medicare loss on sale claim.  The Medicare loss on sale claim, if the provider were to be successful, would be worth approximately $5.4 million in Medicare reimbursement which is not included in the $41 million in cash/liquid assets.

[48]  <u>See</u> e.g. Transcript of Oral Hearing at 115 ("Q....Could you maybe summarize....the three key areas of negation...A.  In my recall, executive leadership, the transition, the future transition of executive leadership."); 116 (regarding the board members) and 198 ("The negotiations...were generally amicable because the motivations of the board members were to do what was best for healthcare in Des Moines, but that there were some points that were, I think points of serious

as the transaction did not involve an arm's length transaction, the transaction was not a *bona fide* sale as required under the regulations and PRM for the recognition of a loss on the disposal of assets.

The Administrator also finds that if the Provider's methodology is applied it means that the Provider transferred the depreciable assets for no consideration.[49] Without conceding this loss methodology, to find a bona fide sale there is a *logical* inconsistency which must be forced upon this transaction. That is, to find that any consideration was paid for the depreciable assets, a less than dollar-to-dollar allocation must be made to the monetary assets. When a dollar-to-dollar allocation is made to the current and monetary assets, the Provider in this case in fact disposed of the depreciable property for no consideration. In conclusion, the Administrator finds that this is not reasonable consideration required of an arms length transaction and bona fide sale. Thus, the transaction fails to meet the criteria required under 42 CFR§413.134(f) for a loss on the disposal of assets to be recognized.

As a loss cannot be allowed in this case, the Administrator does not reach the issue of how to calculate the loss. However, the issue of calculating a loss does point out certain anomalous results of finding that a loss is to be calculated in a case when there has been no bona fide sale. The Administrator concludes that this further supports a finding that no loss is to be calculated under these facts of this case.

Consequently, the Administrator finds that, not only was the transaction between related parties, but that there was no bona fide sale as required under 42 C.F.R. § 413.134(f).

---

negotiation. Several were mentioned by Denny Drake. Certainly the role of the executive teams and the extent to which I would have a role in that system was a part of the negotiation. Probably the one thing that wasn't mentioned this morning and the assurance that was constantly sought and re-sought was the perpetuation of the Lutheran heritage and identity…..")

[49] See e.g. Provider Exhibit 38.1 showing allocation of no consideration for the depreciable assets. The Provider shows the depreciable assets with an approximate net book value of $12.9 million for building and improvements, $3.2 million for fixed equipment and $9.6 million for moveable equipment. In addition, the land asset is shown with a value of $1.7 million for which no consideration is allocated and, thus, under the Provider's analysis was transferred for no consideration. Of note, under section 4505.12 an asset is considered donated when it is acquired without the payment in the form of cash, property or services-including the assumption of liabilities. When provider depreciable assets are donated, there is no gain/loss allowed to the donor under the Medicare program.

## DECISION

The decision of the Board is reversed in accordance with the foregoing opinion.


THIS CONSTITUTES THE FINAL ADMINISTRATIVE DECISION OF THE
SECRETARY OF HEALTH AND HUMAN SERVICES.


Date: 11/8/06 _____

Leslie V. Norwalk, Esq.
Acting Administrator
Centers For Medicare & Medicaid Services

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTRAL IOWA HOSPITAL<br>CORPORATION, successor-in-interest to<br>IOWA LUTHERAN HOSPITAL,<br><br>     Plaintiff,<br><br>        v.<br><br>MICHAEL O. LEAVITT, as Secretary of<br>Health and Human Services,<br><br>     Defendant. | CASE NO.: 1:07-CV-00295-RWR |

## ORDER

Upon consideration of the parties' contentions, it is hereby

ORDERED that:

The Plaintiff's Motion for Leave to Amend Complaint is granted; Plaintiff's Amended Complaint for Judicial Review of Final Adverse Agency Decision on Medicare Reimbursement shall be accepted for filing.

Dated:_____, 2008

_____
Richard W. Roberts
United States District Judge

Attorneys to be notified of entry of order:

Harold Belkowitz, Esquire (e-mail: hgbelkowitz@ober.com)
Ober, Kaler, Grimes & Shriver
A Professional Corporation
1401 H Street, N.W.
Washington, D.C. 20005-3324

Robert E. Mazer, Esquire (e-mail: remazer@ober.com)
Ober, Kaler, Grimes & Shriver
120 East Baltimore Street
Baltimore, Maryland 21202

Joel McElvain (e-mail: Joel.L.McElvain@usdoj.gov)
United States Department of Justice
Civil Division, Federal Programs Branch
Room 7130
20 Massachusetts Avenue, N.W.
Washington, D. C. 20001