IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **CENTRAL IOWA HOSPITAL** | ) | |
| **CORPORATION**, successor-in-interest to | ) | |
| Iowa Lutheran Hospital, | ) | |
| | ) | |
| **Plaintiff**, | ) | |
| | ) | Case No. 1:07-cv-00295-RWR |
| v. | ) | |
| | ) | |
| **MICHAEL O. LEAVITT**, as Secretary of | ) | |
| Health and Human Services, | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION FOR LEAVE TO AMEND COMPLAINT**

The plaintiff, Central Iowa Hospital Corporation, seeks leave to amend its complaint to

add an additional claim for relief.  In its proposed amended complaint, Central Iowa asserts that

the defendant, Michael O. Leavitt, Secretary of the Department of Health and Human Services,

violated 42 U.S.C. § 1395hh(c)(1) by failing to timely list a program memorandum in the

Federal Register.  The Secretary respectfully opposes Central Iowa's motion for leave to amend

its complaint, on grounds both of futility and of undue delay.  The proposed amendment to the

complaint would be futile, for three reasons.  First, Central Iowa did not assert this new claim

during the administrative process, and thus has waived it.  Second, the Secretary has complied

with Section 1395hh(c)(1) by listing the program memorandum that Central Iowa challenges in

the Federal Register.  Third, even if the Secretary had erred in his listing of the memorandum,

Central Iowa cannot show that it suffered any prejudice from this error.  In addition, the motion

for leave to file should be denied as a result of Central Iowa's undue delay; it waited until well

after the conclusion of summary judgment briefing to present this new (and irrelevant) argument.

-2-

## Background

As the Secretary explained in his briefs in support of his summary judgment motion (Docs. 17, 22), this case arises from the merger of Iowa Lutheran Hospital into another hospital, which is now known as Central Iowa.  Lutheran received no consideration for the surrender of its assets (valued at $64.9 million) to Central Iowa in the merger, other than the assumption of its liabilities (valued at $28.1 million).  Instead of negotiating for an exchange of fair value, Lutheran secured a commitment that its principals would retain significant representation on the surviving hospital's board of directors and its management team.

Central Iowa, acting as Lutheran's successor, sought payment from the Medicare program for the purported depreciation of Lutheran's assets.  It asserted that the assumption of Lutheran's liabilities in the merger should have been treated as the "sale price" of Lutheran's assets, that the discrepancy between the value of the assets and the value of the liabilities indicated that Lutheran had suffered additional depreciation on its assets (*i.e.*, depreciation beyond the amount for which Medicare had already paid Lutheran), and that Lutheran was therefore entitled to additional payment from Medicare to compensate for that supposed additional depreciation.

The Administrator of the Centers for Medicare and Medicaid Services denied Central Iowa's claim on December 8, 2006.  (Administrative Record ("A.R.") 2.)  He "appl[ied] the statute, regulations, PRM [Provider Reimbursement Manual], and CMS policy to the facts of this case" (A.R. 26), and concluded that, under the Secretary's long-standing interpretation of 42 C.F.R. §§ 413.134 and 413.17, a hospital must satisfy two conditions in order to claim an adjustment to its depreciation allowance as a result of the disposition of its assets in a merger.

-3-

First, the assets must actually be surrendered in the merger.  In other words, the merging hospital must not retain a significant power of control over the board or the management team of the surviving entity that receives its assets.  Second, the merger must qualify as a bona fide sale of the merging hospital's assets, in order to ensure that those assets, and any depreciation that the hospital had incurred on those assets, are valued accurately.  The Administrator found that the merger of Lutheran into Central Iowa did not satisfy either of these two conditions, and accordingly disallowed the claim for Medicare payment.

In his decision, the Administrator referred to Program Memorandum A-00-76.  (A.R. 1536.)[1]  The Secretary issued the program memorandum on October 19, 2000, in order to clarify his interpretation of 42 C.F.R. §§ 413.134 and 413.17.  The program memorandum explained, in the same manner as did the Administrator's decision, that under those regulations a merger or a consolidation must satisfy both the "related party" and the "bona fide sale" tests in order for a party to the transaction to qualify for an adjustment to its depreciation allowance.  The Secretary re-issued the program memorandum, in materially identical form, on August 7, 2001.  (Program Memorandum A-01-96, attached as Exhibit 2.)  The Secretary also published a list of Medicare manual instructions and other "Medicare issuances" in the Federal Register on June 28, 2002.  That list included both Program Memorandum A-00-76 and Program Memorandum A-01-96.  *See* 67 Fed. Reg. 43,762, 43,784, 43,804 (June 28, 2002).

The decision of the Administrator constituted the final decision of the Secretary with respect to Central Iowa's claim for Medicare payment.  Central Iowa filed a complaint in this Court challenging the decision on February 8, 2007.  (Doc. 1.)  The parties have fully briefed

---

[1]  Program Memorandum A-00-76 is attached as Exhibit 1 to this memorandum.

-4-

their cross-motions for summary judgment.  (Docs. 14, 17, 20, 22.)  After briefing was

completed, the United States Court of Appeals for the Tenth Circuit decided *Via Christi*

*Regional Medical Center v. Leavitt*, 509 F.3d 1259 (10th Cir. 2007).  As the Secretary has

previously explained (Doc. 27), Central Iowa's claim for Medicare payment fails under the

reasoning of *Via Christi*.

On February 1, 2008, after the conclusion of briefing in the case, and after the Tenth

Circuit's decision in *Via Christi*, Central Iowa filed a motion to amend its complaint.  (Doc. 28.)

Its proposed amended complaint asserts that the Secretary violated 42 U.S.C. § 1395hh(c)(1) by

failing to timely include his program memoranda in the list of Medicare manual instructions that

he published in the Federal Register on June 28, 2002.  For the reasons explained below, Central

Iowa's motion to amend its complaint should be denied.

<u>**Argument**</u>

I. <u>**The Motion to Amend the Complaint Should Be Denied Because the Proposed**</u>
<u>**Amendment Would Be Futile**</u>

"While leave to amend 'shall be freely given when justice so requires,' a district court

has discretion to deny a motion to amend on grounds of futility where the proposed pleading

would not survive a motion to dismiss."  *National Wrestling Coaches Ass'n v. Department of*

*Educ.*, 366 F.3d 930, 945  (D.C. Cir. 2004), *cert. denied*, 545 U.S. 1104 (2005) (quoting Fed. R.

Civ. P. 15(a)).  In the present case, Central Iowa's proposed amendment to the complaint would

be futile, for three reasons.

1.  First – as Central Iowa concedes (Doc. 28 at 5) – it did not argue during the

administrative proceedings that the Secretary had violated Section 1395hh(c)(1).  Accordingly,

that claim is waived.  It is well settled that judicial review of agency action is limited to those

-5-

issues presented to the agency itself. "Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." *United States v. L.A. Tucker Truck Lines*, 344 U.S. 33, 37 (1952); *see also Federal Maritime Comm'n v. South Carolina State Ports Auth.*, 535 U.S. 743, 762-63 (2002); *Nuclear Energy Inst. v. EPA*, 373 F.3d 1251, 1297-98 (D.C. Cir. 2004). Central Iowa argues (Doc. 28 at 5) that its failure to raise its argument before the agency should be excused, because the proceedings before the agency did not address the Secretary's regulatory interpretation that is reflected in Program Memorandum A-00-76. This is incorrect. Central Iowa was well aware of the Secretary's interpretation of the Medicare regulations, as expressed both in the program memorandum (*see* A.R. 35), and in a series of decisions of the CMS Administrator that had preceded the decision under challenge here. (*See* Administrator decisions cited in plaintiff's memorandum, Doc. 14 at 43 n. 11.)[2] Central Iowa raised a series of arguments before the agency concerning the procedural validity of the Secretary's interpretation of the Medicare regulations. It could also have raised an argument that the application of the Secretary's interpretation to its claim would violate 42 U.S.C. § 1395hh(c)(1). It simply chose not to do so.

---

[2] Each of those decisions explained that the Secretary had interpreted 42 C.F.R. §§ 413.134 and 413.17 to establish the "related party" and "bona fide sale" tests to determine whether an adjustment to a depreciation allowance could result from a merger or consolidation. Each of those decisions also cited to the Secretary's clarification of those principles in Program Memorandum A-00-76. *See, e.g., Cardinal Cushing Hosp.*, 2003-1 Medicare & Medicaid Guide (CCH) ¶ 80,975 (CMS Admin'r Jan. 29, 2003) (attached as Exhibit 3). Central Iowa was aware of, and argued against the application of, these previous decisions of the Administrator. (A.R. 122.) It simply chose not also to allege any violation of 42 U.S.C. § 1395hh(c)(1).

-6-

Central Iowa also relies (Doc. 28 at 5-6) on *Railroad Yardmasters v. Harris*, 721 F.2d 1332 (D.C. Cir. 1983), to excuse its failure to raise this new issue before the agency. That case, however, "applies only to challenges that concern the very composition or constitution of an agency." *Salt Lake Community Action Program v. Shalala*, 11 F.3d 1084, 1088 (D.C. Cir. 1993) (internal quotation omitted). Central Iowa's proposed new argument does not fall within this narrow exception to the exhaustion requirement. In any event, the principle for which Central Iowa wrongly cites to *Yardmasters* – that a failure to exhaust may be excused where an issue does not implicate the agency's expertise – would be no more availing to the provider. The Administrator certainly does have relevant expertise in considering whether any guidance, such as the program memorandum that Central Iowa challenges, had been properly issued. *See Pleasant Valley Hosp. v. Shalala*, 32 F.3d 67, 70 (4th Cir. 1994) (agency's expertise relevant to determination whether manual had properly been issued); *see also* 42 C.F.R. § 405.1863 (requiring notice to CMS where party seeks to challenge an administrative policy).

2. Second, Central Iowa's proposed amendment to the complaint would be futile because the Secretary has complied with 42 U.S.C. § 1395hh(c)(1). That statute provides:

> The Secretary shall publish in the Federal Register, not less frequently than every 3 months, a list of all manual instructions, interpretative rules, statements of policy, and guidelines of general applicability which –
> (A) are promulgated to carry out this subchapter, but
> (B) are not published pursuant to subsection (a)(1) of this section and have not been previously published in a list under this subsection.

42 U.S.C. § 1395hh(c)(1). The Secretary has published a list of Medicare issuances, and has included both Program Memorandum A-00-76 and Program Memorandum A-01-96 in that list. *See* 67 Fed. Reg. 43,762, 43,784, 43,804 (June 28, 2002). Central Iowa acknowledges that the Secretary has published this list, but contends (Doc. 28 at 4) that he was not timely in doing so.

-7-

It relies on *Chippewa Dialysis Servs. v. Leavitt*, 511 F.3d 172 (D.C. Cir. 2007), as support for its claim that the late publication of the list would require a remand of the case to the agency.  But, in that case, the Secretary had relied on a guideline that had never been listed in the Federal Register.  That case is simply not apposite here.  In his June 2002 Federal Register notice, the Secretary fully complied with Section 1395hh(c)(1) by listing all of his Medicare issuances that "ha[d] not been previously published in a list under this subsection," including the two program memoranda at issue here.  There is therefore no basis for a remand.

    3.  Third, even if the Secretary had erred in his publication of his list of Medicare issuances, any such error would be harmless.  The standards of the Administrative Procedure Act govern this Court's review of the Administrator's decision, including the APA's admonishment that "due account shall be taken of the rule of prejudicial error."  5 U.S.C. § 706; *see* 42 U.S.C. § 1395oo(f).  The plaintiff bears the burden to demonstrate that it suffered prejudice from the Secretary's purported error.  *See First Am. Discount Corp. v. CFTC*, 222 F.3d 1008, 1015 (D.C. Cir. 2000).  Central Iowa cannot show that it suffered any prejudice from the publication of the list in June 2002, as opposed to the end of 2000 (with respect to Program Memorandum A-00-76) or the end of 2001 (with respect to Program Memorandum A-01-96).  The purpose of the listing requirement is to provide interested parties with notice of the Secretary's policy statements relating to Medicare payment, "so that they can seek further information [regarding those statements] if they so desire."  H.R. Rep. No. 100-391 (pt. I) at 430 (1987), *reprinted in* 1987 U.S.C.C.A.N. 2313-1, 2313-250.  But Central Iowa cannot contend that it lacked notice of the program memoranda, nor of the Secretary's interpretation of 42 C.F.R. §§ 413.134 and 413.17 as expressed in those memoranda.  *See Idaho Farm Bureau Found. v. Babbitt*, 58 F.3d

-8-

1392, 1405 (9th Cir. 1995) (failure to provide notice of publication was harmless where parties were aware of content of notice); *see also American Bankers Ass'n v. NCUA*, 38 F. Supp. 2d 114, 139 (D.D.C. 1999) (error in compliance with publication requirement was harmless where parties were unaffected by timing of publication of notice). Indeed, the very fact that Central Iowa waited until this point to raise this argument is, itself, powerful evidence that it saw no prejudice from what it now contends to be the Secretary's procedural error.

Moreover, the Administrator made clear in his decision (which itself became the final decision of the Secretary) that he adopted the Secretary's interpretation of 42 C.F.R. §§ 413.134 and 413.17 to impose the "related party" and "bona fide sale" rules. Central Iowa had a full opportunity to convince the Administrator to adopt a different interpretation of the regulations, but was unsuccessful in that effort. Thus, even if the program memoranda had never been issued, it is clear that the Administrator would have interpreted the regulations in the same manner, and would similarly have found that Central Iowa did not qualify for additional Medicare payment under those regulations. *See Sheppard v. Sullivan*, 906 F.2d 756, 762 (D.C. Cir. 1990) (error harmless where agency adjudication stands on its own, even where agency cited to disputed rule, given that party had opportunity to present contrary arguments in adjudication); *see also Health Ins. Ass'n of Am. v. Shalala*, 23 F.3d 412, 424 (D.C. Cir. 1994) (agency is permitted to interpret its own regulations in course of an adjudication). In short, Central Iowa cannot explain how it suffered any prejudice from the allegedly late publication of the Secretary's list in the Federal Register. Its claim for relief on the basis of that purported error, therefore, is futile.

-9-

## II.     The Motion to Amend the Complaint Should Be Denied, Because the Proposed Amendment Is Untimely

In addition to the grounds of futility, this Court has the discretion to deny a motion for leave to amend a complaint for other sufficiently compelling reasons, "such as undue delay, bad faith or dilatory motive[.]" *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir.1996). In the present case, Central Iowa waited until after the administrative proceedings had been concluded, after it filed its original complaint, after summary judgment briefing was completed, and after the Tenth Circuit decided the *Via Christi* case, before it elected to move to amend to raise a new claim of procedural error. Central Iowa's delay in raising this new claim simply would prolong the final resolution of this action, particularly given that, under the reasoning of *Via Christi*, it could not prevail on the arguments that it had initially raised. As Central Iowa cannot provide a sufficient explanation for its failure to raise its new claim earlier in the proceedings, leave to amend should be denied. *See Berman v. Parco*, 986 F. Supp. 195, 217 (S.D.N.Y. 1997); *SEC v. Norton*, 21 F. Supp. 2d 361, 363 (S.D.N.Y. 1998).

-10-

## **Conclusion**

For the foregoing reasons, Central Iowa's motion for leave to amend the complaint

should be denied.

Dated:  February 15, 2008                    Respectfully submitted,

Of Counsel:                                  JEFFREY S. BUCHOLTZ
                                             Acting Assistant Attorney General

DANIEL MERON
General Counsel                              JEFFREY A. TAYLOR
                                             United States Attorney

JANICE HOFFMAN
Acting Associate General Counsel

     /s/ Joel McElvain

MARK D. POLSTON.                             SHEILA M. LIEBER, Deputy Director
Deputy Associate General                     JOEL McELVAIN, Attorney, D.C. Bar # 448431
   Counsel for Litigation                    United States Department of Justice
                                             Civil Division, Federal Programs Branch
DAVID HOSKINS                                20 Massachusetts Ave., NW, Room 7130
Attorney                                     Washington, D.C. 20001
Office of the General Counsel                Telephone:     (202) 514-2988
U.S. Department of Health                    Fax:           (202) 616-8202
   and Human Services                        Email:         Joel.L.McElvain@usdoj.gov

                                             *Attorneys for Defendant*

**EXHIBIT 1**

# Program Memorandum Intermediaries

Department of Health and Human Services (DHHS)

HEALTH CARE FINANCING ADMINISTRATION (HCFA)

**Transmittal A-00-76**                    **Date: OCTOBER 19, 2000**

**CHANGE REQUEST 1290**

**SUBJECT:**    **Clarification of the Application of the Regulations at 42 CFR 413.134(l) to Mergers and Consolidations Involving Non-profit Providers**

## BACKGROUND

This Program Memorandum (PM) is being issued to clarify application of the regulations at 42 CFR 413.134(l) (originally, 42 CFR 405.415(l)) to mergers and consolidations involving non-profit providers. The purpose of that regulation section, originally published February 5, 1979 (44 FR 6912), was to clarify existing Medicare program policy concerning certain effects of capital stock transactions involving for-profit providers. In summary, that regulation section provides that the acquisition of the capital stock of a provider, in and of itself, is not a change of ownership for Medicare payment purposes, and therefore, would not give rise to a revaluation of the acquired assets, nor an adjustment to recognize a gain or loss on the disposal of assets. The regulation further provides that mergers or consolidations between or among for-profit providers would give rise to a revaluation of the merged or consolidated assets only if the parties to the merger or consolidation are not related organizations as defined in the regulations at 42 CFR 413.17.

With regard to recognizing a gain or loss adjustment on the merged or consolidated assets, the regulation provides that such gain or loss may be recognized, but only as provided for in the regulations at 42 CFR 413.134(f). That latter regulation section provides for the recognition of a gain or loss only where the asset disposal results from a bona fide sale or scrapping (occurring before December 1, 1997), a demolition or abandonment, or an involuntary conversion. A bona fide sale is defined in the Provider Reimbursement Manual (PRM), Part 1, (HCFA Pub. 15-1) at '104.24. Therefore, the merger or consolidation must involve one of those events in order to trigger the recognition of a gain or loss on the merged or consolidated assets.

> **NOTE:**    Section 4404 of the Balanced Budget Act of 1997 effectively eliminated Medicare recognition of gains or losses resulting from the sale or scrapping of an asset that occurs on or after December 1, 1997. Thus, adjustments to recognize gains and losses on sales or scrappings of assets that occur on or after that date will not be recognized for Medicare payment purposes. Regulations implementing this change were published in the ***Federal Register*** on January 9, 1998 (63 FR 1379).

Because there is no similar regulation specifically addressing mergers and consolidations between or among non-profit entities, we are clarifying the applicability of the above cited regulation sections to such mergers or consolidations.

## APPLICATION

The above cited regulation sections are applicable to mergers and consolidations involving non-profit providers. However, as with transactions involving for-profit entities, in order for Medicare to recognize a gain or loss on the disposal of assets, the merger or consolidation must occur between or among parties that are not related as described in the regulations at 42 CFR 413.17 and the transaction must involve one of the events described in 42 CFR 413.134(f) as triggering a gain or loss recognition by Medicare (typically, a bona fide sale, as defined in the PRM at §104.24, because a merger or consolidation could, but usually does not, involve a scrapping, demolition, abandonment, or involuntary conversion).

HCFA-Pub. 60A

## SPECIAL CONSIDERATIONS APPLICABLE TO TRANSACTIONS INVOLVING NON-PROFIT ORGANIZATIONS

Non-profit organizations differ in significant ways from for-profit organizations. Non-profit organizations typically do not have equity interests (i.e., shareholders, partners), exist for reasons other than to provide goods and services for a profit, and may obtain significant resources from donors who do not expect to receive monetary repayment of, or a return on, the resources they provide. These differences, among others, cause non-profit organizations to associate or affiliate through mergers or consolidations for reasons that may differ from the traditional for-profit merger or consolidation. Because the regulations at 42 CFR 413.134(l) were written to address only for-profit mergers and consolidations, certain special considerations must be regarded in applying that regulation section to non-profit mergers and consolidations.

Related Organizations:

Unlike for-profit mergers or consolidations, which often involve a dispatching of the former governing body and/or management team, many non-profit mergers and consolidations involve the continuation, in whole or in part, of the former governing board and/or management team. In applying the related organizations principle at 42 CFR 413.17, consideration must be given to whether the composition of the new board of directors, or other governing body or management team, includes significant representation from the previous board(s) or management team(s). If that is the case, no real change of control of the assets has occurred and no gain or loss may be recognized as a result of the transaction. The fact that the parties are unrelated before the transaction does not bar a related organizations finding as a result of the transaction. That is, it is appropriate to compare the governing board/management team composition before the transaction with the governing board/management team composition after the transaction, even though there was no contemporaneous co-existence of those boards/teams. (See HCFA Ruling HCFAR 80-4 and the PRM at ' 1011.4.) Moreover, whether the constituent corporations in a merger or consolidation are or are not related is irrelevant; rather, the focus of the inquiry should be whether significant ownership or control exists between a corporation that transfers assets and the corporation that receives them. The term "significant" as used in this PM has the same meaning as the terms "significant@ or "significantly@ in the regulations at 42 CFR 413.17 and the PRM at Chapter 10. Important considerations in this regard include that 1) the determination of common control is subjective (i.e., there is no objective measure or "rule of thumb" in establishing common control), 2) each situation stands on its own merits based on the facts and circumstances unique to that situation, 3) a finding of common control does not require 50 percent or more representation, and 4) there is no need to look "behind the numbers" to see if control is actually being exercised, rather the mere potential to control is sufficient.

**EXAMPLE 1**:    Corporation A and Corporation B, both non-profit providers, are combined by statutory merger with Corporation A surviving. Corporations A and B were unrelated prior to the transaction, each being controlled by its respective Board of Directors of ten members each. After the merger, Corporation A's new ten member Board of Directors includes five individuals that served on Corporation A's pre-merger board, and five individuals that served on Corporation B's pre-merger board. Thus, Corporation A's new Board of Directors includes a significant number of individuals from both of the former entities' boards. Because no significant change of control of the assets of former Corporation B has occurred, the transaction as between Corporation A and Corporation B is deemed to be between related parties and no gain or loss will be recognized as a result of the transaction.

**EXAMPLE 2**:    Corporation A and B consolidate to form Corporation C. Corporations A and B were unrelated prior to the transaction, each being controlled by its respective Board of Directors of eight members each. After the consolidation, Corporation C's Board of Directors consists of seven individuals, all of whom were members of Corporation A's board. Because no significant change of control of the assets of Corporation A occurred, the transaction as between A and C is deemed to be one of related parties and no gain or loss on will be recognized as a result of the

3

transaction.  However, because there has been a significant change of control of the assets of Corporation B, the transaction as between B and C is <u>not</u> one of related parties.  Therefore, with respect to the assets transferred from B to C, a gain or loss may be recognized (if the other criteria for recognizing gain or loss, including the requirement of a <u>bona</u> <u>fide</u> sale are met).

<u>Bona Fide Sale</u>:

Unlike for-profit mergers or consolidations, which are typically driven by the ownership equity interests to seek fair market value for the assets involved in the transaction, many non-profit mergers and consolidations have only the interests of the community-at-large to drive the transaction.  This community interest does not always involve engaging in a <u>bona</u> <u>fide</u> sale or seeking fair market value for the assets given.  Rather, the assets and liabilities are simply combined on the merged or consolidated entity's books.  The merged/consolidated entity may or may not record a gain or loss resulting from such a transaction for financial reporting purposes.  Notwithstanding the treatment of the transaction for financial accounting purposes, no gain or loss may be recognized for Medicare payment purposes unless the transfer of the assets resulted from a <u>bona</u> <u>fide</u> sale as required by regulation 413.134(f) and as defined in the PRM at ' 104.24.   The regulations at 42 CFR 413.134(l) do not permit recognition of a gain or loss resulting from the mere combining of multiple entities' assets and liabilities without regard to whether a <u>bona</u> <u>fide</u> sale occurred.

A <u>bona</u> <u>fide</u> sale typically occurs under the following general circumstances.  From the perspective of the seller, a preliminary decision is made to consider selling the business.  Word is spread that the property may be available for purchase. The seller's main objective is to maximize the consideration received and the seller would not be expected to be interested in who the buyer is except for the buyer's ability to pay.  If the seller receives an offer to its liking, it will agree to a sale.  From the buyer's perspective, the environment is the same except the buyer is seeking to minimize the price paid.  If a deal is reached, the marketplace negotiations between the seller and the buyer have defined the arms-length component of a <u>bona</u> <u>fide</u> sale.  In other words, for Medicare payment purposes, a recognizable gain or loss resulting from a sale of depreciable assets arises after an arm's-length business transaction between a willing and well-informed buyer and seller. An arm's-length transaction is a transaction negotiated by unrelated parties, each acting in its own self interest in which objective value is defined after selfish bargaining.  However, frequently this is not the environment that brings non-profit entities together through merger or consolidation.

As with for-profit entities, in evaluating whether a <u>bona</u> <u>fide</u> sale has occurred in the context of a merger or consolidation between or among non-profit entities, a comparison of the sales price with the fair market value of the assets acquired is a required aspect of such analysis.  As set forth in PRM ' 104.24, reasonable consideration is a required element of a <u>bona</u> <u>fide</u> sale.  Thus, a large disparity between the sales price (consideration) and the fair market value of the assets sold indicates the lack of a <u>bona</u> <u>fide</u> sale.  With regard to non-profit mergers or consolidations, often the sales price consists of assumed debt only, but may also include cash and/or new debt.  Non-monetary consideration, such as a seller's concession from a buyer that the buyer must continue to provide care for a period of time or to provide care to the indigent, may not be taken into account in evaluating the reasonableness of the overall consideration (even where such elements may be quantified in dollar terms).  These factors are more akin to goodwill than to consideration.

Appraisals may be relied on to establish the fair market value of depreciable assets.  (See PRM §' 134ff.)  However, caution must be taken in evaluating the appropriateness of the valuations established by appraisal for the purpose of this comparison.

The three most common valuation methodologies are the "cost approach," the "market approach," and the "income approach."  A single appraisal may use one or more of these methodologies to arrive at a valuation of the entity.  The cost approach is the only methodology that produces a discrete indication of the value for the individual assets of the business, and thus, is the approach that is used to allocate a lump sum sales price among the assets sold.  (See 42 CFR 413.134(f)(2)(iv).) The market approach produces an estimate of value by comparing the entity being valued to sales of similar businesses.  The income approach produces a valuation through analysis of the predicted future stream of income.  Both the market approach and the income approach produce a valuation of the business enterprise as a whole, without regard to the individual fair market values of the

constituent assets. As a result, both the market approach and the income approach could produce an entity valuation that is less than the market value of the current assets. Moreover, the income approach has minimal application in the non-profit sector because 1) earnings are often understated due to charity care, pricing limitations, and government regulations, and 2) the approach uses complex formulae that include some factors that are of questionable use in valuing non-profit entities (e.g., common stock risk premium). For the foregoing reasons, the cost approach is the most appropriate methodology to be used in establishing the fair market value of the assets sold for the purpose of comparison with the sales price in a <u>bona fide</u> sale analysis.

Moreover, in analyzing whether a <u>bona fide</u> sale has occurred, a review of the allocation of the sales price among the assets sold is appropriate. In some situations, the "sales price" of the assets may be barely in excess of, or less than, the market value of the current assets sold, leaving a minimal, or no, part of the sales price to be allocated to the fixed (including the depreciable) assets. In such a circumstance, effectively the current assets have been sold, and the fixed assets have been given over at minimal or no cost. If a minimal or no portion of the sales price is allocated to the fixed (including the depreciable) assets a <u>bona fide</u> sale of those assets has not occurred. In this regard, because consideration was exchanged for the business as a whole, this type of transaction should not be considered a donation of the fixed assets (see the PRM at §104.16). Rather, this should be viewed as a non-<u>bona fide</u> sale of the fixed assets.

**EXAMPLE 3**: Corporation A and B merge, with Corporation A being the surviving corporation. The assets transferred from Corporation B consisted of cash, cash equivalents, and other current assets totaling $23 million and fixed assets (plant, property, and equipment) valued at $24 million by an independent appraisal. Corporation B's liabilities that were assumed by Corporation A totaled $22 million. No other consideration was exchanged as part of the transaction. Because the sales price (assumed liabilities) is allocated first to the cash, cash equivalents, and other current assets, no part of the sales price was allocated to the fixed assets. Because no part of the purchase price was allocated to the fixed assets, a <u>bona fide</u> sale of those assets has not occurred and Medicare would not recognize a loss as a result of the transaction.

Absent evidence of a <u>bona fide</u> sale of the assets, a reasonable conclusion may be drawn that the gain or loss resulted from the mere combining of the assets and liabilities of the merged/consolidated entities. Because neither the regulations nor the program instructions provide for Medicare recognition of such gains or losses, the gains or losses must be denied.

**The effective date for this PM is not applicable. This PM does not include any new policies regarding mergers or consolidations involving non-profit entities. Intermediaries are to apply this clarification to all cost reports for which a final notice of program reimbursement has not been issued and to all settled cost reports that are subject to reopening in accordance with the Provider Reimbursement Manual, Part 1, (HCFA Pub. 15-1), Chapter 29.**

**The implementation date for this PM is October 19, 2000.**

**These instructions should be implemented within your current operating budget.**

**This PM may be discarded after July 30, 2001.**

**If you have any questions, contact Ann Pash at (410) 786-4516 or via email (apash@hcfa.gov).**

**EXHIBIT 2**

# Program Memorandum
# Intermediaries

**Department of Health & Human Services (DHHS)**

**Centers for Medicare & Medicaid Services (CMS)**

| Transmittal   A-01-96 | Date:  AUGUST 7, 2001 |

This Program Memorandum re-issues Program Memorandum A-00-76, Change Request 1290 dated October 19, 2000.  The only change is the discard date; all other material remains the same.

**CHANGE REQUEST 1290**

SUBJECT:     **Clarification of the Application of the Regulations at 42 CFR 413.134(l) to Mergers and Consolidations Involving Non-profit Providers**

## BACKGROUND

This Program Memorandum (PM) is being issued to clarify application of the regulations at 42 CFR 413.134(l) (originally, 42 CFR 405.415(l)) to mergers and consolidations involving non-profit providers.  The purpose of that regulation section, originally published February 5, 1979 (44 FR 6912), was to clarify existing Medicare program policy concerning certain effects of capital stock transactions involving for-profit providers.  In summary, that regulation section provides that the acquisition of the capital stock of a provider, in and of itself, is not a change of ownership for Medicare payment purposes, and therefore, would not give rise to a revaluation of the acquired assets, nor an adjustment to recognize a gain or loss on the disposal of assets.  The regulation further provides that mergers or consolidations between or among for-profit providers would give rise to a revaluation of the merged or consolidated assets only if the parties to the merger or consolidation are not related organizations as defined in the regulations at 42 CFR 413.17.

With regard to recognizing a gain or loss adjustment on the merged or consolidated assets, the regulation provides that such gain or loss may be recognized, but only as provided for in the regulations at 42 CFR 413.134(f).  That latter regulation section provides for the recognition of a gain or loss only where the asset disposal results from a bona fide sale or scrapping (occurring before December 1, 1997), a demolition or abandonment, or an involuntary conversion.  A bona fide sale is defined in the Provider Reimbursement Manual (PRM), Part 1, (HCFA Pub. 15-1) at §104.24.  Therefore, the merger or consolidation must involve one of those events in order to trigger the recognition of a gain or loss on the merged or consolidated assets.

NOTE:     Section 4404 of the Balanced Budget Act of 1997 effectively eliminated Medicare recognition of gains or losses resulting from the sale or scrapping of an asset that occurs on or after December 1, 1997.  Thus, adjustments to recognize gains and losses on sales or scrappings of assets that occur on or after that date will not be recognized for Medicare payment purposes.  Regulations implementing this change were published in the ***Federal Register*** on January 9, 1998 (63 FR 1379).

Because there is no similar regulation specifically addressing mergers and consolidations between or among non-profit entities, we are clarifying the applicability of the above cited regulation sections to such mergers or consolidations.

**CMS-Pub. 60A**

## APPLICATION

The above cited regulation sections are applicable to mergers and consolidations involving non-profit providers.  However, as with transactions involving for-profit entities, in order for Medicare to recognize a gain or loss on the disposal of assets, the merger or consolidation must occur between or among parties that are not related as described in the regulations at 42 CFR 413.17 and the transaction must involve one of the events described in 42 CFR 413.134(f) as triggering a gain or loss recognition by Medicare (typically, a <u>bona fide</u> sale, as defined in the PRM at §104.24, because a merger or consolidation could, but usually does not, involve a scrapping, demolition, abandonment, or involuntary conversion).

## SPECIAL CONSIDERATIONS APPLICABLE TO TRANSACTIONS INVOLVING NON-PROFIT ORGANIZATIONS

Non-profit organizations differ in significant ways from for-profit organizations.  Non-profit organizations typically do not have equity interests (i.e., shareholders, partners), exist for reasons other than to provide goods and services for a profit, and may obtain significant resources from donors who do not expect to receive monetary repayment of, or a return on, the resources they provide.  These differences, among others, cause non-profit organizations to associate or affiliate through mergers or consolidations for reasons that may differ from the traditional for-profit merger or consolidation.  Because the regulations at 42 CFR 413.134(l) were written to address only for-profit mergers and consolidations, certain special considerations must be regarded in applying that regulation section to non-profit mergers and consolidations.

Related Organizations:

Unlike for-profit mergers or consolidations, which often involve a dispatching of the former governing body and/or management team, many non-profit mergers and consolidations involve the continuation, in whole or in part, of the former governing board and/or management team.  In applying the related organizations principle at 42 CFR 413.17, consideration must be given to whether the composition of the new board of directors, or other governing body or management team, includes significant representation from the previous board(s) or management team(s).  If that is the case, no real change of control of the assets has occurred and no gain or loss may be recognized as a result of the transaction.  The fact that the parties are unrelated before the transaction does not bar a related organizations finding as a result of the transaction.  That is, it is appropriate to compare the governing board/management team composition before the transaction with the governing board/management team composition after the transaction, even though there was no contemporaneous co-existence of those boards/teams.  (See HCFA Ruling HCFAR 80-4 and the PRM at §1011.4.)  Moreover, whether the constituent corporations in a merger or consolidation are or are not related is irrelevant; rather, the focus of the inquiry should be whether significant ownership or control exists between a corporation that transfers assets and the corporation that receives them.  The term "significant" as used in this PM has the same meaning as the terms "significant" or "significantly" in the regulations at 42 CFR 413.17 and the PRM at Chapter 10.  Important considerations in this regard include that 1) the determination of common control is subjective (i.e., there is no objective measure or "rule of thumb" in establishing common control), 2) each situation stands on its own merits based on the facts and circumstances unique to that situation, 3) a finding of common control does not require 50 percent or more representation, and 4) there is no need to look "behind the numbers" to see if control is actually being exercised, rather the mere potential to control is sufficient.

**EXAMPLE 1**:    Corporation A and Corporation B, both non-profit providers, are combined by statutory merger with Corporation A surviving.  Corporations A and B were unrelated prior to the transaction, each being controlled by its respective Board of Directors of ten members each.  After the merger, Corporation A's new ten member Board of Directors includes five individuals that served on Corporation A's pre-merger board, and five individuals that served on Corporation B's pre-merger board.  Thus, Corporation A's new Board of Directors includes a significant number of individuals from both of the former entities' boards.  Because no significant change of control of the assets of former Corporation B has occurred, the transaction as between Corporation A and Corporation B is deemed to be between related parties and no gain or loss will be recognized as a result of the transaction.

**EXAMPLE 2**:      Corporation A and B consolidate to form Corporation C.  Corporations A and B were unrelated prior to the transaction, each being controlled by its respective Board of Directors of eight members each.  After the consolidation, Corporation C's Board of Directors consists of seven individuals, all of whom were members of Corporation A's board.  Because no significant change of control of the assets of Corporation A occurred, the transaction as between A and C is deemed to be one of related parties and no gain or loss on will be recognized as a result of the transaction.  However, because there has been a significant change of control of the assets of Corporation B, the transaction as between B and C is <u>not</u> one of related parties.  Therefore, with respect to the assets transferred from B to C, a gain or loss may be recognized (if the other criteria for recognizing gain or loss, including the requirement of a <u>bona fide</u> sale are met).

<u>Bona Fide Sale</u>:

Unlike for-profit mergers or consolidations, which are typically driven by the ownership equity interests to seek fair market value for the assets involved in the transaction, many non-profit mergers and consolidations have only the interests of the community-at-large to drive the transaction.  This community interest does not always involve engaging in a <u>bona fide</u> sale or seeking fair market value for the assets given.  Rather, the assets and liabilities are simply combined on the merged or consolidated entity's books.  The merged/consolidated entity may or may not record a gain or loss resulting from such a transaction for financial reporting purposes.  Notwithstanding the treatment of the transaction for financial accounting purposes, no gain or loss may be recognized for Medicare payment purposes unless the transfer of the assets resulted from a <u>bona fide</u> sale as required by regulation 413.134(f) and as defined in the PRM at §104.24.  The regulations at 42 CFR 413.134(l) do not permit recognition of a gain or loss resulting from the mere combining of multiple entities' assets and liabilities without regard to whether a <u>bona fide</u> sale occurred.

A <u>bona fide</u> sale typically occurs under the following general circumstances.  From the perspective of the seller, a preliminary decision is made to consider selling the business.  Word is spread that the property may be available for purchase. The seller's main objective is to maximize the consideration received and the seller would not be expected to be interested in who the buyer is except for the buyer's ability to pay.  If the seller receives an offer to its liking, it will agree to a sale.  From the buyer's perspective, the environment is the same except the buyer is seeking to minimize the price paid.  If a deal is reached, the marketplace negotiations between the seller and the buyer have defined the arms-length component of a <u>bona fide</u> sale.  In other words, for Medicare payment purposes, a recognizable gain or loss resulting from a sale of depreciable assets arises after an arm's-length business transaction between a willing and well-informed buyer and seller.  An arm's-length transaction is a transaction negotiated by unrelated parties, each acting in its own self interest in which objective value is defined after selfish bargaining.  However, frequently this is not the environment that brings non-profit entities together through merger or consolidation.

As with for-profit entities, in evaluating whether a <u>bona fide</u> sale has occurred in the context of a merger or consolidation between or among non-profit entities, a comparison of the sales price with the fair market value of the assets acquired is a required aspect of such analysis.  As set forth in PRM §104.24, reasonable consideration is a required element of a <u>bona fide</u> sale.  Thus, a large disparity between the sales price (consideration) and the fair market value of the assets sold indicates the lack of a <u>bona fide</u> sale.  With regard to non-profit mergers or consolidations, often the sales price consists of assumed debt only, but may also include cash and/or new debt.  Non-monetary consideration, such as a seller's concession from a buyer that the buyer must continue to provide care for a period of time or to provide care to the indigent, may not be taken into account in evaluating the reasonableness of the overall consideration (even where such elements may be quantified in dollar terms).  These factors are more akin to goodwill than to consideration.

Appraisals may be relied on to establish the fair market value of depreciable assets.  (See PRM §§134ff.)  However, caution must be taken in evaluating the appropriateness of the valuations established by appraisal for the purpose of this comparison.

The three most common valuation methodologies are the "cost approach," the "market approach," and the "income approach."  A single appraisal may use one or more of these methodologies to arrive at a valuation of the entity.  The cost approach is the only methodology that produces a

discrete indication of the value for the individual assets of the business, and thus, is the approach that is used to allocate a lump sum sales price among the assets sold.  (See 42 CFR 413.134(f)(2)(iv).)  The market approach produces an estimate of value by comparing the entity being valued to sales of similar businesses.  The income approach produces a valuation through analysis of the predicted future stream of income.  Both the market approach and the income approach produce a valuation of the business enterprise as a whole, without regard to the individual fair market values of the constituent assets.  As a result, both the market approach and the income approach could produce an entity valuation that is less than the market value of the current assets.  Moreover, the income approach has minimal application in the non-profit sector because 1) earnings are often understated due to charity care, pricing limitations, and government regulations, and 2) the approach uses complex formulae that include some factors that are of questionable use in valuing non-profit entities (e.g., common stock risk premium).  For the foregoing reasons, the cost approach is the most appropriate methodology to be used in establishing the fair market value of the assets sold for the purpose of comparison with the sales price in a <u>bona</u> <u>fide</u> sale analysis.

Moreover, in analyzing whether a <u>bona</u> <u>fide</u> sale has occurred, a review of the allocation of the sales price among the assets sold is appropriate.  In some situations, the "sales price" of the assets may be barely in excess of, or less than, the market value of the current assets sold, leaving a minimal, or no, part of the sales price to be allocated to the fixed (including the depreciable) assets.  In such a circumstance, effectively the current assets have been sold, and the fixed assets have been given over at minimal or no cost.  If a minimal or no portion of the sales price is allocated to the fixed (including the depreciable) assets a <u>bona</u> <u>fide</u> sale of those assets has not occurred.  In this regard, because consideration was exchanged for the business as a whole, this type of transaction should not be considered a donation of the fixed assets (see the PRM at §104.16).  Rather, this should be viewed as a non-<u>bona</u> <u>fide</u> sale of the fixed assets.

**EXAMPLE 3**:      Corporation A and B merge, with Corporation A being the surviving corporation.  The assets transferred from Corporation B consisted of cash, cash equivalents, and other current assets totaling $23 million and fixed assets (plant, property, and equipment) valued at $24 million by an independent appraisal.  Corporation B's liabilities that were assumed by Corporation A totaled $22 million.  No other consideration was exchanged as part of the transaction.  Because the sales price (assumed liabilities) is allocated first to the cash, cash equivalents, and other current assets, no part of the sales price was allocated to the fixed assets.  Because no part of the purchase price was allocated to the fixed assets, a <u>bona</u> <u>fide</u> sale of those assets has not occurred and Medicare would not recognize a loss as a result of the transaction.

Absent evidence of a <u>bona</u> <u>fide</u> sale of the assets, a reasonable conclusion may be drawn that the gain or loss resulted from the mere combining of the assets and liabilities of the merged/consolidated entities.  Because neither the regulations nor the program instructions provide for Medicare recognition of such gains or losses, the gains or losses must be denied.

**The effective date for this PM is not applicable.  This PM does not include any new policies regarding mergers or consolidations involving non-profit entities.  Intermediaries are to apply this clarification to all cost reports for which a final notice of program reimbursement has not been issued and to all settled cost reports that are subject to reopening in accordance with the PRM, Part 1, (HCFA Pub. 15-1), Chapter 29.**

**The implementation date for this PM is October 19, 2000.**

**These instructions should be implemented within your current operating budget.**

**<span style="color:red">This PM may be discarded after July 30, 2002.</span>**

**If you have any questions, contact Ann Pash at (410) 786-4516 or via email (apash@hcfa.gov).**

**EXHIBIT 3**

1 of 1 DOCUMENT

Copyright 2008 CCH Incorporated, All Rights Reserved
CCH Medicare & Medicaid Guide Medicare Administrative Decisions

CMS Administrative Decisions
CMS Decision

*Medicare & Medicaid Guide (CCH) P 80,975*

Jan. 29, 2003

P 80,975 Cardinal Cushing Hospital v. CMS.

**CMS Administrator Decision**, Jan. 29, 2003

**Medicare: Recognition of Losses**

Provider reimbursement -- Capital-related costs -- Loss on the transfer of assets. --

The Provider Reimbursement Review Board (PRRB) incorrectly determined that two hospitals could recognize as allowable costs the losses claimed upon the transfer of assets when they consolidated to form a new corporation. Under 42 CFR § 413.134(l), if consolidation is between two or more related corporations, revaluation of provider assets is not permitted. The PRRB's application of the regulation to the relationship of the parties *prior* to the consolidation, and not to the relationship after the consolidation, was rejected. The hospitals' consolidation constituted a reorganization between related parties because the hospitals' owners were the sole two members of the newly formed corporation and maintained control through the members, the Board of Trustees, and the officials of the newly formed corporation. Because significant ownership and continuity of control existed between the old corporations and the newly formed corporation, the loss claimed by the old corporations upon the transfer of assets to the new corporation could not be recognized.

See P 4602.

**The decision of the Provider Reimbursement Review Board (see P 80,950) was reversed.**

TEXT:

**[Text of Ruling]**

**CENTERS FOR MEDICARE AND MEDICAID SERVICES**

*Decision of the Administrator*

Copyright 2008 CCH Incorporated,All Rights Reserved

**In the case of:**

**Cardinal Cushing Hospital Goddard Memorial Hospital Provider vs. Blue Cross /Blue Shield Association Associated Hospital Services of Maine Intermediary**

**Claim for:**

**Provider Cost Reimbursement**

**Determination for Cost Reporting**

**Period Ending: 09/30/94**

**Review of:**

**PRRB Dec. No. 2003-D6**

**Dated: November 27, 2002**

This case is before the Administrator, Centers for Medicare & Medicaid Services (CMS), for review of the decision of the Provider Reimbursement Review Board (Board). The review is during the 60-day period in Section 1878(f)(1) of the Social Security Act (Act), as amended *(42 USC 1395oo*(f)). The Intermediary submitted comments, requesting reversal of the Board's decision. Accordingly, the parties were notified of the Administrator's intention to review the Board's decision. Comments were also received from the Center for Medicare Management (CMM) requesting reversal of the Board's decision. The Providers submitted comments, requesting that the Administrator affirm the Board's decision. All comments were timely received. Accordingly, this case is now before the Administrator for final agency review.

*BACKGROUND*

Copyright 2008 CCH Incorporated,All Rights Reserved

By an amended and restated agreement dated September 7, 1993, Cardinal Cushing Hospital (Cushing) and Goddard Memorial Hospital (Goddard) entered into a Consolidation Agreement. n1  Pursuant to the Consolidation Agreement, a new corporation, Good Samaritan Medical Center was formed. n2  The members of the nonprofit nonstock new corporation were Caritas Christi and Goddard Health Planning Corporation. The new Board of Trustees for Good Samaritan consisted of 24 members, 12 appointed by Cushing and 12 appointed by Goddard the constituent corporations. The new trustees who were specified in the consolidation agreement consisted of 21 members who had been member of the Goddard or Cushing Board's prior to the transaction and three community representatives who had not been members of either Board. The Chairman and Vice Chairman were to be appointed by the constituent corporations prior to the effective date, while the President was to be appointed by the "initial Board of Trustees, subject to approval by the members", and the Treasurer was to be appointed by the "initial Board of Trustees". A certificate of consolidation was filed with the State on October 1, 1993, with the effective date of the consolidation stated as 12:01 October 1, 1993 n3

Good Samaritan acquired the assets of Cushing in exchange for the assumption of Cushing's debts and liabilities and simultaneously acquired the assets of Goddard in exchange for the assumption of Goddard's debts and liabilities. The total of the debts and liabilities assumed by Good Samaritan was $83,075,459. Prior to the consolidation, the book value of Cushing's total property, plant and equipment, net of depreciation, was $15,990,554. After the consolidation, Cushing allocated a portion of the liabilities assumed for those assets, resulting in a claimed revaluation of $12,105,812. Thus, Cushing claims it incurred a loss of $3,884,742 on the disposition of its assets to Good Samaritan. Prior to the consolidation, the book value of Goddard's total property, play and equipment, net of depreciation was $23,081,891. After the consolidation, Goddard allocated a portion of the liabilities assumed for these assets, resulting in a claimed revaluation of $15,566,664. Thus, Goddard claimed it incurred a loss of $7,515,227 on the disposition of its assets to Good Samaritan.

In filing their fiscal year 1994 cost reports, the Providers requested that they be allowed to recognize as allowable costs the losses they claimed they each incurred on the disposal of their assets to Good Samaritan in connection with the consolidation. Specifically, Goddard claimed a reimbursement of $2,725,225 for the previously unrecognized depreciation of its assets, and Cushing claimed a reimbursement of $ 880,614 for the previously unrecognized depreciation of its assets. By letter dated April 30, 1996, the Intermediary denied the claims, asserting "the consolidation was between related parties ... since the members of the Boards of Directors for both Cushing and Goddard before the consolidation were essentially the same as the members of the Board of Trustees for the Good Samaritan after the consolidation."

The Intermediary issued NPRs to both Cushing's and Goddard's on April 29, 1996. However, neither NPR contained an adjustment with respect to the losses at either facility, since neither facility had claimed a loss on its cost reports. n4

## ISSUE AND BOARD'S DECISION

The issue is whether there was recognizable loss upon the transfer of assets to Good Samaritan Medical Center from Goddard Memorial Hospital and Cardinal Cushing Hospital that occurred in connection with the consolidation of

Copyright 2008 CCH Incorporated,All Rights Reserved

the two hospitals and the resulting creation of Good Samaritan Medical Center.

The Board found that the Providers were unrelated under the Medicare regulation at 42 CFR.413.134(1)(3), and that revaluation of assets and recognition of gain or loss incurred as a result of the consolidation is required. The Board looked to the related party regulation, 42 CFR 413.17, to determine whether the consolidation was between unrelated parties. The Board concluded that based upon the plain language of the consolidation regulation, the related party concept only applies to the entities that are consolidating. Further, the Secretary's intent in drafting the regulation was to only look at the relationship prior to the transaction, and not the relationship after the transaction. The Board, therefore, concluded that the plain language of the regulation bars application of the related party principle to the consolidating parties relationship to the new entity.

The Board rejected the Intermediary's argument that the phrase "between related parties" requires that the consolidation transaction be examined for relationships after the transaction as well, and that the relationship between the old and new entities disqualifies the transaction from revaluation of assets. For the same reasons, the Board also found that the Intermediary's arguments that the transaction fails the traditional tests of "bona fide" and "arms length" dealings as applied to Cushing's and Goddard's relationships to Good Samaritan also fails, because Good Samaritan is, by definition, "nothing more than a combination of the old Cushing and Goddard." Therefore, the Board concluded that this concept bars the type of bargaining between the pre/post transaction entities the Intermediary contends is necessary.

The Board also agreed with the Providers claim that they qualify for Medicare reimbursement of the loss commensurate with the revaluation. The Board looked to the consolidation regulation, 42 CFR 413.134, in the context of the entire regulation on depreciation.

The Board held that evidence of a changing healthcare environment and lack of a market for provider facilities is persuasive that Providers incurred a genuine financial loss. The Board also found that evidence supports the Providers' position that the process of finding a suitable consolidation partner requires arms' length evaluation and bargaining similar to that in traditional sale; although the Board believes it may be more imprecise in producing fair market value. The Board relies on the Medicare Manual to support that view. The Board further determined that the assumption of liabilities through a consolidation transaction is persuasive evidence of acquisition costs. Liabilities assumed in a consolidation also may, but do not necessarily, equate to fair market value.

With regard to the calculation of the loss, the Board concluded that the acquisition cost, that is, the amount of assumed liabilities, should be prorated among all of the Providers' assets. The Board remanded this matter to the Intermediary for consideration of the calculation. The Board determined that the Intermediary's determination to deny the Providers' loss on consolidation was improper.

One member of the Board dissented. The dissent stated that the Board did not have jurisdiction to hear this case, because there was only *some* confusion on the part of the Provider as to whether they were harmed or dissatisfied; there was no claim of loss on the Provider's cost report, thus no adjustment by the Intermediary on final determination; there

Copyright 2008 CCH Incorporated,All Rights Reserved

was no documentation of the required $10,000 threshold, and there was an inability of the Board majority to identify a basis upon which to grant relief. The Dissent relied on Section 1878 of the Act establishing the Provider Reimbursement Review Board, to support this view. The Dissent also stated that the "appeal" was not timely. The Dissent emphasized the fact that there was no loss claimed on any cost report.

Finally the Dissent stated that there has to be evidence of a bona fide sales-characteristic loss-on-consolidation; a claim to Medicare for that loss on a cost report a denial of that claim; and a timely appeal. None of those events appeared in the instant case. The Dissent was also not convinced that the consolidating parties were "unrelated," and agrees with the Intermediary that this was simply a "reorganization under a new name."

### SUMMARY OF COMMENTS

The Intermediary commented that the Board's decision on the merits were "seriously flawed" and recommended its reversal. The Intermediary argued that the Board incorrectly assumed jurisdiction and extended its authority to a degree not provided for by statute, regulation or HCFA ruling § 405.1875(c)(3). The Intermediary also commented that the Board's holding presents several problems. First, the Providers make no claim for any losses on any cost reports, and the Board's "1994" rule" seems to be formulated solely from the fact that the Providers acknowledge they missed the chance in 1993. The Intermediary argued that the Board erroneously established the "1994 rule." The Intermediary further commented that the Board erred when it assumed jurisdiction over a "claim" addressed in a letter, but not a cost report, and finds that the letter is sufficient evidence that the Providers were dissatisfied with an Intermediary determinations. The Intermediary agreed with the Dissent that a provider's appeal must be made with respect to a cost report, the determination being appealed from must be from a cost report, and the $10,000 in controversy must relate to a determination on the cost report. The Intermediary argued that the Board's determination introduces an element of uncertainty, which the cost reports form and instructions are designed to avoid. The Intermediary also emphasized that no party made any claim on any cost report for any fiscal year for losses on depreciable assets because of the consolidation that established the Good Samaritan Medical Center, and uses *Bethesda Hosp. Ass'n v. Bowen, 485 U.S. 399 (1988),* a Supreme Court case to support it's views.

Finally, the Intermediary disagreed with the Board's interpretation that alleged confusion or mistakes in oral or other forms of communication on which a Providers claim to exist and not unexpectedly claims to rely relieved the Providers from the clear dictates of the governing regulations, and program policy and instructions. The Intermediary comments that the Board erroneously read and construed the factual record.

CMM commented that the case was incorrectly decided and that the Board's decision should be reversed. CMM argued that the Board incorrectly held that the Providers were entitled to claim capital reimbursement as a result of "losses" through "sales" of their facilities upon consolidation. CMM disagreed with the Board's interpretation of 42 CFR § 413.134(1)(3), and argued that the better reading that "between two or more corporations that are unrelated" in (1)(3)(i) should include the relationship between the constituent corporations and the consolidated entity. CMM also commented that the Board erred in finding that the Program Memorandum, A-00-76 (Oct. 19, 2000), entitled "Clarification of the application of the Regulations at 42 CFR § 413.134(1) to Mergers and Consolidations Involving Non-profit Providers," is not applicable to this case because it was contrary to the plain language of § 413.134(1)(3)(i).

Copyright 2008 CCH Incorporated,All Rights Reserved

CMM further argued that even if the Board is correct, the Program Memorandum nevertheless should be given force and effect. CMM commented that the Administrator should find that each Provider has failed to carry its burden that the transaction was not a related party transaction, and each provider's claimed loss should be denied on this basis.

Finally, CMM commented that the Administrator should also reverse the Board's decision that there was a bona fide sale. CMM stated that selling one's assets at fair market value is a necessary component of a bona fide sale. CMM believed the Board also failed to provide any reasoned analysis of how the Providers demonstrated that they obtained fair market value for their assets. Therefore, CMM requested that the Administrator reverse the Board's decision on the basis that the Providers failed to demonstrate that they engaged in bona fide sales of their depreciable assets to the consolidated entity.

The Providers commented requesting that the Administrator affirm the Board's decision. The Providers stated that the review of the jurisdictional decision is not timely, and that this review should be halted on the grounds that it was not begun and completed within the period provided for by law. The Providers further argued that under the governing statute, the Board's decision on its jurisdiction has already become final and binding and is no longer subject to review by the Administrator.

The Providers also stated that the hospital's claims were properly before the Board, and that the Intermediary's argument ignores the special circumstances of this case. The Providers argued that the Intermediary told Goddard and Cushing that because the two campuses of Good Samaritan were using separate provider numbers, they would be required to file separate cost reports for fiscal 1994.

With respect to the argument that there were no claims of loss reported, the Providers argued that the claim of loss was raised in a cover letter rather than in the body of the cost report, and that is not fatal to the hospitals claims. To support its position, the Providers cited to *Com Hosp. Of Roanoke v. Health & Human Serv., 707 F.2d 1257,* and therefore requested that the Board's decision that it had jurisdiction to hear the Hospitals' appeals be affirmed.

Further, the Providers argue that the Board correctly found that the Providers were unrelated and that recognition of the loss as a result of the consolidation was required under applicable regulations. The Providers argued that they did show that they were not related parties as that term is used in 42 C.F.R. § 413.134. The Provider disagreed with CMM's interpretation of 42 C.F.R. § 413.134(1)(3)(i).

The Provider also contends that Cushing and Goddard did not need to prove that there was a bona fide "sale." They only needed to demonstrate that there was a bona fide consolidation that was negotiated at arm's length by two corporations that were not related to one another at the time of the transaction. The Providers stated that the consolidation of Cushing and Goddard was an arm's length transaction that resulted in a complete transfer of all of their assets to Good Samaritan for valuable consideration. The Providers used *Black's Law Dictionary* (6/th/ edition), *Ashland Regional Medical Center v. Blue Cross and Blue Shield Assoc.*, and *Lac Qui Parle Hospital of Madison, Inc. v. Blue Cross an Blue Shield Assoc,* to support that the assumption of liabilities is valid consideration for assets purchased

Copyright 2008 CCH Incorporated,All Rights Reserved

and is equivalent to the "purchase price" of the transaction. Further, the Providers used 42 C.F.R. § 413.134(b)(2) to support the conclusion that an appraisal is not required to determine fair market value in an arm's length transaction between unrelated parties, and states that the fact that the new entity's Board of trustees was appointed equally by Goddard and Cushing demonstrated that the parties were negotiating at arm's length.

Finally, the Providers further argued that under the applicable regulations, a gain or loss is computed when there is a consolidation between unrelated parties. The Provider contended that, while 42 C.F.R. § 413.134(1(3)(i) contains no reference to bona fide sale, it does, however, mandate that revaluation should occur when unrelated parties consolidate. The Provider further stated that a consolidation is not a sale, and disagrees with CMM when it tries "to link and blend the concept" of "sale" with that of "consolidation."

*DISCUSSION*

The entire record, which was furnished by the Board, has been examined, including all correspondence, position papers, and exhibits. The Administrator has reviewed the Board's decision. All comments received timely are included in the record and have been considered.

Until 1983, Medicare paid for covered hospital inpatient services on the basis of "reasonable cost." Section 1861(v)(1)(A) of the Act defines "reasonable cost" as "the cost actually incurred," less any costs "unnecessary in the efficient delivery of needed health services." While § 1861(v)(1)(A) does not prescribe specific procedures for calculating reasonable costs, it authorizes the Secretary to promulgate regulations setting forth the methods to determine reasonable cost and the items to be included in reimbursable services.

Pursuant to such authority, the Secretary promulgated regulations on capital costs, including depreciation and the gain or loss on the disposal of depreciable assets rendered to patients under the Medicare program. With respect to the determination of reasonable costs, the regulation at 42 C.F.R. § 413.130 explains, *inter alia*, that:

(a) *General rule*. Capital related costs ... are limited to:

(1) Net depreciation expense as determined under § § 413.134, 413.144, and 413.149, adjusted by gains and losses realized from the disposal of depreciable assets under 413.134(f).

The regulations at 42 C.F.R. § 413.134(f) explains the conditions under which depreciable assets may be disposed of in order to be considered reasonable and necessary costs, and thus allowable under the Medicare program. This section of the regulation states:

(1) *General*. Depreciable assets may be disposed of through sale, scrapping, trade-in, exchange, demolition, abandonment, condemnation, fire, theft, or other casualty. If disposal of a depreciable asset results in a gain or loss, an adjustment is necessary in the provider's allowable cost. The amount of a gain included in the determination of allowable cost is limited to the amount of depreciation previously included in Medicare allowable costs. The amount of a loss to be included is limited to the undepreciated basis of the asset permitted under the program. The treatment of the

Copyright 2008 CCH Incorporated,All Rights Reserved

gain or loss depends upon the manner of disposition of the asset, as specified in paragraphs (f)(2) through (6) of this section ...

The regulations at 42 C.F.R. § 413.134(f)(2) address gain and losses realized from the *bona fide* sale of depreciable assets and states:

(2) *Bona fide sale or scrapping.* (i) Except as specified in paragraph (f)(3) of this section, gains and losses realized from the *bona fide* sale or scrapping of depreciable assets are included in the determination of allowable cost only if the sale or scrapping occurs while the provider is participating in Medicare ... (Emphasis added). n5

With respect to assets sold for lump sum the regulations at 42 C.F.R. § 413.134(f)(2)(iv) specifies:

If a provider sells more than one asset for a lump sum sales price, the gain or loss on the sale of each depreciable asset must be determined by allocating the lump sum sales price among all the assets sold, in accordance with the fair market value of each asset as it was used by the provider at the time of sale...

The regulations at 42 C.F.R. § 413.134(f)(4) address gains and losses realized from the exchange, trade-in or donation of depreciable assets and states that: "[g] ains or losses realized from the exchange, trade-in, or donation of depreciable assets are not included in the determination of allowable cost."

Relevant to this case, the regulations at 42 C.F.R § 413.134(1) n6 addresses depreciable assets exchanged for capital stock, statutory mergers and consolidation. In addressing the determination of a gain or loss for proprietary corporations that consolidate, the regulation states that:

(1) *Transactions involving provider's capital stock --*

****

(3) *Consolidation.* A consolidation is the combination of two or more corporations resulting in the creation of a new corporate entity. If at least one of the original corporations is a provider, the effect of a consolidation upon Medicare reimbursement for the provider is as follows:

(i) *Consolidation between unrelated parties.* If the consolidation is between two or more corporations that are unrelated (as specified in § 413.17), the assets of the provider corporation(s) may be revalued in accordance with paragraph (g) of this section.

(ii) *Consolidation between related parties.* If the consolidation is between two or more related corporations (*as specified in § 413.17*), no revaluation of provider assets is permitted. (Emphasis added.) n7

With respect to whether parties will be considered related, the regulations at 42 C.F.R. § 413.17, states, in pertinent part:

(b) *Definitions. (1) Related to the provider.* Related to the provider means that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies.

(2)*Common ownership.* Common ownership exists if an individual or individuals possess significant ownership or equity in the provider and the institution or organization serving the provider.

(3) *Control.* Control exists if an individual or an organization has the power, directly or indirectly, significantly to

Copyright 2008 CCH Incorporated, All Rights Reserved

influence or direct the actions or policies of an organization or institution.

Consistent with the Act and the regulations, the above principles are set forth in the Provider Reimbursement Manual (PRM), which provides guidelines and policies to implement Medicare regulations for determining the reasonable cost of provider services. In determining whether the parties to a transaction are related, the PRM at § 1004 *et. seq.*, establishes that the tests of common ownership and control are to be applied separately, based on the facts and circumstances in each case. With respect to common ownership, the PRM at Section 1004.1 states:

This rule applies whether the provider organization or supplying organization is a sole proprietorship, partnership, corporation, trust or estate, or any other form of business organization, proprietary or nonprofit. In the case of nonprofit organization, ownership or equity interest will be determined by reference to the interest in the assets of the organization (e.g., a reversionary interest provided for in the articles of incorporation of a nonprofit corporation.) n8

With respect to control, the PRM at Section 1004.3 states: "[t]he term 'control' includes any kind of control, whether or not it is legally enforceable and however it is exercisable or exercised." n9

To clarify the application of 42 CFR.413.134(1), CMS issued Program Memorandum (PM), A-00-76, dated October 19, 2000, entitled "Clarification of the Application of the Regulations at 42 CFR 413.134(1) to Mergers and Consolidations Involving Non-profit Providers. Program Memorandum, A-00-76-2000. This PM recognized that, inter alia, certain relationships formed as a result of the consolidation of two entities constituted a related party transaction for which a loss on the disposal of assets could not be recognized.

The Intermediary Manual, Chapter 4000, et seq., addresses changes of ownership (CHOW) for purposes of Medicare certification and reimbursement. These sections provide guidelines based on Medicare law, regulations and implementing instructions for use by the Medicare intermediaries and providers on the reimbursement implications of various types of changes of provider organizations transactions or CHOWs. Section 4502 explains that the first review of a CHOW transaction is to determine the type of transaction which occurred as the Medicare program has developed specific policies on the reimbursement effect of various types of CHOW transactions which may be different from treatment under generally accepted accounting principles.

Corporations are included as one of the possible types of provider organizations. Section 4502.1 explains that a corporation is a legal entity which enjoys the rights, privileges and responsibilities of an individual under the law An interest in a corporation is represented by shares of stock in proprietary situations (stockholders) or membership certificates in nonstick entities (members).

Among the various types of provider structures and transactions recognized by Medicare are mergers, consolidations, and corporate reorganizations at section 4502. Section 4502. 7 describes a consolidation as similar to a statutory merger, except that a new corporation is created. Medicare program policy permits a revaluation of assets affected by a corporate consolidation between unrelated parties. Notably, Medicare policy at section 4502.10 does not permit a revaluation of assets affected by a "reorganization" of a corporate structure. All such transactions are considered among or between related parties.

Copyright 2008 CCH Incorporated,All Rights Reserved

This policy of not recognizing a gain or loss when the transaction consitutes a reorganization is also consistent with Internal Revenue Service (IRS) rules on the non-recognition of a gain or loss when a statutory reorganization has been determined to have occurred. Relevant to this case, while the Medicare rules may diverge from IRS rules and Medicare policy is not bound by IRS policy, IRS policy often reflects rationale underlying the establishment of similar policies under Medicare. n10

Under IRS rules, some consolidations are considered statutory reorganizations and subject to the non-recognition of a gain or loss. The terms reorganization and consolidation are not mutually exclusive terms under IRS rules. Medicare policy similarly indicates that they are not mutually exclusive terms under Medicare rules. That is, consolidations may in fact constitute reorganizations. n11

Similar to Medicare rules, the IRS does not allow the recognition of the gain or loss when there is a reorganization, *inter alia*, because no gain or loss has in fact been realized. As the courts have noted: "The principle under which statutory reorganizations are not considered taxable events is that no substantial change has been affected either in the nature or the substance of the taxpayer's capital position, and *no capital gain or loss has actually been realized*. Such a reorganization contemplates a continuity of business enterprise and a continuity of interest and control accomplished by an exchange of stock for stock." n12  (Emphasis added.)

Similarly, the courts have stated that the underlying purpose of the provisions that find no gain or loss when there is a reorganization was twofold: "1) to relieve certain types of corporate reorganizations from taxation which seemed oppressively premature and 2) to prevent taxpayer's from taking losses on account of wash sales and other fictitious exchanges." n13  Finally, as the Supreme Court found in *Groman v. Commissioners, 302 U.S 82, 87 (1937)* certain transactions speak for themselves regardless of how they might be cast. As the Supreme Court observed: "If corporate A and B transfer assets to C, a new corporation, in exchange for all of C's stock, the stock received is not a basis for calculation of a gain on the exchange ... A and B are so evidently parties to the reorganization that we do not need [the IRS code] to inform us of the fact." Consequently, one purpose of the IRS policy is to prevent the claiming of a gain or loss when no such event has in fact occurred. Similarly, the related party rules under Medicare, in holding that there is no recognition of a gain or loss when there is a reorganization is to avoid the payment of costs not actually incurred by the parties.

In this particular case, the record shows that the assets of old corporations, Cushing and Goddard, were transferred to a newly created corporation for the value of their liabilities. As the corporations were nonstock issuing, there was no transfer of stock, rather members of certificate were issued. The new members of the newly created corporation were the owners of the former two constituent corporations, Caritas Christi and Goddard Health Planning Corporation. The Board of Trustees for the new corporation was appointed by the constituent corporations and comprised 87.5 percent of the new Board of Trustees. Of the 24 members of the Board of Trustees newly established corporation, 12 were appointed by Cushing and 12 by Goddard. n14  The high level officers of the new corporation (Chairman and Vice Chairman) were appointed by the constituent corporations, while the President and Vice President were in turn appointed by the Board of Trustees. The new Board of Trustees authority was subject to the power and reserved power of the new "members." In total, the composition of the old corporations and new corporation members, Board of Trustees and Officials show a continuity of control between the old corporations and the new corporation. Finally, the new corporation, similar to old corporations, was formed to continue the business of providing health care .to the community. Thus, after a review of the record, the Administrator finds that the consolidation constituted a

Copyright 2008 CCH Incorporated,All Rights Reserved

reorganization of the Providers and, thus, as the parties were related, no loss on sale may be recognized by the Medicare program.

The Administrator finds that the rationale for finding that this transaction constitutes a related party transaction under Medicare policy is compelling. An overarching principle of Medicare reimbursement, which serves as the basis for the prophylactic related party rule, is that only costs actually incurred are reimbursable under Medicare. In this case, *inter alia*, the constituent corporations' owners were the sole two members of the newly formed corporation and had continuity of control through the members, the Board of Trustees and the officials of the newly formed corporation, along with a transfer of all the assets of the old corporation to the new corporation. Thus, it is reasonable to find that the old corporations same interests have been but recast in a different form only and, thus, a loss has not actually been incurred by the old corporations that can be recognized by Medicare. n15

Moreover, the Administrator finds that it is a permissible and rational reading of 42 CFR 413.134(1)(3)(i) that "between two or more corporations that are unrelated" should include the relationship between the constituent hospitals and the consolidating entity. The Administrator disagrees with the Board's interpretation that the related party concept only applies to relationships prior to the transaction, and not to the relationships after the transaction. Such a policy suggested by the Board, forbidding the examination of relationships after the transaction, would, *inter alia*, preclude the agency from determining when a transaction constituted a reorganization.

As Program Memorandum, A-00-76 states: "whether the constituent corporations in a merger or consolidation are or are not related is irrelevant; rather the focus of the inquiry is whether significant ownership or control exists between a corporation that transfers assets and the corporation that receives them." Furthermore, HCFA Ruling 80-4 (HCFAR 80-4) holds that, "applicability of the related organization rule which limits costs of a provider to those of its supplier is not necessarily determined by the absence of a relationship between the parties prior to their initial contracting, although this fact is to be considered. *The applicability of the rule is determined by also considering the relationship between the parties according to the rights created by their contract...* (Emphasis added.) Similarly, the consolidation agreement in this case established a relationship between the Providers and the new corporation reflected by a continuity of control.

Accordingly, the Administrator finds that the record contains compelling evidence on the relatedness of the consolidating corporations and the newly established corporation. The Administrator finds that, consistent with a finding that this consolidation represents a reorganization, these facts represents "significant" ownership and control. Thus, based on the facts of this case, the Administrator finds that the parties were related according to 42 C.F.R § 413.17 and a loss on the disposal of assets cannot be recognized under Medicare.

In sum, the Administrator finds that the transaction at issue in this case involved related parties and, thus, Medicare cannot recognize a loss on the transfer of the assets. n16

***DECISION***

Copyright 2008 CCH Incorporated,All Rights Reserved

The decision of the Board is reversed in accordance with the foregoing opinion.


THIS CONSTITUTES THE FINAL ADMINISTRATIVE DECISION OF THE SECRETARY OF HEALTH AND HUMAN SERVICES.


**FOOTNOTES:**


n1 Provider Exhibit A. As reflected in the consolidation agreement, Goddard Health Planning Corporation and Caritas Christi were the owners of the respective Providers.

n2 The new corporation was originally called Goddard Memorial and Cardinal Cushing Medical Center, Inc.

n3 Intermediary Exhibit 52.

n4 As a preliminary matter, the record shows that the Providers were allowed by the Intermediary to continue to file separate cost reports after the consolidation due to system needs and, thus, did not file terminating costs reports as would be expected following the consolidation. The Providers instead filed a notice with their 1994 cost reports requesting the loss on the disposition of assets. Due to the unique facts of this case, this Administrator does not dispute the timing of the Providers appeal. Moreover, as noted below, the Administrator finds that the terms of *Bethesda* apply in this case, as the Intermediary did not have the authority to grant the relief requested by the Providers. The Administrator also notes that jurisdiction can always be raised. The Board's letter granting of jurisdiction (of which the Administrator was not formally notified) was interlocutory in nature. The present Board decision disposed of the case in its entirety giving rise to this timely review of jurisdiction.

n5 Section 104.24 of the PRM addresses a bona fide sale and states: "A bona fide sale contemplates an arm's length transaction between a willing and well informed buyer and seller, neither being under coercion, for reasonable consideration. An arm's length transaction is ... negotiated by unrelated parties, each acting in its own self interest." Trans. No. 415 (May 2000).

n6 Originally codified at 42 C.F.R. § 405.415(1).

n7 *See also* 44 Fed. Reg. 6912-14 (Feb. 5, 1979).

n8 Trans. No. 272 (Dec. 1982)(clarifying certain ambiguous language relating to the determination of ownership or equity interest in nonprofit organizations.)

n9 The concept of "continuity of control" is illustrated at Section 1011.4 of the PRM, in Example 2. Example 2 reads as follow: "The owners of a 200-bed hospital convert their facility to a nonprofit corporation. The owners sell the hospital to a non-profit corporation under the direction of a board of trustees made up of former owners of the proprietary corporation. Both corporations are considered related organizations; therefore, the asset bases to the nonprofit corporations remain the same as contained in the proprietary corporation's records, and there can be no increase in the book value of such assets."

n10 *See*, e. g., *Guernsey v. Shalala*, 115 S. Ct. 1232 (1995), analogizing Medicare rules to IRS rules in citing to *Thor Power Tools v. Commissioner*, 439 U.S. 522 (1979), for support that GAAP cannot dictate the Secretary's Medicare policy.

Copyright 2008 CCH Incorporated,All Rights Reserved

n11 The Administrator also notes that the Providers' certificate of filing refers to this transaction as a consolidation. Intermediary Exhibit 52. However, mergers and consolidations appear to also be referred to as "reorganizations" under Massachusetts law. *See,* e.g., *Emhart Corporation v. State Tax Commission*, 363 Mass.429 (1973)(referring to corporations that participate in merger, consolidation or "other reorganizations"). *See also Black Law Dictionary* definition of a reorganization used interchangeably with merger and consolidation("A reorganization that involves a merger or consolidation under a specific State statute.")

n12 *Commissioners of IRS v. Webster Estates,* 131 F. 2d 426, 429 (2nd Cir.1942) citing *Helvering v. Schoellkopf,* 100 F. 2d 415 (2d Cir).

n13 *C.H. Mead Coal Co. v. Commissioners of IRS*, 72 F. 2d 22, 27-28 (4th Cir. 1934) (analyzing early sections of the code.)

n14 Of those 24 chosen for the new board, only three were not current members of the Board of either Cushing or Goddard.

n15 Therefore, regardless of whether this transaction qualifies as a reorganization under present Federal or State tax rules and is treated as a non recognizable loss, it cannot be allowed under Medicare rules as a loss on the disposition of assets.

n16 After a review of the facts, the Administrator finds that the transaction was not a bona fide sale as the transaction did not involve arms' length transaction as it involved related organization, with no evidence that appraisals of the fair market value of the assets had been sought or conducted, nor a determination of whether fair consideration was given for the assets, all indicative of a non bona fide transfer of the Providers' assets. Finally, because the parties are not related and not allowable, no intermediary determination has been made as to the amount of Medicare's share in any proposed loss.

**UPDATE-DATE:** February 06, 2008

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CENTRAL IOWA HOSPITAL CORPORATION,   )
successor-in-interest to Iowa Lutheran Hospital,   )
                                                   )
                                    Plaintiff,     )
                                                   )
                    v.                             )   Case No. 1:07-cv-00295-RWR
                                                   )
MICHAEL O. LEAVITT, as Secretary of Health         )
and Human Services,                                )
                                                   )
                                    Defendant.     )

## [PROPOSED] ORDER

Upon consideration of plaintiff's motion for leave to amend the complaint and

defendant's opposition thereto, it is hereby

ORDERED that, for the reasons identified in defendant's opposition, plaintiff's

motion is DENIED.


Dated: _____, 2008    _____
                              RICHARD W. ROBERTS
                              UNITED STATES DISTRICT JUDGE

Copy To:

Joel McElvain
U.S. Department of Justice
20 Massachusetts Avenue, N.W., Room 7130
Washington, D.C.  20001
Attorney for Defendants

Harold G. Belkowitz
Ober, Kaler, Grimes & Shriver
1401 H Street, N.W., Suite 500
Washington, D.C.  20005
Attorney for Plaintiffs